# EXHIBIT 2

1

**NOTAIRES**

**BERQUIN**

**NOTARISSEN**

CVBA Berquin Notarissen – Lloyd Georgelaan, 11 – 1000 Brussels
VAT BE 0474.073.840 – RLP BRUSSELS – www.berquinnotarissen.be
Tel.: + 32 2 645 19 45 Fax: + 32 2 645 19 46

# Coordinated text of the Articles of Association of '**KBC Equity Fund**' abbreviated to '**Equity Fund**'
Public open-ended investment company with a variable number of units under Belgian law (BEVEK)
opting for investments complying with the conditions of Directive 2009/65/EC – UCITS
Naamloze vennootschap (company with limited liability)

with office at 1080 Brussels, Havenlaan 2, company number 0443.681.463 RPR Brussels

# following the amendments of 10 February 2021

2

**BACKGROUND INFORMATION**
**(pursuant to Article 2:8 §1, 4° of the Code on companies and associations)**

DEED OF INCORPORATION :
The company was incorporated by deed executed before Maître Hans BERQUIN, notary-public in Brussels, on the twenty-first of March nineteen hundred and ninety-one, published in the Appendices to the Belgian Official Gazette of the twelfth of April nineteen hundred and ninety-one, under number 910412-114.

AMENDMENTS TO THE ARTICLES OF ASSOCIATION :
        The Articles of Association were amended by deed executed before Maître Hans BERQUIN, notary-public in Brussels, on:
        – the twenty-ninth of March nineteen hundred and ninety-one, published in the Appendices to the Belgian Official Gazette of the first of May nineteen hundred and ninety-one, under number 910501-164;
        – the twenty-ninth of December nineteen hundred and ninety-three, published in the Appendices to the Belgian Official Gazette of the third of February nineteen hundred and ninety-four, under number 940203-13;
        The Articles of Association were amended by deeds executed before Maître Carl OCKERMAN, notary-public in Brussels, on:
        – the thirteenth of September nineteen hundred and ninety-five, published in the Appendices to the Belgian Official Gazette of the seventeenth of October thereafter, under number 951017-201;
        – the sixth of October nineteen hundred and ninety-five, published in the Appendices to the Belgian Official Gazette of the thirty-first of October thereafter, under number 951031-562;
        – the twenty-eighth of May nineteen hundred and ninety-seven, published in the Appendices to the Belgian Official Gazette of the eighteenth of July thereafter, under number 970718-384;
        – the twenty-eighth of August nineteen hundred and ninety-seven, published in the Appendices to the Belgian Official Gazette of the eighth of October thereafter, under number 971008-80;
        – the thirtieth of January nineteen hundred and ninety-eight, published in the Appendices to the Belgian Official Gazette of the third of March thereafter, under number 980303-119;
        – the twenty-sixth of February nineteen hundred and ninety-eight, published in the Appendices to the Belgian Official Gazette of the eighth of April thereafter, under number 980408-205;
        – the twenty-seventh of April nineteen hundred and ninety-eight, published in the Appendices to the Belgian Official Gazette of the thirtieth of May thereafter, under number 980530-271;
        – the twenty-seventh of May nineteen hundred and ninety-eight, published in the Appendices to the Belgian Official Gazette of the twenty-first of July thereafter, under number 980721-563;
        – the eighteenth of June nineteen hundred and ninety-eight, published in the Appendices to the Belgian Official Gazette of the twelfth of August thereafter, under number 980812-383;
        The Articles of Association were amended by deeds executed before Maître Eric SPRUYT, notary-public in Brussels, on:
        – the twenty-eighth of September nineteen hundred and ninety-eight, published in the Appendices to the Belgian Official Gazette of the fourteenth of November thereafter, under number 981114-36;
        – the twenty-sixth of November nineteen hundred and ninety-eight, published in the Appendices to the Belgian Official Gazette of the sixth of January nineteen hundred and ninety-nine, under number 990106-876.
        The Articles of Association were amended by deed executed before Maître Carl OCKERMAN, notary-public in Brussels, on the twenty-eighth of December nineteen hundred and ninety-eight, published in the Appendices to the Belgian Official Gazette of the fourth of February nineteen hundred and ninety-nine, under number 990204-54.

        The Articles of Association were amended by deeds executed before Maître Eric SPRUYT, notary-public in Brussels, on:

3

– the first of February nineteen hundred and ninety-nine, published in the Appendices to the Belgian Official Gazette of the twenty-third of February thereafter, under number 990223-76;

– the twenty-sixth of February nineteen hundred and ninety-nine, published in the Appendices to the Belgian Official Gazette of the twenty-sixth of March thereafter, under number 990326-324;

The Articles of Association were amended by deeds executed before Maître Carl OCKERMAN, notary-public in Brussels, on:

– the twenty-sixth of March nineteen hundred and ninety-nine, published in the Appendices to the Belgian Official Gazette of the fourth of May thereafter, under number 990504-210;

– the twenty-sixth of April nineteen hundred and ninety-nine, published in the Appendices to the Belgian Official Gazette of the tenth of June thereafter, under number 990610-109;

– the twenty-seventh of May nineteen hundred and ninety-nine, published in the Appendices to the Belgian Official Gazette of the twentieth of July thereafter, under number 980720-751;

– the thirty-first of May nineteen hundred and ninety-nine, published in the Appendices to the Belgian Official Gazette of the twenty-second of June thereafter, under number 990622-364;

The Articles of Association were amended by deed executed before Maître Eric SPRUYT, notary-public in Brussels, on:

– the twenty-sixth of August nineteen hundred and ninety-nine, published in the Appendices to the Belgian Official Gazette of the twenty-fifth of November thereafter, under number 991125-136;

The Articles of Association were amended by deed executed before Maître Carl OCKERMAN, notary-public in Brussels, on:

– the twenty-fourth of November nineteen hundred and ninety-nine, published in the Appendices to the Belgian Official Gazette of the fifth of January two thousand, under number 20000105-249;

– the fifth of January two thousand, published in the Appendices to the Belgian Official Gazette of the seventeenth of February thereafter, under number 20000217-216;

– the twenty-fifth of January two thousand, published in the Appendices to the Belgian Official Gazette of the twenty-sixth of February thereafter, under number 20000226-263;

The Articles of Association were amended by deed executed before Maître Vincent BERQUIN, notary-public in Brussels, on:

– the twenty-seventh of April two thousand, published in the Appendices to the Belgian Official Gazette of the thirtieth of May thereafter, under number 20000530-609;

The Articles of Association were amended by deed executed before Maître Denis DECKERS, notary-public in Brussels, on:

– the twenty-fifth of May two thousand, published in the Appendices to the Belgian Official Gazette of the second of August thereafter, under number 20000802-460;

The Articles of Association were amended by deed executed before Maître Carl OCKERMAN, notary-public in Brussels, on:

– the twenty-ninth of June two thousand, published in the Appendices to the Belgian Official Gazette of the seventeenth of August thereafter, under number 20000817-371;

The Articles of Association were amended by deed executed before Maître Benedikt van der VORST, notary-public in Brussels, on:

– the thirty-first of July two thousand, published in the Appendices to the Belgian Official Gazette of the fourteenth of September thereafter, under number 20000914-11;

The Articles of Association were amended by deed executed before Maître Carl OCKERMAN, notary-public in Brussels, on:

– the twenty-ninth of August two thousand, published in the Appendices to the Belgian Official Gazette of the nineteenth of October thereafter, under number 20001019-381;

– the fourth of September two thousand, published in the Appendices to the Belgian Official Gazette of the twenty-ninth of September thereafter, under number 20000929-137;

– the thirtieth of November two thousand, published in the Appendices to the Belgian Official Gazette of the twenty-sixth of January two thousand and one, under number 20010126-140;

– the twenty-second of December two thousand, published in the Appendices to the Belgian Official Gazette of the twenty-first of February two thousand and one, under number 20010221-341;

– the first of March two thousand and one, published in the Appendices to the Belgian Official Gazette of the fifteenth of May two thousand and one, under number 20010515-70;

4

– the twenty-eighth of March two thousand and one, published in the Appendices to the Belgian Official Gazette of the fifteenth of May two thousand and one, under number 20010515-69;
– the twenty-ninth of August two thousand and one, published in the Appendices to the Belgian Official Gazette of the thirty-first of October two thousand and one, under number 20011031-704;
– The Articles of Association were enacted by deed executed before Maître Eric SPRUYT, notary-public in Brussels, on the first of March two thousand and two, published in the Appendices to the Belgian Official Gazette of the eighth of May two thousand and two, under number 20020508-28;
     The Articles of Association were enacted by deed executed before Maître Carl OCKERMAN, notary-public in Brussels, on:
     – the ninth of October two thousand and two, published in the Appendices to the Belgian Official Gazette of the twenty-ninth of October two thousand and two, under number 20021029-0132401;
     – the twenty-seventh of March two thousand and three, published in the Appendices to the Belgian Official Gazette of the twenty-third of April thereafter, under number 20030423-0046685;
     – the twenty-ninth of December two thousand and three, published in the Appendices to the Belgian Official Gazette of the seventeenth of February two thousand and four, under number 20040217-25550;
– the thirtieth of September two thousand and five, published in the Appendices to the Belgian Official Gazette of the sixth of January two thousand and six, under number 20060106-5303;
– the twenty-second of February two thousand and six, published in the Appendices to the Belgian Official Gazette of the twenty-fourth of March thereafter, under number 20060324-054745;
– seventh of March two thousand and six, submitted for publication in the Appendices to the Belgian Official Gazette.
     – the thirty-first of March two thousand and six, published in the Appendices to the Belgian Official Gazette of the twenty-fifth of April two thousand and six, under number 20060425-072401;
     – the third of May two thousand and six, published in the Appendices to the Belgian Official Gazette of the second of June thereafter, under number 20060602-91205;
– The Articles of Association were amended by deed executed before Maître Daisy DEKEGEL, notary-public in Brussels, on the thirtieth of November two thousand and six, published in the Appendices to the Belgian Official Gazette of the twentieth of December thereafter, under number 20061228-192520;
The Articles of Association were amended by deed executed before Maître Carl OCKERMAN, notary-public in Brussels, on the twenty-eighth of June two thousand and seven, published in the Appendices to the Belgian Official Gazette of the thirty-first of July two thousand and seven, under number 20070731-114144.
The Articles of Association were amended by deed executed before Maître Carl OCKERMAN, notary-public in Brussels, on the thirty-first of August two thousand and seven, published in the Appendices to the Belgian Official Gazette of the twenty-first of September two thousand and seven, under number 20070921-137743.
– notarial record drawn up by Maître Carl Ockerman on the twenty-sixth of September two thousand and seven, published in the Appendices to the Belgian Official Gazette of the twenty-fifth of October two thousand and seven, under number 20071025-155842;
– notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the twenty-eighth of November two thousand and seven, published in the Appendices to the Belgian Official Gazette of the nineteenth of December thereafter, under number 20071219-182792;
     – notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the thirteenth of January two thousand and nine, published in the Appendices to the Belgian Official Gazette of the thirteenth of February two thousand and nine, under number 20090213-23287;
– notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the twenty-sixth of March two thousand and ten, published in the Appendices to the Belgian Official Gazette of the twenty-first of April thereafter, under number 20100421-57404;
– notarial record drawn up by Maître Vincent Berquin, notary-public in Brussels, on the twenty-fourth of September two thousand and ten, published in the Appendices to the Belgian Official Gazette of the twenty-ninth of October thereafter, under number 20101029-159299;

5

– by notarial record drawn up by Maître Vincent Berquin, notary-public in Brussels, on the twenty-fourth of September two thousand and ten, published in the Appendices to the Belgian Official Gazette of the eighth of November thereafter, under number 20101108-162209;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the twenty-sixth of January two thousand and eleven, published in the Appendices to the Belgian Official Gazette of the twenty-fifth of February thereafter under number 20110225-030698;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels on the seventeenth of February two thousand and eleven, published in the Appendices to the Belgian Official Gazette of the sixteenth of March thereafter, under number 20110316-040925.

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels on the twenty-fourth of February two thousand and eleven (creation of new sub-funds and merger through takeover: of various sub-funds of KBC Equity Fund), published in the Appendices to the Belgian Official Gazette of the twenty-second of March thereafter, under numbers 20110322-043759 and 20110322-043760.

– by notarial record drawn up by Maître Eric Spruyt, notary-public in Brussels, on the seventh of March two thousand and eleven, published in the Appendices to the Belgian Official Gazette of the eighteenth of April thereafter, under number 20110418058359;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the thirty-first of March two thousand and eleven, published in the Appendices to the Belgian Official Gazette of the nineteenth of April two thousand and eleven, under number 11059162.

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the twenty-first of April two thousand and eleven, published in the Appendices to the Belgian Official Gazette of the sixteenth of May two thousand and eleven, under number 11072890;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the first of July two thousand and eleven, published in the Appendices to the Belgian Official Gazette of the second of September thereafter, under number 20110902-133659.

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels on the twenty-third of November two thousand and eleven, published in the Appendices to the Belgian Official Gazette of the sixteenth of December thereafter, under number 20011216-188753.

– by notarial record drawn up by Maître Alexis Lemmerling, notary-public in Brussels, on the twelfth of July two thousand and twelve, published in the Appendices to the Belgian Official Gazette of the third of August thereafter, under number 20120803-136762;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the fifteenth of March two thousand and thirteen, published in the Appendices to the Belgian Official Gazette of the third of April thereafter, under number 20130403-51604;

– by notarial record drawn up by Maître Alexis LEMMERLING, notary-public in Brussels, on the twenty-sixth of April two thousand and thirteen, published in the Appendices to the Belgian Official Gazette of the sixteenth of May thereafter, under number 13074503.

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the twenty-seventh of August two thousand and thirteen, published in the Appendices to the Belgian Official Gazette of the twelfth of September thereafter, under number 20130912-139461;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the twenty-seventh of September two thousand and thirteen, published in the Appendices to the Belgian Official Gazette of the seventeenth of October thereafter, under number 20131017-157573;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the third of October two thousand and thirteen, published in the Appendices to the Belgian Official Gazette of the twenty-fourth of October thereafter, under number 20131024-16122;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the twenty-ninth of November two thousand and thirteen, published in the Appendices to the Belgian Official Gazette of the nineteenth of December thereafter, under number 20131219-190415;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the twenty-seventh of March two thousand and fourteen, published in the Appendices to the Belgian Official Gazette of the fifteenth of April thereafter, under number 20140415-080711;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the fourth of June two thousand and fourteen, published in the Appendices to the Belgian Official Gazette of the twenty-third of June thereafter, under number 20140623-120944;

Public

6

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the twenty-seventh of June two thousand and fourteen, published in the Appendices to the Belgian Official Gazette of the seventh of August thereafter, under number 20140807-151124;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the nineteenth of June two thousand and seventeen, published in the Appendices to the Belgian Official Gazette of the tenth of July thereafter, under number 17098129;

– by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the seventh of December two thousand and seventeen, published in the Appendices to the Belgian Official Gazette of the twentyseventh of December thereafter, under number 17180197;

– by notarial record drawn up by Maître Tim Carnewal, notary-public in Brussels, on the twinty eight of May two thousand and nineteen, submitted for publication in the Appendices to the Belgian Official Gazette.

– by notarial record drawn up by Maître Tim Carnewal, notary-public in Brussels, on the forth of May two thousand and twinty, submitted for publication in the Appendices to the Belgian Official Gazette.

–by notarial record drawn up by Maître Tim Carnewal, notary-public in Brussels, on the twenty seventh of May two thousand and twenty, submitted for publication in the Appendices to the Belgian Official Gazette.

- by notarial records drawn up by Maître Tim Carnewal, notary-public in Brussels, on the twenty-third of December two thousand and twenty, submitted for publication in the Appendices to the Belgian Official Gazette.

- and most recently by notarial records drawn up by Maître Tim Carnewal, notary-public in Brussels, on the tenth of February two thousand and twenty one, submitted for publication in the Appendices to the Belgian Official Gazette.

----------

Public

7

| CO-ORDINATED |
| :---: |
| ARTICLES OF ASSOCIATION AS OF 10 February 2021 |

<u>Article 1. Name, form, capacity, category and management company</u>

The company **'KBC Equity Fund'**, abbreviated to **'Equity Fund'** and hereinafter referred to as 'the Company', is established as a naamloze vennootschap (company with limited liability) under the system of a public open-ended investment company under Belgian law (public bevek under Belgian law). The full and abbreviated names may be used together or separately.

The Company has opted for the category of investments Which comply with the conditions of Directive 2009/65/EC.

The Company appoints KBC Asset Management NV as its management company, pursuant to Article 44, §1, of the act of the third of August two thousand and twelve relative to undertakings for collective investment complying with the conditions of Directive 2009/65/EC and the undertakings for investment in receivables.(referred to below as the "**Act**").

<u>Article 2.Office</u>

The office is established in the Brussels-capital region.

The Company may, by simple decision of the Board of Directors, set up subsidiaries and offices both in Belgium and abroad.

<u>Article 3. Life</u>

The Company is established for an unlimited period. Without prejudice to the causes for winding up provided for by law and the Articles of Association, the Company may be wound up by a decision of the General Meeting taken in accordance with Article 19 of the Articles of Association.

<u>Article 4. Subject</u>

The Company's sole subject is collective investment in the category of investments defined in Article 1, pursuant to the provisions of the Act, the rules adopted in implementation thereof and these Articles of Association.

It may take all measures and effect all transactions that it deems useful for achieving and developing its subject within the limits of the laws to which it is subject.

It is entitled to exercise the voting rights attached to the securities in its portfolio in the sole interest of its shareholders.

<u>Article 5. Capital</u>

The capital will always be equal to the value of the net assets of the Company.- It may not be less than the legally prescribed minimum amount.

The capital may be changed without requiring any amendment of the Articles of Association. The formalities for capital increases and decreases of naamloze vennootschappen (companies with limited liability), provided in the Code on companies and associations, do not apply.

The capital is represented by one or more categories of shares within the meaning of the Act, each of which corresponds to a separate portion or 'sub-fund' of the assets of the Company.

Furthermore, the capital of each sub-fund may be represented by one or more share classes (referred to below as "**share classes**")  in accordance with the criteria laid down by the Act and the rules adopted in implementation thereof. The objective elements accounting for the distinction between the share classes are specified in the prospectus and, where required by the Act or by the rules adopted in implementation thereof, in the Articles of Association. Unless stipulated otherwise in the prospectus, each sub-fund and each share class may have both capitalisation shares and distribution shares.

<u>Article 6. Shares</u>

The shares of the Company shall be registered or in book-entry form, or in any other form provided for by law.

They are fully paid up and without par value.

Registered or book-entry shares, or shares in any other form provided by law may be converted into one another, within the limits of the law. The cost of such conversion will be borne by the shareholder in so far as this is permitted by law.

The names of the holders of registered shares are entered in the share register kept by the Company or by one or more persons appointed to that end by the Company. The share register may

Public

8

be kept in electronic form. The Company may instruct the custodian or another person to carry out the requisite registration and provide proof of registration to these shareholders. The transfers and transitions shall only have effect in respect of the Company and third parties as from their entry in the share register.. The book-entry shares are represented by an entry on an account, in the name of the owner or holder, with a registered account holder or clearing institution. Book-entry shares are transferred by transfer from one account to another. The number of book-entry securities in circulation is entered in the name of the registered account holder or clearing institution in the register of shareholders.

The Board of Directors may decide to split or regroup shares.

Within the limits of the relevant laws, the Board of Directors of the Company may, at any time and without restriction, issue additional fully paid shares or fractions of shares at a price as specified below in these Articles of Association, without reserving preferential rights for existing shareholders. Save as otherwise provided for by law, fractions of shares do not entitle the holder to membership rights (including voting rights), but do entitle the holder to a corresponding fraction of the property rights (including the right to a corresponding fraction of the net assets allocated to the relevant sub-fund or share class and the right to a corresponding fraction of the dividends).

The Board of Directors may create two types of share, namely distribution shares and capitalisation shares.

Distribution shares entitle the holder to dividends and interim dividends as set out below. Capitalisation shares do not entitle their owners to receive dividends. The share in the profits to which they are entitled is capitalised within the relevant sub-fund or share class in favour of the capitalisation shares (referred to below as "**type(s) of shares**").

The Board of Directors may, for one or more sub-funds or share classes, decide not to issue any shares of a particular type or form or to discontinue the issue thereof.

Article 7. Investment policy

The Company may invest in securities, money market instruments, units in collective investment undertakings, deposits at credit institutions, financial derivatives, liquid assets and all other instruments insofar as and to the extent permitted by the Act, the Royal Decree of 12 November 2012 concerning public undertakings for collective investment that comply with the terms of Directive 2009/65/EC (referred to below as the "**Royal Decree**") and other rules adopted in implementation of the Act, for the category of investments that the Company has opted for in Article 1 of the Articles of Association.

The extent to which the above instruments constitute part of the investment portfolio may be specified in more detail by the Board of Directors in the description of the investment policy set out in the prospectus.

With regard to the markets referred to in Article 52, §1, 2°, of the Royal Decree, the Company opts for any secondary market of a Member State of the European Economic Area, provided such a market is regulated, operates regularly, and is recognised and open.

With regard to the markets referred to in Article 52, §1, 3°, a) of the Royal Decree, the Company opts for the following markets: any market of a state that is not a Member State of the European Economic Area but to which provisions apply that are equivalent to those laid down in Directive 2001/34/EC.

With regard to the markets referred to in Article 52, §1, 3°, b), of the Royal Decree, the Company opts for any secondary market of a state that is not a Member State of the European Economic Area, provided this market is regulated, operates regularly, and is recognised and open.

With regard to the markets referred to in Article 52, §1, 4° of the Royal Decree, the Company opts for the following markets: any regulated market within the meaning of Article 2, 3°, 5° or 6° of the Act of 2 August 2002; any market of a state that is not a Member State of the European Economic Area but to which provisions apply that are equivalent to those laid down in Directive 2001/34/EC; and any secondary market that is regulated, operates regularly, and is recognised and open.

The Company may lend financial instruments within the limits of the relevant statutory and regulatory provisions.

The investment policy set out in Article 7 of the Articles of Association is based on the Act and the Royal Decree currently in force If, for whatever reason, those regulations are amended, the investment policy may be modified accordingly without amendment of the provisions in the Articles of Association being required.

9

The investment policy for the Company's sub-funds is described in the prospectus.

10

<u>Article 8. Issue, redemption and exchange</u>
1. Issue
Without prejudice to the provisions of Article 9.4 below, shares in each sub-fund or share class may be subscribed to at least twice a month at the institutions designated by the Board of Directors of the Company. For each sub-fund and each share class, subscription orders will be received on the days specified by the Board of Directors and stated in the prospectus. The Board of Directors may decide to change these days and may decide to change the number of days on which these orders are received. The approval of the General Meeting is required in order to reduce the number of days on which subscription orders can be received.

The subscription price for shares in each sub-fund and each share class equals their net asset value determined in accordance with Article 9 below, plus the fees, commissions and charges determined by the Board of Directors in accordance with the conditions of the market on which they are offered, and pursuant to the applicable legislation. These fees, commissions and charges are specified in the prospectus.

Duties, taxes and any stamp duty are added to the price according to local law.

The Board of Directors may change the rate of the fees, commissions and charges at any time, provided it observes the relevant legal provisions.

The powers of the Board of Directors regarding the following fees are limited to the maximum percentages stated below:

– the amount to be paid to the collective investment undertaking, to cover the costs of acquiring the assets: maximum three per cent (3%) This maximum percentage also includes the anti-dilution levy referred to in Article 117, §4 of the Royal Decree;
– the trading commission for the companies responsible for trading the units: maximum five per cent (5%);
– the amount to cover the administrative costs for the companies responsible for trading the units: maximum two per cent (2%).

The method of calculating these fees, commissions and charges must be specified in the prospectus.
The subscription price must be paid no later than ten banking days following subscription. The actual period applying to the various sub-funds and share classes is stated in the prospectus.
2. Redemption
Without prejudice to the provisions of Article 9.4 below, the shareholders of each sub-fund and each share class may, at least twice a month, request redemption of their shares at the institutions designated by the Board of Directors of the Company. For each sub-fund and each share class, redemption orders will be received on the days specified by the Board of Directors and stated in the prospectus. The Board of Directors may decide to change these days and may decide to change the number of days on which these orders are received. The approval of the General Meeting is required in order to reduce the number of days on which redemption orders can be received.

The redemption price for shares in each sub-fund and each share class equals their net asset value, determined in accordance with Article 9 below, less the fees, commissions and charges determined in accordance with the conditions of the market on which they are offered, and pursuant to the applicable legislation. These fees, commissions and charges are specified in the prospectus.

Duties, taxes and any stamp duty are deducted from the surrender proceeds, as required by applicable law.

The Board of Directors may change the rate of the fees, commissions and charges at any time, provided it observes the relevant legal provisions.

The powers of the Board of Directors regarding the following fees are limited to the maximum percentages stated below:
– the amount to be paid to the collective investment undertaking, to cover the cost of selling the assets: maximum three per cent (3%) This maximum percentage also includes the anti-dilution levy referred to in Article 117, §4 of the Royal Decree;
– the amount to cover the administrative costs for the companies responsible for trading the units: maximum two per cent (2%);
– the amount to be paid to the collective investment undertaking to discourage redemption within one month of subscription: maximum five per cent (5%).

11

The method of calculating these fees, commissions and charges must be specified in the prospectus.

This price must be paid no later than ten banking days following the redemption order and provided the shares have also been received. The actual period applying to the various sub-funds and share classes is stated in the prospectus.

The Board of Directors has the powers described in Article 117, §3, 3°, of the Royal Decree in terms of the policy pursued by the Management Company with regard to the prevention of market timing.

The Company may redeem directly securities representing a participation in investment undertakings that have been wound up and whose assets have been contributed to it. These securities will be redeemed at the redemption price indicated above, taking into account their exchange ratio.

The Company is entitled at any time to buy back shares held by shareholders who are not entitled to purchase or hold shares of the Company.

3. Exchange

Without prejudice to the provisions of Article 9.4 below, shareholders may, at least twice a month, request to exchange their shares for shares in another sub-fund or another share class or for shares of another type or category, based upon their respective net asset values, at the institutions designated by the Board of Directors of the Company. For each sub-fund and each share class, the exchange orders will be received on the days specified by the Board of Directors and stated in the prospectus. The Board of Directors may decide to change these days and may decide to change the number of days on which exchange orders are received. The approval of the General Meeting is required in order to reduce the number of days on which exchange orders can be received.

In the event of an exchange of shares, the fees, commissions and charges determined in accordance with the conditions of the market on which the shares are offered and pursuant to the applicable legislation may be charged to shareholders.

The Board of Directors may change the rate of the fees, commissions and charges at any time, provided it observes the relevant legal provisions.

The powers of the Board of Directors regarding the following fees are limited to the maximum percentages stated below:
– the fee to be paid to the previous sub-fund to cover the selling costs: maximum three per cent (3%) This maximum percentage also includes the anti-dilution levy referred to in Article 117, §4 of the Royal Decree;
– the fee to be paid to the new sub-fund to cover acquisition costs: maximum three per cent (3%) This maximum percentage also includes the anti-dilution levy referred to in Article 117, §4 of the Royal Decree;
– the trading commission for the companies responsible for trading the units: maximum five per cent (5%);
– the amount to cover the administrative costs for the companies responsible for trading the units: maximum two per cent (2%).
The method of calculating these fees, commissions and charges must be specified in the prospectus.

The Board of Directors may decide that the Company will redeem the share fraction remaining after the exchange.

Article 9. Net asset value-

For each sub-fund, each share class and each type of shares, the net asset value used to calculate the subscription, redemption and exchange prices is determined every day that subscription, redemption or exchange orders are received.

The reference currency for each sub-fund and the currency in which each share class is denominated is determined by the Board of Directors and stated in the prospectus.

1. Assets

Save as otherwise stipulated by law, the assets of the Company, divided up per sub-fund and, where applicable, per share class and/or per type of shares, are valued as follows:
Upon their purchase or sale, securities, money market instruments, units in undertakings for collective investment and financial derivatives are allocated a carrying value equal to their purchase or sale price, as the case may be. Additional expenses like negotiation and delivery costs are charged directly

12

to the profit and loss account. Following initial recognition, securities, money market instruments and financial derivatives are measured at fair value in line with the following rules:

a) Securities that are traded on an active market without the involvement of third-party financial institutions are measured at fair value using the closing price;

b) Assets that have an active market which functions through third-party financial institutions that guarantee continuous bid and ask prices are measured using the current bid price set on that market. However, since most international benchmarks use mid-prices, and data providers (like JP Morgan, iBoxx and MSCI) cannot supply bid prices, mid-prices are used to measure debt instruments at fair value, as according to law. The method of adjusting mid-prices to arrive at a bid price is not used as it lacks reliability and has the potential to produce wide variances.

c) Securities whose last known price is not representative and securities that are not admitted to official listing or admitted to another organised market are valued as follows:

  a. When measuring these securities at fair value, use is made of the current fair value of similar assets for which there is an active market, provided this fair value is adjusted to take account of the differences between the assets concerned.

  b. If no fair value for similar assets exists, the fair value is calculated on the basis of other valuation techniques which make maximum use of market data, which are consistent with generally accepted economic methods and which are verified and tested on a regular basis.

  c. If no organised or unofficial market exists for the assets being valued, account is also taken of the uncertain character of these assets, based on the risk that the counterparties involved might not meet their obligations.

d) Shares for which there is no organised or unofficial market, and whose fair value cannot be calculated reliably as set out above, are measured at cost. Impairment is applied to such shares where there are objective grounds for doing so.

e) Units in undertakings for collective investment (for which there is no organised market) are measured at fair value using their last net asset value.

f) Cash instruments, including demand balances held with credit institutions, current-account commitments towards credit institutions, amounts payable and receivable in the short-term that are not embodied in negotiable securities or money market instruments (other than with respect to credit institutions), and tax credits and tax liabilities are valued at nominal value.

g) Other long-term receivables that are not embodied in negotiable securities or money market instruments are measured at fair value.

h) Impairment is recorded on the assets, amounts to be received and receivables where there is uncertainty concerning their payment in full or in part on the maturity date or if the going concern value of those assets is lower than the acquisition value. Additional impairment is recorded on the assets, amounts to be received and receivables referred to in the previous paragraph to ensure that any change in their value, or risks inherent in the asset in question, are taken into account.

i) The income arising from securities lending is recognised as the lending rate, and is accounted on an accruals basis in the profit and loss account over the term of the contract.

j) Securities issued in a currency other than that of the relevant sub-fund are converted into the currency of the sub-fund at the last known mid-market exchange rate.

2. Liabilities

To calculate the net assets of the various sub-funds and, where applicable, the share classes and/or types of shares, the value of the liabilities of the relevant sub-fund,share class and/or type of shares is subtracted from the value of that sub-fund, share class and/or type of shares calculated as specified in article 9.1.

The liabilities of the Company, divided up per sub-fund and, where applicable, per share class and/or type of shares, consist of loans, if any, and debts, whereby debts not yet due are calculated pro rata temporis according to their exact value, if known, or, if not known, according to their estimated value. Brokerage and other costs due on securities purchases are added to their purchase price. Brokerage and other costs due on securities sales are deducted from their sale price.

Public

13

3.Net asset value-

Each Company share for which redemption has been requested is deemed to be an issued and existing share until the period for receiving orders closes, and is thereafter deemed a liability for the relevant sub-fund, the relevant share class and/or the relevant type of shares of the Company until the redemption price has been paid.

Shares to be issued by the Company in accordance with subscription orders received are deemed to have been issued with effect from the time the period for receiving orders closes, and the subscription price is deemed to be an amount receivable by the relevant sub-fund, the relevant share class and/or the relevant type of shares of the Company until payment thereof is received.

The net asset value of the shares of a sub-fund, share class or type of shares is determined by dividing the net assets (assets less liabilities) of that sub-fund, that share class or that type of shares by the number of shares in circulation of the sub-fund, share class or type of shares.

To calculate the net asset value of units relating to orders to issue or redeem units or switch between sub-funds on day D, the fair values for day D are used if a maximum of 20% of the fair values is known at the time the period for receiving orders was closed.

To calculate the net asset value of units relating to orders to issue or redeem units or switch between sub-funds on day D, the fair values for day D + 1 are used if more than 20% of the fair values are already known at the time the period for receiving orders was closed.

Within the limits of the Act and the rules adopted in implementation thereof, the provisions in the prospectus may differ from those set out in the two previous paragraphs for one or more sub-funds or one or more share classes.

The net assets of the Company are equal to the sum of the net assets of all the sub-funds, converted into the reference currency of the Company based on the last known exchange rates. To the extent permitted by law, the Board of Directors may decide to change the reference currency of the Company or of a sub-fund or to change the currency in which a share class is denominated, or to use multiple reference currencies or currencies in which share classes are denominated.

4. Suspension of the calculation of the net asset value-

By decision of the Board of Directors, the Company will suspend calculation of the net asset value of the shares, and will suspend their issue, redemption and exchange in the circumstances listed in the Royal Decree.-

Furthermore, by decision taken by the Board of Directors, the Company may, under certain special circumstances in which it appears necessary, at any time suspend the issue of shares if such a measure is required to protect the interests of the shareholders of the Company.

The Company may, by decision taken by the Board of Directors, refuse or spread over time one or more subscriptions that could upset its equilibrium.

The measures described in the present article may be limited to one or several share classes.

Article 10. Board of Directors

1. General

The Company will be managed by a Board of Directors consisting of at least three members, who may or may not be shareholders. The members of the board of directors shall form a college. They  will be elected or re-elected by the General Meeting for a term not exceeding six years, but their mandate is renewable indefinitely. Unless the appointment decision of the general meeting provides otherwise, their mandate from the general meeting at which they are appointed runs until after the end of the ordinary general meeting in the financial year in which their mandate expires according to the appointment decision.

The general meeting may terminate the appointment of any director at any time and without giving any reason with immediate effect.

Any director may resign by mere notification to the board of directors. At the Company's request, he shall remain in office until the Company can reasonably provide for his replacement. If one or more offices become vacant because of death, resignation, dismissal or any other reason, the remaining directors may fill the vacancy temporarily. In such a case, the next General Meeting will proceed to the definitive appointment. The director thereby appointed will be appointed for the period required to complete the term of office of the director he/she replaces, unless the General Meeting decides otherwise.

Directors shall be deemed to exercise their mandate unremunerated unless the general meeting decides otherwise.

14

2. Meetings

From among its members, the Board of Directors will elect a chairman and may elect one or more deputy chairmen. It may also appoint a secretary, who is not required to be a director and who records the minutes of the meetings of the Board of Directors.

The board of directors will meet at the invitation of the chairman or of two directors whenever the interests of the Company so require.

The meeting will be held at the location, date and time indicated in the invitation.

Except in case of extreme urgency, a notification of each meeting of the Board of Directors will be given to all directors at least twenty-four hours before the scheduled time of the meeting. The convocation is valid by letter or e-mail.

The chairman of the Board of Directors will preside over the meetings of the Board of Directors. In his/her absence, the Board of Directors will, by majority vote, designate another person to chair these meetings.

Each director may by any means of communication that can be reproduced in writing and bears his signature, grant power of attorney to another member of the board of directors to represent him at a meeting of the board of directors and to vote on his behalf. The Board of Directors may deliberate and take decisions only if at least half of the members are present or represented. Each director may represent one or more directors, but no single director may represent all other directors. Decisions will be taken by simple majority vote. Where the vote is tied, the person chairing the meeting will have the casting vote.

Directors who, in application of the law, are not entitled to take part in deliberations and voting are not taken into account for the purpose of determining this quorum.

Each member of the Board of Directors may, by any means of telecommunication or videography, take part in the deliberations of a Board of Directors and vote in order to organise meetings between different participants who are geographically separated from one another, in order to enable them to communicate simultaneously.

The decisions of the Board of Directors may also be taken by written decision . Decisions taken in this way must be unanimous. The signatures of the directors will be appended to either a single document or to several copies of that document. Such decisions have the same validity and the same authority as if they had been taken during a Board meeting regularly convened and held on the date the last signature was appended by the directors to the document referred to above.
The minutes of the meetings of the Board of Directors must be signed by the chairman (or by the person who has assumed the chairmanship in his absence) and the members who so desire.- Copies of or extracts from the minutes, intended for use in court or otherwise, must be signed by the chairman, the secretary or by two directors.

3. Powers

The Board of Directors has the power to perform all acts that are necessary or useful for achieving the Company's subject, with the exception of those acts that, by law or pursuant to the Articles of Association, are reserved for the General Meeting.

The Board of Directors is empowered to create new sub-funds and/or share classes at any time and to give them a specific name. It is vested with all powers to have any resulting amendments to the Articles of Association duly recorded.

The Board of Directors may change the characteristics and terms and conditions of a sub-fund or share class. The approval of the General Meeting is required for changes to the characteristics and terms and conditions that are specified in the Articles of Association.

Subject to the limitations imposed by the Act, the Royal Decree and other rules adopted in implementation of the Act, the Board of Directors has the power to determine the Company's investment policy for each sub-fund.

Article 11. Representation of the Company

The Company shall be validly represented vis-à-vis third parties and in court as plaintiff or defendant by two directors acting jointly.

The Company shall also be validly represented by the representative appointed by special power of attorney.

Article 12. Executive management

The Board of Directors will appoint two directors who will be responsible for the executive management of the Company.

15

Article 13. The custodian and the companies providing the financial services
1. The custodian

The Company shall conclude an agreement with an institution within the meaning of Article 50, §2, of the Act, in which it is stipulated that the institution will perform the tasks of custodian in accordance with the Act, the Royal Decree and other rules adopted in implementation of the Act.

The Company may revoke custodianship on condition that a replacement custodian is appointed. Replacement of the custodian with another custodian will be published in two nationally distributed newspapers or in any other equivalent publication approved by the Financial Services and Markets Authority (FSMA).

2. Companies providing the financial services

The companies providing the financial services will be appointed in an agreement with the Company, in which the companies' fees (if any) will also be specified.

The Company may remove a company from its duties subject to a notice in writing. A financial services contract can only terminate once at least one financial institution assumes responsibility for performing the duty of providing the financial services.

Pending the appointment of another company, the remaining company will continue to carry out its obligations specified in the agreement with the Company.

Article 14. General meetings
1. Convening

The ordinary General Meeting will be held at nine a.m. on the second-last banking day of March. If there is only one shareholder, he will sign the annual accounts for approval on this date.

The general meeting will be held at the office of the Company or at any other place in Belgium indicated in the convening notice.

The ordinary General Meeting may be held abroad, should the Board of Directors determine that exceptional circumstances so warrant.

General Meetings of Shareholders of a specific sub-fund may also be held.

An extraordinary or special meeting of the Company or of a sub-fund must be convened by the Board of Directors or, where appropriate, by the statutory auditor whenever the law or the interests of the Company or of the sub-fund so requires. It must be convened if so requested by shareholders who together represent one-tenth of the capital of the Company or of the relevant sub-fund.

The shareholders shall meet after being convened by the Board of Directors by means of a convening notice that sets out the agenda.

Holders of registered and book-entry shares will be convened in the manner prescribed by law.

The convocation may require that, in order to be admitted to the General Meeting, and unless otherwise determined by law, holders of registered and of book-entry shares notify the Board of Directors in writing, at the latest on the sixth calendar day before the date scheduled for the meeting, of their intention to attend the General Meeting and of the number of shares they intend to use when participating in the voting. and this in the manner stated in the convening notice.

Moreover, holders of book-entry shares will be admitted to the General Meeting only if they, at the latest on the sixth calendar day before the determined date of the meeting, deposit a certificate issued by the recognized account holder or the settlement institution, which establishes the unavailability of the dematerialized shares until the date of the meeting, at the office of the Company or at one of the Company's financial services providers.

Any person can renounce the convocation and shall in any case be deemed to have been convened regularly if he is present or represented at the meeting.

Each time all shareholders are present or represented and declare that they agree to the agenda submitted to them for deliberation, the General Meeting may be held without being convened in advance.

Once the convening notice has been published, shareholders may submit questions in writing which must be received by the company at least on the sixth calendar day before the date fixed for the meeting.

2. Attendance list

Before participating in the general meeting, the shareholders or their proxy holders are obliged to sign the attendance list, indicating the name, first name(s) and number of shares with which they are participating in the general meeting.

16

3. Decisions

The General Meeting shall deliberate on the agenda items and take decisions in accordance with the rules of the Code on companies and associations.

No meeting may deliberate on items that do not appear on the agenda, unless all shares are present or represented at the meeting and a unanimous resolution is passed to that effect. Except in those cases determined by law, decisions will be taken by simple majority vote, irrespective of the number of shares represented at the meeting. An abstention is not taken into account when counting the votes.

Each shareholder may participate in the meeting by appointing, in writing, another person, who need not be a shareholder, as proxy.

The shareholders may, unanimously and in writing, take all decisions that fall within the competence of the general meeting, with the exception of those that must be drawn up in a deed. In this case, the formalities for convening the meeting do not have to be completed.

Co-owners, usufructuaries and bare owners, pledgees and pledgers, in short, all persons who, for one reason or another, are jointly entitled to one and the same share or fraction of a share, must respectively arrange to be represented by one and the same person. Unless otherwise determined by law, if a General Meeting is organised at Company level, all decisions will be taken by simple majority vote of those shareholders of the Company who are present or represented. Unless otherwise determined by law, if a General Meeting is organised at sub-fund level, all decisions will be taken by simple majority vote of those shareholders of the relevant sub-fund who are present or represented. When the shares have the same value, each share grants entitlement to one vote. When they do not have the same value, each legally represents a number of votes proportional to the part of the capital they represent, whereby the share that represents the smallest part is counted as one vote.

If the Company has only one shareholder, it can only exercise the powers granted to the general meeting.

Article 15. Financial year
The financial year begins on the first of January and ends on the thirty-first of December.
Article 16. Reports
Prior to the ordinary General Meeting, shareholders may obtain the annual report from the office of the Company. This report contains the financial information on each of the Company's sub-funds, the composition and performance of those sub-funds' assets, and the management report intended to inform shareholders.

All elements of the financial situation of the Company are audited by an accredited statutory auditor, who is appointed and replaced by the General Meeting. Unless otherwise determined by law, the financial statements are approved and discharge is granted to the directors and to the statutory auditor of each sub-fund by a simple majority vote of those shareholders of the Company who are present or represented.

Article 17. Distribution
Each year, on the basis of a proposal by the Board of Directors, the ordinary General Meeting of the Company shall determine the share of the result to be allocated to each sub-fund in accordance with the legislation in force.

The Company may pay dividends to the distribution shares. The Board of Directors may decide to pay an interim dividend, subject to the provisions of the law.

The institutions responsible for paying dividends to the shareholders are designated by the Board of Directors and stated in the prospectus.

The General Meeting may decide to allocate part of the profit to the directors by way of remuneration. The amount allocated will be divided among the directors in accordance with the rules laid down by the Board of Directors. The General Meeting must be notified in the event that certain or all of the directors do not wish to receive a share of the profit.

Article 18. Costs charged to the undertaking for collective investment
Within the limits of the laws to which it is subject, the Company will bear the expenses relating to its formation, operation and possible liquidation. These expenses include:

17

– the fee payable to the manager for managing the investment portfolio of the collective investment undertaking, as stated in the prospectus;
– any commissions and charges for allocating the assets, payable to the financial institution responsible for allocating the assets, as stated in the prospectus;
– any performance fee, within the meaning of Article 115, §4 of the Royal Decree, payable to the manager, as stated in the prospectus;
- the custodian's fee;
– the fee for the administration of the collective investment undertaking, payable to the financial institution responsible for the administration of the collective investment undertaking.
The method of calculating the above fees must be specified in the prospectus.

The Board of Directors may at any time alter the rate of the aforementioned fees, provided that the relevant legal provisions are observed.

The powers of the Board of Directors regarding the following fees are limited to the maximum percentages stated below. The exact percentages are stated in the prospectus.
– the fee for managing the investment portfolio of the collective investment undertaking: maximum two per cent (2%). This maximum percentage does not include any performance fee within the meaning of Article 115, §4 of the Royal Decree.
– any commissions and charges for allocating the assets, payable to the financial institution responsible for allocating the assets, as stated in the prospectus: maximum one per cent (1%).
– The custodian's fee: maximum zero point two zero per cent (0.20%).
– The fee for the administration of the collective investment undertaking: maximum zero point two zero per cent (0.20%).
The expenses relating to the formation, operation and possible liquidation of the Company also include:
– the formation expenses of the Company;
– the investment adviser's consultancy fee;
- the statutory auditors' fees;
- any fees paid to the directors;
- amounts paid to the supervisory authorities of the countries where the Company's shares are offered for sale;-
– the costs of publicity, legal notices and other announcements;
– the costs of printing and distributing the issue prospectuses and periodic reports, as well as all other reports and documentation required by law and regulations;
– the costs of all other information intended for the shareholders;
– the commissions and other costs for transactions relating to the Company's portfolio;
- interest and other loan charges;
– the costs of calculating the net asset value, and accounting costs;-
– any costs related to a listing on a stock exchange;
– the costs of publishing the share price;
– the charges for the financial services provided in relation to the shares and coupons;
– expenses for official deeds;
- the duties and costs relating to changes in the Company's capital;
- expenses relating to domiciliation and the general secretariat of the Company;
- expenses relating to the General Meetings and the meetings of the Board of Directors;
- the judicial costs and costs of legal advice specific to the Company;
- any other costs or taxes relating to the Fund's operation;
– the costs and fees relating specifically to the winding up or liquidation of a sub-fund or the Company;
– all other expenditure incurred in the interest of the shareholders of the Company.

The Board of Directors may at any time alter the rates of the aforementioned charges and fees, provided that the relevant legal provisions are observed.
Each sub-fund, share class and/or type of shares is charged all costs and expenditure that can be allocated to it. Costs and expenses that can be allocated to one sub-fund, share class and/or type of shares are charged to that sub-fund, that share class and/or that type of shares. Costs and expenses that can be allocated to more than one sub-fund, share classes and/or types of shares are ventilated over those sub-funds, share classes and/or types of shares concerned in proportion to their respective

18

net assets. Costs and expenses that cannot be allocated to one sub-fund, share class and/or type of shares or to a group of types of shares are ventilated over all sub-funds, share classes and/or types of shares that are part of the Company in proportion to their respective net assets.

Article 19. Winding up and restructuring

The Company's General Meeting has the power to decide to wind up or restructure the Company.

If the Company is wound up, liquidation is proceeded to by one or more liquidators, who may be either natural or legal persons and who are appointed by the General Meeting, which also determines their powers and remuneration.

For each sub-fund, the liquidation value of the shares will be distributed among the shareholders in proportion to their rights.

The General Meeting of a sub-fund has the power to decide to wind up or restructure the relevant sub-fund.

If the maturity date for a sub-fund is specified in the prospectus, that sub-fund will be automatically wound up on that date and put into liquidation, unless the Board of Directors, at the latest on the day preceding that date, exercises its authority to extend the life of the relevant sub-fund. If the sub-fund is wound up by operation of law:

– the Board of Directors will appoint one or more liquidators;

– the units in the relevant sub-fund will be redeemed at redemption value according to the terms and conditions determined by the Board of Directors, subject to the conditions set at the time of issue, as may have been amended during the life of the sub-fund, notified through publication in two newspapers or in any other equivalent publication approved by the FSMA;

– the Board of Directors will draw up a report on the liquidation of the relevant sub-fund;

– the terms and conditions for redemption and the report of the Board of Directors will be verified by the Company's statutory auditor;

– each year at the ordinary General Meeting, a motion will be put forward to grant discharge to the directors and to the statutory auditor of the sub-funds that were wound up and put into liquidation during the preceding financial year;

– the General Meeting that granted the discharge will close the liquidation of the relevant sub-funds and will grant power of attorney to one or more persons to have resulting amendments to the Articles of Association duly recorded by the notary-public.

Article 20. Amendment of the Articles of Association

These Articles of Association may be amended by the General Meeting of Shareholders, subject to the mandatory quorum and voting requirements by the Code on companies and associations or by law.

Any change affecting the rights of the shareholders of one sub-fund shall therefore be subject to the same quorum and majority requirements in the relevant sub-fund. Any amendment to the Articles of Association requires the prior approval of the FSMA. Article 21. General provisions
In respect of all the items not specified in the present Articles of Association, the parties concerned will observe and be subject to the provisions of the Code on companies and associations, as well as to the Act, the Royal Decree and the rules adopted in implementation thereof.
The court of the District of Brussels has sole jurisdiction in the event of a dispute.

Article 22. Sub-funds

No sub-fund may invest more than 10% of its assets in units of other undertakings for collective investment.

No sub-fund has been granted a derogation to invest up to 100% of its assets in securities or money market instruments that are issued or guaranteed by a Member State of the European Economic Area, by its local authorities, by a state that is not a Member State of the European Economic Area or by public international institutions in which one or more Member States of the European Economic Area participate.

The investment policy of the sub-funds is not designed to track the composition of any specific benchmark index or specific benchmark indices, with the exception of the following sub-fund: Latin America sub-fund. The benchmark index (indices) in the latter case is (are) stated in the prospectus.

19

No single sub-fund provides for the annual payout of at least 90% of income to the investor, following deduction of remuneration, fees and charges, with the exception of the following sub-funds: Eurozone DBI-RDT, Fundamental Opportunities DBI-RDT, World DBI-RDT and SRI World DBI-RDT.

Article 23. Share classes

The Board of Directors may issue the following share classes in each sub-fund:

- 'Classic Shares', intended for all categories of persons. 'Corporate Shares', intended for all categories of persons. There is a minimum subscription value, as specified in the prospectus.
- 'Corporate Wealth Shares', intended for all categories of persons. There is a minimum subscription value, as specified in the prospectus.
- 'Institutional Shares', reserved for institutional investors as defined in Article 5, §3 of the Law. There is a minimum subscription value, as specified in the prospectus.
- 'Institutional B Shares', reserved for collective investment undertakings that are managed by KBC Asset Management NV or by another company associated with it. There is a minimum subscription value, as specified in the prospectus.
- 'institutional F Shares', reserved for collective investment undertakings that are managed by KBC Asset Management NV or by another company associated with it and which invests its assets predominantly in this share class.
- 'Discretionary Shares', reserved for trading to persons who acquire and hold the units on the basis of a discretionary management contract with KBC Asset Management NV or with another company associated with KBC Asset Management NV. The prospectus may specify that persons who acquired these units other than on the basis of a discretionary management contract can retain these units, provided that they already held the units prior to the date specified by the prospectus.

All share classes may be denominated in a currency other than the currency of the sub-fund. If this is the case, the currency shall be added to the name of the share class.

All share classes may be retained for trading by one or more distributors. If this is the case, the distributor or the distributors  shall be added to the name of the share class.

All share classes may be retained for trading within one or more segment of one or more distributors. If this is the case, the segment(s) shall be incorporated in the name of the share class. The prospectus states the distributors for which trading in the relevant share class is reserved. If a distinction is made regarding the costs mentioned in Article 6, §1, 2 and 3 of the Royal Decree, a minimum subscription value will apply, as determined in the prospectus.

All share classes may be retained for investors of a particular nationality or several particular nationalities. If this is the case, the abbreviation of the nationality shall be added to the name of the share class.

When a share class is created, the Board of Directors will check that the financial service providers have a procedure in place which allows for constant checks to see whether or not the persons who have purchased shares belonging to a particular share class which benefits from more favourable tax treatment in terms of one or more items always satisfy the criteria.
The Board of Directors may take any measures necessary to ensure that the aforementioned criteria are satisfied.

Insofar as this is specified in the prospectus and in the manner stipulated by the prospectus, if it turns out that shares from a particular share class are being held by persons other than those permitted to hold them, these shares will be converted to shares of a share class which these persons are permitted to hold.

The Board of Directors may decide to stop the issue of one or more share classes.

In the event of a discrepancy between the Dutch and foreign-language editions of the Articles of Association, the Dutch text shall prevail.


**FOR UNIFORM COORDINATION**

Internal

Berquin Notarissen
cvba
Lloyd Georgelaan 11
1000 Brussels
RLP Brussels 474.073.840
Tel.: + 32 2 645 19 45 Fax: + 32 2 645 19 46



# Co-ordinated Articles of Association for
# 'KBC Eco Fund'
# abbreviated to 'Eco Fund'
# Public open-ended investment company with a variable number of units (BEVEK) under Belgian law opting for investments complying with the conditions of Directive 2009/65/EC – UCITS Naamloze vennootschap (company with limited liability)

with office at Havenlaan 2, 1080 Brussels,
company number 0446.922.055 – RLP Brussels

# following the amendments of 29 March 2021

2

**BACKGROUND INFORMATION**
**(pursuant to Article 2:8, §1, 4° of the Belgian Companies Code on companies and associations))**

DEED OF INCORPORATION:
The company was incorporated under the denomination 'KB ECO FUND' by deed, executed before Maître Hans BERQUIN, notary-public in Brussels on the twenty-seventh of March nineteen hundred and ninety-two, published in the *Appendices to the Belgian Official Gazette* of the tenth of April nineteen hundred and ninety-two under number 920410-83.

AMENDMENTS TO THE ARTICLES OF ASSOCIATION:
The Articles of Association were amended by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on:
– the sixth of October nineteen hundred and ninety-five, published in the *Appendices to the Belgian Official Gazette* of the first of November nineteen hundred and ninety-five, under number 951101-144;
– the twelfth of August nineteen hundred and ninety-eight, published in the *Appendices to the Belgian Official Gazette* of the twenty-second of September nineteen hundred and ninety-eight, under number 980922-383.
The Articles of Association were amended by notarial record drawn up by Maître Denis Deckers, notary-public in Brussels, on the twenty-seventh of September two thousand, published in the *Appendices to the Belgian Official Gazette* of the first of November two thousand, under number 20001101-469.
The Articles of Association were amended by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on:
– the twenty-third of October two thousand, published in the *Appendices to the Belgian Official Gazette* of the thirtieth of November two thousand, under number 20001130-77;
– the thirtieth of November two thousand, published in the *Appendices to the Belgian Official Gazette* of the twenty-sixth of January two thousand and one, under number 20010126-141;
– the sixteenth of June two thousand and four, published in the *Appendices to the Belgian Official Gazette* of the twenty-fourth of August thereafter, under number 20040824-123114;
– the thirtieth of September two thousand and five, published in the *Appendices to the Belgian Official Gazette* of the sixth of January two thousand and six, under number 20060106-6609;
– the seventh of March two thousand and six, published in the *Appendices to the Belgian Official Gazette* of the third of April thereafter, under number 20060403-59363;
– the twenty-ninth of December two thousand and six, published in the *Appendices to the Belgian Official Gazette* of the twenty-second of February two thousand and seven, under number 20070222-30178;
– the eleventh of May two thousand and seven, published in the *Appendices to the Belgian Official Gazette* of the twenty-third of July thereafter, under number 20070723/108410;
– the twenty-eighth of November two thousand and seven (adoption of new Articles of Association), published in the *Appendices to the Belgian Official Gazette* of the eighth of January two thousand and eight, under number 20080108-4274.
The Articles of Association were amended by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the twenty-seventh of May two thousand and eleven, published in the *Appendices to the Belgian Official Gazette* of the twenty-third of June two thousand and eleven, under number 20110623-0093045.
The Articles of Association were amended by notarial record drawn up by Maître Daisy Dekegel, notary-public in Brussels, on the twenty-fourth of June two thousand and eleven, published in the *Appendices to the Belgian Official Gazette* of the tenth of August two thousand and eleven, under number 20110810123208.
The Articles of Association were amended by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the first of July two thousand and eleven, published in the *Appendices to the Belgian Official Gazette* of the second of September two thousand and eleven, under number 20110902-133627.

Internal

3

The Articles of Association were amended by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels on the twenty-third of November two thousand and eleven, published in the *Appendices to the Belgian Official Gazette* of the sixteenth of December thereafter, under number 20111216-188682.

The Articles of Association were amended by notarial record drawn up by Maître Carl Ockerman, notary-public in Brussels, on the twenty-third of September two thousand and thirteen, published in the *Appendices to the Belgian Official Gazette* of the seventh of October thereafter, under number20131007-0151511.

The Articles of Association were amended by notarial record drawn up by Maître Carl OCKERMAN, notary-public in Brussels, on the twenty-seventh of June two thousand and fourteen, submitted for publication in the *Appendices to the Belgian Official Gazette*.

The Articles of Association were amended by notarial record drawn up by Maître Tim Carnewal, notary-public in Brussels, on the twenty-third of December two thousand and twenty, submitted for publication in the *Appendices to the Belgian Official Gazette*.

The Articles of Association were amended most recently by notarial record drawn up by Maître Tim Carnewal, notary-public in Brussels, on 29 March 2021, submitted for publication in the *Appendices to the Belgian Official Gazette*.

RELOCATION OF OFFICE:

The office was relocated to the current address by a decision of the Board of Directors of the twenty-seventh of March two thousand, published in the *Appendices to the Belgian Official Gazette* of the twenty-seventh of February two thousand and one, under number 20010227-249.

----------

4

---

**CO-ORDINATED**
**ARTICLES OF ASSOCIATION AS OF 29 March 2021**

---

Article 1. Name, form, capacity, category and management company

The company '**KBC Eco Fund**', abbreviated to '**Eco Fund**' and hereinafter referred to as 'the Company', is established as a *naamloze vennootschap* (company with limited liability) under the system of a public open-ended investment company under Belgian law (public *bevek* under Belgian law). The full and abbreviated names may be used together or separately.

The Company has opted for the category of investments which comply with the conditions of Directive 2009/65/EC
The Company appoints KBC Asset Management NV as its management company, pursuant to Article 44, §1, of the act of the third of August two thousand and twelve relative to undertakings for collective investment complying with the conditions of Directive 2009/65/EC and the undertakings for investment in receivables.(referred to below as the "**Act**").

.Article 2. Office

The office is established in the Brussels-capital region.

The Company may, by simple decision of the Board of Directors, set up subsidiaries and offices both in Belgium and abroad.

Article 3. Life

The Company is established for an unlimited period. Without prejudice to the causes for winding up provided for by law and the Articles of Association, the Company may be wound up by a decision of the General Meeting taken in accordance with Article 19 of the Articles of Association.

Article 4. Subject

The Company's sole subject is collective investment in the category of investments defined in Article 1, pursuant to the provisions of the Act, the rules adopted in implementation thereof and these Articles of Association.

It may take all measures and effect all transactions that it deems useful for achieving and developing its subject within the limits of the laws to which it is subject.

It is entitled to exercise the voting rights attached to the securities in its portfolio in the sole interest of its shareholders.

Article 5. Capital

The capital will always be equal to the value of the net assets of the Company. It may not be less than the legally prescribed minimum amount.

The capital may be changed without requiring any amendment of the Articles of Association. The formalities for capital increases and decreases of *naamloze vennootschappen* (companies with limited liability), provided in the Code on companies and associations, do not apply, do not apply.

The capital is represented by one or more categories of shares within the meaning of the Act, each of which corresponds to a separate portion or 'sub-fund' of the assets of the Company.

Furthermore, the capital of each sub-fund may be represented by one or more share classes (referred to below as "**share classes**") in accordance with the criteria laid down by the Act and the rules adopted in implementation thereof. The objective elements accounting for the distinction between the share classes are specified in the prospectus and, where required by the Act or by the rules adopted in implementation thereof, in the Articles of Association. Unless stipulated otherwise in the prospectus, each sub-fund and each share class may have both capitalisation shares and distribution shares.

Article 6. Shares

The shares of the Company shall be registered or in book-entry form, or in any other form provided for by law.

They are fully paid up and without par value.

Registered or book-entry shares, or shares in any other form provided by law may be converted into one another, within the limits of the law. The cost of such conversion will be borne by the shareholder in so far as this is permitted by law.

The names of the holders of registered shares are entered in the share register kept by the Company or by one or more persons appointed to that end by the Company. The share register may

5

be kept in electronic form. The Company may instruct the custodian or another person to carry out the requisite registration and provide proof of registration to these shareholders. The transfers and transitions shall only have effect in respect of the Company and third parties as from their entry in the share register.. The book-entry shares are represented by an entry on an account, in the name of the owner or holder, with a registered account holder or clearing institution. Book-entry shares are transferred by transfer from one account to another. The number of book-entry securities in circulation is entered in the name of the registered account holder or clearing institution in the register of shareholders.

The Board of Directors may decide to split or regroup shares.

Within the limits of the relevant laws, the Board of Directors of the Company may, at any time and without restriction, issue additional fully paid shares or fractions of shares at a price as specified below in these Articles of Association, without reserving preferential rights for existing shareholders. Save as otherwise provided for by law, fractions of shares do not entitle the holder to membership rights (including voting rights), but do entitle the holder to a corresponding fraction of the property rights (including the right to a corresponding fraction of the net assets allocated to the relevant sub-fund or share class and the right to a corresponding fraction of the dividends).

The Board of Directors may create two types of share, namely distribution shares and capitalisation shares (referred to below as "**type(s) of shares**").

Distribution shares entitle the holder to dividends and interim dividends as set out below.

Capitalisation shares do not entitle their owners to receive dividends. The share in the profits to which they are entitled is capitalised within the relevant sub-fund or share class in favour of the capitalisation shares.

The Board of Directors may, for one or more sub-funds or share classes, decide not to issue any shares of a particular type or form or to discontinue the issue thereof.

Article 7. Investment policy

The Company may invest in securities, money market instruments, units in collective investment undertakings, deposits at credit institutions, financial derivatives, liquid assets and all other instruments insofar as and to the extent permitted by the Act, the Royal Decree of 12 November 2012 concerning public undertakings for collective investment that comply with the terms of Directive 2009/65/EC (referred to below as the "**Royal Decree**") and other rules adopted in implementation of the Act, for the category of investments that the Company has opted for in Article 1 of the Articles of Association.

The extent to which the above instruments constitute part of the investment portfolio may be specified in more detail by the Board of Directors in the description of the investment policy set out in the prospectus.

With regard to the markets referred to in Article 52, §1, 2°, of the Royal Decree, the Company opts for any secondary market of a Member State of the European Economic Area, provided such a market is regulated, operates regularly, and is recognised and open.

With regard to the markets referred to in Article 52, §1, 3°, a) of the Royal Decree, the Company opts for the following markets: any market of a state that is not a Member State of the European Economic Area but to which provisions apply that are equivalent to those laid down in Directive 2001/34/EC.

With regard to the markets referred to in Article 52, §1, 3°, b), of the Royal Decree, the Company opts for any secondary market of a state that is not a Member State of the European Economic Area, provided this market is regulated, operates regularly, and is recognised and open.

With regard to the markets referred to in Article 52, §1, 4° of the Royal Decree, the Company opts for the following markets: any regulated market within the meaning of Article 2, 3°, 5° or 6° of the Act of 2 August 2002; any market of a state that is not a Member State of the European Economic Area but to which provisions apply that are equivalent to those laid down in Directive 2001/34/EC; and any secondary market that is regulated, operates regularly, and is recognised and open.

The Company may lend financial instruments within the limits of the relevant statutory and regulatory provisions.

The investment policy set out in Article 7 of the Articles of Association is based on the Act and the Royal Decree currently in force. If, for whatever reason, those regulations are amended, the investment policy may be modified accordingly without amendment of the provisions in the Articles of Association being required.

The investment policy for the Company's sub-funds is described in the prospectus.

6

<u>Article 8. Issue, redemption and exchange</u>
*1. Issue*

Without prejudice to the provisions of Article 9.4 below, shares in each sub-fund or share class may be subscribed to at least twice a month at the institutions designated by the Board of Directors of the Company. For each sub-fund and each share class, subscription orders will be received on the days specified by the Board of Directors and stated in the prospectus. The Board of Directors may decide to change these days and may decide to change the number of days on which these orders are received. The approval of the General Meeting is required in order to reduce the number of days on which subscription orders can be received.

The subscription price for shares in each sub-fund and each share class equals their net asset value determined in accordance with Article 9 below, plus the fees, commissions and charges determined by the Board of Directors in accordance with the conditions of the market on which they are offered, and pursuant to the applicable legislation. These fees, commissions and charges are specified in the prospectus.

Duties, taxes and any stamp duty are added to this price in accordance with the applicable legislation.

The Board of Directors may change the rate of the fees, commissions and charges at any time, provided it observes the relevant legal provisions.

The powers of the Board of Directors regarding the following fees are limited to the maximum percentages stated below:

– the amount to be paid to the collective investment undertaking, to cover the costs of acquiring the assets: maximum three per cent (3%) This maximum percentage also includes the *anti-dilution levy* referred to in Article 117, §4 of the Royal Decree;

– the trading commission for the companies responsible for trading the units: maximum five per cent (5%);

– the amount to cover the administrative costs for the companies responsible for trading the units: maximum two per cent (2%).

The method of calculating these fees, commissions and charges is specified in the prospectus.

The subscription price must be paid no later than ten banking days following subscription. The actual period applying to the various sub-funds and share classes is stated in the prospectus.

*2. Redemption*

Without prejudice to the provisions of Article 9.4 below, the shareholders of each sub-fund and each share class may, at least twice a month, request redemption of their shares at the institutions designated by the Board of Directors of the Company. For each sub-fund and each share class, redemption orders will be received on the days specified by the Board of Directors and stated in the prospectus. The Board of Directors may decide to change these days and may decide to change the number of days on which these orders are received. The approval of the General Meeting is required in order to reduce the number of days on which redemption orders can be received.

The redemption price for shares in each sub-fund and each share class equals their net asset value, determined in accordance with Article 9 below, less the fees, commissions and charges determined in accordance with the conditions of the market on which they are offered, and pursuant to the applicable legislation. These fees, commissions and charges are specified in the prospectus.

Duties, taxes and any stamp duty will be deducted from this price in accordance with the applicable legislation.

The Board of Directors may change the rate of the fees, commissions and charges at any time, provided it observes the relevant legal provisions.

The powers of the Board of Directors regarding the following fees are limited to the maximum percentages stated below:

– the amount to be paid to the collective investment undertaking, to cover the cost of selling the assets: maximum three per cent (3%) This maximum percentage also includes the *anti-dilution levy* referred to in Article 117, §4 of the Royal Decree;

– the amount to cover the administrative costs for the companies responsible for trading the units: maximum two per cent (2%);

– the amount to be paid to the collective investment undertaking to discourage redemption within one month of subscription: maximum five per cent (5%).

7

The method of calculating these fees, commissions and charges is specified in the prospectus.

This price must be paid no later than ten banking days following the redemption order and provided the shares have also been received. The actual period applying to the various sub-funds and share classes is stated in the prospectus.

The Board of Directors has the powers described in Article 117, §3, 3°, of the Royal Decree in terms of the policy pursued by the Management Company with regard to the prevention of market timing.

The Company may redeem directly securities representing a participation in investment undertakings that have been wound up and whose assets have been contributed to it. These securities will be redeemed at the redemption price indicated above, taking into account their exchange ratio.

The Company is entitled at any time to buy back shares held by shareholders who are not entitled to purchase or hold shares of the Company.

*3. Exchange*

Without prejudice to the provisions of Article 9.4 below, shareholders may, at least twice a month, request to exchange their shares for shares in another sub-fund or another share class or for shares of another type or category, based upon their respective net asset values, at the institutions designated by the Board of Directors of the Company. For each sub-fund and each share class, the exchange orders will be received on the days specified by the Board of Directors and stated in the prospectus. The Board of Directors may decide to change these days and may decide to change the number of days on which exchange orders are received. The approval of the General Meeting is required in order to reduce the number of days on which exchange orders can be received.

In the event of an exchange of shares, the fees, commissions and charges determined in accordance with the conditions of the market on which the shares are offered and pursuant to the applicable legislation may be charged to shareholders.

The Board of Directors may change the rate of the fees, commissions and charges at any time, provided it observes the relevant legal provisions.

The powers of the Board of Directors regarding the following fees are limited to the maximum percentages stated below:

– the fee to be paid to the previous sub-fund to cover the selling costs: maximum three per cent (3%) This maximum percentage also includes the *anti-dilution levy* referred to in Article 117, §4 of the Royal Decree;

– the fee to be paid to the new sub-fund to cover acquisition costs: maximum three per cent (3%) This maximum percentage also includes the *anti-dilution levy* referred to in Article 117, §4 of the Royal Decree;

– the trading commission for the companies responsible for trading the units: maximum five per cent (5%);

– the amount to cover the administrative costs for the companies responsible for trading the units: maximum two per cent (2%).

The method of calculating these fees, commissions and charges is specified in the prospectus.

The Board of Directors may decide that the Company will redeem the share fraction remaining after the exchange.

Article 9.  Net asset value

For each sub-fund, each share class and each type of shares, the net asset value used to calculate the subscription, redemption and exchange prices is determined every day that subscription, redemption or exchange orders are received.

The reference currency for each sub-fund and the currency in which each share class is denominated is determined by the Board of Directors and stated in the prospectus.

*1. Assets*

Save as otherwise stipulated by law, the assets of the Company, divided up per sub-fund and, where applicable, per share class and/or per type of shares, are valued as follows:

When purchased or sold, securities, money market instruments, units in undertakings for collective investment and financial derivatives are recorded in the accounts at their acquisition price or sale price, respectively. Any additional expenses, such as trading and delivery costs, are charged

8

directly to the income statement. After initial recognition, securities, money market instruments and financial derivatives are measured at fair value on the basis of the following rules:

a) Securities that are traded on an active market without the involvement of third-party financial institutions are measured at fair value using the closing price.

b) For assets that have an active market which functions through third-party financial institutions guaranteeing continuous bid and ask prices, the current bid price set on that market is used for measuring the assets. However, since most international benchmarks use mid-prices, and the data providers (e.g., JP Morgan, iBoxx, MSCI, etc.) cannot supply bid prices, the mid-prices are used to measure debt instruments at fair value, in accordance with the statutory provisions. The method to correct these mid-prices and generate the bid price is not used, as it is not reliable enough and could result in major fluctuations.

c) Securities whose last known price is not representative and securities that are not admitted to official listing or admitted to another organised market are valued as follows:

   a. When measuring these securities at fair value, use is made of the current fair value of similar assets for which there is an active market, provided this fair value is adjusted to take account of the differences between the assets concerned.

   b. If no fair value for similar assets exists, the fair value is calculated on the basis of other valuation techniques which make maximum use of market data, which are consistent with generally accepted economic methods and which are verified and tested on a regular basis.

   c. If no organised or unofficial market exists for the assets being valued, account is also taken of the uncertain character of these assets, based on the risk that the counterparties involved might not meet their obligations.

d) Shares for which there is no organised or unofficial market, and whose fair value cannot be calculated reliably as set out above, are measured at cost. Impairment is applied to these shares if there are objective instructions to this end.

e) Units in undertakings for collective investment (for which there is no organised market) are measured at fair value using their most recent net asset value.

f) Cash balances, including demand balances held with credit institutions, current-account obligations towards credit institutions, amounts payable and receivable in the short-term that are not embodied in negotiable securities or money market instruments (other than with respect to credit institutions), tax credits and tax liabilities are valued at nominal value.

g) Other long-term receivables that are not embodied in negotiable securities or money market instruments are valued at fair value.

h) Impairment is recorded on the assets, amounts to be received and receivables where there is uncertainty concerning their payment in full or in part on the maturity date or if the going concern value of those assets is lower than the acquisition value. Additional impairment is recorded on the assets, amounts to be received and receivables referred to in the previous paragraph to ensure that any change in their value, or risks inherent in the asset in question, are taken into account.

i) The income arising from securities lending is recognised as the lending rate and is included on an accruals basis in the profit and loss account over the term of the transaction.

j) Securities denominated in a currency other than that of the relevant sub-fund are converted into the currency of the sub-fund at the last known mid-market exchange rate.

*2. Liabilities*

To calculate the netassets of the various sub-funds and, where applicable, the share classes and/or types of shares, the value of the liabilities of the relevant sub-fund, share class and/or type of shares is subtracted from the value of that sub-fund,share class and/or type of shares calculated as specified in article 9.1.

The liabilities of the Company, divided up per sub-fund and, where applicable, per share class and/or type of shares, consist of loans, if any, and debts, whereby debts not yet due are calculated pro rata temporis according to their exact value, if known, or, if not known, according to their estimated value. Brokerage and any other costs relating to the purchase of securities are added

Internal

9

to the purchase price. Brokerage and any other costs relating to the sale of securities are deducted from the redemption price.

*3. Net asset value*

Each Company share for which redemption has been requested is deemed to be an issued and existing share until the period for receiving orders closes, and is thereafter deemed a liability for the relevant sub-fund, the relevant share class and/or the relevant type of shares of the Company until the redemption price has been paid.

Shares to be issued by the Company in accordance with subscription orders received are deemed to have been issued with effect from the time the period for receiving orders closes, and the subscription price is deemed to be an amount receivable by the relevant sub-fund, the relevant share class and/or the relevant type of shares of the Company until payment thereof is received.

The net asset value of the shares of a sub-fund, share class or type of shares is determined by dividing the net assets (assets less liabilities) of that sub-fund, that share class or that type of shares by the number of shares in circulation of the sub-fund, share class or type of shares.

To calculate the net asset value of units relating to orders to issue or redeem units or switch between sub-funds on day D, the fair values for day D are used if a maximum of 20% of the fair values is known at the time the period for receiving orders was closed.

To calculate the net asset value of units relating to orders to issue or redeem units or switch between sub-funds on day D, the fair values for day D + 1 are used if more than 20% of the fair values are already known at the time the period for receiving orders was closed.

Within the limits of the Act and the rules adopted in implementation thereof, the provisions in the prospectus may differ from those set out in the two previous paragraphs for one or more sub-funds or one or more share classes.

. The net assets of the Company are equal to the sum of the net assets of all the sub-funds, converted into the reference currency of the Company based on the last known exchange rates. To the extent permitted by law, the Board of Directors may decide to change the reference currency of the Company or of a sub-fund or to change the currency in which a share class is denominated, or to use multiple reference currencies or currencies in which share classes are denominated.

*4. Suspension of the calculation of the net asset value*

By decision of the Board of Directors, the Company will suspend calculation of the net asset value of the shares, and will suspend their issue, redemption and exchange in the circumstances listed in the Royal Decree.

Furthermore, by decision taken by the Board of Directors, the Company may, under certain special circumstances in which it appears necessary, at any time suspend the issue of shares if such a measure is required to protect the interests of the shareholders of the Company.

The Company may, by decision taken by the Board of Directors, refuse or spread over time one or more subscriptions that could upset its equilibrium.

The measures described in the present article may be limited to one or several share classes.

Article 10. Board of Directors

*1. General*

The Company will be managed by a Board of Directors consisting of at least three members, who may or may not be shareholders. The members of the board of directors shall form a college.

They will be elected or re-elected by the General Meeting for a term not exceeding six years, but their mandate is renewable indefinitely. Unless the appointment decision of the general meeting provides otherwise, their mandate from the general meeting at which they are appointed runs until after the end of the ordinary general meeting in the financial year in which their mandate expires according to the appointment decision.

The general meeting may terminate the appointment of any director at any time and without giving any reason with immediate effect. Any director may resign by mere notification to the board of directors. At the Company's request, he shall remain in office until the Company can reasonably provide for his replacement.

If one or more offices become vacant because of death, resignation, dismissal or any other reason, the remaining directors may fill the vacancy temporarily. In such a case, the next General Meeting will proceed to the definitive appointment. The director thereby appointed will be appointed for the period required to complete the term of office of the director he/she replaces, unless the General Meeting decides otherwise.

10

Directors shall be deemed to exercise their mandate unremunerated unless the general meeting decides otherwise..

*2. Meetings*

From among its members, the Board of Directors will elect a chairman and may elect one or more deputy chairmen. It may also appoint a secretary, who is not required to be a director and who records the minutes of the meetings of the Board of Directors.

The board of directors will meet at the invitation of the chairman or of two directors whenever the interests of the Company so require.

The meeting will be held at the location, date and time indicated in the invitation.

Except in case of extreme urgency, a notification of each meeting of the Board of Directors will be given to all directors at least twenty-four hours before the scheduled time of the meeting. The convocation is valid by letter or e-mail.

The chairman of the Board of Directors will preside over the meetings of the Board of Directors. In his/her absence, the Board of Directors will, by majority vote, designate another person to chair these meetings.

Each director may by any means of communication that can be reproduced in writing and bears his signature, grant power of attorney to another member of the board of directors to represent him at a meeting of the board of directors and to vote on his behalf. The Board of Directors may deliberate and take decisions only if at least half of the members are present or represented. Each director may represent one or more directors, but no single director may represent all other directors. Decisions will be taken by simple majority vote.. Where the vote is tied, the person chairing the meeting will have the casting vote.

Directors who, in application of the law, are not entitled to take part in deliberations and voting are not taken into account for the purpose of determining this quorum.

Each member of the board of directors may, by any means of telecommunication or videography, take part in the deliberations of a board of directors and vote, in order to organise meetings between several participants who are geographically separated from one another, so as to enable them to communicate simultaneously

The decisions of the Board of Directors may also be taken decisions by written decision. Decisions taken in this way must be unanimous. The signatures of the directors will be appended to either a single document or to several copies of that document. Such decisions have the same validity and the same authority as if they had been taken during a Board meeting regularly convened and held on the date the last signature was appended by the directors to the document referred to above.

The minutes of the meetings of the Board of Directors must be signed by the chairman (or by the person who has assumed the chairmanship in his/her absence) and the members who so desire. Copies of or extracts from the minutes, intended for use in court or otherwise, must be signed by the chairman, the secretary or by two directors.

*3. Powers*

The Board of Directors has the power to perform all acts that are necessary or useful for achieving the Company's subject, with the exception of those acts that, by law or pursuant to the Articles of Association, are reserved for the General Meeting.

The Board of Directors is empowered to create new sub-funds and/or share classes at any time and to give them a specific name. It is vested with all powers to have any resulting amendments to the Articles of Association duly recorded.

The Board of Directors may change the characteristics and terms and conditions of a sub-fund or share class. The approval of the General Meeting is required for changes to the characteristics and terms and conditions that are specified in the Articles of Association.

Subject to the limitations imposed by the Act, the Royal Decree and other rules adopted in implementation of the Act, the Board of Directors has the power to determine the Company's investment policy for each sub-fund.

Article 11. Representation of the Company

The Company shall be validly represented vis-à-vis third parties and in court as plaintiff or defendant by two directors acting jointly.

The Company shall also be validly represented by the representative appointed by special power of attorney..

Article 12. Executive management

11

The Board of Directors will appoint two directors who will be responsible for the executive management of the Company.

Article 13. The custodians and the companies providing the financial services

*1. Custodians*

The Company shall conclude an agreement with an institution within the meaning of Article 50, §2, of the Act, in which it is stipulated that the institution will perform the tasks of custodian in accordance with the Act, the Royal Decree and other rules adopted in implementation of the Act.

The Company may revoke custodianship on condition that a replacement custodian is appointed.

Replacement of the custodian with another custodian will be published in two nationally distributed newspapers or in any other equivalent publication approved by the Financial Services and Markets Authority (FSMA).

*2. Companies providing the financial services*

The companies providing the financial services will be appointed in an agreement with the Company, in which the companies' fees (if any) will also be specified.

The Company may remove a company from its duties subject to a notice in writing. A contract for providing financial services may only be terminated if at least one financial institution takes on the responsibility for and carries out the relevant financial services tasks.

Pending the appointment of another company, the remaining company will continue to carry out its obligations specified in the agreement with the Company.

Article 14. General meeting

*1. Convening*

The ordinary General Meeting will be held at eleven a.m. on the second-last banking day of November. If there is only one shareholder, he will sign the annual accounts for approval on this date.

The general meeting will be held at the office of the Company or at any other place in Belgium indicated in the convening notice.

The ordinary General Meeting may be held abroad, should the Board of Directors determine that exceptional circumstances so warrant.

General Meetings of Shareholders of a specific sub-fund may also be held.

An extraordinary or special meeting of the Company or of a sub-fund must be convened by the Board of Directors or, where appropriate, by the statutory auditor whenever the law or the interests of the Company or of the sub-fund so requires. It must be convened if so requested by shareholders who together represent one-tenth of the capital of the Company or of the relevant sub-fund.

The shareholders shall meet after being convened by the Board of Directors by means of a convening notice that sets out the agenda.

Holders of registered and book-entry shares will be convened in the manner prescribed by law.

In order to be admitted to the General Meeting, and unless otherwise determined by law, holders of registered and of book-entry shares are required to notify the Board of Directors in writing, at the latest on the sixth calendar day before the date scheduled for the meeting, of their intention to attend the General Meeting and of the number of shares they intend to use when participating in the voting and this in the manner stated in the convening notice.

Moreover, holders of book-entry shares will be admitted to the General Meeting only if they at the latest on the sixth calendar day before the determined date of the meeting, deposit a certificate issued by the recognized account holder or the settlement institution, which establishes the unavailability of the dematerialized shares until the date of the meeting, at the office of the Company or at one of the Company's financial services providers..

Any person can renounce the convocation and shall in any case be deemed to have been convened regularly if he is present or represented at the meeting

Each time all shareholders are present or represented and declare that they agree to the agenda submitted to them for deliberation, the General Meeting may be held without being convened in advance.

Once the convening notice has been published, shareholders may submit questions in writing which must be received by the company at least on the sixth calendar day before the date fixed for the meeting.

*2. Attendance list*

12

Before participating in the general meeting, the shareholders or their proxy holders are obliged to sign the attendance list, indicating the name, first name(s) and number of shares with which they are participating in the general meeting.

*3. Decisions*

The General Meeting shall deliberate on the agenda items and take decisions in accordance with the rules of the Code on companies and associations.

No meeting may deliberate on items that do not appear on the agenda, unless all shares are present or represented at the meeting and a unanimous resolution is passed to that effect.

Except in those cases determined by law, decisions will be taken by simple majority vote, irrespective of the number of shares represented at the meeting. An abstention is not taken into account when counting the votes.

Each shareholder may participate in the meeting by appointing, in writing, another person, who need not be a shareholder, as proxy.

The shareholders may, unanimously and in writing, take all decisions that fall within the competence of the general meeting, with the exception of those that must be drawn up in a deed. In this case, the formalities for convening the meeting do not have to be completed.

Co-owners, usufructuaries and bare owners, pledgees and pledgers, in short, all persons who, for one reason or another, are jointly entitled to one and the same share or fraction of a share, must respectively arrange to be represented by one and the same person.

Unless otherwise determined by law, if a General Meeting is organised at Company level, all decisions will be taken by simple majority vote of those shareholders of the Company who are present or represented.

Unless otherwise determined by law, if a General Meeting is organised at sub-fund level, all decisions will be taken by simple majority vote of those shareholders of the relevant sub-fund who are present or represented.

When the shares have the same value, each share grants entitlement to one vote. When they do not have the same value, each legally represents a number of votes proportional to the part of the capital they represent, whereby the share that represents the smallest part is counted as one vote.

If the Company has only one shareholder, it can only exercise the powers granted to the general meeting.

Article 15. Financial year

The financial year begins on the first of September and ends on the thirty-first of August of the following year.

Article 16. Reports

Prior to the ordinary General Meeting, shareholders may obtain the annual report from the office of the Company. This report contains the financial information on each of the Company's sub-funds, the composition and performance of those sub-funds' assets, and the management report intended to inform shareholders.

All elements of the financial situation of the Company are audited by an accredited statutory auditor, who is appointed and replaced by the General Meeting.

Unless otherwise determined by law, the financial statements are approved and discharge is granted to the directors and to the statutory auditor of each sub-fund by a simple majority vote of those shareholders of the Company who are present or represented.

Article 17. Distribution

Each year, on the basis of a proposal by the Board of Directors, the ordinary General Meeting of the Company will determine the share of the result to be allocated to each sub-fund in accordance with the legislation in force.

The Company may pay dividends to the distribution shares. The Board of Directors may decide to pay an interim dividend, subject to the provisions of the law.

The institutions responsible for paying dividends to the shareholders are designated by the Board of Directors and stated in the prospectus.

The General Meeting may decide to allocate part of the profit to the directors by way of remuneration. The amount allocated will be divided among the directors in accordance with the regulations laid down by the Board of Directors. The General Meeting must be notified in the event that certain or all of the directors do not wish to receive a share of the profit.

Article 18. Costs charged to the undertaking for collective investment

13

Within the limits of the laws to which it is subject, the Company will bear the expenses relating to its formation, operation and possible liquidation.

These expenses include:

– the fee payable to the manager for managing the investment portfolio of the collective investment undertaking, as stated in the prospectus;

– any commissions and charges for allocating the assets, payable to the financial institution responsible for allocating the assets, as stated in the prospectus;

– any performance fee, within the meaning of Article 115, §4, of the Royal Decree, payable to the manager, as stated in the prospectus;

the custodian's fee;

– the fee for the administration of the collective investment undertaking, payable to the financial institution responsible for the administration of the collective investment undertaking.

The method of calculating the above fees is specified in the prospectus.

The Board of Directors may at any time alter the rate of the aforementioned fees, provided that the relevant legal provisions are observed.

The powers of the Board of Directors regarding the following fees are limited to the maximum percentages stated below. The exact percentages are stated in the prospectus:

– The fee for managing the investment portfolio of the collective investment undertaking: maximum two per cent (2%).  This maximum percentage does not include any performance fee within the meaning of Article 115, §4, of the Royal Decree.

– Any commissions and charges for allocating the assets, payable to the financial institution responsible for allocating the assets, as stated in the prospectus: maximum one per cent (1%).

– The custodian's fee: maximum zero point two per cent (0.20%).

– The fee for the administration of the collective investment undertaking: maximum zero point two per cent (0.20%).

The expenses relating to the formation, operation and possible liquidation of the Company also include:

– the formation expenses of the Company;

– the investment adviser's consultancy fee;

– the statutory auditors' fees;

– any fees paid to the directors;

– amounts paid to the supervisory authorities of the countries where the Company's shares are offered for sale;

– the costs of publicity, legal notices and other announcements;

– the costs of printing and distributing the issue prospectuses and periodic reports, as well as all other reports and documentation required by law and regulations;

– the costs of all other information intended for the shareholders;

– the commissions and other costs for transactions relating to the Company's portfolio;

– interest and other loan charges;

– the costs of calculating the net asset value, and accounting costs;

– any costs related to a listing on a stock exchange;

– the costs of publishing the share price;

– the charges for the financial services provided in relation to the fund's shares and coupons;

– expenses for official deeds;

– the duties and costs relating to changes in the Company's capital;

– expenses relating to domiciliation and the general secretariat of the Company;

– expenses relating to the General Meetings and the meetings of the Board of Directors;

– the judicial costs and costs of legal advice specific to the Company;

– any other costs or taxes relating to the Company's operation;

– the costs and fees relating specifically to the winding up or liquidation of a sub-fund or the Company;

– all other expenditure incurred in the interest of the shareholders of the Company.

The Board of Directors may at any time alter the rates of the aforementioned charges and fees, provided that the relevant legal provisions are observed.

Each sub-fund, share class and/or type of shares is charged all costs and expenditure that can be allocated to it. Costs and expenses that can be allocated to one sub-fund, share class and/or type of shares are charged to that sub-fund, that share class and/or that type of shares. Costs and

14

expenses that can be allocated to more than one sub-fund, share classes and/or types of shares are ventilated over those sub-funds, share classes and/or types of shares concerned in proportion to their respective net assets. Costs and expenses that cannot be allocated to one sub-fund, share class and/or type of shares or to a group of types of shares are ventilated over all sub-funds, share classes and/or types of shares that are part of the Company in proportion to their respective net assets. Article 19. Winding up and restructuring

The General Meeting has the power to decide to wind up or restructure the Company.

If the Company is wound up, liquidation is proceeded to by one or more liquidators, who may be either natural or legal persons and who are appointed by the General Meeting, which also determines their powers and remuneration.

For each sub-fund, the liquidation value of the shares will be distributed among the shareholders in proportion to their rights.

The General Meeting of a sub-fund has the power to decide to wind up or restructure the relevant sub-fund.

If the maturity date for a sub-fund is specified in the prospectus, that sub-fund will be automatically wound up on that date and put into liquidation, unless the Board of Directors, at the latest on the day preceding that date, exercises its authority to extend the life of the relevant sub-fund. If the sub-fund is wound up by operation of law:

– the Board of Directors will appoint one or more liquidators;

– the units in the relevant sub-fund will be redeemed at redemption value according to the terms and conditions determined by the Board of Directors, subject to the conditions set at the time of issue, as may have been amended during the life of the sub-fund, notified through publication in two newspapers or in any other equivalent publication approved by the FSMA;

– the Board of Directors will draw up a report on the liquidation of the relevant sub-fund;

– the terms and conditions for redemption and the report of the Board of Directors will be verified by the Company's statutory auditor;

– each year at the ordinary General Meeting, a motion will be put forward to grant discharge to the directors and to the statutory auditor of the sub-funds that were wound up and put into liquidation during the preceding financial year;

– the General Meeting that granted the discharge will close the liquidation of the relevant sub-funds and will grant power of attorney to one or more persons to have resulting amendments to the Articles of Association duly recorded by the notary-public.

Article 20.  Amendment of the Articles of Association

These Articles of Association may be amended by the General Meeting, subject to the mandatory quorum and voting requirements by the Code on companies and associations or by law/

Any change affecting the rights of the shareholders of one sub-fund shall therefore be subject to the same quorum and majority requirements in the relevant sub-fund. Any amendment to the Articles of Association requires the prior approval of the FSMA.

Article 21. General provisions

In respect of all the points not specified in the present Articles of Association, those parties concerned will observe and be subject to the provisions of the Code on companies and associations, as well as to the Act, the Decree and the rules adopted in implementation thereof.

The court of the District of Brussels has sole jurisdiction in the event of a dispute.

Article 22. Sub-funds

No sub-fund can invest more than 10% of its assets in units of other undertakings for collective investment.

No sub-fund has been granted special a derogation to invest 100% of its assets in securities and money market instruments that are issued or guaranteed by a Member State of the European Economic Area, by its local authorities, by a state that is not a Member State of the European Economic Area or by public international institutions in which one or more Member States of the European Economic Area participate.

The investment policy of the sub-funds is not designed to track the composition of any specific benchmark index or specific benchmark indices.

Article 23. Share classes

The Board of Directors may issue the following share classes in each sub-fund:

- 'Classic Shares', intended for all categories of persons.

Internal

15

- 'Corporate Shares', intended for all categories of persons. There is a minimum subscription value as set out in the prospectus.
- 'Institutional Shares', reserved for institutional investors as defined in Article 5, § 3 of the Act. There is a minimum subscription value as set out in the prospectus.
- 'Institutional B Shares', reserved for collective investment undertakings that are managed by KBC Asset Management NV or by another company associated with it. There is a minimum subscription value as set out in the prospectus.
- 'institutional F Shares', reserved for collective investment undertakings that are managed by KBC Asset Management NV or by another company associated with it and which invests its assets predominantly in this share class.

All share classes may be denominated in a currency other than the currency of the sub-fund. If this is the case, the currency shall be added to the name of the share class.

All share classes may be retained for trading by one or more distributors. If this is the case, the distributor or distributors shall be added to the name of the share class.

All share classes may be retained for trading within one or more segment of one or more distributors. If this is the case, the segment(s) shall be incorporated in the name of the share class.

All share classes may be retained for investors of a particular nationality or several particular nationalities. If this is the case, the abbreviation of the nationality shall be added to the name of the share class.

When a share class is created, the Board of Directors will check that the financial service providers have a procedure in place which allows for constant checks to see whether or not the persons who have purchased shares belonging to a particular share class which benefits from more favourable tax treatment in terms of one or more items always satisfy the criteria.

The Board of Directors may take any measures necessary to ensure that the aforementioned criteria are satisfied.

Insofar as this is specified in the prospectus and in the manner stipulated by the prospectus, if it turns out that shares from a particular share class are being held by persons other than those permitted to hold them, these shares will be converted to shares of a share class which these persons are permitted to hold.

The Board of Directors may, for one or more share classes, decide to discontinue the issue thereof.

In the event of a discrepancy between the Dutch and foreign-language editions of the Articles of Association, the Dutch text shall prevail.

**FOR UNIFORM COORDINATION**