**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Dr., Suite #180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

**MOTLEY RICE LLC**
Max N. Gruetzmacher (*pro hac vice*)
mgruetzmacher@motleyrice.com
Christopher F. Moriarty (*pro hac vice*)
cmoriarty@motleyrice.com
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

*[Additional Counsel Listed on Signature Page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN LEVENTHAL, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CHEGG, INC., DANIEL L. ROSENSWEIG, ANDREW J. BROWN, and NATHAN SCHULTZ, <br><br> Defendants. | Case No.: 5:21-cv-09953-EJD <br><br> **CLASS ACTION** <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

1

## **TABLE OF CONTENTS**

2    I.    INTRODUCTION ................................................................................................. 1

3    II.   JURISDICTION AND VENUE ......................................................................... 8

4    III.  PARTIES ............................................................................................................ 9

5          A.    Lead Plaintiffs ......................................................................................... 9

6          B.    Defendants ............................................................................................... 9

7    IV.   SUBSTANTIVE ALLEGATIONS ................................................................. 12

8          A.    Chegg Purports To Offer Critical Online Academic Support That Students
                 Desperately Need To "Master" And "Learn" Their Coursework ...................... 12
9
10         B.    During The Class Period, Defendants Represented To Investors That
                 Chegg's "Unprecedented Growth" During The COVID Pandemic Was
                 Attributable To Accelerated Adoption Of Its Online "Learning Platform"
11               And Other Legitimate Business Factors, And Emphasized That The
                 Switch To Remote Learning Was "Completely Irrelevant" To Chegg's
12               Long-Term Success ............................................................................... 15

13         C.    Defendants Repeatedly Deny That Chegg's Remarkable Growth During
                 The Pandemic Was Due To Student Cheating, Claiming That The
14               "Overwhelming Majority" Of Its Customers Do Not Use Chegg To Cheat ........ 20

15         D.    In Truth, Defendants Knew Throughout The Class Period That Chegg's
                 Growth During The Pandemic Was Predicated Upon Widespread Student
16               Cheating And Was Not Sustainable ....................................................... 25

17               1.    Documents Provided In Response To FOIA Requests By
                       Universities Across The Country Confirm That Student Cheating On
18                     Chegg's Platform Was Rampant, Chegg Was Repeatedly Informed
                       About It, And Chegg Failed To Implement Effective Procedures To
19                     Stop It ........................................................................................... 26

20               2.    The Accounts of High-Ranking University Officials And Faculty
                       From Across The Nation Confirm That Student Cheating On
21                     Chegg's Platform Was Rampant, Chegg Was Repeatedly Informed
                       About It, And Chegg Failed To Implement Effective Procedures To
22                     Stop It ........................................................................................... 39

23               3.    The Accounts Of Former Chegg Employees Confirm Defendants'
                       Fraud ............................................................................................. 51
24
25               4.    Lead Counsel's Empirical Analysis Confirms That Chegg's Growth
                       Was Attributable To Rampant Student Cheating During Remote
26                     Learning, Which Was Blatantly Obvious To Chegg ................................ 58

27               5.    Chegg Refused To Implement Obvious Steps That Would Have
                       Prevented Cheating ....................................................................... 62
28

E.    Defendants Capitalize On The Fraud Through Massive Insider Sales With Shares Trading At Record Highs And The End Of Remote Learning Approaching .......................................................................................... 66

F.    The Truth Regarding Chegg's Unsustainable Growth Emerges As Students Return To Campus And Stop Using Chegg To Cheat, Reversing The Company's Explosive Growth And Causing Its Stock Price to Crater ......... 68

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 70

VI.    LOSS CAUSATION ...................................................................................... 103

VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ........................... 104

A.    Defendants Meticulously Tracked User Engagement Across Chegg's Online Platform, Including Expert Q&A ............................................................. 105

B.    Chegg Study And The Expert Q&A Service Constituted Chegg's Core Operations And "Flagship Service" .................................................................. 107

C.    Throughout the Class Period, Defendants Were Repeatedly Informed of Cheating Scandals Involving Chegg At Universities Across the Country .......... 108

D.    Defendants Made Highly Specific Statements Minimizing And Denying Student Use Of The Platform To Cheat In Response To Repeated Analyst Questioning .................................................................................................. 109

E.    Chegg Designed Expert Q&A To Make Cheating Faster And Easier ................ 112

F.    The Gross Disparity Between The Individual Defendants' Words And Reality Reinforces Scienter ........................................................................... 113

G.    Lead Counsel's Empirical Analysis Confirmed The Existence of Widespread, Blatant Cheating On Chegg's Website ......................................... 114

H.    Chegg's Officers And Directors Capitalized On The Fraud By Selling Nearly $100 Million Of Their Personally Held Shares At Inflated Prices ......... 115

VIII.    PRESUMPTION OF RELIANCE ....................................................................... 117

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ................................................................... 118

X.    CLASS ACTION ALLEGATIONS ..................................................................... 119

XI.    CLAIMS FOR RELIEF .................................................................................. 120

XII.    PRAYER FOR RELIEF .................................................................................. 126

XIII.    JURY DEMAND ......................................................................................... 126

1.     Court-appointed Lead Plaintiffs Pompano Beach Police and Firefighters' Retirement System ("Pompano") and KBC Asset Management NV ("KBC") (together, "Lead Plaintiffs" or "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of the undersigned Lead Counsel. Lead Counsel's investigation included, among other things, review and analysis of: (i) public filings made by Chegg, Inc. ("Chegg" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (ii) transcripts of Chegg's conference calls with analysts and investors; (iii) presentations, press releases, media reports and publications concerning Chegg, and postings on and data available through Chegg's website; (iv) interviews with former Chegg employees as well as professors, deans, and academic administrators at colleges and universities across the United States; (v) documents produced by colleges and universities in response to requests made pursuant to public records laws, including the Freedom of Information Act (together, "FOIA Requests"); (vi) research reports by securities and financial analysts concerning Chegg; (vii) consultation with industry and financial experts; (viii) data reflecting Chegg's stock price; and (ix) review of other publicly available information concerning the Company. Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery, as many of the facts related to Plaintiffs' allegations are known only by Defendants (defined below) or are exclusively within their custody or control.

2.     Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, Section 20(a) of the Exchange Act, and Section 20A of the Exchange Act on behalf of all persons or entities who purchased, or otherwise acquired Chegg common stock between May 5, 2020, and November 1, 2021, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

## I.    **INTRODUCTION**

3.     Chegg is a subscription online "learning platform" that purports to "help students master their subjects, better understand their course material, and have better outcomes on their learning journey." Chegg claims to serve a $1.3 trillion education industry by providing

purportedly critical "academic support" to students desperately in need of help due to schools' strapped budgets, unwillingness to provide needed support, and failure of foresight. As Chegg's Chief Executive Officer ("CEO"), Daniel L. Rosensweig ("Rosensweig"), crowed during one of his many interviews on CNBC during the Class Period, online learning "is the wave of the future" and Chegg provides services that "every student around the world clearly needs."

4.      In particular, Chegg Study and its featured "Expert Q&A" service were purportedly designed to "help[] students master challenging concepts on their own" in courses spanning the fields of science, math, and English, among others. For as little as $15 per month, the Expert Q&A feature allowed subscribers to ask a pool of 70,000 to 100,000 experts (mostly freelance workers in India) with advanced-level degrees for an "instantaneous step-by-step solution" to "homework" questions that "come back [] usually in less than an hour" and were often "almost immediate." Chegg relentlessly promoted its Expert Q&A feature as a key reason to invest in the Company, emphasizing that Chegg "already ha[d]" a searchable archive of "35 million academic questions asked and answered" as of the start of the Class Period, which provided a "huge" and "incredible competitive moat" that grew to 70 million questions and answers by the end of the Class Period. Chegg referred to the Expert Q&A tool as the "Uber" and "Amazon Prime" of the education world due to how quickly students could receive comprehensive homework answers— "the real magic to our model."

5.      The Class Period tracks the arc of the COVID-19 pandemic, which shut down college campuses across the country and forced students into distance learning. During this period, Chegg reported rapidly escalating "record" subscriber numbers that more than doubled by the end of 2020, with accompanying "unprecedented" and "fantastic" financial results. Indeed, Chegg's total revenues surged by nearly 50% from Q1 2020 to Q2 2021, and for each and every quarter in the Class Period, Chegg reported large and consistent growth in year-over-year revenue and earnings,[1] ranging between 35% at the onset of the pandemic and approaching 90% by Q4 2020— the first final exam period after a full semester of remote learning. Defendants continually raved

---

[1] Earnings refers to the Company's adjusted EBITDA – earnings before interest, taxes, depreciation and amortization – which Chegg highlighted as a key performance metric in its earnings releases and presentations to investors during the Class Period.

about these "tremendous" results, touting that Chegg had "outperformed even our most enthusiastic expectations," and repeatedly raised the Company's full-year revenue and earnings guidance in 2020 and 2021. The market applauded Chegg's unprecedented growth, and the Company's stock price soared to all-time highs.

6.    Significantly, as Chegg reported quarter after quarter of record subscriber numbers and strong financial performance, industry observers and short sellers questioned whether Chegg's online platform was being used by students to cheat, rather than for legitimate educational purposes. As a result, investors were hyper-focused on the reasons for Chegg's growth during the Class Period—namely, whether it was due to rising and sustainable student demand for online academic support, or was the result of large numbers of students opportunistically using Chegg to cheat during a fleeting period of distance learning. Naturally, investors wondered whether Chegg's explosive growth would continue once in-person instruction resumed.

7.    To silence those concerns, Defendants reassured investors in nearly two dozen earnings calls and investor conference calls during the Class Period—including in direct response to analyst questions on the matter—that Chegg's "unprecedented" and "dramatic" growth was indeed "sustainable" because it was due to the "inevitable" adoption of online learning and other legitimate business factors, and wholly unrelated to the temporary effects of remote learning or use of the platform to cheat. At every opportunity, Defendants assured investors that the Company's success was predicated on a variety of legitimate business factors, such as the Company's efforts to prevent students from casually sharing their Chegg accounts without paying for additional subscriptions, and repeatedly underscored that Chegg's sharp growth trajectory during remote learning was "not a result of people being on campus or not being on campus"—a factor Defendant Rosensweig proclaimed was "completely irrelevant to Chegg."

8.    Moreover, Defendants assured investors that Chegg took every effort to prevent and address any cheating on its platform. Thus, in response to several articles and reports during the Class Period alleging that Chegg's growth was due to student cheating, Defendants repeatedly issued vehement denials and asserted that cheating did not contribute to Chegg's success in any meaningful way. Defendants also pointed to Chegg's "Honor Code," which avowed that Chegg

strictly prohibited cheating, and declared that "[t]he vast majority of Chegg students use our services to help them learn and understand," and that "misuse of our platform represents an extremely small portion of the activity on our platform." Chegg responded to reports accusing the Company of facilitating cheating with strong public denials, repeatedly emphasizing that the Company supported academic integrity and hadn't seen "any relative increase in Honor Code issues since the COVID-19 crisis began"; that cheating was "not what Chegg was built for"; and that only a "tiny fraction" of students used Chegg's platform to cheat. Halfway through the Class Period, in January 2021, Chegg also announced that it had launched an "Honor Shield" initiative that was purportedly geared toward curbing even the purportedly tiny number of students who may have been using Chegg to cheat.

9.    Investors and analysts fully credited Defendants' statements. For example, Northland Capital Markets reported that "the vast majority of students use [Chegg] to assist with learning difficult concepts" while only "some students" used Chegg "to misuse the platform for help during quizzes/exams." Analysts also favorably reported on Chegg's implementation of the "Honor Shield" program, which would "assuage[] bear concerns around cheating," and credited Chegg's growth to the legitimate business practices emphasized by Defendants. For example, analysts at Craig-Hallum reported that Chegg's "cracking down on students sharing passwords" would "help[] to boost (paid) membership and should continue to do so for years to come."

10.    In response to Defendants' representations, Chegg's stock price skyrocketed, nearly tripling from a closing price of $43.79 per share immediately prior to the Class Period to an all-time high of over $113 per share on February 12, 2021.

11.    Company insiders wasted no time in capitalizing on Chegg's inflated stock price. Overall, Chegg insiders reaped nearly ***$100 million*** in proceeds from suspiciously timed insider stock sales and, in February 2021, only days after Chegg's stock reached its all-time high, Defendants conducted a ***$1 billion*** secondary public offering ("SPO") in which Defendant Rosensweig alone pocketed over ***$30 million***. In total, Defendants Rosensweig and Nathan Schultz ("Schultz") (Chegg's President of Learning Services) collectively pocketed a staggering ***$74 million*** from their insider stock sales in suspiciously timed sales during the Class Period. Indeed,

as Defendants knew full well, the impending end of remote learning meant that students would no longer have the unbridled opportunity to cheat using Chegg's platform, and thus the Company's financial results would soon crater.

12.    Defendants' representations to investors regarding the reasons for Chegg's remarkable growth were utterly false.  Lead Counsel's investigation confirms that Chegg's remarkable growth during the Class Period was unquestionably due to rampant use of Chegg's "Expert Q&A tool" for cheating during distance learning, and not legitimate "academic support" as Defendants publicly proclaimed.  As set forth below, this extensive investigation included (i) review of over 1,000 pages of documents provided in response to FOIA Requests by many of the nation's most respected institutions of higher learning, (ii) interviews and surveys of over twenty professors, deans, and officials from universities across the nation, (iii) the corroborating accounts of numerous former Chegg employees, and (iv) a comprehensive empirical analysis of archived Expert Q&A data.  In essence, students posting questions on Chegg were paying experts in India to take tests for them—or as students called it, "Chegging."

13.    *First*, documents provided by prominent universities, including The University of California, Los Angeles ("UCLA"), Georgia Institute of Technology ("Georgia Tech"), The University of Nebraska, and the United States Air Force Academy ("Air Force Academy"), among others, in response to FOIA Requests show not only students' widespread use of Chegg for cheating during the Class Period, but also the universities' repeated desperate pleas to Chegg for help in combating the "***raining cases***" of academic integrity violations involving Chegg.  Those documents describe in specific detail Chegg's "***professional cheating operation***" with students "accessing Chegg during the final exam" and getting "solutions directly" from Chegg experts.  Indeed, professor emails repeatedly described students "***posting the entire test to Cheng [sic] and submitting answers completely copied from the solutions provided by Chegg***."  The documents also show that Defendants' vaunted "Honor Code" and "Honor Shield" programs were little more than corporate propaganda:  empty promises by Defendants to prevent cheating that instead erected onerous "hurdles" for professors investigating blatant academic integrity violations— "***a master class in misdirection and frustration***," as one professor put it.  Chegg's systems to prevent cheating

provided schools with largely useless information even when Chegg's onerous guidelines were followed, and *never* the actual names of the students/Chegg subscribers who cheated.  As two Georgia Tech deans noted, these extraordinary circumstances put the onus squarely on universities to make exams, quizzes, and homework "*Chegg-proof*."

14.     *Second*, Lead Counsel's own interviews and written correspondence with over twenty professors, deans, and university officials across the country confirmed that, based on their personal experiences with students and Chegg, and despite Defendants' staunch assertions to the contrary, "*a vast majority of students using Chegg did so for illegitimate reasons*" and overwhelmingly, these educators were "*not personally aware of any students that use [Chegg] for genuine learning purposes*."  Professors' damning, firsthand accounts were confirmed by deans and high-level university officials charged with enforcing academic integrity standards.  These administrators similarly described how their institutions grappled with a surge in academic misconduct cases during remote learning with Chegg at the center—including exams being posted to Chegg within moments of going live—and finding after thorough investigations and direct communications with Chegg that "*our students used Chegg to cheat, and not for other aspects of the platform*."  As one Vice Provost declared, the level of student cheating that occurred via Chegg during the period of remote learning "*was insane.*"

15.     *Third*, numerous former Chegg employees—including former high-ranking Vice Presidents who personally attended weekly meetings with Defendants Rosensweig, Schultz, and Andrew J. Brown ("Brown") during which cheating was regularly discussed—confirmed that account sharing "*was not the driver*" behind Chegg's growth during the Class Period, and that it was instead "*the cheating business*."  Former Chegg employees specifically confirmed that Chegg's Expert Q&A service was the Company's "*main moneymaker*," and that student use of Expert Q&A to cheat "*absolutely accelerated*" during remote learning.  Former employees further confirmed that Chegg management closely tracked user engagement, including during weekly "all-hands meetings" attended by Defendants Rosensweig, Brown, and Schultz (among others), that executives "*always had access to data*," and that Rosensweig and Schultz "*knew everything, they were micromanagers*."  Not surprisingly, then, the cheating issues were "*absolutely well

*understood*" internally.   The former employees also described how these Defendants were completely uninterested in preventing cheating.  As one former employee stated, Chegg "***didn't really put any effort into stopping [cheating] because it was putting money into their pocket[s]***."

16.    *Fourth*, Lead Counsel's empirical analysis of the Chegg Expert Q&A service shows that Defendants understood that the Company's "unprecedented growth" during the pandemic was predicated on rampant student cheating.  As an initial matter, Lead Counsel's review of non-public, archived, and proprietary Expert Q&A data demonstrates that student usage of the tool for instantaneous answers surged during remote learning, with students submitting ***twice*** as many questions to "Chegg Experts" in April 2020 as they had during the same exam period in 2019.  By the end of May 2020, as finals wrapped up for the first semester of remote learning, these questions had almost ***quadrupled***.   Lead Counsel's empirical analysis further shows that this surge in questions to Chegg during remote learning was driven by obvious student cheating.  Indeed, Lead Counsel's random sampling of over 6,000 questions from Chegg's Q&A database confirmed clear and blatant indicia of cheating in the middle of actual exams, including hundreds of photos demonstrating that Defendants were keenly aware of, and failed to take any effort to meaningfully prevent, cheating on Chegg.  The findings of Lead Counsel's empirical analysis are extraordinary: approximately ***one-quarter*** of all questions submitted to the Expert Q&A platform during the Class Period contained clear indicia of cheating.  Indeed, Lead Counsel uncovered photos of "homework" questions uploaded by Chegg in which users explicitly stated:  "***This is a test question and any use of online resources … is considered academic dishonesty***" and others begging experts "***Please help as soon as possible, I have 30 minutes to answer***" and "***please solve this question urgently, its exam questions***."

17.    The truth about the reasons for Chegg's record growth during the period of remote learning emerged on November 1, 2021.  On that day, the Company reported its third quarter results—the first quarter in which the majority of college students had returned to campus to attend classes for the fall semester—and disclosed a sudden ***10% decline*** in subscribers, marking an abrupt 180-degree reversal from the "dramatic" subscriber growth Defendants had reported throughout the Class Period.  Beyond this decimation in subscribers, and despite the fact that the fourth quarter

was historically Chegg's most profitable quarter, the Company further stunned investors by issuing fourth-quarter revenue guidance that was over **20% below** Wall Street expectations, and ***entirely postponed*** the issuance of its revenue guidance for 2022. On this news, Chegg's stock price plunged nearly **50%**, from $62.76 per share on November 1, 2021, to $32.12 per share on November 2, 2021—wiping out a staggering **$4 billion** in shareholder market capitalization in a single day.

18. In the aftermath of this debacle, Defendants attempted to blame the Company's poor results on a "combination of variants," including an "industry-wide" slowdown, "increased employment opportunities and compensation," and student "fatigue," all of which purportedly led to "fewer enrollments than expected this semester." However, analysts rejected these excuses as inconsistent with actual enrollment trends, and instead attributed Chegg's faltering performance on students' diminished ability to easily use Chegg's platform to cheat on exams upon the widespread return to in-person instruction. For example, *Forbes* explained that "***the enrollment excuse makes no sense*** ... enrollment declines this year were smaller than they were last year, when Chegg's revenue and stock were soaring," and noted that "***most students use Chegg to cheat on exams, quizzes and homework***," and "***[n]ow that students are back in the classroom, they can't easily use Chegg to cheat***." Morgan Stanley also saw past Defendants' false explanations for Chegg's sudden decline: "as students returned to campus for in person learning, they did not return to the Chegg platform," as there were "more graded assignments in class where Chegg would not be helpful."

19. Significantly, since the end of the Class Period, Chegg's subscriber growth and financial performance have ***never*** come close to the levels they reached during the Class Period. Chegg's stock price has also never recovered. As of the date of this filing, Chegg stock continues to trade below $30 per share, a fraction of its price during the Class Period.

## II.   JURISDICTION AND VENUE

20. The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Chegg maintains its corporate headquarters in Santa Clara, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.     **PARTIES**

A.     **Lead Plaintiffs**

22.     Lead Plaintiff Pompano Beach Police and Firefighters' Retirement System is a defined-benefit public employee retirement system providing benefits for police officers and firefighters in Pompano Beach, Florida.  As of October 1, 2021, Pompano managed approximately $245 million in assets on behalf of 600 members.  As set forth in its PSLRA certification (ECF No. 41-1), Pompano purchased Chegg common stock during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

23.     Lead Plaintiff KBC Asset Management NV is an asset management company headquartered in Brussels, Belgium.  As part of KBC's asset management services, it is responsible for managing mutual funds, private funds, and institutional funds. KBC manages assets in excess of €200 billion.  As set forth in its PSLRA certification (ECF No. 41-1), KBC's funds purchased Chegg common stock during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

B.     **Defendants**

24.     Defendant Chegg is incorporated under the laws of Delaware with its principal executive offices located in Santa Clara, California.  Chegg's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "CHGG."

25.     Defendant Rosensweig has served as Chegg's President and CEO since 2010.  He also has served as the Co-Chairperson of Chegg's Board of Directors (the "Board") since July 2018,

having previously served as the Chairperson of the Board from March 2010 to July 2018.[2]  During the Class Period, Defendant Rosensweig reviewed, approved, signed and certified Chegg's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on May 4, 2020, August 3, 2020, October 26, 2020, February 22, 2021, May 3, 2021, August 9, 2021, and November 1, 2021.

26.     Defendant Brown has served as Chegg's Chief Financial Officer since 2011.  During the Class Period, Defendant Brown reviewed, approved, signed and certified Chegg's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including the same Forms 10-Q and 10-K listed above for Defendant Rosensweig.

27.     Defendant Schultz is currently Chegg's Chief Operating Officer ("COO") and throughout the Class Period served as the Company's President of Learning Services. Schultz became Chegg's President of Learning Services in 2018, and before that served in a variety of roles at Chegg for approximately ten years.   As President of Learning Services, Schultz was responsible for student achievement, overseeing all aspects of Chegg's self-directed "learning tools," which includes content development and publisher relations.

28.     Defendants Rosensweig, Brown, and Schultz (collectively, the "Individual Defendants," and together with Chegg, "Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and retail and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and thus the Individual Defendants had the ability and opportunity to prevent the issuance of these reports and press releases or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being

---

[2] Prior to joining Chegg, Rosensweig did not have relevant employment experience in the education industry. Indeed, before joining Chegg as President and CEO, Rosensweig served as President and CEO of Activision's *Guitar Hero*, a video game where players use a guitar-shaped game controller to simulate playing popular music.

concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

29. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Chegg, were privy to confidential, proprietary, and material adverse non-public information concerning Chegg, its operations, finances, financial condition, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

30. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Chegg's business.

31. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Chegg's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Chegg's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Chegg Purports To Offer Critical Online Academic Support That Students Desperately Need To "Master" And "Learn" Their Coursework

32.    Chegg purports to be an online provider of educational study services. Both prior to and during the Class Period, Chegg marketed itself as a "leading direct-to-student" online "learning platform" providing a range of educational services, otherwise unavailable to students, to "enhance students' ability to master their subjects, to learn [and to] get better grades." According to Chegg, students worldwide are desperately in need of this academic support, as higher education is on the brink of a momentous transition to online learning—an "inevitable" trend that was only accelerated by the COVID pandemic. Indeed, as Defendant Rosensweig declared during an interview on CNBC's *Mad Money*, online learning "is the wave of the future" with "institutions, governments, educations, their budgets are going down, [and] their willingness to support is going down." Chegg was therefore uniquely poised to benefit, given its comprehensive suite of study services that "every student around the world clearly needs."

33.    Chegg, which bills itself as a "Smarter Way To Student," is comprised of two main business segments: (1) "Chegg Services," which consists of the Company's online subscription products, including Chegg Study (the Company's flagship product that includes the "Expert Q&A" tool), Chegg Writing, and Chegg Math Solver, among others; and (2) "Required Materials," consisting of Chegg's print and e-textbook offerings. As provided below, the vast majority of the Company's revenues during the Class Period came from the Chegg Services segment. By the end of the Class Period, Chegg Services accounted for nearly 90% of the Company's total revenues.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    34.    Significantly, Chegg reports revenues only for its Chegg Services and Required

16 Materials segments and does not break out the relative financial contribution of the constituent

17 products within either segment.  Accordingly, there was no way for investors to know during the

18 Class Period how much of the Company's growth and financial success was driven by its core

19 Chegg Study product and its "Expert Q&A" tool, compared to the Company's other online

20 offerings.  Similarly, while the Company updated investors every quarter of the Class Period on the

21 total number of "content views" on its "integrated platform," Chegg did not break out the number

22 of content views per service, instead reporting only the total number of content views across the

23 entire platform or the entire Chegg Study service offering.  As a result of Chegg's opaque method

24 of reporting, there was no way for investors to evaluate how students used the platform and break

25 out which features were driving demand.

26    35.    Defendant Brown admitted during a May 19, 2021 investor conference that Chegg's

27 refusal to provide this information was deliberate, purportedly because Chegg was "more of a

28 platform company" such that "breaking out things gets awfully messy."  The refusal was made in

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

the face of repeated inquiries from analysts for greater transparency into Chegg's operations. As Defendant Brown acknowledged, "I know we get questions about this a lot," but Brown insisted that Chegg was "better served reporting how we're reporting." Thus, despite analysts' questions seeking additional detail about which aspects of Chegg's platform were driving customer demand (and, in turn, the Company's financial performance), Defendants refused to provide such transparency.

36.    Nevertheless, Defendants acknowledged during the Class Period that Chegg Study was by far the most widely used feature of Chegg Services—and within Chegg Study, Expert Q&A was the most popular feature, comprising 90% of Chegg Study's proprietary content. Chegg's management, including the Individual Defendants, repeatedly noted how critically important Expert Q&A was to Chegg's financial performance and prospects, describing the Company's huge and growing archive of Expert Q&As as its "strong," "giant," "huge," "actually massive," and "incredible competitive moat."

37.    The Company's flagship "Expert Q&A" service allowed subscribers to submit "homework" questions to a pool of 70,000 to 100,000 experts worldwide and receive "almost immediate" answers. It also allowed users to access a searchable database of millions of previously submitted questions. Non-paying users could search it to see if their question had been asked, but only paying customers could access the answers. The Company charged subscribers $14.95 per month for access to Chegg Study which included textbook solutions, 20 Expert Q&A submissions per month, and unlimited access to archived Expert Q&A questions. For $19.95 per month, students could subscribe to the Chegg Study Pack that included everything offered by Chegg Study plus additional access to Chegg Math Solver, Chegg Writing, and Chegg Practice. Both subscriptions included a maximum of 20 expert answers per month, with the option for students to purchase additional answers to unique questions for a flat fee of $3 per question. Each quarter, the Company updated investors on the size of the Q&A database, which grew from approximately 30 million "step-by-step solutions" at the start of the Class Period, to 70 million by the end.

38.    Chegg built its massive searchable database of expert answers by engaging between 70,000 to 100,000 "Chegg Experts" worldwide. These experts, almost all freelance workers in

14

India, typically held advanced degrees in various subject matters and were available around the clock to quickly provide answers to questions uploaded by users.[3]   The questions could be submitted by users in text or, as Chegg encouraged, by simply uploading photos taken from cell phones.  Defendants touted that "Chegg Experts" would provide answers "instantaneous[ly]," in no more than two hours, and sometimes in as little as five minutes.

39.    During the Class Period, Defendants dubbed Expert Q&A the "Uber" and "Amazon Prime" of the education industry because when students would ask a question, if it was not already in the Company's massive archive, it would "get[] sent out to tutors that are available around the world, that are available now" and that "can answer that question" on an "almost immediate" basis. Defendants thus described Expert Q&A as "the real magic to our model" that distinguished Chegg from its competitors and constituted the primary way Chegg would attract new subscribers to the platform.  As Defendant Rosensweig told investors in May 2021 while touting the Expert Q&A database, "[t]he more expert-generated content we offer and the higher the quality, the better our growth, renewals and retention for students in the US and around the world."  Or, as Defendant Brown reiterated to investors in September 2021, "it's super-important for folks to understand that . . . how we acquire students, it's primarily through actually our Expert Q&A."

**B.    During The Class Period, Defendants Represented To Investors That Chegg's "Unprecedented Growth" During The COVID Pandemic Was Attributable To Accelerated Adoption Of Its Online "Learning Platform" And Other Legitimate Business Factors, And Emphasized That The Transition To Remote Learning Was "Completely Irrelevant" To Chegg's Long-Term Success**

40.    At the outset of the Class Period, COVID-19-related lockdowns forced colleges across the country into remote learning.  Defendants thereafter proclaimed that Chegg's "subscriptions have exploded," and described how subscriptions "accelerat[ed] dramatically" during the Class Period.  Indeed, Chegg subscriptions increased by 70% from 3.9 million in 2019

---

[3] According to the Company, throughout the Class Period, Chegg maintained three offices in the United States.  However, the heart of Chegg's operations was in India where it engaged, largely through its "Chegg India" affiliate, a pool of 70,000 to 100,000 individuals with advanced math, science, technology, and engineering degrees.  According to Chegg India, these "subject matter experts" or "SMEs" are engaged on a "freelance, contractual, or full-time basis to answer questions pertaining to their subject which are posted by students," and are paid "lucrative" compensation with "top performers earning "upwards of 80k [rupees] in a month." *See* www.cheggindia.com/earn-online/what-does-a-subject-matter-expert-do-roles-responsibilities/.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

to 6.6 million in 2020, and Chegg's content views grew from 810 million in 2019 to 1.3 billion in 2020—an increase of over 65%.  As a result, the database of Expert Q&As increased by more than 55% over the same period, from 30 million expert answered questions to approximately 47 million by the end of 2020.  Chegg's annual revenues soared by 60% due to the increased subscriptions, growing from $411 million in 2019 to over $640 million in 2020.  Chegg's annual earnings also surged, nearly doubling from $68 million in 2019 to approximately $128 million in 2020.  As news of Chegg's "dramatic growth" reached the market, the Company's stock price followed suit, increasing more than 32%, from a close of $43.79 on May 4, 2020, to close at $57.92 the following day.

41.    In response to this "unprecedented growth," investors became hyper-focused on the reasons for Chegg's sudden acquisition of millions of new online subscribers, and whether it was due to legitimate and sustainable reasons—*i.e.*, students genuinely seeking academic support in a wide variety of STEM-B (science, technology, engineering, and math, plus business) courses on which Chegg purports to focus—rather than students using Chegg to cheat, a phenomenon made easier by the widespread shift to remote learning during the pandemic.  As a former Columbia University student who extensively researched and reported on Chegg explained, "pre-pandemic, people would get a Chegg account to get answers to their homework, graded homework; not on tests, because that wasn't possible when you were taking tests in person."  Thus, throughout the Class Period, Defendants repeatedly assured investors that the Company's "explo[sive]" growth during the period of remote learning was attributable to students' legitimate use of Chegg's online educational services and the Company's other legitimate business strategies.

42.    Specifically, Defendants asserted during nearly two dozen earnings calls and investor conference calls in the 18-month Class Period that Chegg's "dramatic" and "record" growth during remote learning was due to legitimate and sustainable factors, and ***not*** to any increase in student cheating.   According to Defendants, Chegg was acquiring millions of new subscribers due to two principal factors:  (1) students in the United States and internationally were increasingly turning to Chegg's "leading direct-to-student learning platform" for critical academic support to "get help with their education" and "master their subject matter and get better grades," which was

unavailable at their colleges and universities due to, among other things, lack of funding or failure of planning and preparation by their institutions; and (2) Chegg was having greater success in "clamping down" on "account sharing," *i.e.*, limiting students' ability to casually share their Chegg passwords with each other without paying for additional subscriptions.

43.    Defendants repeatedly emphasized that because Chegg's sudden growth was due to legitimate uses, it had merely been "accelerated" by the shift to remote learning, rather than being dependent upon it—and that, as a result, the Company's sudden growth was sustainable and would continue even after COVID restrictions were lifted and students returned to on-campus, in-person education.    Indeed, Defendant Rosensweig strongly reassured investors, including in direct response to numerous analyst questions on the matter, that "COVID [was] just an acceleration" of the Company's "inevitable" growth due to the "overwhelming" value of its "on demand" online services; that students' return to campus would have no "meaningful impact" on the Company's growth; that the reason for Chegg's growth "was never [based on] whether you're physically on a campus or at home" but rather "an acknowledgement that what we do is what students need and schools cannot offer"; and that, in fact, students being on or off campus was "completely irrelevant to Chegg."    Defendant Rosensweig specifically assured investors that Chegg's growth during remote learning was not "temporary," but instead a "permanent situation."

44.    Defendants supported their statements by asserting that Chegg had been meticulously tracking how students were using the Company's online platform.    For example, during the Company's October 26, 2020, Q3 earnings call, Defendant Rosensweig proclaimed that, based on the real-time data Defendants were observing, the Company "now ha[d] proof" that students were purportedly "subscrib[ing] and us[ing] Chegg [in] very similar ways," regardless of whether they were on or off campus.    Indeed, Defendants were "comfortable" in concluding that the Company's "extraordinary growth" was largely due to "our efforts around [reducing] account sharing" and the increasing number of students using Chegg's educational services to help them "master their subject matter."

45.    Defendant Rosensweig similarly represented during the Company's May 3, 2021, earnings call that Defendants had "looked at all of the data," which showed that regardless of

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

whether students were on or off campus, students' "conversion levels, [] engagement levels, [] [and] renewal levels [were] almost identical." Rosensweig unequivocally proclaimed that, as a result, "as we come to an end of COVID, it's not going to affect us negatively at all." He also explained that Chegg was most certainly "not a COVID stock" that would be affected by "the behavior that happens post-COVID" because the Company's data confirmed that the drivers of the Company's "extraordinary growth" and "incredible profitability" were all legitimate factors that would continue post-pandemic:

> *[W]e are not a COVID stock*. If we were a COVID stock, we would have to question the behavior that happens post COVID. But because we are not a COVID stock, we don't have [to] question it. *We have the trends. We have the patterns. We are a very data-driven company. We track every single action, every single sale, every single renewal.*

46.    Even as late as September 3, 2021—just two months before Defendants would reveal the truth that Chegg's growth was, in fact, highly dependent upon remote learning—Defendant Rosensweig told investors that Chegg was "different" from other online companies that saw sharp growth during the pandemic because "what we do isn't dependent on where you are physically" but rather "on whether or not you need help with learning." Defendant Rosensweig proclaimed that, as a result, Chegg "did incredibly well through the pandemic, and we will continue to do extraordinarily well post-pandemic."

47.    Investors and analysts fully credited Defendants' explanations of the drivers for the Company's growth and that these drivers would be sustainable after COVID restrictions ended. Craig-Hallum reported that Chegg benefitted from several "ongoing catalysts," including "cracking down on students sharing passwords" and "impressive" "[i]nternational growth," and noted that Chegg's strong growth would continue "whether students are on campus or not." Similarly, Lake Street Capital Markets posited that the Company's "[g]rowth highlights included international expansion and efforts to limit account sharing and we believe both trends should sustain." Citi commented that "[t]o a large extent the traction in the US is independent of COVID and is in fact being driven by the crackdown on account sharing," leading it to conclude that "[t]his trend should persist independent of how the pandemic progresses." Because management had "found that students show similar usage and take rates regardless of whether they are on or off campus,"

analysts at Needham concluded that the "rapid rise in [Chegg's] subscriber base is likely to remain long after the pandemic has subsided." William Blair also found that it was "fair to assume that more of the acceleration in 2020 has been driven by Chegg's underlying growth levers (international expansion, bundle rollout, limiting account sharing) rather than any one-time benefits from the pandemic."

48.    Given its surging userbase, Chegg consistently reported strong top- and bottom-line financial results during the Class Period. Total revenues grew nearly 50%, from almost $132 million in Q1 2020, when the COVID pandemic began its sweep across America, to $198 million in Q2 2021, the last full quarter before restrictions were eased and students widely returned to classrooms. The impact to profits was even greater. Chegg's earnings nearly tripled during the period of remote learning, climbing from almost $32 million in Q1 2020 to over $84 million in Q2 2021. Indeed, throughout the Class Period, Chegg reported remarkable year-over-year growth ("YoY")[4] in both revenues and earnings, as provided below.

| Period | Total Revenue | YoY Revenue Change | YoY Revenue Change in % | Adjusted EBITDA | YoY Adj. EBITDA Change | YoY Adj. EBITDA Change in % |
|---|---|---|---|---|---|---|
| **Q1 2020** | $131.6 | $34.2 | 35.1% | $31.8 | $7.9 | 33.0% |
| **Q2 2020** | $153.0 | $59.1 | 63.0% | $55.5 | $24.4 | 78.6% |
| **Q3 2020** | $154.0 | $59.9 | 63.6% | $31.9 | $8.9 | 38.5% |
| **Q4 2020** | $205.7 | $80.2 | 63.9% | $87.9 | $40.9 | 87.0% |
| **FY 2020** | **$644.3** | **$233.4** | **56.8%** | **$207.1** | **$82.0** | **65.6%** |
| **Q1 2021** | $198.4 | $66.8 | 50.8% | $57.1 | **$25.4** | 79.7% |
| **Q2 2021** | $198.5 | $45.5 | 29.7% | $84.4 | **$28.9** | 52.1% |

All dollar figures in millions, rounded to the nearest million.

---

[4] Throughout the Class Period, Chegg and the Individual Defendants repeatedly highlighted year-over-year growth metrics as critical in evaluating the Company's financial performance due to the "seasonality" in Chegg's business. For example, at the start of the Class Period, Defendant Brown responded to an analyst question during the Q1 2020 earnings call about how investors should analyze margin growth, stating that "it's the seasonality, right?" He noted that results would be lower in "Q1 and in Q3" and higher "in Q2 and Q4" "because you got a bigger percentage of overall services revenue associated with those quarters."

49.     Chegg's explosive growth during remote learning enabled Defendants to raise the Company's financial forecasts repeatedly, further stoking investor demand.  In August 2020, following the widespread implementation of distance learning, Defendants promptly raised the Company's 2020 full year revenue guidance by 14% and full-year earnings guidance by nearly 20%.  In October 2020, with the year-end approaching, Chegg again raised 2020 full-year revenue guidance by 3% and full-year earnings guidance by nearly 5%.  In 2021, Defendants raised Chegg's 2021 full-year revenue guidance and earnings guidance three times.

50.     In response to Defendants' numerous representations regarding the purportedly legitimate drivers of Chegg's explosive subscriber growth, the Company's stock price skyrocketed, from $43.79 per share immediately prior to the Class Period to a Class Period-high of $113.51 per share on February 12, 2021—a staggering increase of over 150% in under one year.

51.     Significantly, and as set forth further below, Company insiders wasted no time capitalizing on Chegg's inflated stock price, pocketing nearly $100 million in suspiciously timed insider sales at or near historic highs—with Defendants Rosensweig and Schultz alone reaping over $74 million in ill-gotten insider trading proceeds.

### C.     Defendants Repeatedly Deny That Chegg's Remarkable Growth During The Pandemic Was Due To Student Cheating, Claiming That The "Overwhelming Majority" Of Its Customers Do Not Use Chegg To Cheat

52.     Chegg's steep growth trajectory during remote learning prompted concerns that Chegg's success might predicated, in part, on students using Chegg to cheat.  In response, Defendants not only repeatedly assured investors that Chegg's "record" subscriber growth and "fantastic" financial performance during the Class Period was attributable to the Company's own legitimate business strategies, but also vehemently denied that the growth had anything to do with student cheating or other violations of academic integrity.  Defendants stressed that they had not observed *any* increase in cheating as a result of the COVID pandemic and distance learning.

53.     For example, on January 28, 2021, *Forbes* published an article about Chegg titled, "This $12 Billion Company is Getting Rich Off Students Cheating Their Way Through Covid." According to the article, *Forbes* interviewed 52 students who used Chegg Study, including undergraduate and graduate students from some of the most prestigious universities in the nation.

Of those interviewed, all but four admitted they used the site to cheat (aside from the half-dozen students specifically referred to *Forbes* by Chegg).

54.    A week later, on February 4, 2021, a study in the *International Journal for Educational Integrity* ("IJEI") concluded, after observing an excess of "exam style questions" that had been submitted to Chegg's Expert Q&A service, that it "appear[ed] highly likely that students are using this site as an easy way to breach academic integrity by obtaining outside help."  The article noted that while Chegg was not promoting itself "as a service designed to help students [] cheat," it suspected Chegg was offering a service "where you can get your answers completed quickly by a tutor, and the answers are delivered within the short time frame which matches an exam."

55.    Then, in April and May 2020, media outlets reported on a burgeoning number of cheating scandals involving online learning services, including Chegg.  The coverage included major news outlets such as *The Boston Globe* and *The Atlanta Journal Constitution*, as well as university publications such as *The Daily Princetonian*.

56.    Chegg quickly responded to these reports, and vehemently denied that Chegg was being used by students to cheat in any meaningful way.  The Company emphasized that it was fully committed to halting the use of its platform to cheat, and was in fact undertaking extensive efforts in that respect.  Indeed, in the same *Forbes* article accusing Chegg of "getting rich off students cheating their way through COVID," Chegg's President, Defendant Schultz, was quoted as saying that while Chegg was "not naïve" that cheating had increased during remote learning, the Company "***remain[ed] 100% committed to addressing it and are investing considerable resources to do so***."  In his written statement to *Forbes*, Defendant Schultz further claimed that Chegg was actively cooperating with universities and professors to stop cheating, stating that "***[w]e cannot do it alone and are working with faculty and institutions and will continue to do more, including educating students.***"

57.    Chegg went even further in response to the IJEI study, issuing another strongly worded written statement that was published the very next day.  In it, the Company's Director of Academic Relations, Candace Sue ("Sue"), declared that the authors of the IJEI study had

"*mistakenly impl[ied] – without any evidence – that increased usage of Chegg has correlate[d] to an increase in cheating*."  Instead, Sue attributed Chegg's dramatic growth in subscribers during remote learning to students' legitimate need for Chegg to "*provide[] much needed learning support*" due to the loss of "*valuable on-campus and faculty support services*" as a result of the pandemic. In her written statement, which was published by the influential industry newsletter *Insider Higher Ed*,[5] Sue reiterated that "*[w]e take extremely seriously any attempts to cheat by those who abuse our offerings, and we invest heavily to prevent misuse of our learning platform*." Chegg cast further doubt on the IJEI study during the Company's earnings call on February 8, 2021, when CEO Defendant Rosensweig dismissed the study as biased, stating that it was "*written by somebody who works for one of our competitors*."  During the same earnings call, Rosensweig described the results of a different "*blind study of students who used Chegg for more than two months*" and "*found that 90% reported that Chegg Study 'helps them better understand their schoolwork.'*"

58.    Following articles in April and May 2020 from *The Boston Globe*, *The Atlanta Journal Constitution*, and *The Daily Princetonian* regarding cheating scandals involving Chegg at Boston University, Georgia Tech, North Carolina State University, and Princeton, on June 12, 2020, Defendant Rosensweig gave an interview to *The New York Times* in which he dismissed the notion Chegg in any way contributed to cheating stating, "*It's always been a problem for colleges, Let's face it: Students have always found a way to cheat*," and unequivocally stated: "*Chegg is not built for [cheating].*"  Similarly, in an August 7, 2020 *Washington Post* article about the rise of online cheating, a Company spokesperson stated that it supported academic integrity and hadn't seen "*any relative increase in Honor Code issues since the COVID-19 crises began*."  A Chegg spokesperson even responded to an article in *Teen Vogue* discussing a cheating scandal at North Carolina State University, dismissing the report as anecdotal because "*the vast majority of Chegg users are honest and use our platform to supplement their learning*."

---

[5] *Inside Higher Ed* provides news and analysis for the higher education community, and claims to have the "largest online audience in higher ed" with 2.3 million monthly readers.

59.     In addition to Defendants' repeated, staunch public denials that Chegg's remarkable growth during remote learning was in any way due to student cheating, Chegg attempted to silence any concerns that its success was due to anything other than legitimate and sustainable purposes by rolling out new initiatives that were purportedly designed to eliminate any possibility of cheating. For example, on January 13, 2021, Chegg announced in a press release that it was launching "Honor Shield," a new initiative that would empower professors to prevent any cheating via Chegg. (Honor Shield allowed professors to pre-submit exam questions; Chegg asserted it would then use advanced software to block those questions from being answered by Chegg Experts during exam periods.)  In announcing Honor Shield, Defendant Schultz nonetheless went out of his way to minimize the recent cheating allegations, stressing that only "*a small number of students*" had "*misused our platform in ways it wasn't designed for*" as a result of the pandemic:

> *The overwhelming majority of students use our platform to get the support they need to learn and master their subjects.* The sudden impact of the Covid-19 pandemic forced many schools to go online, almost overnight, creating understandable confusion, stress, and the loss of many on-campus support services. *As a result, a small number of students have misused our platform in ways it wasn't designed for,* which we believe is not in the spirit of the majority of hard-working students.

60.     In addition to the Honor Shield program, Defendants told investors that Chegg had implemented a variety of other safeguards to eliminate cheating on its website.  For example, during the Company's February 8, 2021 earnings call, Defendant Rosensweig described how "if we ever got contacted by schools" regarding cheating, Company policy was to take the question down immediately, investigate the matter, and then "actually build technology that blocks people" from asking "specific questions" that educators do not want to appear on Chegg, and students from "submit[ting] a test all at once."  During the same earnings call, Rosensweig went so far as to tell investors that, given Chegg's sophisticated processes to prevent cheating—including "AI and Machine Learning"—it was colleges and universities that were to blame for any cheating occurring on Chegg's platform because, unlike Chegg, "*they were woefully underinvested in technology*," "*didn't prepare to teach online,*" and students had "*no scalable support from their institutions*."

61.     Through the end of the Class Period, Defendants unequivocally reaffirmed that Chegg's dramatic subscriber growth was not because of the popularity of the platform's cheating abilities, and continued to emphasize Chegg's sophisticated processes to eliminate any cheating. For example, during a June 17, 2021 investor conference, an analyst asked Defendant Brown about how Chegg was "curbing cheating on the platform."  Brown responded by reasserting that it was only "***a very small group of folks that would potentially want to cheat on the platform***." Nonetheless, Brown emphasized that Chegg had implemented a variety of anti-cheating measures such as Honor Shield: "***just one more way of many ways that we . . . discourage and really [do] not allow cheating for those students who decide they want to do that***."  Similarly, in his August 7, 2022 interview in *The New York Times*, Defendant Rosensweig explained that Honor Shield and the Company's other sophisticated technology would curb any cheating: "***We have built technology that removes copyrighted material before it even gets posted.  If we're notified by a professor or a school that there's copyrighted material, it immediately gets flagged and then removed***."

62.     Just as analysts had fully credited Defendants' statements attributing the Company's dramatic subscriber growth to legitimate factors, they again credited Chegg's vehement denials of rampant cheating on Chegg's platform.  For example, on January 14, 2021, Northland Capital Markets noted that "the vast majority of students use [Chegg] to assist with difficult learning concepts," while only "some" were "mis[using] the platform for help during quizzes/exams."  A February 9, 2021 William Blair report stated that Chegg was being "more proactive" to "limit the way students can use Chegg to cheat on exams" through the launching of Honor Shield and implementation of artificial intelligence programs.  A June 2, 2021 Morgan Stanley report observed that Chegg's "[t]ighter relationship with educators," as evidenced by its launching of the Honor Shield, "assuages bear concerns around cheating."  Additionally, a September 23, 2021 William Blair report recounting a "Fireside Chat" with Defendant Rosensweig highlighted Rosensweig's comments that "Chegg does more than its part to prevent dishonest conduct and promote academic integrity," and also quoted Rosensweig as significantly downplaying cheating on the platform by claiming that schools' low use of the Company's "Honor Shield" indicated that professors were "not [] as concerned with students using Chegg to cheat as most may think."

63.     Defendants' representations were utterly false.  Chegg's explosive subscriber growth and financial performance were **not** due to the legitimate factors that Defendants repeatedly represented to investors.  Contrary to Defendants' repeated public statements and vehement denials, it was in fact students' use of Chegg's platform for rampant cheating during the pandemic which fueled the Company's Class Period Success.  Lead Counsel's investigation (detailed below) has confirmed that Chegg's subscribers were, in fact, widely using the platform to cheat, and that the Company failed to implement effective procedures to stop rampant cheating on its platform during remote learning.  As a result, when COVID restrictions lifted and students returned to in-person learning, Chegg's "record" growth abruptly reversed, shocking investors and devastating the Company's stock price.

**D.     In Truth, Defendants Knew Throughout The Class Period That Chegg's Growth During The Pandemic Was Predicated Upon Widespread Student Cheating And Was Not Sustainable**

64.     Lead Counsel's comprehensive investigation has confirmed that despite Chegg's repeated denials and vehement assertions that only an "extremely small portion" of its platform was being used by students to cheat, cheating was in fact widespread on Chegg's online platform and was what attracted students in record numbers during the Class Period.  This investigation reveals myriad facts diametrically opposed to Defendants' repeated public statements that Chegg's "dramatic" subscriber growth during the Class Period was attributable to legitimate uses of Chegg's platform as an educational tool and had nothing to do with cheating.  It also reveals that the legitimate business initiatives to increase paying subscribers by limiting their ability to share accounts was little more than a smokescreen touted by Defendants to mask the true source of the Company's growth.  Lead Counsel's investigation further confirms that demand for Chegg plummeted after students returned to in-person learning, which made it much more difficult for them to use Chegg to cheat—particularly given academia's heightened awareness and scathing criticism of Chegg as "*a very professional cheating operation*."

65.     Lead Counsel's investigation is based on the following: (i) responses to FOIA Requests from multiple prominent universities, which included Chegg's own internal documents and spreadsheets, showing that Defendants were repeatedly notified of students' widespread use of

Chegg for cheating in the midst of taking remote exams; (ii) interviews of professors, deans, and officials at prominent universities across the country who similarly described their firsthand accounts of widespread student cheating using Chegg, and their conclusions that (a) the main purpose their students used Chegg was to cheat (as they were in fact unaware of any legitimate reason their students used Chegg), (b) that Chegg was informed of the rampant cheating at their institutions and, (c) rather than implementing effective procedures to curb cheating, Chegg placed obstacles in the way of school investigations and persistently refused to identify cheaters by name; (iii) accounts from former Chegg employees with direct knowledge of Chegg's business during the Class Period who confirmed that it was well known internally that the Company's "record" subscriber growth was primarily due to cheating and not the legitimate reasons Defendants cited; and (iv) Lead Counsel's own empirical analysis of thousands of questions submitted to Chegg's Expert Q&A during the Class Period, which similarly confirmed that students blatantly used Chegg to cheat, including by submitting final exam questions ***while in the midst of taking those very exams*** for Chegg Experts to answer.

        **1.      Documents Provided In Response To FOIA Requests By Universities Across The Country Confirm That Student Cheating On Chegg's Platform Was Rampant, Chegg Was Repeatedly Informed About It, And Chegg Failed To Implement Effective Procedures To Stop It**

      66.     Lead Counsel have reviewed more than 1,500 pages of documents produced by four separate public universities and the Air Force Academy in response to FOIA Requests and other public records laws. Those documents uniformly paint a picture of university professors, deans, and officials across the country—including at several of the nation's most respected institutions of higher learning and service academies—discovering rampant student cheating using Chegg on remote learning exams, tests, and homework assignments. Significantly, despite these universities' exhaustive reporting to Chegg that its platform was being used by their students to cheat on an unprecedented scale and repeated pleas to the Company for help, Chegg refused to implement even the most basic safeguards suggested by schools. Instead, Chegg erected pointless and time-consuming obstacles to delay or discourage academic integrity investigations involving its online

platform, and to protect students' ability to cheat that rendered the Company's touted "Honor Code" meaningless and put the onus on professors to make exams "***Chegg-proof***."

67.     **UCLA.**   UCLA, the nation's highest-ranked public university by U.S. News & World Report, produced 445 pages of documents in response to a FOIA Request regarding Chegg, including internal faculty emails detailing rampant cheating during the Class Period.  These same faculty further made clear that when Chegg was informed of the extensive cheating, Chegg erected numerous "hurdle[s] for faculty" who diligently tried to work with the Company to address the serious issues.  Indeed, notwithstanding Chegg's repeated assurances that it was committed to academic integrity, Chegg refused to remove exam questions and answers from its website unless the university complied with formal procedures set forth in the Company's "Honor Code," which dictated everything from who at the university the request needed to come from down to the letterhead of the request—requirements that, notably, served no purpose other than to deter, delay, and complicate investigations into students using its platform to cheat.  Worse yet, even after UCLA complied with all of Chegg's guidelines, Chegg staunchly refused to reveal the names of the university students who blatantly used its Expert Q&A service to cheat.

68.     Internal faculty emails produced by UCLA described use of Chegg to cheat as a "***severe issue,***" and that the university was experiencing "***raining cases***" of academic integrity violations attributable to Chegg.  For example, in a June 4, 2020 email, UCLA's Dean of Students Maria Blandizzi detailed to its Associate Dean of Students & Director, Office of Student Conduct, Jasmine J. Rush, the significant increase in academic misconduct cases immediately after UCLA went to remote learning as a result of students' use of Chegg. Dean Blandizzi compared how between "March-May in 2019 and 2020 [UCLA] experienced a ***44% increase*** in academic misconduct reports" and explained that over 250 academic misconduct cases were reported at the university in only a ***10-week*** period between March to May 2020, compared to 287 such cases over a ***35-week*** period in 2018-2019—in other words, as Dean Blandizzi put it in her email, "***its raining cases***."  Significantly, Dean Blandizzi tied the cheating directly to Chegg, stating that "Chegg.com allows user[s] to pose questions of an academic nature for response on its website," however, students were "posting actual questions of current homework assignments and exams" on Chegg.

69.    The UCLA documents further show that students were not just using Chegg to cheat on isolated questions, but entire exams.  For example, in a May 18, 2020, email to Associate Dean Rush and other faculty, UCLA Assistant Professor, Dr. Sylvester Eriksson-Bique, wrote, "***my midterms have been compromised severely by Chegg.com.  Nearly all questions have been posted, sometimes many times.***"  He noted that this "almost renders all of my assessments meaningless," adding that "***the assessment[s] that are tainted so far are almost 80% of my course grade.***"

70.    Significantly, though UCLA directly informed Chegg of rampant cheating among its students using Chegg, the Company took steps to make it ***more*** difficult to deter cheating, rather than less.  For example, in May 2020, professors in the Department of Chemistry & Biochemistry discovered "several cases of potential academic misconduct related to exams being uploaded to Chegg.com"—including for midterm and final exams across several different courses (namely, CHEM 110B, CHEM 153A, and CHEM 172).  A professor in the department then contacted Chegg, informed the Company of the cheating, and specifically requested that the exam questions and answers be removed from the Chegg website.  Remarkably, Chegg refused to remove the exam questions and answers from the Company's website.  In so doing, Chegg told the requesting professor that, in accordance with the Company's "Honor Code," the takedown request had to come "directly from the office of the dean or the body in charge of handling matters of academic investigation at the university," had to be "made on university letterhead," and had to be "dated, signed and include URLs" to the exam questions and answers.  In internal emails, Associate Dean Rush characterized Chegg's requirement that the request come from the Dean of Students Office "***concerning,***" as it unnecessarily "***create[d] a hurdle for faculty***" on a time-sensitive issue.

71.    Even when UCLA complied with Chegg's Honor Code requirements, Chegg would go out of its way to protect the identity of students who were using its platform to cheat. Specifically, Chegg refused to provide schools with the names or addresses students used to open their accounts, and even though Chegg occasionally provided the students' email addresses, this was essentially useless in conducting Honor Code investigations because Chegg did not require students to use their school email addresses—meaning Chegg freely allowed students to provide non-school emails that did not include their first name, last name, initials, or any other information

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

that could be used to identify them.  Thus, in an April 30, 2020 email from UCLA's Office of Student Conduct to Chegg's official Honor Code email address, UCLA reported numerous questions that had been posted to Chegg's website from a midterm exam administered in a Life Sciences 7A course taught by UCLA Assistant Teaching Professor Dr. Jeffrey Maloy and, although UCLA complied with Chegg's tedious Honor Code guidelines, the Company did not provide UCLA with names or ***any*** other information that would have allowed the university to determine the identities of the students involved.

72.     Associate Dean Rush sent Chegg ***more than ten letters*** in May 2020 reporting students' use of Chegg to cheat and specifically requested Chegg provide information regarding who posted the problems, when they were posted, and when Chegg provided the solutions.  Only after Associate Dean Rush's repeated and extensive efforts did Chegg finally provide Excel spreadsheets that included usernames, email addresses, and dates and times the questions were asked and answered.  Notably, however, the student email addresses provided to educators were meaningless because Chegg allowed students to use third-party email addresses (such as Gmail) when signing up for its services that did not reveal any personally identifying information.  Chegg did so because it understood full well that to require students to use their student emails would allow universities to identify them, and that such a policy would obviously greatly reduce (if not eliminate entirely) the ability of students to cheat undetected.  As Associate Dean Rush lamented when her requests were stonewalled, "the unfortunate news [is] that email addresses are included rather than names," significantly hampering the university's investigations.

73.     Throughout the Class Period, UCLA faculty continued to raise concerns to Chegg about students using its platform to engage in widespread cheating, including for final exams.  Yet, Chegg continued to put up hurdles to the university's efforts to stop the cheating.  For instance, on June 11, 2020, Dr. Mi-Hyun Park, a professor in UCLA's Department of Civil and Environmental Engineering, emailed Chegg via its dedicated Honor Code e-mail address regarding reports of cheating on a final exam for a Probability and Statistics course.  Professor Park told Chegg in her email that "***all of the final exam problems (and solutions by the 3rd party?) were posted to your website***," and asked Chegg to provide information regarding who posted the problems, when they

were posted, and when the "solutions" were provided. In response, Chegg **admitted** that the questions and answers were posted on its website and provided specific times the questions and answers were posted. A frustrated Professor Park wrote an internal email decrying that the "**problems were posted right after the exam began**." Regardless, Chegg **still did not** provide the names of the students who posted the questions or viewed the questions or answers. Instead, Chegg informed her it would not provide any names because Professor Park had failed to follow Chegg's Honor Code procedures dutifully, noting that her request had not come directly from the Dean and was not on official university letterhead.

74. Chegg's excuse was complete nonsense. Dr. Park later complied with Chegg's onerous Honor Code requirements, but Chegg **still** did not provide student names. Dr. Park forwarded Chegg's response to Associate Dean Rush and noted that "Chegg asked the Dean to request an honor code investigation." She copied a link to Chegg's Honor Code, which, she stated, "shows that they will fully cooperate in the investigation." In response, Associate Dean Rush informed Dr. Park that she had submitted a request to Chegg for information on the students involved in the cheating but that, in her experience, they "provide email addresses, **but not names**." Chegg's refusal to identify these suspected cheaters had ramifications for Dr. Park's whole class. Indeed, "without enough evidence" to identify the "specific students" who cheated using Chegg, Dr. Park did not record the final exam grade for the "**entire class**."

75. **Georgia Tech.** Chegg also facilitated widespread cheating on exams during remote learning by students at Georgia Tech, which U.S. News & World Report ranks as one of the nation's top public universities. The more than 800 pages of documents produced by Georgia Tech in response to a FOIA Request regarding Chegg show "widespread use of Chegg" to cheat by the university's students during the Class Period. Indeed, student use of Chegg to cheat was so pervasive at Georgia Tech that the school's leadership actually discussed internally how to make the upcoming school year "Chegg-proof."

76. Emails between Georgia Tech faculty show numerous distinguished and prominent professors at one of the nation's most respected engineering schools repeatedly complaining about massive cheating facilitated by Chegg. For instance, Dr. Jonathan S. Colton, a professor in the

Mechanical Engineering School, which has nearly 3,000 students enrolled, stated in a May 4, 2020, e-mail to the university's Vice President of Student Life and Dean of Students Chair, John M. Stein, that "***the questions to my [] ME 3210 take home exam were on Chegg. How do I find out who cheated?***"  Similarly, in a May 7, 2020 email among faculty in the School of Mechanical Engineering, Professor Colton noted that "a quick poll in [Mechanical Engineering] showed ***widespread use of Chegg this semester***."  Incredibly, Chegg required professors to purchase a Chegg subscription to investigate cheating in their classes and refused to respond to "informal" inquiries from professors; yet another unnecessary hurdle the Company imposed on universities attempting to curb cheating using Chegg.  Professor Colton thus inquired about the school obtaining an account for the faculty "***so that [they] can monitor cheating in [their] classes***" and "***determine the magnitude of the problem***."

77.    Similarly, numerous emails between Georgia Tech faculty discuss the discovery of hundreds of Georgia Tech students in the physics department using Chegg to cheat on the first exams taken during remote learning.  For example:

- An April 27, 2020, email from physics professor Dr. Jennifer E. Curtis described "***rampant cheating***" by Georgia Tech students.  Professor Curtis found ***four out of five*** of the problems on her April 2020 final exam on Chegg's website.  After this troubling discovery, Professor Curtis contacted Chegg and requested information regarding who accessed the questions and answers during the 24-hour exam period.  When Professor Curtis informed her colleagues that she had requested this information but had not received a response from Chegg, the overwhelming sentiment expressed by her colleagues was that Chegg would not provide the information or take action to curb the abuses.  As one fellow faculty member expressed, ***"[I]'m not optimistic about timely action on [Chegg's] part"*** and the only solution would have to be a return to in-person, proctored exams.

- An April 29, 2020, email from Georgia Tech physics professor Martin M. Jarrio to Georgia Tech's Office of Student Integrity reported an extensive "problem with students posting copies of the exam question--***during the exam itself--to Chegg***."  Professor Jarrio later emailed the same Office of Student Integrity, writing: "***[A]ll of my test questions had been posted"*** and that, "***just about everything [one student] submitted for the exam was drawn from the Chegg web site***."

- An April 30, 2020, email from Georgia Tech Professor of Physics, Dr. Michael Schatz to Georgia Tech's Assistant Vice Provost for Advocacy and

1
2
3
4

Conflict Resolution, Dr. Kyla Turpin Ross, explained: "[T]here are ***multiple instances [of cheating] spread across multiple sections of both PHYS2211 and PHYS2212***" and, while "the numbers [were] still rolling in," roughly "***125 students out of 900 in selected sections***" had already ***self-reported*** accessing Chegg during their physics final exam. "[I]n many cases," Professor Schatz exclaimed, "questions and solutions directly from the ***ongoing exam*** were showing up on [C]hegg."

5
6
7

78.    Use of Chegg to cheat was also widespread in Georgia Tech's College of Computing, as evidenced by numerous emails between Georgia Tech faculty.  For example:

8
9
10
11
12
13

- Brian Hrolenok, an instructor in the School of Interactive Computing, reported to the university's Assistant Director of Student Integrity in an April 6, 2020 email that the ***entirety of an online quiz*** in his CS 4641 class was posted to Chegg.  Professor Hrolenok noted that while this was a clear violation of the university's honor code, he did not fill out an incident report since he did not have any information on who posted the quiz and did not want to pay Chegg to find out more.  He also provided a link to Chegg's Honor Code policy and lamented that Chegg required "***a signed letter on letterhead before they'll do anything.***"[6]

14
15
16
17

- In a May 1, 2020 email to the Office of Student Integrity, Professor Monica Sweat described how one student in her Computer Science 2050 class ***posted about half*** of the questions from an April 2020 online exam to Chegg and ***received answers to all of the questions*** from Chegg Experts.  Professor Sweat emphasized that this exposed all of the exam questions and answers to other students searching the internet and undermined the integrity of the exam for roughly 500 students.

18
19
20
21
22
23
24

- A May 5, 2020 e-mail from Cedric Stallworth, Assistant Dean of the College of Computing at Georgia Tech, to the university's Assistant Director of Student Integrity, Andrew K. Lawrence, explained that during the Computing for Engineers Spring 2020 online final exam, students were given a 24-hour window to take their final exam and, once started, each student had 2 hours and 50 minutes to complete the exam.  After teaching assistants grading the exams noted similarities in the coding responses for many students, Assistant Dean Stallworth investigated and determined that at least ***44 of the 350*** students who took the exam had copied answers posted on Chegg—over ***12%*** of the class.

25
26
27
28

---

[6] Professor Garrett Schieber of Georgia Tech's School of Mechanical Engineering faced similar obstacles when attempting to investigate cheating in one of his classes.  In response to Professor Schieber's request that Chegg identify the students who posted his exam questions on Chegg during a take home final exam, Chegg told him the request needed to come directly from the office of the dean or the body in charge of handling matters of academic investigation at the university.  Further, according to Chegg, the written request needed to be "made on university letterhead and indicate that the information is needed as part of an official school investigation into academic integrity."

- College of Computing Professor Olufisayo A. Omojokun noted in a May 6, 2020 email to the university's Assistant Director that cheating increased dramatically when the university ceased digital proctoring. He began the email stating, "***I'm sure you received lots of emails from instructors about honor code violations over the past couple of weeks. Here's another one!***" He went on to explain that "[f]or my spring course, we had been using a digital proctoring tool for the first two tests and things were quite good," however, "[a]fter the COVID switch, the Provost sent an announcement that no one is allowed to use digital proctoring, so I turned it off for my third exam and final." Professor Omojokun then detailed the troubling results: "***It turns out that my test questions were posted on Chegg.com and answers were provided on the site during the testing periods***."

79. Georgia Tech repeatedly reported to Chegg that students were using its platform to cheat, yet Chegg failed to mitigate or prevent the cheating from continuing to occur, and worse yet, imposed a number of hurdles to hinder any investigation of the misconduct. Specifically, Dr. Marguerite Matherne, an instructor in Georgia Tech's School of Mechanical Engineering, sent an email to the Chegg Honor Code email address on June 3, 2020, to report cheating in her ME 3340 class. The email explained she had discovered "***all three of [her] exam problems posted on Chegg Study***" and caught one student cheating because "***his answer was a carbon copy of the Chegg solution***." She also: (1) provided Chegg links to the problems posted on Chegg's website; (2) attached her exam showing that the problems posted to Chegg were directly copied and pasted from her exam; and (3) requested access to the solutions posted on Chegg. While Chegg ***admitted*** the questions were posted on its website and provided a spreadsheet with dates and times the questions were accessed, the Company refused to provide student names or other identifying information, telling Dr. Matherne that the request would have to come directly from the office of the Dean, had to be made on official university letterhead, "indicate that the information is needed as part of an official school investigation into academic integrity," and be signed and dated. Even then, Chegg still would not provide the university with names of the students/Chegg subscribers at issue.

80. Similarly, on April 6, 2020, Georgia Tech Associate Professor of Mechanical Engineering Dr. Marta Hatzell reported to Chegg that "***[i]t was recently brought to my attention that my exam problems were posted on Chegg. This is in violation of the academic code as students were not supposed to use outside help***." Like Professor Matherne, Associate Professor

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

Hatzell provided links to the questions on Chegg's platform that were posted from her take home exam and requested Chegg's assistance in investigating the misconduct. Once again, Chegg **admitted** that the exam questions were posted on its website but refused to provide information necessary for Dr. Hatzell to investigate without an official request from the office of the dean or body in charge of handling academic investigations at the university.

81.    Chegg's refusal to meaningfully assist professors adversely impacted thousands of students. Dr. Antonia Antoniou, an Associate Professor in the School of Mechanical Engineering, for example, assigned final grades for her ME4214 course without taking the final exam into account. Dr. Antoniou was forced to forgo any reliance on her final exam "***because solutions of the exam were posted on Chegg during the 26 hour window where the exam was available***."

82.    Remarkably, "Chegging" was so prevalent at Georgia Tech that some of the university's most senior officials internally discussed how to make the next school year "***Chegg-proof***." In an email to the Vice President of Student Life and Brandt-Fritz Dean of Students Chair, John M. Stein, the Dean of the College of Sciences asked, "looking beyond this particular case, what guidance can be provided to faculty regarding exams for summer. . . . Synchronous exams are still not cheat-proof, but what else can we do to equip faculty to set assignments that are ***Chegg-proof***?" In response, Mr. Stein stated that "we need to talk more about how to proceed this summer and beyond ***with testing***," and noted multiple examples of students accessing Chegg's website "***with the sole purpose of cheating***."

83.    **University of Nebraska**. The University of Nebraska produced fifty-five pages of documents in response to a FOIA Request including internal faculty emails and other documents describing the use of Chegg to cheat. The documents from this major national research university repeated a familiar refrain: that use of Chegg to cheat was rampant on its campus; that Chegg knew students were routinely using its platform to cheat; and that Chegg refused to turn over the names of students using the Chegg platform to cheat.

84.    In internal emails, University of Nebraska faculty discussed the extensive use of Chegg by students to cheat on remote exams. For example, as Allan Donsig, Professor and Vice Chair of the Department of Mathematics, described in an April 9, 2020 email: "We've had a number

of students cheating on take-home tests, i.e., ***posting the entire test to Cheng [sic] and submitting answers completely copied from the solutions provided by Chegg. The current circumstances are exceptional. . . .***"

85. As with the other universities discussed above, during the Class Period the University of Nebraska's Office of Student Conduct sent Chegg numerous letters and emails regarding the increasing use of Chegg to cheat and requested Chegg's assistance with the university's investigations, yet Chegg did nothing to deter students from using its platform to cheat or meaningfully assist the university in investigating the academic misconduct. Indeed, between April 24 and May 12, 2020, the Office of Student Conduct sent Chegg at least ***five letters*** regarding students cheating using Chegg's website, specifically identifying exam questions that had been posted on Chegg.com and answered by Chegg's experts. The letters were sent on April 24, April 25, May 1, May 2, and May 12, 2020, via Chegg's dedicated Honor Code e-mail address. Chegg once again provided wholly deficient responses; ***admitting*** the content was posted on its website and reiterating that it "takes academic integrity very seriously" yet only provided spreadsheets of the content that had been posted and ***refused to provide names of the students who posted the questions and/or viewed the answers***.

86. **California State University, Fullerton**. California State University at Fullerton ("Cal State Fullerton"), which enrolls nearly 40,000 students, produced numerous documents in response to a FOIA Request regarding Chegg. The documents produced by Cal State Fullerton similarly confirm that its students' utilization of Chegg to cheat exponentially escalated during remote learning. As with UCLA, Georgia Tech, and the University of Nebraska, Chegg knew about the rampant student cheating at Cal State Fullerton but again erected obstacles for faculty seeking to investigate and curb the cheating, rather than working with them to address the cheating.

87. For example, on May 5, 2020, Christopher Lyons, Associate Professor of Mathematics at Cal State Fullerton, emailed Matt Waid, a Student Conduct Investigator at the university, regarding an exam for his course that was posted on Chegg "during the test." Specifically, Associate Professor Lyons noted that "***one of my students posted my exam on Chegg to 'ask an expert' during the exam window, and I'm guessing that several students (who weren't***

*so good at covering their tracks) accessed this during the test, even though this was explicitly forbidden in the directions*."  Associate Professor Lyons described Chegg's onerous procedures for obtaining information about suspected cheaters to Mr. Waid: "Chegg's policy regarding investigations, and the request for information needs to come from a Dean or from an official academic investigation that's already underway . . . . ***Worse yet, when you read the fine print under the student section, it says they might actually terminate the student's account and remove the offending material. . . thus covering up the evidence!***"  Associate Professor Lyons commented: "***It really is a very professional cheating operation they run***."

88.    Even when Cal State Fullerton personnel did comply with Chegg's onerous Honor Code procedures, Chegg refused to identify the student cheaters involved, citing purported concern for the cheaters' "privacy."   Mr. Waid sent Chegg multiple letters between June 11 and June 13, 2020, in compliance with Chegg's Honor Code, requesting Chegg provide "available information about these links and associated user accounts, including, but not limited to, date & time uploaded, email and name of the uploading party, content of the Expert Answers, and emails and names of others who accessed the Expert Answers and when."  Mr. Waid sent Chegg another request on June 18, 2020, for viewer details for 42 questions, noting that "[a]t this stage in the investigation, it seems there are several additional individuals involved who accessed the respective answers during this time frame."

89.    Once again, Chegg provided an excel spreadsheet including the dates and times users accessed the referenced questions but did ***not*** provide Mr. Waid with any substantive response to his request for identifying information of the students who had viewed the posted questions.  In response to yet another request by Mr. Waid on June 30, 2020, Chegg responded: "[f]or privacy reasons, we may not investigate user id or email addresses."  Instead, Chegg would only provide the requested information if the account owner—**i.e.**, ***the cheating student***—requested it directly, and provided ***verification*** that they were in fact the owner of the account.

90.    **United States Air Force Academy**.  Chegg also facilitated massive cheating at the United States Air Force Academy, in Colorado Springs, Colorado.   The Air Force Academy produced more than 100 pages of documents in response to a FOIA Request regarding Chegg,

which demonstrate widespread use of Chegg to cheat by Air Force Academy cadets during the Class Period.  Despite being governed by a strict honor code (akin to those at the nation's other service academies) which states, "We will not lie, steal, or cheat, nor tolerate among us anyone who does," the Air Force Academy found that *249 cadets* used Chegg to cheat while the academy held remote learning in Spring 2020—and of those, a staggering *228 admitted using Chegg to cheat*.

91.    Once again, the Air Force Academy documents show Chegg was aware of rampant cheating at the elite institution but refused to assist in the Air Force Academy's investigation in any meaningful way.  For example, on July 10 and 14, 2020, the Academy requested from Chegg information on cadets using Chegg to cheat on remotely proctored exams.  Chegg turned over information that included students' user IDs, email addresses, and dates and times certain questions were viewed by Air Force Academy cadets—but, notably, did not provide any of their names.  The Air Force Academy sent Chegg another request for information on July 14, 2020, regarding cheating during Math and Engineering Mechanics exams, asking Chegg to merely "verify" if certain specified cadets "accessed any math related content on Chegg" or "Engineer[ing] Mechanics related content on Chegg" during the period of the exams.  Remarkably, in a July 15, 2020 response, Chegg refused to provide the information, writing: "For privacy reasons, we may not investigate email addresses."

92.    ***Other Student Cheating Scandals***: The five academic institutions that responded to these FOIA Requests were far from alone in enduring rampant cheating during distance learning. Reports of cheating scandals directly tied to Chegg emerged from colleges and universities across the country.  For example:

- In April 2020, **Boston University** was rocked by a cheating scandal where chemistry students were caught using Chegg to cheat on exams and quizzes. In December 2020, Boston University experienced another cheating scandal where engineering students used Chegg to cheat on an exam. Both times, Boston University informed Chegg.

- In May 2020, **Princeton University** was hit with a Chegg-related cheating scandal in which numerous linear algebra students used Chegg to cheat on homework assignments.  Chegg was informed of the suspected cheating.

- In May 2020, **North Carolina State University** suffered a cheating scandal in which over 200 students (out of 800 total in the class) were accused of using Chegg to cheat on final exams in a statistics course.  Chegg was informed of this cheating scandal by the university.

- In December 2020, **Texas A&M** discovered widespread cheating involving Chegg. Hundreds of finance students were accused of cheating on multiple online exams after submitting answers quicker than it would have taken to read the questions.  Moreover, Texas A&M faculty discovered entire exams posted on Chegg.  Chegg was contacted by multiple parties regarding the cheating scandal, including university officials and even students who self-reported their misuse of Chegg's services.

- In January 2021, the **University of Oregon** suffered a cheating scandal where biology students used Chegg Study to cheat on exams. According to university officials, the cheating was obvious, with some students' scores increasing from 50% to nearly 100%, before plummeting again when the professors took measures to stop cheating.  Chegg was informed of this scandal by the university.

- In March 2021, the **University of Minnesota** experienced a Chegg-related cheating scandal where math and science students copied directly from online sites, including Chegg.  Chegg was informed of the cheating by university officials.

- In March 2021, **Boise State University** was hit with a Chegg-related cheating scandal, where numerous students used Chegg to cheat on take-home exams in mechanical and biomedical engineering courses.  Once again, Chegg was informed of the cheating scandal.

- Cheating scandals involving Chegg were not limited to the United States.  Indeed, in April 2021, the **University of Cape Town** and the **University of Witwatersrand** in South Africa were rocked by cheating scandals in which large amounts of students were caught uploading and receiving exam answers from Chegg.  Again, Chegg was informed of the cheating by the universities.

93.    Despite the ubiquitousness of cheating scandals implicating Chegg, the Company refused to implement easy, obvious, and straight-forward measures recommended to them by professors and others in academia that would have drastically curtailed cheating.  As just one example (nine other examples are discussed below), Chegg could have immediately tamped down cheating on its platform by simply requiring subscribers to register the student e-mail address issued by their academic institution.  Indeed, the founder of a prominent online newsletter dedicated to academic integrity and cheating, *The Cheat Sheet* (https://thecheatsheet.substack.com), Derek

Newton, stated that he "raised this issue with Chegg" and in response "they've said - more or less - that such a change is implausible because of non-standard educational e-mail addresses around the world."  Newton noted how patently frivolous this argument was, noting that "[i]t's hard to imagine that a company worth something like $12 billion is flummoxed by non-standard official e-mail addresses."  Moreover, it did not provide any justification for not requiring students enrolled at U.S.-based institutions—all of whom are assigned standard educational (*.edu) email addresses by their schools—to provide such information.

94.    Indeed, Chegg's stated excuse for why it could not require students to sign up using their school email address is blatantly contradicted by its requirement that *professors* who wish to use Honor Shield register using their official university email.  As seen in the image below, Chegg's website instructed professors to "[u]se your faculty .edu email to get started" with Honor Shield.



95.    Furthermore, as described below (*see* IV.D.2), faculty that used Honor Shield found that it did not even work properly, and that students were *still* able to have exam questions answered during the exam, even when they availed themselves of Chegg's supposed anti-cheating technology.

**2.    The Accounts of High-Ranking University Officials And Faculty From Across The Nation Confirm That Student Cheating On Chegg's Platform Was Rampant, Chegg Was Repeatedly Informed About It, And Chegg Failed To Implement Effective Procedures To Stop It**

96.    Lead Counsel also gathered information from direct interviews and surveys of over twenty professors, deans, and officials from numerous colleges and universities across the country.

Their firsthand accounts of the difficulties educational institutions faced struggling to combat rampant cheating during the period of remote learning are fully consistent with the FOIA responses discussed above.  They also further confirm that students' use of Chegg to cheat increased dramatically during the Class Period and resulted in numerous academic integrity investigations and violations at colleges and universities across the nation.  These professors, deans, and administrators routinely discovered that ***up to 40%*** of students in their classes used Chegg—and that, based on their experiences, ***<u>virtually all students who used Chegg used it to cheat</u>; indeed, most were unaware of any students that used Chegg for legitimate educational purposes***.

97.    Remarkably, these distinguished officials and faculty implored the Company to curtain the use of Chegg's platform to cheat at their respective institutions.  However, they uniformly described Chegg's response as being focused far more on protecting students' ability to cheat rather than attempting to stop it, and described how Chegg's Honor Shield program, Honor Code investigation process, and the Company's other purported methods of preventing or addressing cheating were ineffective and illusory.  Indeed, these professors, deans, and university officials stated that even after bringing specific cheating incidences to Chegg's attention, the Company often declined to take any action at all, or instituted obstacles to investigations—and, even more troubling, consistently protected the identities of students who used Chegg to cheat, apparently loathe to kill their golden goose.

98.    The accounts of ten deans and other high-ranking faculty members at major universities around the world are provided below, followed by the accounts of twelve professors.

99.    The former Director of the Honor System Office at **Texas A&M University** was specifically charged with educating students, faculty, and staff about the Aggie Code of Honor as it relates to academic misconduct on campus, training and supervising the operations of the Honor Council and the Aggie Honor System Office and generating assessment-driven educational opportunities for students and training for faculty.  This individual, who served in that role from July 2011 through January 2022,[7] explained that Texas A&M's academic misconduct cases

_____

[7] To maintain their confidentiality, and for ease of comprehension and readability, the Complaint

1   *doubled* in 2020-2021 to 1,700 cases and estimated that a staggering ***80-85% of that massive***

2   ***increase involved Chegg***.   She noted that ***exams were being posted to Chegg within moments of***

3   ***going live and students used the Expert Q&A service to broadcast answers to everyone in the***

4   ***class***.   Moreover, Chegg refused to deal with professor complaints without further support from

5   their institutions.   After a cheating outbreak in Fall 2020, the former Director of the Honor System

6   Office at Texas A&M University was "***fed up with Chegg***," and ***emailed Defendant Rosensweig***

7   ***directly at danlr@chegg.com***.   No fewer than three high-level Chegg representatives responded to

8   her email: Sue (Chegg's Head of Academic Relations); Kimberly Quach (Operations Leader at

9   Chegg); and Kelly Cutforth (Chegg's Director of Customer Service).   Incredibly, they dismissed

10  her concerns, replying that the use of Chegg to cheat "was an anomaly and the vast majority of

11  students are using it legitimately."   Despite her email directly to Defendant Rosensweig, and the

12  response of three high-level Chegg representatives minimizing the cheating scandal, Texas A&M

13  continued to struggle with students using Chegg to cheat until the Fall of 2021, when students

14  largely returned to in-person classes and academic misconduct cases dropped nearly to pre-

15  pandemic levels.

16          100.    **Virginia Tech** maintains a comprehensive academic integrity program, including a

17  written Honor Code and Honor Code pledge that each member of the university community must

18  agree to abide by; "success modules" for students to complete to demonstrate their understanding

19  of the university's academic integrity standards; and course syllabi providing specific academic

20  integrity guidelines and expectations for all Hokies (which "are the same in an online class as they

21  are in an in-person class").   The university's Director of Academic Integrity[8] explained that, in a

22  typical year, her office received between 700 and 750 academic integrity cases, but during the

23  2020–2021 academic year when Virginia Tech went to remote learning, her caseload ***almost***

---

uses the pronoun "she" and possessive "her" in referencing the professors, deans, and
administrators.  However, this convention is not meant to identify the actual gender of any of the
professors, deans, or administrators.

[8] The Director of Academic Integrity joined Virginia Tech in January 2019 as the Senior Associate
Director for Undergraduate Academic Integrity, where she oversaw a team that supported
the Undergraduate Honor System and was responsible for, among other things, overseeing the
academic integrity adjudication process and providing campus-wide education on academic
integrity.

*doubled* to 1,297 cases.  She added that Virginia Tech "*did attribute the rise in cases largely to Chegg, as more and more faculty were identifying materials placed online*."  She also described "faculty frustrations with Chegg regarding responsiveness and lack of complete information," describing one instance where a "faculty member [] attempted to use the Chegg Honor Lock program (where they provided a watermarked exam beforehand and Chegg promises it will not allow students to place the exam on the site or have questions answered)."  Remarkably, the Director of Academic Integrity found the exam that had been watermarked on Chegg while students were taking the same exam, which she described as "a frustrating experience for the faculty."  Based on her experience, she stated that "*outside of using Chegg for textbook purchase/rentals, I do not know of any students who use Chegg for a legitimate purpose that does not violate university policies*."

101.    The Director of Academic Honesty, Policy & Education at the **University of Rochester**[9]—whose responsibilities include making policy recommendations to the university governing bodies and administrators regarding academic integrity issues, offering confidential counseling to students and faculty about how the academic honesty process works, and providing academic integrity educational outreach to the entire university community—reported that academic integrity issues at the university increased nearly ***70%*** due to students' use of Chegg during the pandemic. Despite this huge increase in cheating, she explained that Chegg's responsiveness to academic integrity investigations actually ***worsened*** as the pandemic progressed. "Chegg previously provided email addresses of account holders (with no further information).  Now … Chegg no longer provides this information to us or to other institutions."  She added that "[w]hile there may have been some confusion during the early days of the pandemic about legitimate services Chegg provides, such as textbook rental, ***90-98% of students who accessed Chegg did so either with specific intent to deceive or because they knew Chegg's hands-off policies meant they wouldn't ask too many questions.***"

---

[9] She was promoted to this role in March 2021, having previously served as the University of Rochester's Assistant Director of Faculty Development and Director of Academic Honesty since April 2019.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

102.    The Associate Dean of Students in the Office of Student Rights and Responsibilities at **Purdue University**—which promotes responsibility and encourages honesty, integrity, and respect among Purdue students, including with respect to academic integrity—questioned whether *any* Purdue students used Chegg for "legitimate purposes." She stated frankly, "***our students used Chegg to cheat, and not for the other aspects of the platform***." In fact, the majority of students interviewed for academic integrity investigations confirmed to her that they only used Chegg to cheat and "***not for any legitimate purposes***." Moreover, students routinely told her that they decided the "legitimate" aspects of the Chegg platform were simply "***not worth it***" as students were offered "***similar or better resources on campus for free***." The Associate Dean "doesn't deal with people at Chegg" as inquiries to the Company regarding cheating were "all handled via an automated response." Because Chegg refused to personally engage with professors or deans, she developed a form letter. However, after the Class Period, she stopped sending even the form letter to Chegg because the Company ceased providing any personally identifying information to universities for students suspected of using Chegg to cheat.

103.    The Head of Complaints, Appeals, and Misconduct at **Macquarie University** in Sydney, Australia[10]—responsible for the handling of complaints, appeals and disciplinary processes for the university concerning "contract cheating" websites (such as Chegg) and other violations of academic integrity—similarly relayed that prior to the pandemic, her unit dealt with roughly 250 academic integrity cases per year. During the pandemic, that figure grew to approximately 1,200, a nearly ***fivefold*** increase. She also described experiencing declining support from Chegg in connection with academic integrity investigations as the pandemic progressed. "***They have basically reduced the info they provide under their 'Honor Code' to nothing***." Regarding how students used Chegg, she stated that "***a vast majority of students using Chegg did so for illegitimate reasons***" and that she was "***not personally aware of any students that use [Chegg] for genuine learning purposes***."

---

[10] She was promoted to this role in May 2022, after serving as Macquarie University's Head of Student Conduct and the Integrity Unit since June 2017 where she was responsible for a team handling allegations of serious academic integrity violations and related misconduct across the university community, and proactively worked to stay ahead of trends in academic integrity. While at Macquarie University, she pioneered new methods to detect contract cheating.

104.    The Director of Academic Integrity at **The State University of New York at Buffalo** ("SUNY Buffalo") —which promotes the university's fundamental value of integrity in the academic enterprise by holding students accountable to honesty in the learning and research processes, supporting faculty in creating academically sound learning environments, and working with the campus community to enforce academic policies fairly and consistently—described having direct contact with Chegg in 2020 about the Company's academic integrity processes.  She asked Chegg if the Company "could require students to use school-affiliated email addresses" in order to help identify cheaters, but inexplicably "was told [by Chegg] this was impossible."  She further stated, "*I really believe that the vast majority of Chegg use from [SUNY Buffalo] students is to look up assignment or test problems/questions that they cannot figure out on their own – a violation of our policy*."

105.    A Vice Provost for Online and Innovation Education and the Center for Learning and Teaching at the **State University of New York at Binghamton** ("SUNY-Binghamton)[11]— which supports student-centered learning at the university, including by providing technological support for classrooms and courses, tutorial services, support for instructors, and support for testing accommodations—originally thought Chegg was merely a textbook rental service until a student corrected her, stating it was "where you can get answers to homework."  She noted that pre-pandemic, students could not cheat on exams with Chegg but after the pandemic hit, students began using Chegg to cheat on exams.  She also found that "*during the pandemic the main use [of Chegg] was illegitimate – for answers on exams*."  Indeed, according to students she has spoken to, "*80 percent or more*" of students used Chegg to cheat on homework and "*maybe a quarter of the class, maybe more*" used Chegg to cheat on exams.  "*It was insane*."  She noted that since students returned to the classroom, cheating has gone "*way, way down*" and Chegg is "*not much of a problem now*."

---

[11] She has served as Vice Provost at SUNY-Binghamton since 2013 and is also a Professor of Mechanical Engineering at the university.

106.    The Director and Associate Director of the Office for Community Standards at the **University of Minnesota**[12]—which is charged with handling academic integrity matters and student disciplinary processes—stated that the use of Chegg to cheat was so pervasive that it ***updated the Student Conduct Code to explicitly include reference to Chegg***.  The updated Student Conduct Code warns students in bold lettering "***Beware of homework help websites***" including "***Chegg***," which purport to be offering "***harmless tutoring or homework help***," but may "***actually be considered cheating***."[13]  The Director and Associate Director also described how Chegg "made it cumbersome to request this data [on investigating student cheating on Chegg] or to remove content" and that Chegg "***added multiple steps [that] took more time (and more people) than it needed to***."

107.    An Associate Dean of Undergraduate Programs and Student Affairs Faculty of Science at the **University of Calgary**—which holds academic integrity as a "core value" of the school, maintains a comprehensive academic integrity policy, and offers robust educational opportunities concerning academic misconduct—stated she dealt with a lot of academic misconduct that involved Chegg, and described the obstacles Chegg put in place preventing professors, deans, and other high-ranking university officials from easily investigating cases of academic dishonesty. She stated that through Chegg's Honor Code, University of Calgary professors at one point were able to request data about who posted questions to Chegg, and when it was posted, adding that Chegg also gave professors the same information about the answers to questions posted to Chegg. However, Chegg changed its Honor Code policy during the pandemic, requiring professors to supply a letter directly from the Dean or Associate Dean indicating there is a formal investigation ongoing in order to receive information.  Later Chegg again changed its policy, requiring the Dean or Associate Dean make the data request themselves along with a letter containing more specific

---

[12] The Director and Associate Director of the Office for Community Standards at the University of Minnesota have served in these roles since July 2017 and December 2018, respectively.

[13] https://conduct.d.umn.edu/conduct-procedures/scholastic-dishonesty-procedures/avoid-scholastic-dishonesty.  Like the University of Minnesota, other universities have also updated their student codes of conduct to explicitly warn students against using Chegg.  For example, UCLA updated its Student Conduct Code on January 15, 2021 to include: "Cheating includes, but is not limited to, the use of unauthorized materials" including "online sources such as . . . Chegg."

1   information.  Now, Chegg will *only* give the dates and times for when the questions and solutions

2   are posted if requested directly by the Dean and will not provide *any* other information.

3          108.    College professors around the country provided accounts akin to those of the deans

4   and other high-level university officials set forth above.  They described how cheating on Chegg

5   was rampant during remote learning, students overwhelmingly used Chegg to cheat, and Chegg

6   erected hurdles that stifled academic integrity investigations.  The accounts of eleven of these

7   professors are set forth below.

8          109.    A Professor of Mechanical Engineering at **Purdue University** reported that "***what***

9   ***distinguished Chegg [from competitors] was that it was on-demand.***" "***Solutions got out there***

10  ***very, very quickly; I found this egregious***."  She stated that before the pandemic, the Department

11  of Mechanical Engineering would catch approximately 10 to 15 cheaters in a class of approximately

12  300 students.  During the pandemic, those figures dramatically increased, at least doubling and

13  perhaps tripling.  For example, in one of her classes of 300-400 students, on the first two tests after

14  students went remote, ***well over 100 people cheated during the test by copying a solution uploaded***

15  ***to Chegg***.  She was not alone.  When other Purdue faculty members searched for individual exam

16  questions on Chegg, they found solutions for the exact questions that appeared on the exam.

17         110.    This Purdue professor explained that during COVID, while there were some

18  homework integrity violations, they were not as bad as exams.  She further explained that Chegg

19  promised to provide solutions to questions asked by students quickly, within one or two hours, and

20  at that time (she suspected) it realized it had a gold mine on its hands because the biggest cheating

21  incidents had to do with exams.  The same Purdue professor was never able to track down students

22  that submitted questions to Chegg, as Chegg inexplicably claimed it did not even know who the

23  users were.  She believed that Chegg was acting in "bad faith" with respect to the Honor Shield,

24  stating that ***the Company knew it was not going to work***.

25         111.    Significantly, the same Purdue professor ***communicated with Chegg about once a***

26  ***week—both to report incidents and to request blocking of content***.  It bothered her that Chegg

27  knew the Honor Shield system was not going to work.  Remarkably, Chegg eventually stopped

28  responding to requests from her colleagues to take down questions from the platform altogether.

The Purdue professor surmised that Chegg did not provide resources from which students can learn; it was instead an opportunity to sell a product with the students getting no gain. When asked if Chegg had any legitimate uses, the Purdue Professor laughed, stating, "***I am not aware of any students using Chegg for legitimate purposes.***"

112.    A Professor of Chemistry at **Boston University** described Chegg as "***a cheating site***" and specifically equated the Company's growth during the pandemic to students using the platform to post exam questions and get answers. She initially heard rumblings that students were using Chegg more because they were not taking exams in person, and then she found her exam questions on Chegg by searching online. She contacted Chegg about the cheating, but the Company put up roadblocks, such as making her go through the dean's office, and even then, provided minimal information about the cheaters. Instead, Chegg provided a spreadsheet of account names and when the accounts accessed specific pages, which she described as "***basically useless***" since it did not help identify the students who had cheated. Regarding the Honor Shield program, the Boston University Professor recalled thinking "these guys are full of it" and that she did not want to provide Chegg—which "***I have no doubt [] engaged in unethical practices***" —with her content. She explained: "you don't need Chegg to get homework help, there are free resources; ***the reason Chegg ballooned during the pandemic was cheating during timed exams***," "***everything they offer is useless for learning***," and "***nothing about their business model is legit.***"

113.    A Statistics Instructor at **North Carolina State University** found ***hundreds*** of students used Chegg to cheat on the midterm and final exam in her introductory statistics course during remote learning. On the midterm exam, she noticed a handful of students answered one question with the same 3-4 sentence response, in broken English. In total, she found 10-15 students with the same answer. She googled a phrase from the common answer and saw that it was posted to Chegg, but she needed a paid subscription to Chegg in order to read the answer that was uploaded to Chegg in full. She identified approximately 20 students who cheated on the midterm using Chegg. The Statistics Instructor stated that she tried to flag the posts that came from her exam and contact Chegg, but she did not hear anything from the Company. For the spring 2020 final exam, the North Carolina State University instructor and her teaching assistants ("TAs") monitored Chegg

during the exam for test questions appearing on the site.  When they found questions from the ongoing exam posted to Chegg, the Statistics Instructor attempted to remove the posts using the link that says "flag this post for removal."  However, Chegg either was not monitoring the site or simply did not care because she was not able to get anything removed during the exam, leaving her to conclude "*there was no active moderation going on*."

114.    In the spring of 2020, the same Statistics Instructor submitted a record number of cases to the academic integrity office—*the most the office had ever seen from a single course*—and stated that *95% of cheating cases at North Carolina State University that semester involved Chegg*.  Indeed, she determined that in her class of 800 students, almost half—380 accounts—accessed posts on Chegg with answers to the spring 2020 final exam.  Tellingly, when she asked Chegg to provide the names of students, it refused.  The same Statistics Instructor also heard about other cheating incidents from colleagues.  For example, one of her colleagues at **Duke University** had a situation where *half the class—35 students in a 70-student course—used Chegg to cheat*. When asked if students used Chegg for legitimate educational purposes, the Statistics Instructor stated "*definitely not*," as she had never received a solid description of a student using Chegg for legitimate educational purposes.

115.    A former Senior Instructor of Biology at the **University of Oregon** first learned of cheating on Chegg in the fall of 2020 after she searched for her own exam questions and *found all of them on Chegg's website*.  Similar to other professors Lead Counsel interviewed or surveyed, based on her experiences, she "*was not aware of students using Chegg for legitimate purposes*."

116.    A Professor of Economics at **Oswego State University of New York** also observed an increase in academic integrity cases during the pandemic.  The Professor of Economics said she begrudgingly purchased a Chegg account in order to more easily search the site, adding that she sent at least two DMCA [Digital Millennium Copyright Act] takedown requests to Chegg per semester, with multiple questions in each request. The Professor of Economics stated that overall, she spent 15-20 hours per semester checking Chegg for questions posted on the site and dealing with academic dishonesty cases, adding that she has changed the way she assesses students and the kinds of questions she writes as a result of Chegg.  Based on her review of the site, and her

conversations with colleagues and students, ***almost all students used Chegg for illegitimate purposes***.  She further stated that she "***know[s] of no students that subscribe to this service without the intent to find answers to questions in their graded work***."

117.    A Teaching Assistant Professor at **Kansas State University** found that Chegg was "misused by students [and] [the Company was] ***misleading shareholders*** about what it is REALLY being used for."  She described Chegg as "***unethical***."  For this professor member, it remains "***very difficult to actually 'catch' students that submit solutions from Chegg because [professors] need to pay for an account to get the solution,*** *and* ***cross check that solution with students' submissions, which is very time consuming***."

118.    Professors also willingly shared their experiences about student cheating using Chegg through a dedicated online message board for professors.[14]  In response to Lead Counsel's questions about professors' experiences with Chegg, a half-dozen professors provided a similar refrain: academic integrity cases sharply increased during the pandemic, Chegg made it difficult for professors to combat cheating on its online platform, Chegg had zero, or near zero, legitimate use, and students overwhelmingly used its platform to cheat.

119.    For example, a former Professor at the **University of California, Santa Cruz**, wrote "***Every use of Chegg that I have observed has been clearly an academic-integrity violation***."

120.    A Computer Science Professor in New York similarly stated "during COVID (basically students taking exams online). ***Students used chegg [sic] DURING THE EXAM and were able to get answers back during the exam time.***  This is obviously not possible in-person when I can walk around and see what everyone is doing."  The Computer Science Professor also stated "Chegg could stop the site being useful for cheating (during exams) ***by simply adding a 3 hour delay***. Essentially if somone [sic] posts something, do not even have it show up to be answered by anyone for 3 hours. Literally just update an SQL [Structured Query Language] query to have posted time + 3 hours. ***Done***."

---

[14] Lead Counsel followed-up via direct message to each individual who responded on to the message board to confirm they were a professor and additional details about their employment.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

121.    Another STEM professor described how she "deal[s] with one to five academic integrity issues every semester, most of which involve students using Chegg to cheat on lab assignments or exams."  The STEM professor explained that "[a]cademic integrity issues have doubled at our community college since 2020," with a significant portion (e.g., one-third) involving Chegg. Discussing her efforts to combat cheating on the site and Chegg's inability or refusal to comply, the STEM professor stated that "*I've sent over thirty [Digital Millennium Copyright Act] takedown notices to Chegg.  Each one requested that they remove multiple postings on their site that infringe on my copyrighted intellectual property.  Often, the exact same items are posted on their site the following semester*."

122.    A professor at the **College of San Mateo** in California stated that "during the past couple of years, waning now of course, the number of students cheating *exploded*." She added that "during shelter in place, everyone seemingly learned of various sites. . . and saw the opportunities they allowed."  She described Chegg as "*a cheat site, pure and simple*."  According to the professor, "*nobody actually used this to 'study' and now that we're (sort of) back in class, I don't see any of my students using it*."  Despite living "down the road from [Chegg] hq," the professor saw no benefit from interacting with the Company because Chegg was "very good at responding and yet not responding. I've had peers try that route, and *it's a master class in misdirection and frustration*."  She added that, as for trying to get information from Chegg about suspected cheating, it was more productive to "*see paint drying*"

123.    Another professor posted about her fruitless efforts to contact the Company about her students cheating using Chegg, stating "I worked with Chegg but found their response inadequate. To make a request for info was deliberately convoluted and difficult and their response was no [sic] helpful."  The professor stated, "I met *1 student* who used Chegg as per the intended purpose," adding that "the rest used it to cheat on exams by submitting the questions live during online exams and copying the result.  Using original questions did not help.  So as a percentage? 5% using it in the manner that Chegg describes."  "*My opinion: Chegg is used nearly exclusively for cheating.  All original questions that I've ever written have been posted on there. It is a shady*

1    *site. All of my colleagues['] experiences were the same as mine; we struggled to get it under*

2    *control*."

3    124.    Another professor referred to "Chegg and its ilk as 'academic dishonesty sites' in

4    official documentation for my course." The professor stated that all her experiences of students

5    using Chegg were "severely negative (as in, a student illicitly got a copy of the exam ahead of time,

6    posted it on Chegg, and provided those somewhat-incorrect answers verbatim on the exam)." The

7    professor further stated that "*100% of the interactions with Chegg I have had - whether directly*

8    *due to an academic honesty issue, or casual mention by students in conversation - were illicitly*

9    *obtaining the solutions to problems, often to online homework systems.* The way it works is that

10   students pay the publishers for access to the online homework systems, and pay Chegg for the

11   answers, *thereby paying for 100% grades on their homework. Naturally, this is an extremely*

12   *popular service, accounting for Chegg's huge growth*."

13   125.    As for her attempts to get Chegg to remove her coursework from the site, the same

14   professor stated that Chegg "*host[s] tons of my content which they are literally pirating.*

15   *Homework sets, tests, etc. All those are copyright me, and despite my contacting them and*

16   *providing emailed notice with specific links to the assignments, the assignments remained up*.

17   They replied with some form I had to fill out for each individual assignment, which process *is*

18   *clearly designed to slow the removal down to where it's not manageable for a single person*."

19   The professor added that the removal process she described "*is not a good-faith effort . . . it's*

20   *easier for me to design around Chegg than to fight them.*"

21   126.    A student commenting on the message board put it bluntly: "*Honestly as a college*

22   *student, I thought Chegg was for cheating. I had zero clue it had ANY legitimate uses. I know*

23   *at least 30 people who sailed through classes with it*."

24
        ### 3.    The Accounts Of Former Chegg Employees Confirm
25              Defendants' Fraud

26   127.    Lead Counsel's investigation of Defendants' fraud included interviews with

27   numerous former Chegg employees who had direct knowledge of Chegg's business, including the

28

Expert Q&A tool—*i.e.*, its "cheating business."[15]  The accounts of these former employees further confirm that (1) Chegg's explosive growth during the Class Period was driven by students' widespread use of Chegg's Expert Q&A to cheat during remote learning—so much so, in fact, that Chegg launched an internal initiative dubbed the "Big Egg" project to make it more efficient for students to cheat; (2) the Individual Defendants knew widespread student cheating was driving subscriber and revenue growth—its "main moneymaker" and "main driver for revenues"; (3) Chegg management deliberately failed to take action to prevent students from cheating; and (4) Defendants' claims that its growth was largely due to limits on account sharing were false.

### a.    The Expert Q&A Service Fueled Chegg's Growth

128.    Multiple former Chegg employees confirmed that the Expert Q&A service drove Chegg's growth during the pandemic, to the point that the Company designed its marketing around Expert Q&A and continued to refine Expert Q&A to make student cheating more efficient.  As FE 1[16] explained, Expert Q&A and Homework Help (which includes the Expert Q&A database and other tools for students to get answers to coursework, such as a math problem solver) were Chegg's main source of revenue—the "***main moneymaker***" and "***the main reason for people to subscribe, it was driving [growth]***."  FE 2[17] similarly described Expert Q&A as "***absolutely number one***" in terms of the Company's most popular product.  She explained the "***number one way that students found Chegg was by looking for a particular question, so Q&A is what drove the most traffic***."  FE 3[18] confirmed that Chegg's Exam Prep business "did not contribute much to subscriber growth" and "was not a main driver for revenues." Rather, it was "***the cheating business***" that drove the growth.

---

[15] Former employees of Chegg are referred to herein as "FE __" and are referenced in the feminine form to maintain their confidentiality.

[16] FE 1 worked as an engineer at Chegg from 2018 to 2022.

[17] FE 2 worked as a Customer Relationship Management ("CRM") Manager at Chegg from Q3 2019 to Q1 2022.  In this role, she worked with CRM modeling technology to lead Chegg marketing campaigns.  The Chegg Study Pack and a more comprehensive product bundling project were two of FE 2's primary projects.

[18] FE 3 worked as a project manager at Chegg from 2018 to mid-2021. In this role, FE 3 worked with and helped various teams, including the Exam Prep team on the "study" side of the business.

129.    Expert Q&A and Homework Help were so instrumental to the Company's growth that the Company designed the Chegg Study Pack around these products.  Indeed, FE 2 described Expert Q&A and Homework Help as the "***pillars***" of the Chegg Study Pack.  Chegg simply added "some of the ancillary products, and some of the newly acquired products" to Expert Q&A and Homework Help when designing the Chegg Study Pack, and then sold it as a special deal even though it included services subscribers already received for free.

130.    Moreover, Chegg launched an internal initiative dubbed the "***Big Egg***" project, to modify the Chegg Study Pack to make Chegg's Expert Q&A tool even more efficient for cheating than it already was.  Ordinarily, a Chegg user could quickly find an answer to an exam or homework question by running a general search by subject matter across Chegg's massive database of 35 million to 70 million questions.  However, according to FE 3, during the Class Period, the Company launched an internal project, known as the "Big Egg," which, according to FE 2, attempted to make Expert Q&A even more efficient by allowing students to search by the specific university and university course they were taking rather than by general subject matter.  This made it far easier for students to immediately find answers to their specific exam or homework questions in the Expert Q&A database.  Indeed, referencing the "Big Egg" project, FE 2 stated that she and her coworkers recognized that tailoring Chegg Study to specific courses—which the executive team had told FE 2 would "create a better experience" for users—could make cheating easier such that, from a marketing standpoint, "we were asking questions like how is this going to work when we were already dealing with bad press [regarding cheating]."  However, FE 2 explained that the Company felt the need to implement Big Egg in order "to do something radical with the product," because Chegg recognized that things "would likely not go well [for its business] when students returned to campus."

### b.    Former Chegg Employees Confirm Defendants Were Aware of Widespread Student Cheating Using Chegg

131.    Chegg knew that students were using Chegg to cheat, even prior to the pandemic.  FE 4 cited complaints from universities and professors, like those detailed in Sections IV.D.1-2,

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

*supra*, to confirm the Company's knowledge of students' use of the platform to cheat.  FE 4[19] further reported that, in her role, she saw students' posts on social media in which the students plainly acknowledged using Chegg to cheat. According to FE 4, college professors were uncomfortable partnering with Chegg because they associated Chegg with cheating. FE 4 pointed to photos of tests being posted to Expert Q&A as something that would particularly upset professors.  FE 4 asked and answered her own question, stating "Is Chegg a good product versus did they mislead people? I would say they embellished a lot on their story."

132.    FE 1 added that "***our CEO would sometimes talk about***" student cheating "***during all-hands [meetings]***."  She confirmed the Company and its employees were aware students used Chegg to cheat, emphasizing, "***Yes, that was known***."  According to FE 5,[20] cheating was also discussed during ***weekly meetings of Chegg executives***.  These meetings were held on either Monday or Tuesday at 10:00 a.m. or 11:00 a.m. and took place in what FE 5 described as a classroom type conference room to the right of reception on the first floor in the Company's headquarters.  ***Defendants Rosensweig, Brown, and Schultz and a variety of Vice Presidents attended those meetings.***  In reference to the discussions of cheating during these weekly meetings, FE 5 explained that Company executives "***always had access to data***" and that Defendants Rosensweig and Schultz "knew everything, ***they were micromanagers***."

133.    FE 2 corroborated that "all [Chegg employees] knew it at some level" that students used Chegg to cheat.  FE 2 even saw evidence of students cheating when "working on campaigns and testing things" and she noted of cheating "***absolutely it was accelerated***" during distance learning.   Moreover, FE 2 posited that the Big Egg project discussed above was a decision "to do something radical with the product, because I think deep down, they knew that if they didn't do something radical with the product at that point, then … ***it would likely not go well when students returned to campus***."

---

[19] FE 4 worked for Chegg from 2016 to 2019 as a Growth & Marketing Outreach Manager.
[20] FE 5 is a former Vice President of Global Learning & Organizational Development. She left Chegg in October 2019.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

134.    Other former employees reported the Defendants were aware of the issue of student cheating based on the fact **executives distributed a Forbes article discussing widespread student cheating using Chegg to employees in January or February 2021**.  Specifically, FE 6[21] recalled that a member of Chegg's executive team sent out an email in January or February 2021 attaching a *Forbes* article discussing cheating at Chegg (*see* ¶¶53, 56).   FE 7[22] corroborated this account, noting that the *Forbes* article was sent by a member of the executive team to the **whole Company**, leaving FE 7 with no doubt that "everyone knew about the article," "people weren't surprised," and "**the [cheating] issues were absolutely well understood**."

135.    Importantly, FE 8[23] confirmed Defendants' own public statements that they tracked data which would show students used Chegg to cheat.  According to FE 8, Chegg closely tracked user consumption in order to analyze which consumers the Company would retain and how to best attract new consumers.  Chegg tracked user data through an Oracle system, which the Company migrated to in approximately 2018.  She recalled that the migration took approximately 18 months to complete.  FE 8 explained that, using the Oracle system, Chegg closely monitored student sign ups and retention.  To monitor user consumption, Chegg tracked consumer "ongoing usage" of the platform.   FE 8 used "SQL queries" to report metrics, such as consumer usage, internally.  According to FE 8, **the reporting metrics were made available in a dashboard that was accessible by all Director-level employees and above, including the C-Suite**.

136.    FE 2 stated that the marketing team also "had access to when you last logged in, [and] what questions you asked." FE 2 explained that Chegg's engagement team was responsible for retaining students who simply wished to "look for their Q&A, pay for their subscription for 30 days, and then be done."

---

[21] FE 6 worked as an analyst at Chegg for two periods between 2020 and 2022, including from Q4 2020 through Q1 2021, and from Q1 to Q3 2022.

[22] FE 7 worked as a Data Scientist at Chegg from Q2 2014 to Q1 2022.

[23] FE 8 worked for Chegg from April 2009 until March 2019, holding various titles, most recently Vice President of Operations and Data Engineering.  In this role, FE 8 was responsible for Business Intelligence, Data Engineering, E-Commerce Platform, Web Operations and "anything to do with IT."

137.    FE 8 confirmed that Chegg had the ability to, and did in fact, monitor student use of the platform for student cheating long before the Class Period.  As FE 8 explained, Chegg initially began to monitor students for potential cheating in response to litigation brought against Chegg by publishers for copyright infringement.[24]  "People at the top wanted to find folks who were using Chegg to cheat because of the lawsuit brought against Chegg by the publishers."  FE 8 further explained that Chegg was able to make a reasonable guess if a student was using Chegg to cheat by taking a "quick look at web logs."  Chegg web logs "showed students checking through questions provided in search of the answers."  Furthermore, students were moving through questions faster than the students could possibly read the questions.

### c.    Defendants Chose To Not Stop The Cheating

138.    Despite knowing students used Chegg to cheat, Defendants did nothing to stop it because, as FE 4 explained, the cheating "***was putting money into their pocket***."  Put another way, FE 4 reported that because students' use of Chegg to cheat "do[es] make up a big part of Chegg's revenue," the Company "***didn't really put any effort into stopping it***" and that "they're not going to spend employee hours on ways to reduce money."

139.    FE 2 even flagged instances of cheating, but she was told that it was "not something [marketing] can really address."  Likewise, FE 5 stated that although the "cheating" discussions came up, she never witnessed or heard of the Company taking a proactive stance to remediate the conduct.

140.    FE 8 recalled that the Company's inquiry into whether students were using Chegg to cheat following publishers initiating litigation against the Company prior to the Class Period proved to be short lived.  She described the Company's research of student cheating as "ad hoc" and only in response to copyright infringement litigation brought by one of the publishers Chegg

---

[24] In 2017, the Examinations Institute of the American Chemical Society, Division of Chemical Education, a not-for-profit corporation that has developed and administered chemistry exams since 1934, filed a lawsuit against Chegg alleging the Company infringed on its copyrights by selling answers to the institute's exams, which Chegg made available to students via its online Expert Q&A service.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

worked with. Once there was less litigation pressure from publishers, "the interest to determine if Chegg was being utilized for cheating slowed significantly."

    **d.**  **Former Chegg Employees Confirm Defendants Used Account Sharing As A Pretext To Justify The Growth**

  141. While student cheating during distance learning led to Chegg reporting unprecedented subscriber growth, Defendants falsely attributed the growth to the Company's crack down on account sharing. Indeed, FE 1 was on the team addressing account sharing. She confirmed that account sharing "***was not the driver***" behind the Company's subscriber and revenue growth during the Class Period. In fact, the "major effort" to reduce account sharing took place before the Class Period, in a four-to-five-month window in 2019. In fact, FE 1 described Chegg's efforts to crack down on account sharing as a "Stone Age approach," in which the Company primarily "looked at IP addresses" and "how many current sessions" a user was in. Her team then reviewed user activity in spreadsheets and wrote scripts to automate a response to users who were account sharing.

  142. Even with subscribers that were sharing their accounts during the Class Period, Chegg sought to balance clamping down on account sharing with the threat of losing a subscriber. FE 1 explained that if a user was in more than ten sessions at a time, "then we would block their account." Chegg "didn't want to go too hard on users either, the logic was that we know you are account sharing, but we still want that subscription – so there were tiers. If we know that you are just blatantly selling [your account], we would ban you." Or if a customer shared "over fifty accounts," that subscriber would be banned. However, if the subscriber was "just with a group of friends, maybe five or more of your buddies," Chegg would only "warn you about it and log you out of your accounts."

  143. While FE 1 acknowledged that Chegg's cracking down on account sharing was "increasing revenues" to some degree, significantly, she saw data showing that Chegg's overall dramatic increase in subscribers was definitely not "a result of the mitigating account sharing efforts."

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

e.    **Additional FE Accounts Further Confirm Defendants'
Fraud**

144.    Former Chegg employees questioned the Company's Class Period representations to investors and Defendants' motives.  For example, FE 1 described how the pandemic led to "overblown" projections regarding the future of Chegg's success, stating that the Company's stock price increase "is not a natural progression," or "a natural growth."  Indeed, FE 2 "saw the growth [in subscribers] when everyone went remote," and was skeptical of Defendants' statement to shareholders that whether students were remote or not did not matter to Chegg's growth.  As a result, when the Company forecasted the revenues for 2021, she "thought they were out of their mind."

145.    Former employees also questioned the Individual Defendants' Class Period motives. For example, FE 5 shared that Rosensweig and Brown were enamored with their personal wealth, recalling Defendant Brown describing himself as a "one-percenter."  Likewise, FE 8 explained that "***Dan [Rosensweig]'s job was to get the stock up and make the company look good, Dan was a salesman***."

4.    **Lead Counsel's Empirical Analysis Confirms That
Chegg's Growth Was Attributable To Rampant Student
Cheating During Remote Learning, Which Was
Blatantly Obvious To Chegg**

146.    Lead Counsel's empirical analysis of the Expert Q&A tool and how it was used before, during, and after the Class Period confirms that: (1) usage soared during the pandemic and remote learning; (2) large numbers of questions submitted by students and answered by Chegg Experts contained clear indicia of cheating; (3) usage of the Expert Q&A service was concentrated around final exam periods; and (4) Chegg failed to implement effective measures to prevent obvious cheating.

147.    *First*, Lead Counsel analyzed archived daily and weekly data of all unique user questions submitted to Chegg's Expert Q&A service before, during, and after the Class Period.  The result of this comprehensive analysis shows that, in the years leading up to the pandemic and prior to the Class Period, growth of customer use of Chegg's Q&A rapidly decelerated.  Indeed, the empirical analysis demonstrates that, as of January 2017, Chegg enjoyed a 60% annual growth rate

in questions asked to Expert Q&A. By February 2020, however, annual growth in student questions asked to Expert Q&A had declined to 20%.

148.    In March 2020, the pandemic forced colleges and universities to implement remote learning. The usage of the Chegg Q&A service almost immediately surged, growing by roughly 40% the week of March 29, 2020, over the same week the prior year. The week of April 15, 2020, students submitted well over **double** as many questions to the Q&A service as the same week in 2019. Importantly, this surge in use was across each of the more than twenty subjects offered by Chegg for Q&A services. In general, STEM subjects such as trigonometry, biology, and earth sciences had the largest growth in student usage, with each subject growing by well over 125% compared to the same week in 2019. By May 2020, questions asked to the Expert Q&A service had almost **quadrupled** since mid-March.

149.    *Second*, Lead Counsel's empirical analysis shows that usage consistently spiked around final exam periods at U.S. colleges and universities, generally, the months of May and December.[25] As provided below, during peak finals periods, students submitted 48%, 50%, and 51% more questions to the service during the weeks ended May 10, 2020, December 13, 2020, and May 2, 2021, respectively, than the same week in the preceding month, with a staggering total of over 1 million questions submitted the week ending December 13, 2020.

---

[25] Lead Counsel researched 30 U.S. universities and colleges to determine when finals were held during the pandemic. Of the schools surveyed, 29 held finals for the spring 2020 semester between April 23 and May 23, all 30 held finals for the fall 2020 semester between November 30 and December 23, and all 30 held finals for the spring 2021 semester between April 23 and May 25.



150. *Third*, Lead Counsel's empirical analysis confirms the flagship Expert Q&A service was widely used by students to cheat on homework, quizzes, and exams. Indeed, out of Lead Counsel's random sampling of over 6,000 Expert Q&A photo submissions, a staggering 1 in 4 had **clear indicia of cheating** in the midst of a final exam, test, or quiz that was evident from the face of the photo itself. These startling findings demonstrate it was patently obvious to Chegg that a large percentage of students were using its flagship Expert Q&A service to cheat during the Class Period, and the Company had no effective procedures in place to prevent even the most blatant cheating.

151. To evaluate the extent of cheating using Chegg's Expert Q&A service, Lead Counsel analyzed the months of May 2020, December 2020, and May 2021, i.e., the "seasonality" in Chegg's business when usage of the Expert Q&A platform was at its greatest levels. For these months, Lead Counsel reviewed a sample of 3,700 submissions of questions from Chegg's Expert Q&A archive across five subjects: biology, chemistry, physics, calculus, and statistics. Of the 3,700 questions reviewed, 2,971 were photographic submissions. Lead Counsel's review of those photos **revealed that more than one-in-four (771 of the 2,971 photos, or 26.0%) included on their face**

60

***clearly obvious evidence of cheating***.  The photos showed clear-cut cheating indicators such as "Final Exam," "graded assignment," a countdown of how much time was left to complete the exam, or point values assigned to each submitted question.  Some photos contained multiple such indicia. Additionally, Lead Counsel frequently found strings of submitted photos that almost certainly came from the same exam or graded assignment, one question after the next.[26]

152.    Notably, Lead Counsel's findings remained roughly consistent even when the time period analyzed was expanded to include months of lower usage, indicating that Chegg was also widely used to cheat on tests, quizzes, and homework throughout the Class Period.  Specifically, Lead Counsel analyzed a sample set of 6,200 questions covering the six-month period of December 2020 through May 2021.  Of the 6,200 questions reviewed, 5,003 had accompanying photos. Lead Counsel's review of those photos revealed nearly the same rate of cheating – 24.3% of the photos analyzed (1,202 of the 5,300 photos) included an indicia of cheating.

153.    Moreover, many of the photos uncovered in Lead Counsel's empirical analysis were accompanied by posts with brazen language informing Chegg of the cheating, such as phrases like "***Please help as soon as possible.  I have 30 minutes to answer,***" "***need perfect answer asap in 20 minutes maximum***," "***please solve this question urgently its exam questions***," and "***NEED 100 PERFECT ANSWER. GIVE ANSWER IN LESS THAN 20 MINUTES. MAKE SURE YOU SOLVE PERFECTLY***."  Regardless of the fact that Chegg was on notice of the cheating, its experts ***still*** provided answers to the questions.

154.    *Fourth*, Lead Counsel's empirical analysis confirms that Chegg failed to effectively prevent use of Chegg Expert Q&A by students to cheat on exams. For example, Defendant

---

[26] Significantly, in conducting its empirical analyses, Lead Counsel utilized a highly conservative approach as to what constituted an indicia of cheating. For example, even if a photo submission clearly showed a question was taken from an ongoing exam (e.g., because "Final Exam" appeared at the top of the photo with the same date the question was submitted), photos of ***other*** questions evidently from the exact ***same*** exam were ***not*** counted towards the total number of images with an indicia of cheating.  In other words, an indicia of cheating must have been present on the face of any individual question analyzed for it to be counted as having an indicia of cheating.  If the four concerns of a photo did not contain an indicia of cheating, Lead Counsel did not count the submission as having an indica of cheating even if such a determination would have been wholly supported by Lead Counsel's review of other photos that contained blatant indicia of cheating and were evidently taken from the exact same exam.  Accordingly, it is highly likely that the actual cheating that occurred on the platform far exceeded Lead Counsel's one-in-four aggregate estimate.

Rosensweig touted the Company's Honor Shield program and told investors that Chegg had implemented software that would automatically reject test answers: "The second thing is we use technology and AI to actually build technology that blocks people from asking multiple questions. So, you can't submit a test all at once." Defendant Rosensweig added that "if you submit it either in text or you submit it in photos, we now use technology, AI and machine learning to actually block it, ask which specific question you want to ask." While Chegg's systems did, in fact, convert photographed test questions into readable text, that text showed that even when phrases such as "final exam" or the like appeared, Chegg Experts nevertheless still routinely answered the questions. Thus, for example, Chegg answered questions despite its systems picking up phrases such as: *"[T]his is a test question and any use of online resources other than myHSSU is considered academic dishonesty"*; "*Make Up Test* 2"; "*This test can only be taken once*"; "*MIDTERM EXAM*"; "submit your answers via Microsoft Teams to the assignment section titled '*Exam 2 Submissions*.'"

### 5.   Chegg Refused To Implement Obvious Steps That Would Have Prevented Cheating

155.   As discussed above, throughout the Class Period, Chegg was repeatedly informed by colleges and universities across the country and the world that its "direct-to-student learning platform" was widely being used by students to cheat. Despite repeated and explicit pleas from across academia for help addressing rampant cheating during remote learning, and while publicly representing that the Company was "deeply committed to academic integrity," took cheating "extremely seriously," was "constantly working to improve [its] abilities to detect and respond to issues around both copyright and academic integrity" and responded to such issues "as quickly as possible," in truth, the Company utterly failed to take even the most obvious remedial steps to stop cheating.

156.   *First*, the most obvious step Chegg could have taken to clamp down on students using the Company's platform to cheat was to require students to sign-up for their accounts using the email addresses provided by their academic institution. Requiring students to sign-up with Chegg using their actual school email addresses, rather than an anonymous email such as

acedmyexam@gmail.com or sororitystar@icloud.com, would have made it easy for Chegg to stop students from cheating, catch the cheaters, and suspend or terminate their accounts.  With this basic information, Chegg could have (i) blocked students from searching for or submitting questions to the Expert Q&A service during the period of a timed exam, blocked such questions from being answered by Chegg Experts, or both; (ii) rendered the Company's much-touted "Honor Shield" program – which required professors to pre-submit their entire exam to Chegg, often giving Chegg a copyright to the material – completely unnecessary; (iii) made Chegg's "Honor Code" investigations yield useful information, namely, the identities of students who were cheating rather than the spreadsheets of "basically useless" information Chegg occasionally provided to schools; and, perhaps most significantly,  (iv) served as an obvious and powerful deterrent to students even considering using Chegg to cheat rather than for legitimate educational purposes.  Indeed, this specific and obvious fix was proposed to Chegg by university faculty, industry observers, high-level university administrators, and others in academia, who specifically recommended that Chegg "*require students to use school-affiliated email addresses*."  *See supra* at ¶104.  These requests were ignored and this fix never implemented, despite Chegg having the technology and wherewithal to require **professors** to do exactly that.

157.    *Second*, Chegg could have prevented cheating by simply delaying providing answers through the Expert Q&A service by a short period of time (such as after a three-hour timed exam) rather than guaranteeing a response within two hours, if not almost "immediately."  Again, this specific and obvious fix was suggested to Chegg during the Class Period.  Indeed, the Director of the Academic Integrity Office at the University of California San Diego ("UCSD") and board member of the International Center for Academic Integrity stated: "If they were truly interested in academic integrity and helping institutions uphold academic integrity, and their sites are truly about helping students learn and not about cheating, then *a simple delay from the time of the posting of the question and the answer of the question would help with that. If a question was posted and not answered for a day, maybe even just three hours, then students couldn't cheat with the answer… That is a simple thing to do*."  When this suggestion was relayed to Chegg, the Company's Head of Academic Relations, Sue, confirmed "this is a very common request, that we

hear from faculty, I would say it's almost the number one thing that we hear." Yet, Chegg refused to implement this easy and obvious fix, claiming that students needed help "**right away**" and it was "**unfair**" to make them wait **any** amount of time for answers – a consideration that apparently far outweighed the chorus of academic stakeholders begging Chegg to reign in cheating.

158.    *Third*, Chegg could have greatly reduced cheating on its platform by providing professors and their institutions with free accounts to monitor violations of academic integrity. Faculty could then have assisted Chegg, at no-cost, in curbing cheating.  Instead, Chegg charged professors and institutions the same subscription fees it charged cheating students, milking academia of resources while publicly claiming that Chegg strove to work with schools to prevent cheating.  Moreover, Chegg even went so far as to blame universities for not doing enough to stop cheating, declaring that schools were "woefully underinvested in technology" and "didn't prepare to teach online."  Chegg similarly blamed students, stating that Chegg abides by an "honor code" and claimed to "expel" cheaters, adding "Chegg's not really the problem it's more the student."

159.    *Fourth*, Chegg could have upgraded its "Honor Shield" program so that it detected and blocked problems that not only matched known questions verbatim, as designed, but also those that were substantially similar.  Slightly modifying the language of test questions was an incredibly easy and quick "hack" to avoid Honor Shield, as highlighted in a variety of internet and social media posts reviewed by Lead Counsel.  Moreover, the Company already purported to use such software, telling investors "[s]o actually, if you submitted either in text or you submitted in photos, we now use technology, AI and machine learning, to actually block it, ask which specific question you want to ask."  Despite these assurances, the Honor Shield program was, in practice, a hollow gesture intended to assuage investor concern about Chegg's dependance on cheating, when, in fact, it did not.  As one university official described, even after Chegg announced the Honor Shield program, a faculty member at her university found an exam that had been **watermarked** on Chegg **at the same time students were taking it**.

160.    Finally, there were numerous additional, basic steps that Chegg could have taken to prevent and remedy cheating on its website.  Such steps included (i) requesting a statement of compliance with Chegg's Honor Code each time a student posted a question; (ii) requiring Chegg's

Experts to assess, prior to answering a student's question, whether it violated the terms of Chegg's "Honor Code" and, if it did, requiring the Chegg Expert to direct the student to the Honor Code, not to answer the question, and to internally flag the user as an Honor Code violator; (iii) implementing automated software monitoring, with immediate reporting to instructors whose assessments or exam questions were found on Chegg, and otherwise being proactive in informing professors about suspected cheating cases; (iv) facilitating the use of remote proctoring applications to obtain student credentials and allow instructors to monitor student activities when taking online exams, quizzes, or homework; and (v) adding "suspected cheating" to the list of reporting defaults on Chegg's application to clarify that such questions be flagged with appropriate steps taken by Chegg in response, such as warning the student and/or suspending or cancelling their account.

161.    Rather than implement *any* of these clear measures to prevent cheating, Chegg waited until halfway through the Class Period to announce its launch of its "Honor Shield" program, which would purportedly block professors' pre-submitted or watermarked exams from being posted on Chegg's site.  However, the Company did so only belatedly, following growing media reports raising questions about cheating scandals involving Chegg, and in tandem with Defendants' patently false assertions that it was only a "*tiny fraction*" and "*very small*" number of students who were using Chegg to cheat.

162.    Moreover, and as numerous professor and university accounts confirmed, the Honor Shield program was mere window dressing, an empty promise to address criticism that students were using Chegg to cheat, and was in fact completely ineffective.  Indeed, as professors and university administrators described, the Honor Shield program was obviously impractical and unfeasible, as it essentially created an entirely new job responsibility for thousands of educators across the country who were already stretched thin by the demands of remote teaching.  Honor Shield put the onus squarely on educators to pre-submit their exams to Chegg on a regular basis, to solve a pressing issue *Chegg* created and had knowingly allowed to fester.  Moreover, Honor Shield did not work for its intended purpose, as it did nothing to prevent exams from being posted online, and students could readily avoid any problem by slightly modifying the test question submitted (i.e., changing one word was sufficient).  As noted above, one professor believed that Chegg was

acting in "bad faith" with respect to Honor Shield because the Company knew that it would not work.  Another professor would not use the program on principle because she did not want to provide Chegg with her content due to its "unethical practices," and one high-level administrator reported that the service did nothing to prevent an exam that had been appropriately watermarked from being posted online during the exam period, which was "a frustrating experience for the faculty."

**E.    Defendants Capitalize On The Fraud Through Massive Insider Sales With Shares Trading At Record Highs And The End Of Remote Learning Approaching**

163.    With Chegg stock trading multiples higher than at any point in the Company's entire history as a public company since 2013, Defendants capitalized on the fraud by selling millions of shares at fraud-inflated prices to an unsuspecting investing public.   Overall, Defendants Rosensweig and Schultz, along with nearly a half dozen other Company insiders unloaded over ***$65 million*** of their personal holdings on the open market during the Class Period. Defendants Rosensweig and Schultz alone collectively sold more than ***$43 million*** of their personal shares on the open market during the Class Period, at prices massively inflated as a result of Defendants' fraud.

164.    In addition to unloading large amounts of their personal holdings on the open market, Chegg conducted a suspiciously timed ***$1 billion*** SPO with the Company's stock price trading near record highs, at a price ***two and half times*** that at the start of the Class Period.  On February 18, 2021, the Company announced a SPO of over 9.8 million shares of common stock at a price of $102.00 per share—less than ***one week*** after shares reached their all-time high of over $113 per share on February 12, 2021, and just after the Company had reported "unprecedented" annual results, including revenue growth of nearly 60%, that "outperformed even our most enthusiastic expectations" and marked 2020 as "our best year as a company" due to students subscribing to Chegg in "record numbers." The SPO closed on February 22, 2021, with the Company realizing total gross proceeds of over $1.1 billion, and Defendant Rosensweig personally raking in proceeds of over $30 million.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

165.    Notably, Defendants launched the SPO in the immediate wake of new reports questioning whether Chegg was being used by students to cheat, prompting Defendants' strong public denials and their launch of the Honor Shield program in January 2021.  The SPO also occurred less than two months after COVID vaccines started being rolled out to the general public, including distributions of Moderna's and AstraZeneca's vaccines in the United States and United Kingdom.  Moreover, the SPO also followed on the heels of then–President-Elect Biden's January 8, 2021, announcement that he would quickly release most available vaccine doses to inoculate more people, reversing then-President Trump's previous policies, and making it clear that the end of remote learning was approaching.

166.    Accordingly, the timing of the SPO and insiders' open market insider sales are highly suspicious and strongly suggests that Defendants sought to capitalize on the Company's inflated share price before the curtains closed on Chegg's short-lived, cheating-fueled success.  The stock price chart below depicts the rampant insider selling that occurred during the Class Period, both on the open market and in the $1 billion SPO, shortly before the stock price plummeted to levels below that at the start of the Class Period.



## Chegg Insider Selling During The Class Period

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

**F.    The Truth Regarding Chegg's Unsustainable Growth Emerges As Students Return To Campus And Stop Using Chegg To Cheat, Reversing The Company's Explosive Growth And Causing Its Stock Price to Crater**

167.    On November 1, 2021, after the markets closed, Chegg announced disappointing financial results for Q3 2021 that were significantly below analysts' consensus estimates. Significantly, this was the Company's first quarter of earnings since students widely returned to colleges and universities across the nation, to resume in-person, on-campus learning.  Chegg stunned the market by reporting a ***decline*** in subscribers for the first time since the start of the Class Period, specifically, a 10% subscriber drop after six quarters of consecutive growth.  In addition, Chegg dramatically lowered the Company's full-year 2021 revenue guidance (reducing net total revenues from a range of $805-815 million to only $762-764 million) and disclosed $195 million in projected revenue for the fourth quarter—typically Chegg's busiest time of the year—which was ***20% below*** analyst's consensus expectations of $240 million.  In addition to lowering revenue guidance dramatically, Chegg also guided lower on a host of other key performance metrics, including Adjusted EBITDA (lowered by $41.5 million or 14%), GAAP EBITDA (lowered by $44.5 million or 40%), and GAAP Net Income (slashed from a $75.1 million *gain* to a $22.7 *loss*). Making matters worse, Chegg postponed the issuance of full-year 2022 guidance until February 2022.

168.    In reaction to this news, Chegg's stock price was eviscerated, plummeting nearly 50%, falling from a close of $62.76 per share on November 1, 2021, to close at $32.62 per share on November 2, 2021.  This represented a massive decline of $30.14 per share that wiped out a staggering $4 billion in shareholder market capitalization in a single day and brought the stock price ***below*** its level at the start of the Class Period.

169.    While the Company attempted to blame Chegg's disappointing results on "industry-wide" factors—including a purported "slowdown" in the education industry resulting in "significantly fewer enrollments than expected this semester," and purported student "fatigue" causing students to "tak[e] fewer and less rigorous classes"—analysts and sophisticated market participants immediately saw through these excuses and easily connected the Company's disappointing performance and attendant stock price plunge to the widespread return of on-campus

learning, which collapsed student demand for Chegg because it made it much more difficult to use Chegg to cheat. As *Forbes* stated succinctly in a November 2, 2021, article: "Now that students are back in the classroom, they can't easily use Chegg to cheat." Similarly, Morgan Stanley issued a report on November 2, 2021 stating that Chegg's results were "Worse Than We Expected," citing a "reversal" of the "covid tailwinds" and noting that: "as students returned to campus for in person learning, they did not return to the Chegg platform, as they might now have access to in-person study groups, teaching assistants, on campus resources, and have more graded assignments in class where Chegg would not be helpful." Morgan Stanley further stated there was "uncertainty around" the stock, that Chegg was "in the penalty box," and that the Company's announcement was "a complete reset, given the enrollment and consumer behavioral changes that began to materialize in September."

170.    The conclusions of *Forbes* and Morgan Stanley were echoed by other major business and financial press. *Barron's* reported on November 2, 2021, that "Chegg shares lost nearly half their value after the company provided an earnings outlook that raised concern about the health of its business." Moreover, at least seven analysts downgraded Chegg stock in response to the November 1, 2021, disclosures. For example, in downgrading Chegg from "Outperform" to "Market Perform," analysts at Raymond James explained that "investors may be caught off guard by the slowing usage of the platform." Needham downgraded Chegg stock from "Buy" to "Hold," and similarly stated that the "subscriber losses … create a structural headwind to growth." Notably, in downgrading Chegg from "Buy" to "Neutral," Citi firmly rejected Chegg's attempt to blame its disappointing performance and lowered outlook on declining student enrollments, noting in a November 2, 2022 report that "enrollments have been in decline for a number of years now, and as bad as Fall 2021 has turned out to be, it is not worse than 2020. If anything, the decline in enrollments at Public 2-year institutions (community colleges) did moderate in 2021 vs. 2020." BNP Paribas also rejected Chegg's explanation, emphasizing in a November 2, 2021 report that "[e]nrollment has been declining for 10 years," and "official data actually show that the rate of decline in U.S. college enrollment eased in Fall 2021 vs. 2020."

171.     On December 30, 2021, *Forbes* continued to connect Chegg's stock price decline to cheating and, like Citi, excoriated the Company for providing false excuses.  *Forbes* reported that "the enrollment excuse makes ***no sense***.  This fall, the enrollment statistics showed a drop of about 3.2%.  In the fall of the previous year, enrollment fell about 3.4%.  ***In other words, enrollment declines this year were smaller than they were last year, when Chegg's revenue and stock were soaring***."  Once again, *Forbes* set the record straight as to the true reasons for Chegg's decline: "The difference between fall 2020 and fall 2021 was not enrollment. It was that ***fewer students were taking online classes and online tests which, in turn, meant fewer students were willing and able to pay Chegg for test answers*** … that's probably what the CEO meant when he alluded to a downturn in 'graded assignments' – ***the kind someone might be willing to pay to cheat on.***"

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.     May 2020 False Statements

172.     On May 4, 2020, after market close, Chegg announced its Q1 2020 financial results.  The Company reported that it had acquired 2.9 million subscribers in the quarter (a 35% increase year-over-year) and corresponding strong financial results reflecting "dramatic growth" for Q1 2020—including total net revenues of $131.6 million (a 35% increase year-over-year), adjusted EBITDA of $31.8 million (a 33% increase year-over-year), and Chegg Services revenues of $100.4 million (a 33% increase year-over-year).  The same day, Chegg held an accompanying conference call with analysts and investors to discuss the Q1 2020 results.  During the call, Defendant Rosensweig touted the Company's "extraordinary first quarter," telling investors "growth has been quite remarkable" and calling the Q1 results "remarkable trends." On this news, Chegg's stock price soared more than 32%, from a close of $43.79 on May 4, 2020, to close at $57.92 the following day.

173.     During the Q1 2020 earnings call, Defendant Brown similarly touted the "substantial increase" in Chegg's subscription services since remote learning began and attributed it to legitimate sources.  For example, Brown stated that "since mid-March . . . ***we have [] seen a substantial increase in our subscription services driven by new US and International subscribers to our platform, as well as increased success with our account sharing efforts*** and we see these

trends continuing into Q2."  Also on May 4, 2020, Chegg issued a press release, which was also filed with the SEC on Form 8-K, containing the same statement from Defendant Brown.

174.    In response to an analyst question asking about "changes that you're making . . . in the event" school remains "more online," Rosensweig responded: "***Whether the curriculum is taught offline or online by the schools, Chegg is the beneficiary in the fact that more and more students need more and more help, and there's only one service that has incredibly high quality, has the integrity,*** is on demand, is low-cost, and covers every conceivable subject that you can imagine, whether it's by step-by-step solution, video and those things."

175.    Similarly, a securities analyst asked if student interest and engagement with Chegg was "sustainable" after remote learning ended.  Rosensweig replied by emphasizing that the Company's success was purportedly attributable to the fact that Chegg's services were effectively replacing legitimate on-campus educational tools and "teach[ing]" students to "master the subject":

> ***I do*** . . . there are students that we believe that we've picked up who used to use on-campus services, like labs, tutors, and other things. Unfortunately, if you look at the state of higher education, every budget is being cut, and sadly, those will be amongst the first services that will be cut. ***But even if they weren't, once you've used and experienced Chegg and once you've learned how it can help you and what it really teaches you and you master the subject,*** there's really no reason, given the price is only $14.95 or $19.95, if you buy the bundle, which gets you writing and math on top of that, for you to stop using it. And every indication that we see suggests that the more they experience it, the more they use it, and the better results they get.

176.    The statements in ¶¶173-75 were materially false and misleading, and omitted material facts when made.  Chegg's subscriber growth was not due to legitimate factors, such as students' need for "more and more help," Chegg's purported effective replacement of traditional legitimate on-campus educational tools, or the Company's efforts to prevent account sharing.  Rather, as Lead Counsel's investigation confirmed, Chegg's massive subscriber growth at this time was instead directly attributable to students' increasing use of Chegg's platform to cheat which was made easier by the transition to remote learning, such that numerous professors from prominent universities across the country concluded that, based on their uniform experience, the "vast majority of students using Chegg" did so to cheat.  Former Chegg employees similarly confirmed that student cheating on Chegg "absolutely accelerated" during the pandemic, that it was "the cheating

business" that was responsible for Chegg's exponential growth during the Class Period, and that, despite Defendants' public statements to the contrary, Chegg's efforts to prevent account sharing— which former employees confirmed had already been implemented prior to the Class Period in 2019—were not the "driver" behind the Company's significant subscriber, revenue, and earnings growth.  This was borne out by the fact that, at the end of the Class Period after students returned to in-person learning, Chegg's subscriber growth sharply declined even though Defendants had put permanent measures in place to prevent account sharing.

177.    Later during the earnings call, Defendant Rosensweig stated, in response to an analyst question about whether the Company was prepared for "a range of on and off campus learning scenarios" that ***the only part of our business that on-campus, off-campus can affect would be textbooks.***"  Rosensweig further emphasized that "***our Chegg Services business will continue to grow whether it's on-campus, off-campus, whether they do a hybrid,***" and thus "***it shouldn't have a meaningful impact one way or the other given the momentum that we're seeing.***"

178.    The statements in ¶177 were materially false and misleading, and omitted material facts when made. Defendants' assertions that "Chegg Services business will continue to grow whether it's on-campus, off-campus" were false and misleading because Chegg's platform was widely used by students to cheat, which Defendants knew would be much more difficult once Chegg's users returned to on-campus, in-person education.  Indeed, Lead Counsel's investigation confirmed that use of Chegg to cheat was "severe" and "rampant," such that Chegg was essentially a "professional cheating operation" where the "vast majority of students using Chegg did so for illegitimate reasons."

179.    On May 14, 2020, Chegg presented at the JP Morgan Virtual Technology, Media Communications Conference.  During the conference, Defendant Rosensweig highlighted the Company's efforts to reduce account sharing as the principal reason for the Company's remarkable growth during the pandemic, stating that the Company's efforts to stop account sharing and its international growth "***alone***" "***will account for a significant growth, and are accounting for significant growth.***"    Rosensweig also attributed Chegg's remarkable growth to students'

legitimate need for educational help, stating that ***"when students were moved off campus and they had no access to a professor or a friend or the computer lab or the writing lab . . . without any campus support, people started taking the [Chegg Study Pack] bundle in a much more significant way."***

180.    Later during the same conference, in response to an analyst question about how "COVID-19 and remote learning chang[ed] things," Defendant Rosensweig rejected any notion that Chegg's success was due to the temporary effects of the pandemic, asserting instead that it was sustainable because students' need for Chegg's legitimate educational services was purportedly driven by schools' inability to provide adequate educational resources.  Rosensweig stated: "***More students are going to need more help because schools can't supply the help . . . They never made the investment in the tools that they needed.  So, we have been the beneficiary but not in a temporary way,*** like some maybe, because we just believe that this is inevitable."

181.    The statements in ¶¶179-80 were materially false and misleading, and omitted material facts when made.  Chegg's growth was not driven by "account sharing" efforts and international growth, or students "taking the [Chegg Study Pack] bundle in a much more significant way" due to a lack of "campus support."  Rather, as Lead Counsel's investigation confirmed, Chegg's explosive subscriber growth at this time was instead directly attributable to students' increasing use of Chegg's platform to cheat as a result of the transition to remote learning, such that numerous professors from prominent universities across the country concluded that, based on their uniform experience, the "vast majority of students using Chegg" did so to cheat.  Former Chegg employees similarly confirmed that student cheating on Chegg "absolutely accelerated" during the pandemic, that it was "the cheating business" that was responsible for Chegg's exponential growth during the Class Period, and that, despite Defendants' public statements to the contrary, Chegg's efforts to prevent account sharing—which former employees confirmed had already been implemented prior to the Class Period in 2019—were not the "driver" behind the Company's significant subscriber, revenue, and earnings growth.   This was borne out by the fact that, when students returned to in-person learning, Chegg's subscriber growth sharply declined despite the fact that Defendants had put permanent measures in place to prevent account sharing.

### B.    June 2020 False Statements

182.    On June 12, 2020, *The New York Times* published an interview with Defendant Rosensweig titled "For Online Learning, Business Has Never Been Better."   In the article, Rosensweig was asked about the extent to which students were using Chegg to cheat and, if so, what the Company was doing about it: "Many teachers believe that their students are using Chegg as a means by which to cheat.   Is this a problem? And if so, what are you doing about it?" In response, Rosensweig flatly asserted that "Chegg is not built for that," and claimed that Chegg took extensive efforts to curb any use of its platform to cheat, stating: "***We have built technology that removes copyrighted material before it even gets posted. If we're notified by a professor or a school that there's copyrighted material, it immediately gets flagged and then removed.***"

183.    The statements in ¶182 were materially false and misleading, and omitted material facts when made because, in reality, cheating on Chegg was rampant and pervasive at universities across the nation, as evidenced by numerous university personnel accounts stating that Chegg was "a very professional cheating operation" because the "vast majority of students using Chegg did so for illegitimate reasons."   Indeed, Defendant Rosensweig's assertions that "Chegg is not built" for cheating, and that Chegg took extensive efforts in response to evidence of cheating, misrepresented that, in truth, Chegg facilitated "rampant" and "severe" cheating through its Expert Q&A tool that provided "on demand" answers on an "almost immediate" basis.    Moreover, far from "immediately" "flagg[ing]" and then remov[ing]" exam questions that had been improperly posted to Chegg, university and professor accounts uniformly described how Chegg instead encouraged cheating by refusing to remove exam questions unless numerous burdensome criteria were met— even when prominent professors provided direct and incontrovertible evidence of student cheating during exams directly to Chegg—and by erecting numerous "hurdles[s] for faculty" to identify and discipline student cheaters.   Former Chegg employees similarly confirmed that, rather than not being "built" for cheating, it was in fact "the cheating business" that "ma[d]e up a big part of Chegg's revenue" and led to the Company's exponential growth during the Class Period—such that Chegg management "didn't really put any effort into stopping it because it was putting money into their pocket."

184.    On June 24, 2020, the Company participated in the Jefferies Global Consumer Conference.  At the conference, an analyst asked whether the Company would see "continued momentum" after students returned to campus.  In response, Brown stated that the pandemic had merely "accelerated" the "inevitable" long-term adoption of Chegg's online educational services, which he attributed to legitimate business reasons and sources, stating: "***This we believe has accelerated the inevitable,***" adding "***we believe a combination of all three of those things [efforts to stop account sharing, international penetration, and the Chegg Study Pack] continues to provide tailwinds beyond this kind of short-term period.***"

185.    The statements in ¶184 were materially false and misleading, and omitted material facts when made because Defendant Brown omitted that Chegg's "unprecedented" growth during the Class Period was not due to an "inevitable" transition to "online" learning, the Company's efforts to stop account sharing, or students' uptake of the Chegg Study Pack, but rather students' "rampant" and "severe" cheating facilitated by the pandemic and Chegg's Expert Q&A tool.  Lead Counsel's extensive empirical analysis of thousands of questions submitted to Chegg's Q&A during the Class Period similarly confirmed that the platform was widely used for blatant exam cheating, with students routinely submitting final exam questions to Chegg and receiving answers while in the midst of taking the exam.  Furthermore, numerous professors from prominent universities across the country concluded that, based on their uniform experience, the "vast majority of students using Chegg" did so to cheat.  Former Chegg employees similarly confirmed that student cheating on Chegg "absolutely accelerated" during the pandemic, that it was "the cheating business" that was responsible for Chegg's exponential growth during the Class Period, and that, despite Defendants' public statements to the contrary, Chegg's efforts to prevent account sharing—which former employees confirmed had already been implemented prior to the Class Period in 2019—were not the "driver" behind the Company's significant subscriber, revenue, and earnings growth.

C.    **August 2020 False Statements**

186.    On August 3, 2020, Chegg reported strong earnings results for Q2 2020.  The Company reported that it had acquired a "record" 3.7 million subscribers for the quarter (a 67%

increase year-over-year)—with Defendants touting that Chegg had "more subscribers in Q2 of this year than we had in all of 2018"—and "unprecedented growth" in key financial metrics, including (1) total net revenues of $153 million (a 63% increase year-over-year); (2) adjusted EBITDA of $55.5 million (a 78% increase year-over-year); and (3) Chegg Services revenue of $126 million (a 57% increase year-over-year).

187.    During the Company's earnings call later that day, Defendants Rosensweig and Brown extolled Chegg's extraordinary financial results, boasting that "Q2 was a fantastic quarter for Chegg," with "unprecedented engagement," "unprecedented growth," and a "record" number of subscribers, and emphasizing that these trends were "likely to continue for the foreseeable future."  Defendant Brown directly attributed this "unprecedented growth" to students "around the globe turn[ing] to Chegg" for legitimate educational assistance *"to help them master their subject matter and get better grades."*  Also on August 3, 2020, Chegg issued a press release, which was also filed with the SEC on Form 8-K, containing the same statement from Defendant Brown.

188.    Three days later, on August 6, 2020, Defendant Brown was interviewed on *Benzinga's* "Premarket Prep" podcast, a live online premarket broadcast hosted by veteran traders and featuring finance industry guests.  During the show, Defendant Brown was asked about a short seller report that had called Chegg "the poster child for institutionalized academic cheating."  In response, Brown flatly denied that Chegg's growth was based in any meaningful way on cheating, and emphasized the "fact" that Chegg was "a learning site" where cheating "doesn't happen."  Specifically, Brown replied: *"What you're talking about is some very isolated cases [of cheating] . . . the fact of the matter is this: we are a learning site."*  Brown continued, stating *"When you think about other services out there where there's a lot of user generated content where kids can upload papers and can upload tests, and they can download papers and download tests. That doesn't happen on Chegg — all of the content on Chegg is generated by Chegg."*  Brown underscored that Chegg followed a strict "Honor Code," and if there was any cheating "problem," the student was to blame: "We also have an honor code that our students are obliged to follow and *if we find they haven't followed that honor code then we will suspend them and at some point we*

1    *expel them if they're repeat offenders . . .* In any environment you have some kids that want to

2    cheat, so *Chegg's not really the problem it's more the student*."

3        189.    On August 7, 2020, *The Washington Post* published an article titled "Another

4    problem with shifting education online: A rise in cheating." The article noted that a spokesman for

5    Chegg said the Company supports academic integrity and hasn't seen *"any relative increase in*

6    *honor code issues since the covid-19 crisis began."*

7        190.    The statements in ¶¶187-89 were materially false and misleading, and omitted

8    material facts when made. Far from Chegg's "unprecedented growth" being attributable to students

9    using Chegg to "master their subject matter and get better grades," it was instead due to students'

10   use of Chegg's online services for "rampant" and "severe" cheating, such that prominent professors

11   across the country reported that they were "not aware of any students using Chegg for legitimate

12   purposes." Indeed, rather than students being prevented from "upload[ing] tests" onto Chegg,

13   numerous professors described how "[a]ll of my test questions had been posted" on Chegg, and

14   how they would routinely directly inform Chegg that "all of the final exam problems [] and

15   solutions . . . were posted to your website." Moreover, rather than cheating on Chegg being limited

16   to "very isolated cases," Lead Counsel's investigation confirmed that the exact opposite was true,

17   as numerous university FOIA responses and detailed accounts from university professors across

18   the country uniformly described how students' use of Chegg to cheat was "severe" and "rampant,"

19   such that Chegg was essentially a "professional cheating operation" where the "vast majority of

20   students using Chegg did so for illegitimate reasons." Indeed, multiple professors, deans, and high-

21   ranking officials at prominent universities concluded that, based on their experiences, as many as

22   "90-98%" of students using Chegg did so to cheat—with many stating that they were not aware of

23   *any* students who used Chegg for legitimate educational purposes. Further, Lead Counsel's own

24   empirical analysis of a limited, random sampling of thousands of Expert Q&A questions revealed

25   that approximately 25% had clear indicia of blatant student cheating. Additionally, far from

26   attempting to curb cheating, university and professor accounts uniformly described how Chegg

27   instead encouraged cheating by inexplicably erecting numerous "hurdles[s] for faculty" to identify

28   and discipline student cheaters. Former Chegg employees similarly confirmed that, rather than

being a "learning site," it was "the cheating business" that "ma[d]e up a big part of Chegg's revenue" and led to the Company's exponential growth during the Class Period—such that Chegg management "didn't really put any effort into stopping it because it was putting money into their pocket." Furthermore, in contrast to Chegg's statement that there had been no "relative increase in honor code issues" since the beginning of the pandemic, Lead Counsel's investigation confirmed that honor code violations involving Chegg skyrocketed during the pandemic, with professors stating that "the number of students cheating exploded" such that it was "raining [academic integrity] cases" during remote learning.

### D.    September 2020 False Statements

191.    On September 9, 2020, Chegg updated its Honor Code posted on the Company's website. The Honor code stated: "[Students] should never . . . use our services for any sort of cheating or fraud . . . *The vast majority of Chegg students use our services to help them learn and understand."* The Honor Code further stated that "[w]e don't tolerate abuse of our platform or services . . . *[M]isuse of our platform represents an extremely small portion of the activity on our services . . . We are constantly working to improve our abilities to detect and respond to issues around both copyright and academic integrity. We take both of these situations very seriously, and we will respond as quickly as possible."*

192.    The statements in ¶191 above were materially false and misleading, and omitted material facts when made. First, rather than the "misuse of" Chegg's platform representing only "an extremely small portion of the activity on our services," Chegg's business model and "dramatic" revenue growth was dependent upon widespread student cheating. Indeed, Lead Counsel's investigation, which included reviewing extensive documents produced by universities across the country in response to FOIA Requests, interviews with former Chegg employees as well as professors, deans, and high-ranking university officials at universities around the country, and an empirical analysis of thousands of questions submitted to Chegg during the Class Period, confirmed that Chegg facilitated "rampant" and "severe" widespread cheating through its Expert Q&A tool. Furthermore, the Company did not genuinely "take" cheating and copyright violations "seriously" and "respond as quickly as possible" to takedown requests. To the contrary, far from

attempting to curb cheating, university and professor accounts uniformly described how Chegg instead encouraged cheating by erecting numerous "hurdles[s] for faculty" to identify and discipline student cheaters.  Former Chegg employees similarly confirmed that, rather than aiming to provide services that help students "learn and understand," it was "the cheating business" that "ma[d]e up a big part of Chegg's revenue" and led to the Company's exponential growth during the Class Period—such that Chegg management "didn't really put any effort into stopping it because it was putting money into their pocket."

193.     On September 23, 2020, Defendant Rosensweig gave a speech at the CMU Silicon Valley Summit Distinguished Speaker Series, where he claimed that the Company's "insane" growth during the pandemic was essentially attributable to Chegg's efforts to clamp down on account sharing.  Rosensweig explained that: "What happened [during COVID] was twice as many people wanted it, I shouldn't say that.  *Truth is we had done a lousy job for years almost on purpose of blocking account sharing as I'm sure many of you know. When the pandemic came in the United States what happened was proximity sharing . . . went away at the same time we had been working on all this technology to block it*."  As a result, Rosensweig claimed, *"so what ended up happening was all these students that have been using it suddenly started to pay for it and we grew organically 58% year-over-year in the second quarter which is insane if you understand businesses."*

194.     The statements in ¶193 were materially false and misleading, and omitted material facts when made.  Rather than being driven by the Company's measures to "block[] account sharing," Chegg's growth was driven by an increase in cheating during the pandemic facilitated by remote learning. As confirmed from Lead Counsel's investigation, Chegg's explosive subscriber growth at this time was directly attributable to students' increasing use of Chegg's platform to cheat, which was made easier by the transition to remote learning.  Former Chegg employees similarly confirmed that student cheating on Chegg "absolutely accelerated" during the pandemic, that it was "the cheating business" that was responsible for Chegg's exponential growth during the Class Period, and that Chegg's efforts to prevent account sharing were not the "driver" behind the Company's significant subscriber, revenue, and earnings growth.

E.     **October 2020 False Statements**

195.     On October 26, 2020, Chegg reported "extraordinary" results for Q3 2020, including 3.7 million subscribers (a 69% increase year-over-year), total revenues of $154 million (a 64% increase year-over-year), adjusted EBIDTA of $31.9 million (a 38% increase year-over-year), and Chegg Services revenue of $118.9 million (a 72% increase year-over-year).

196.     Chegg held its Q3 2020 earnings call later the same day.  During the call, Defendants Rosensweig and Brown hailed the "great quarter," "extraordinary growth," and "extraordinary year" Chegg was having, and raised the Company's revenue and earnings guidance for 2020 for the second time that year based on the continued "momentum" and "*permanent situation*" Chegg was experiencing. Specifically, responding to an analyst's "longer-term question" about whether Chegg's explosive growth would "sustain when we kind of go back to a more normal environment," Defendant Rosensweig stated that student usage of Chegg "*is agnostic to geography*," and "*[i]f you're at the school or if you're not at the school, you subscribe and use Chegg [in] very similar ways*."  Rosensweig added that *"[t]hose that are at school and not at school are taking the same take rates of Chegg Study whether they're in school physically or not in school.  So for us, we see this as a permanent situation*."

197.     In the Company's Form 10-Q for Q3 2020, which was also filed with the SEC on October 26, 2020, Defendants attributed the 69% year-over-year increase in subscribers, and the corresponding 72% year-over-year increase in Chegg Services revenue, to "*our efforts to reduce account sharing.*"

198.     On October 27, 2020, Defendant Rosensweig was interviewed by CNBC on the television program "Closing Bell."   During the interview, Rosensweig was asked "where the demand is coming from?" In response, Rosensweig again made clear that Chegg's growth was attributable to the Company's efforts to prevent account sharing: "In the U.S., *coincidental with COVID, was the fact that we were working on account sharing efforts* because for every one student that was paying for Chegg, two were using Chegg, so not a great business model. We were still growing over 30 percent but we are working on that. *When COVID came and students had to leave campus, it was much harder for them to share. We've been the beneficiary of that. We built*

*all the technology to block it, so that's why even when they went back to campus, the growth rate*

*accelerated even more."*

199.    The statements in ¶¶196-98 were materially false and misleading, and omitted material facts when made.  Rather than revenue and subscriber growth being driven by legitimate reasons such as the Company's "efforts to reduce account sharing," Chegg's explosive subscriber growth was in fact directly attributable to students' increasing use of Chegg's platform to cheat, which was made easier by the transition to remote learning.  Former Chegg employees similarly confirmed that student cheating on Chegg "absolutely accelerated" during the pandemic, that it was "the cheating business" that was responsible for Chegg's exponential growth during the Class Period, and that Chegg's efforts to prevent account sharing were not the "driver" behind the Company's significant subscriber, revenue, and earnings growth.  Finally, Chegg was not "agnostic to geography," and students did not use the platform in "very similar ways," if they were "at the school" or "not at the school."  Indeed, use of Chegg exploded during remote learning precisely because it was far easier to use Chegg to cheat when students were not on campus and were not attending school in-person.

F.    **November 2020 False Statements**

200.    On November 12, 2020, Chegg presented at the Citi Virtual Education Series.  During the conference, a securities analyst asked if Chegg's total addressable market "has changed pre-COVID and as of today?"  In response, Brown stated: ***"I don't think it's changed at all pre-COVID to post-COVID"*** adding that the Company's revenue and subscriber growth was due to ***"a combination of two things"*** the first being the Company's successful initiative to reduce "***account sharing in the US***."

201.    The statements in ¶200 were materially false and misleading, and omitted material facts when made. In truth, Chegg's total addressable market greatly changed due to COVID because students had flocked to Chegg's platform to cheat during remote learning.  Furthermore, Chegg's growth during the Class Period was not due to "account sharing" measures, but a sharp increase in students using the platform to cheat.  Lead Counsel's investigation confirmed that student cheating on Chegg "absolutely accelerated" during the pandemic, that it was "the cheating business" that

was responsible for Chegg's exponential growth during the Class Period, and that Chegg's efforts to prevent account sharing were not the "driver" behind the Company's significant subscriber, revenue, and earnings growth.

### G.     December 2020 False Statements

202.     On December 8, 2020, Chegg presented at the Raymond James Technology Investor Conference.  During the conference, a securities analyst asked, "how do you think the pandemic has shifted [] longer term consumer behavior in the online learning space," adding that "it seems like it's still going to be a long-term catalyst as well."  In response, Brown again attributed Chegg's success during the pandemic to a purported reduction in account sharing:

> I do believe, and we've said this before, that it was inevitable that more and more learning was going to go online. It would just – to us, it was like a no-brainer. Do we believe that has accelerated as a result of COVID? The answer is, yes. *So I think the dynamic we saw in the US was more so around that account sharing, maybe some that were there – because they didn't have the on-campus help, but I think the vast majority was account sharing, again. And that to me is – those tailwinds continue into 2021 and 2022 because any time somebody signs up for a subscription, they can't share with one or two other people.*

203.     During the same conference, another analyst pressed Brown on whether the Company's efforts to crack down on account sharing would continue to be a "driver" of growth in "2021 and 2022" or had Chegg "largely gotten through. . .the account sharing issues?"  In response, Defendant Brown reiterated: "*No. No. No . . .when you think about account sharing . . .the tailwinds there continue into 2021, because every new user that comes onto the platform that actually subscribes to Chegg Study doesn't have the ability to share anymore.*"  According to Brown, "*those tailwinds continue as we get into 2021 and 2022 as we potentially refine some of the conditions around those technologies.*"

204.     The statements in ¶¶202-03 were materially false and misleading, and omitted material facts when made because Defendant Brown falsely attributed the increase in subscriber growth to the Company's efforts to limit "account sharing," rather than rampant cheating facilitated by the pandemic and Chegg's Expert Q&A tool. Lead Counsel's investigation confirmed that student cheating on Chegg "absolutely accelerated" during the pandemic, that it was "the cheating business" that was responsible for Chegg's exponential growth during the Class Period, and that

Chegg's efforts to prevent account sharing were not the "driver" behind the Company's significant subscriber, revenue, and earnings growth.

205.    On December 16, 2020, *KAGS News* published a story discussing a cheating scandal at Texas A&M university titled "Maroon, white & gray areas: Texas A&M investigating academic dishonesty with online classes." In response, Devonya Batiste, a Chegg Communications Manager is quoted in the article as stating: **"*All our services*, including textbook rentals, online tutoring and revision aids, *are designed to support the learning process and have been an invaluable resource to students, especially during the pandemic. We are deeply committed to academic integrity. The vast majority of students who use our platform are honest and here to learn. However, we take extremely seriously any attempts to cheat by a tiny fraction of users.*"**

206.    The statements in ¶205 were materially false and misleading, and omitted material facts when made. Rather than "all [Chegg's] services" being "designed to support the learning process," and cheating being limited to a "tiny fraction of users," Chegg's services were widely used by students to cheat. Indeed, numerous university FOIA responses and detailed accounts from university professors across the country uniformly described how students' use of Chegg to cheat was "severe" and "rampant," such that Chegg was essentially a "professional cheating operation" where the "vast majority of students using Chegg did so for illegitimate reasons." Moreover, Lead Counsel's extensive empirical analysis of a random sampling of thousands of questions submitted to Chegg's Q&A during the Class Period similarly confirmed that the platform was widely used for blatant exam cheating—with *approximately 25%* of the submitted questions Lead Counsel reviewed showing clear indicia of blatant student cheating, including *while in the midst of taking the exam.* Indeed, far from attempting to curb cheating, university and professor accounts uniformly described how Chegg instead encouraged cheating by inexplicably erecting numerous "hurdles[s] for faculty" to identify and discipline student cheaters. Former Chegg employees similarly confirmed that Chegg "didn't really put any effort into stopping [cheating] because it was putting money into their pocket."

### H.    January 2021 False Statements

207.    On January 13, 2021, Chegg issued a press release announcing the launch of the Company's new "Honor Shield" program, which the Company claimed would prevent student use of Chegg's online platform to cheat.  The press release stated that "Honor Shield allows professors to confidentially, and without charge, pre-submit exam or test questions, *preventing them from being answered on the Chegg platform during a time-specified exam period.*" The press release further assured that: **"*We are working with faculty, administrators, and students, to do our part in protecting the integrity of the online evaluation process*.**"  The press release also quoted Defendant Schultz as stating: "***The overwhelming majority of students use our platform to get the support they need to learn and master their subjects***," and that only "***a small number of students have misused our platform in ways it wasn't designed.***"

208.    The statements in ¶207 were materially false and misleading, and omitted material facts when made.  *First*, Honor Shield did not "prevent[]" exam questions from being answered during "a time-specified exam period."  Rather, Lead Counsel's empirical analysis found that, based on a random sampling of thousands of Expert Q&A submissions, approximately 25% of students were using Chegg to blatantly cheat, often in the midst of timed exams.  Numerous prominent professors similarly detailed instances of how they routinely found answers to their own exam content on Chegg's Expert Q&A platform that were posted during timed exams—including those who had utilized Honor Shield.  *Second*, Honor Shield was not a real effort by Chegg to "help" universities prevent cheating on the platform, but rather a façade the Company implemented to address public concern in the wake of a growing number of cheating scandals involving Chegg.  Indeed, one professor interviewed by Lead Counsel stated the Company was acting in "bad faith" with respect to Honor Shield because the Company knew that the program was not going to work.  *Third*, rather than "working with faculty, administrators, and students, to … protect[] the integrity of the online evaluation process," "building systems to support student learning," having a "range of measures already in place to prevent abuse of Chegg's platform," Chegg erected numerous "hurdles" to identifying cheaters and refused to cooperate with faculty to remove exam content during the time exams were being administered.  *Finally*, Defendants' statement that the "majority"

of Chegg usage was by students seeking support "to learn and master their subjects" was false and misleading because, in truth, the use of Chegg to cheat was "severe" and "rampant," such that Chegg was essentially a "professional cheating operation" where the "vast majority of students using Chegg did so for illegitimate reasons." Indeed, multiple professors, deans, and high-ranking officials at prominent universities concluded that based on their experiences, as many as "90-98%" of students using Chegg did so to cheat—with many stating they were not aware of *any* students who used Chegg for legitimate educational purposes.

## I.     February 2021 False Statements

209.     On February 5, 2021, *Inside Higher Ed* published an article titled "A Spike in Cheating Since the Move to Remote?" The article reported on a research paper published by the *IJEI* the day before that examined potential cheating on Chegg. In response to the paper, Candace Sue, Chegg's "Director of Academic Relations," was quoted in the *Inside Higher Ed* article stating that the authors of the research paper ***"mistakenly imply – without any evidence – that increased usage of Chegg has [sic] correlates to an increase in cheating.*** With millions of students going online in a matter of months, students have lost valuable on-campus and faculty support services, and stress and anxiety is high. ***Chegg provides much needed learning support to these students, especially during the pandemic."*** Sue further said that "***we cooperate with every official academic Honor Code investigation*** and respond to every copyright takedown request as soon as possible. ***We remain 100% committed to addressing this challenge."***

210.     The statements in ¶209 were materially false and misleading, and omitted material facts when made. Rather than being "100% committed to addressing" cheating by "cooperat[ing] with every official academic Honor Code investigation," as numerous detailed professor and university accounts during the Class Period confirmed, in truth, Chegg erected numerous "hurdle[s] for faculty" to address cheating, including by refusing to take exam questions down unless burdensome requirements were satisfied and refusing to provide any identifying information for student-cheaters. As a result, as these universities and professors confirmed, students using Chegg engaged in "severe" and "rampant" cheating by routinely posting "entire test[s]" to Chegg's Expert Q&A—such that universities were forced to strategize to make their classes "Chegg-proof." Lead

Counsel's empirical analysis also confirmed rampant cheating using Chegg during the Class Period, with blatant cheating being clearly evident in approximately 25% of the thousands of Expert Q&A submissions Lead Plaintiffs randomly sampled. Former Chegg employees similarly confirmed that Chegg "didn't really put any effort into stopping [cheating] because it was putting money into their pocket." Indeed, in contrast to Chegg's statements that there was "no evidence" increased usage of Chegg "correlates to an increase in cheating," Lead Counsel's investigation confirmed that the increase in Chegg usage *was* due to rampant cheating, which "absolutely" increased during the pandemic, and that the "cheating business" "ma[d]e up a big part of Chegg's revenue," leading to the Company's remarkable growth during the Class Period.

211.    On February 8, 2021, Chegg released its earnings results for Q4 2020 and full year 2020, stating that the Company had "outperformed all expectations" due to students subscribing to Chegg in "record numbers," such that "2020 was our best year as a company." Specifically, for the fourth quarter, Chegg reported (1) 4.4 million subscribers (a 74% increase year-over-year); (2) total net revenues of $205.7 million (a 64% year-over-year increase); (3) adjusted EBITDA of $89.7 million (a 47% increase year-over-year); and (4) $176 million in revenue for Chegg Services (a 64% increase year-over-year). For the full year 2020, Chegg reported (1) 6.6 million subscribers (a 67% increase year-over-year); (2) total net revenues of $644.3 million (a 57% increase year-over-year); (3) adjusted EBITDA of $207.1 million (a 66% increase year-over-year); and (4) Chegg Services revenue of $521.2 million (a 57% increase year-over-year). Defendants touted Chegg's "extraordinary growth," telling investors that "[w]e far exceeded our initial expectations for revenue, adjusted EBITDA and all key operating metrics," and hailed 2020 as "our best year as a company."

212.    The same day, Chegg held an earnings call to discuss its Q4 2020 results. During the call, Defendant Rosensweig attributed the Company's stellar financial performance to an increasing number of students using Chegg to "learn," and stated that this "irreversible trend" supported raising Chegg's financial guidance for 2021. Rosensweig stated: "We believe this massive shift to learning online accelerated by the pandemic is an irreversible trend and is actually more student centric. … ***Our results reflect the growing importance of Chegg's learning support***

*services to millions of students around the world.* In 2020, we saw year-over-year annual subscriber growth of 67%, representing over 6.6 million subscribers, and total revenue growth of 57%. *The trends toward online learning are continuing and, as a result, it gives us the confidence to raise our guidance in 2021.*" Also on February 8, 2021, Chegg issued a press release, which was also filed with the SEC on Form 8-K, containing the same statements from Defendant Rosensweig.

213.    During the February 8, 2021, earnings call, an analyst asked Defendant Rosensweig about "some negative media stories about how students might have been abusing the Chegg product." In response, Rosensweig ridiculed the question and vehemently denied that cheating was a problem:

> *[R]eporters don't understand what Chegg does and the way we do it. And it's sort of like traditional media defending traditional media actually – versus actually looking at the changes and the advancements that are happening in every industry.* Look, the Internet is here to stay. Technology is here to stay. What happened for the schools, unfortunately, is they were woefully underinvested in technology. They didn't prepare to teach online. They tried not to teach online. And then when push came to shove, they gave take-home tests of – often those tests were old questions or they're auto generated . . . *So we stepped in and we said, look, that's not what Chegg was built for. That's not what we want it for. The overwhelming majority, I mean overwhelming majority students who use us every week, whether they have a test or have a quiz or not, because they have no scalable support from their institutions,* and frankly, overwhelmingly, none of them ever had in it in high school. *So we're the first high-quality, affordable, on-demand support that they can use to master their subject* . . . ."

> But we said, look, we have a role to play here, too. And so, the first thing is we doubled the number of people that we have that handle these kinds of issues almost overnight. Because we saw our subscriber base double almost overnight, and not just domestically, outside the U.S. So that's the first thing. *So if we ever got contacted by schools, our policy is we take it down first, and then we investigate it. And then if we shift it, put it back up, we do. ... The second thing is we use technology and AI to actually build technology that blocks people from asking multiple questions. So, you can't submit a test all at once. There are other sites that do that. We're not one of the ones that does that because that's not what we're for. So actually, if you submitted either in text or you submitted in photos, we now use technology, AI and machine learning, to actually block it, ask which specific question you want to ask. And then the last thing we did was launch Honor Shield …*

> *In the case of Honor Shield, we said, look, what we want to do is provide a free*

*tool that's really robust, that can scale, that any professor or any school in the world can pre-submit their tests and give us the specific time that those tests happened, and then we block the ability for that question to be answered during that test time.* And then, we store them on a segregated server, and then the plan is to delete them all and then they go back to the professor. *So, we stepped up and did that all within 90 days, because we saw the possibility for this.*

214.    The statements in ¶¶212-13 were materially false and misleading, and omitted material facts when made. *First*, contrary to Rosensweig's statement that cheating was "not what Chegg was built for," in reality, and as Lead Counsel's comprehensive investigation confirmed, Defendants were deliberately capitalizing on rampant student cheating on Chegg's platform—which was the real reason for the Company's dramatic growth during the Class Period.  Indeed, Lead Counsel's investigation revealed that numerous prominent universities and professors across the country uniformly described student cheating using Chegg as "severe" and "rampant," such that Chegg was essentially a "professional cheating operation."  Former employees similarly described how cheating using Chegg "absolutely accelerated" during the pandemic, and how the Company deliberately "didn't really put any effort into stopping it because it was putting money into their pocket." *Second*, rather than only a small minority of students using Chegg to cheat—such that the "overwhelming majority" was using it legitimately—in reality, and as numerous prominent professors across the country described, "the vast majority of students using Chegg did so for illegitimate reasons."   Indeed, Lead Counsel's empirical analysis of a random sampling of thousands of questions from Chegg's Expert Q&A archive during the Class Period easily revealed that approximately 25% of students' submissions bore clear indicia of blatant student cheating, often during the midst of taking an exam. *Third*, it was not the case that if Chegg was "ever [ ] contacted by schools" the Company would "take it down first"—to the contrary, and as professors across the country uniformly described, Chegg would routinely *refuse* to take the objectionable content down, instead requiring faculty to clear numerous burdensome "hurdles"—and even then refused to provide identifying information for student cheaters. *Fourth*, rather than blocking students from submitting an entire test "all at once," as numerous professor accounts cross-corroborated, students in fact routinely submitted "entire tests" to Chegg, prompting numerous professor complaints sent directly to Chegg that the Company failed to address. *Fifth*, as numerous

professor accounts confirmed, the Company's launch of Honor Shield was a mere façade, as long after its launch, Chegg continued to refuse to cooperate with university faculty to prevent cheating during the period of a timed exam. Indeed, while Defendants held out Honor Shield as a "really robust" tool "that can scale, that any professor or any school in the world" could use, there were many other measures that would have been far easier for Chegg to implement and that also would have been far more effective in stopping cheating – in particular, simply requiring students to register for Chegg with their school email address – that Defendants refused to take despite receiving repeated pleas from university faculty to do so.

215.    During the same earnings call, an analyst asked about the "returns" the Company was seeing from its efforts to prevent account sharing. In response, Defendant Rosensweig stated: "So a lot of people ask what happens post-COVID, and I think Andy [Brown] just articulated [] *Chegg's success in the US is not a result of people being on campus or not being on campus*," adding that "*we [] had an extraordinary number of people who were sharing accounts*" but now pay the monthly subscription fee because "*they just feel it's worth it now because they weren't able to share it anymore.*"

216.    In response to another analyst question about the Company's "growth levers," Rosensweig reiterated that "*the one that has had the most immediate impact is account sharing*. And *I think people are confusing that domestically as if we're a stay-home company or not a stay-home company. That's completely irrelevant to Chegg.* What's relevant is that students know who we are, they want us, we provide an unbelievable service, and the numbers reflect that."

217.    The statements in ¶¶215-16 were materially false and misleading, and omitted material facts when made. *First*, Chegg's growth was not driven by legitimate factors such as the Company's "account sharing" measures. In truth, Chegg facilitated widespread cheating through its Expert Q&A tool that provided "on demand" answers on an "almost immediate" basis. Furthermore, as confirmed by Lead Counsel's investigation, the Company's explosive subscriber growth at this time was directly attributable to students' increasing use of Chegg's platform to cheat as a result of the shift to remote learning, such that numerous professors from prominent universities across the country concluded that, based on their uniform experience, the "vast majority of students

using Chegg" did so to cheat.   Former Chegg employees confirmed that it was "the cheating business" that was responsible for Chegg's exponential growth during the Class Period, and Chegg's efforts to prevent account sharing were not the "driver" behind the Company's significant subscriber, revenue, and earnings growth.  This was borne out by the fact that, at the end of the Class Period after students returned to in-person learning, Chegg's subscriber growth sharply declined despite the fact that Defendants had put permanent measures in place to prevent account sharing. *Second*, whether school was online or in-person was not "completely irrelevant" to Chegg, as the Company's "success in the US" *was entirely* a result of people "not being on campus," which made it possible for students to cheat by using Chegg.

218.    On February 11, 2021, Defendant Rosensweig participated in Goldman Sachs' Technology & Internet Virtual Conference. During the conference, an analyst asked about the Company's efforts to prevent account sharing.  In response, Rosensweig largely attributed Chegg's accelerated U.S. growth during the pandemic to the Company's efforts to prevent account sharing, including: (1) eliminating "*stealing and reselling*" account login information; and (2) implementing "*2-step authentication*." In addition, Rosensweig attributed Chegg's U.S. growth to the fact that *"institutions are providing almost zero support to students off-campus, let alone back on campus when they get there*."

219.    Additionally, during the Goldman Sachs conference a securities analyst asked, "what's giving you confidence to" raise guidance "at this stage with this sort of ongoing uncertainty?"  In response, Rosensweig stated that *"because unlike other businesses that are affected one way by COVID, it became clear to us that whether you are on-campus or not on-campus, [it] didn't matter to Chegg's growth.  So we're going to grow through when they go back to campus."*

220.    The statements in ¶¶218-19 were materially false and misleading, and omitted material facts when made. The Company's efforts to curb account sharing were not the source of Chegg's unprecedented growth during the Class Period.  Rather, in truth, Chegg's dramatic growth was driven by "severe" and "rampant" cheating that "absolutely" increased during the pandemic. Former Chegg employees similarly confirmed that student cheating on Chegg "absolutely

accelerated" during the pandemic, that it was "the cheating business" that was responsible for Chegg's exponential growth during the Class Period, and that Chegg's efforts to prevent account sharing were not the "driver" behind the Company's significant subscriber, revenue, and earnings growth. This was borne out by the fact that, when students returned to in-person learning, Chegg's subscriber growth sharply declined despite the fact that Defendants had put permanent measures in place to prevent account sharing. Finally, contrary to Defendants' statements, Chegg *was* "affected … by COVID" and "whether [students] were on campus or not on campus" *did* matter to Chegg's growth as the Company's revenue and subscriber growth was driven by an increase in cheating during the pandemic facilitated by the switch to online learning.

221. On February 22, 2021, Chegg filed its annual report on Form 10-K for the year ended December 31, 2020 ("2020 Form 10-K"). The 2020 Form 10-K touted strong revenue growth for Chegg Services, stating that revenues increased $189 million, or 57% year-over-year, primarily due to a 67% increase in subscriber growth, which was "***driven by***," among other things, "***our efforts to reduce account sharing***."

222. The statements in ¶221 were materially false and misleading, and omitted material facts when made. The Company's efforts to curb account sharing were not the "driver" behind the Company's significant growth. In truth, Chegg's growth was driven by rampant cheating that "absolutely" increased during the pandemic. Former Chegg employees similarly confirmed that student cheating on Chegg "absolutely accelerated" during the pandemic, that it was "the cheating business" that was responsible for Chegg's exponential growth during the Class Period, and that Chegg's efforts to prevent account sharing were not the "driver" behind the Company's significant subscriber, revenue, and earnings growth. This was borne out by the fact that, when students returned to in-person learning, Chegg's subscriber growth sharply declined despite the fact that Defendants had put permanent measures in place to prevent account sharing.

**J.    March 2021 False Statements**

223. On March 3, 2021, Chegg presented at the Morgan Stanley Technology, Media and Telecom conference. During the question-and-answer session, an analyst asked Defendant Rosensweig whether Chegg's growth was sustainable or whether it was tied to COVID-19 and

remote learning. In response, Rosensweig responded that Chegg's growth was sustainable and "agnostic" as to where students were located because of Chegg's purportedly successful efforts to limit account sharing:

> *So, we had already started to reaccelerate our growth, because we had fixed some things around account sharing and we started our international efforts, and we started to see the beginning of the success of the bundle. Those things are not going to stop regardless of where the student is physically located… for somebody like Chegg, we have always been agnostic of where the physical seat of the student is … on the domestic front, we already started to see reacceleration before COVID; second, we've been working on account sharing efforts, which were accelerated by COVID*, meaning because students couldn't proximity share, be in the same dorms, be in the same room, they couldn't share as much, so you really saw the full usage of Chegg. *And those students started to pay*. At the same time, we accelerated our technology efforts to block those kinds of things. We did it in August and October of last year and *they are holding*.

224.    On March 11, 2021, Chegg presented at the Jefferies Virtual Online Education e-Learning Summit. During the conference, an analyst noted that "last year was unprecedented," and asked "[h]ow … [do] you think about the world and education over the next couple of years?" In response, Rosensweig stated that Chegg was not a "stay-at-home" stock whose performance depended on the pandemic, but instead had "accelerating growth before the pandemic and the pandemic just accelerated it more." Rosensweig then represented that Chegg's performance was sustainable because it was based on legitimate academic support that schools did not provide, stating "*post the pandemic, it's not going to go back to the way that it was. Because the issue for Chegg was never whether you're physically on a campus or at home, the issue for Chegg was an acknowledgment that what we do is what students need and schools cannot offer it, and do not offer it.*"

225.    During the same conference, an analyst asked about the impact of Chegg's efforts to stop "password sharing," noting it had been a "major driver" of the Company's growth. In response, Defendant Rosensweig agreed, explaining that *"what we did last August and last October when we did sort of revamped the passwords and did MFA [multi-factor authentication]. So we now limit the number of devices they can use, and that, more than anything else, coincided with COVID, but more than anything else that's what drove our domestic growth."*

226.    The statements in ¶¶223-25 were materially false and misleading, and omitted material facts when made.  *First*, Chegg's growth during the Class Period was not driven "more than anything else" by the Company's "account sharing efforts."  Lead Counsel's investigation confirmed that the Company's efforts to curb account sharing were not the "driver" behind the Company's significant growth.  In truth, Chegg's growth was driven by rampant cheating that "absolutely" increased during the pandemic.  This was borne out by the fact that, when students returned to in-person learning, Chegg's subscriber growth sharply declined despite the fact that Defendants had put permanent measures in place to prevent account sharing.

227.    *Second*, rather than Chegg being "agnostic of where the physical seat of the student is," Chegg's usage was largely driven by student cheating fueled by the pandemic and Chegg's "Expert Q&A" tool, which was much more difficult to use for cheating once students physically returned to school.

**K.    May 2021 False Statements**

228.    On May 3, 2021, Chegg reported its earnings results for Q1 2021.  Specifically, the Company reported (1) 4.8 million subscribers for the quarter—or "almost 1 million more subscribers than we had in all of 2019"; (2) $198.4 million in total net revenues (a 51% increase year-over-year); (3) $57.1 million in adjusted EBITDA (an 80% increase year-over-year); and (4) $162.4 million in Chegg Services revenue (a 62% increase year-over-year). Defendants touted Chegg's "strong Q1 results," "incredible profitability," and "extraordinary growth"—which they continued to attribute to "***our continued efforts around limiting account sharing,***"—and assured investors that these trends would continue for "the foreseeable future."  The Company's Q1 2021 Form 10-Q filed the same day similarly attributed the increase in Chegg Services revenues as being "***primarily due to our efforts to reduce account sharing***."

229.    The same day, Chegg held its Q1 2021 earnings call.  As investors began to question the impact of COVID-19 related restrictions lifting, including students' anticipated return to in-person learning, Defendants continued to strongly deny that COVID-19 and remote learning had anything to do with the Company's break-out success.  Specifically, during the call, a securities analyst asked if the Company's full-year outlook included "conservatism around retention rates as

students go back to campus?" In response, Rosensweig stated that, based on the Company's

extensive research, the "end of COVID" is "not going to affect us negatively at all":

> [T]here's a lot of people that I think are confusing whether Chegg is a back to work, back   to not work, we're neither of those things [] **as long as students are in school, they want, they need, and they're using Chegg. It doesn't matter their geography, physical location. So, we have looked at all of the data. If you were back at school and in classroom, if you were back at school and in classroom sometimes but not the rest, or if you were at home, your conversion levels, your engagement levels, your renewal levels are almost identical. So, we are not affected by whether schools teach online or offline or teach hybrid. The only thing that could affect us, which isn't the case, is if there was no school. And that is not what happened. It's not what's happening. And so as we come to an end of COVID, it's not going to affect us negatively at all.**

230.    In response to the same question, Rosensweig further highlighted the Company's

efforts to limited account sharing, which purportedly continued to contribute to Chegg's growth:

> [A] lot of the people have said our growth last year had a lot to do with COVID. … [I]n the US, we have been working on account sharing efforts and those account[] sharing efforts were benefited from the fact that students left campus and couldn't proximity-share, sit next to somebody and share. But as you know, we have done a lot of work to block all those things. So, as students went back to school and they lived in pods or they went to classrooms, and most of their pods were people in the same class. So we saw only the positive impact of what we've done on account sharing. **So, we are not a COVID case in any way in terms of going back or staying home. If you're in school, you want Chegg. And we have the numbers that back that up.**

231.    The statements in ¶¶229–30 were materially false and misleading, and omitted

material facts when made. *First*, contrary to Rosensweig's statement that demand, and usage was

not affected whatsoever by "their geography, [or] physical location" of students, user engagement

and renewal levels were significantly driven by remote learning, which made it easier to use

Chegg's Expert Q&A tool to cheat. *Second*, the pandemic did not increase the Company's growth

because "students left campus and couldn't proximity share [accounts]," but rather because it made

it far easier for students to cheat during unsupervised remote learning.  Indeed, Lead Counsel's

investigation confirmed that the Company's efforts to curb account sharing were not the "driver"

behind the Company's significant growth.  In truth, Chegg's growth was driven by rampant

cheating that "absolutely" increased during the pandemic.  This was borne out by the fact that,

when students returned to in-person learning, Chegg's subscriber growth sharply declined despite

the fact that Defendants had put permanent measures in place to prevent account sharing.

1

2

3

4

232.    On May 5, 2021, Defendant Brown was interviewed on TD Ameritrade Network. During the interview, Defendant Brown stated, "*clearly we're not a COVID play I mean a big part of our success is really what we're doing in the business, particularly in the US, around account sharing.*"

5

6

7

8

233.    On May 19, 2021, Chegg presented at the Needham Virtual Technology & Media Conference.  During the conference, an analyst asked, "Assuming we return to primarily in-person learning this fall, what gives you the confidence in your ability to retain the so-called COVID cohort of the subscribers you added in 2020?"  In response, Brown stated:

9

10

11

12

13

> *We're not sure it's a COVID cohort.* So I just want to make sure that's clear. I mean there were quite a few things that occurred kind of in the middle of 2020 that we're -- I call it, we're lapping as it were, right? One is the COVID part. What part of that is COVID? *But at almost the same time, we started doing things around account sharing. So how much of that is COVID and how much is account sharing? And we do believe a big part of that is actually what we have done, which is account sharing, and that continues.*

14

15

16

17

> *… And so, there are really three dynamics that we are lapping. It's not just about – it certainly isn't just about COVID.* What – but what we do know is this is that, what we saw last year was just an acceleration of what we call the inevitable. And that is that more and more educational services were going to go online. *More and more students once they found the fact that they could get on-demand educational services, why would they go away, right?* I mean because that's how they live their normal lives. Everything is on demand.

18

19

20

21

22

23

24

25

26

27

28

234.    The statements in ¶¶232-33 were materially false and misleading, and omitted material facts when made.  Chegg was in fact a "COVID play" and a "COVID cohort" was driving its demand because the Company facilitated widespread cheating through its Expert Q&A tool that provided "on demand" answers on an "almost immediate" basis that was made possible by remote learning.  Thus, Chegg's revenue and subscriber growth was fueled by cheating during remote learning, and such cheating would be dramatically curtailed once students returned to in-person school.  Additionally, Lead Counsel's investigation confirmed that the Company's efforts to curb account sharing were not the driver behind the Company's significant growth.  In truth, Chegg's growth was driven by rampant cheating that "absolutely" increased during the pandemic.  This was borne out by the fact that, when students returned to in-person learning, Chegg's subscriber growth

95

1    sharply declined despite the fact that Defendants had put permanent measures in place to prevent

2    account sharing.

3         **L.    June 2021 False Statements**

4         235.    During June 2021, Defendants continued to claim that Chegg was proactively

5    addressing and successfully curbing cheating on its platform—such that the Company "really [did]

6    not] allow" it—while also asserting that any cheating that was occurring on the platform was

7    minimal.  For example, on June 17, 2021, Bank of America held a Telecom and Media Internet

8    conference. During the conference, Defendant Brown discussed Chegg's "Honor Shield" program

9    and minimized any usage of Chegg's platform to cheat. Brown stated: "*One of the things we*

10   *introduced earlier this year was … Honor Shield. … And what it was, was 1 more step for us to*

11   *be able to help the professor guard against those folks that – and it's a very small group of folks*

12   *that would potentially want to cheat on the platform … And so it's just one more way of many*

13   *ways that we – on our platform where we have things in place to discourage and really not allow*

14   *cheating for those students that decide they want to do that."*

15        236.    On June 23, 2021, Chegg continued to minimize cheating by updating its Honor

16   Code, which was posted on the Company's website, to emphasize that only a "very small"

17   percentage of students were cheating using Chegg.  The Honor Code stated: "Honoring Academic

18   Integrity . . . *We believe academic integrity is a fundamental part of the learning process and we*

19   *work to preserve it* . . . Our products and services should never be used by you for any sort of

20   cheating or fraud – like asking for answers to an active test exam, or copying answers online and

21   submitting them as your own … *The vast majority of Chegg students use our services to help*

22   *them learn and understand.*"  The Honor Code further stated that "[w]e don't tolerate abuse of our

23   platform or services … *[M]isuse of our platform represents a very small portion of the activity on*

24   *our platform … We are constantly working to improve our abilities to detect and respond to*

25   *issues around both copyright and academic integrity.*  We take both of these situations very

26   seriously and we will respond as quickly as possible."

27        237.    The statements in ¶¶235-36 were materially false and misleading, and omitted

28   material facts when made.  *First*, Defendant misrepresented that "a very small group" of users used

Chegg to cheat, "misuse of" the platform "represents a very small portion of the activity on our platform," and the "vast majority of Chegg students" use the service "to help them learn and understand."  However, in truth, numerous university FOIA responses and detailed accounts from university professors across the country uniformly described how students' use of Chegg to cheat was "severe" and "rampant," such that Chegg was essentially a "professional cheating operation" where the "vast majority of students using Chegg did so for illegitimate reasons."  Indeed, Lead Counsel's extensive empirical analysis of thousands of questions submitted to Chegg's Q&A during the Class Period confirmed that the platform was widely used for blatant exam cheating, with students routinely submitting final exam questions to Chegg and receiving answers while in the midst of taking the exam.

238.    *Second*, Honor Shield was not a legitimate effort by Chegg to "really not allow cheating" by its users, but a façade the Company implemented to address public concern in the wake of a growing number of cheating scandals involving Chegg.  Indeed, one professor interviewed by Lead Counsel stated the Company was acting in "bad faith" with respect to Honor Shield, knowing that the program was not going to work, and an administrator stated that a faculty member at her university found her exam questions being answered on Chegg during the exam period despite the faculty member utilizing Honor Shield.  Similarly, the Company did not genuinely "take" cheating "seriously," "respond as quickly as possible" to takedown requests, or work to "preserve" academic integrity.  Far from attempting to curb cheating, university and professor accounts uniformly described how Chegg instead encouraged cheating by inexplicably erecting numerous "hurdles[s] for faculty" to identify and discipline student cheaters.  Former Chegg employees similarly confirmed that Chegg "didn't really put any effort into stopping it because it was putting money into their pocket."

## M.    August 2021 False Statements

239.    On August 9, 2021, Chegg again reported favorable financial results, including (1) total net revenues of $198.5 million (a 30% increase year-over-year); (2) adjusted EBITDA of $84.4 million (a 52% increase year-over-year); and (3) Chegg Services revenue of $173.5 million (a 38% increase year-over-year).   Defendants specifically highlighted the "great" earnings results and

"phenomenal" earnings margin growth for Q2 2021, which confirmed the "unquestionable" value of Chegg's services to students.   Significantly, Defendants again directly attributed these "excellent" results to "*our efforts to reduce account sharing as students have returned to campus.*"

240.    The same day, Chegg held its Q2 2021 earnings call.  During the call, Defendant Rosensweig addressed the fact that most students were expected to return to in-person learning in the fall, and touted the educational value of Chegg wherever schooling occurred, stating: "*It is clear wherever [students] are learning, whether online, on campus, or in a hybrid model, the value of Chegg to students is unquestionable.*"   Also on August 9, 2021, Chegg issued a press release, which was also filed with the SEC on Form 8-K, containing substantially the same statement from Rosensweig.

241.    Also, during the Q2 2021 earnings call, an analyst asked Defendants to "talk about account sharing a little bit more," and specifically whether the purported benefits the Company had seen from its efforts to prevent account sharing would be sustainable in light of students returning to in-person learning in the fall.  In response, Rosensweig affirmed that, because the Company had "specifically reviewed" the activity of students who had returned to campus, the benefits yielded from account sharing efforts were "absolutely" "sustainable":

> On the account sharing question, and this is where -- it was just one of those weird scenarios where it was hard to explain to people that *it really wasn't COVID that caused people to come to Chegg.  It was the fact that so many people were using Chegg, but not enough of them who were using it were paying for it . . .* What I do know is *we specifically reviewed students that went back to campus schools that were open, IP addresses that were on those campus[es], and we know that our efforts are holding up very strong . . . it is absolutely, in our mind, sustainable,* based on all the evidence that we've currently seen for students that have already gone back to campus in the first 6 months of this year.  So it's really all good news for us.

242.    During the same earnings call, Defendant Brown told investors, "[m]oving to the second half of the year, *with the efforts we made to increase engagement and reduce account sharing as students have gone back to campus, we feel even more confident to raise our revenue and adjusted EBITDA guidance for the remainder of the year*."  Also on August 9, 2021, Chegg

issued a press release, which was also filed with the SEC on Form 8-K, containing the same statement from Defendant Brown.

243.   The statements in ¶¶240-42 were materially false and misleading, and omitted material facts when made.  *First*, Chegg's "value" was not due to "learning" purposes "whether online, in the classroom, or in a hybrid model." Rather, in truth, Chegg attracted record numbers of new subscribers because it facilitated widespread cheating through its Expert Q&A tool, such that cheating "absolutely" increased during the pandemic and was rampant while schools were "online"—meaning that cheating would become much more difficult "in the classroom," thus significantly impacting the Company's financials.  *Second*, as confirmed by Lead Counsel's investigation, Chegg's growth was "not" driven by "efforts [Chegg] made to increase engagement and reduce account sharing," but by rampant cheating facilitated by remote learning and Chegg's Expert Q&A tool.  As a result, Chegg's growth during remote learning was not "sustainable," and thus, there was no reasonable basis for Defendants to raise revenue and EBITDA guidance for the second half of 2021 – particularly with distance learning coming to an end and growing backlash against Chegg as an incubator of cheating by educational institutions across the globe.

244.   On August 11, 2021, Chegg presented at the KeyBanc Technology Leadership Forum. During the conference, an analyst noted Chegg's explosive subscriber growth over the past two years during COVID-19 related remote learning, and asked, "help me unpack where these incremental subscribers might be coming from and the sustainability of it."  In response, Defendant Brown compared Chegg Study to Amazon Prime, noting that both had sustainable growth due to addition of legitimate services and capabilities:

> So then question is where are we getting the new subscribers post that, all right? And a lot of that has to do with the type of content that we're putting on to our platform, right? So if you -- once again, I look at Chegg Study very much like Amazon Prime. Amazon Prime started out as 2-day shipping way, way, way back when the same way, way back when Chegg started out as textbook solutions. Amazon Prime has added much more -- many more capabilities to it, whether it be video, music, fresh, whatever they add. And today, kind of 2-day shipping is an afterthought. Same thing with Chegg Study, right? Textbook solutions, a little bit of an afterthought. I mean still used but it's less than 10% of our total content. ***So as we've added new forms of content, new subject matters, new modalities, we're picking up more and more subscribers.***

245.   The statements in ¶244 were materially false and misleading, and omitted material facts when made because Chegg's remarkable subscriber growth during the pandemic was not due to legitimate uses of the "Chegg Study" service – including "new forms of content, new subject matters, new modalities" – but rather rampant student cheating facilitated by remote learning and Chegg's Expert Q&A tool.

246.   On August 24, 2021, Chegg presented at the BMO Virtual Technology Summit. During the conference, a securities analyst asked "Can you talk about how [Honor Shield] worked and what impact has that had[?]"  In response, Brown stated:

> *And so what we rolled out earlier in the year, like I said, called Honor Shield that allows professors to upload their tests onto Honor Shield, and we block the test for the period of time that the test is going. So a student can't get the test -- an open test and then start asking that question on Chegg Study. They can't do that … We just felt like we had an obligation to help these guys. It was a fairly easy technology to implement.* It's gone reasonably well. I mean, once again, it's free to educators. So this isn't something that we're charging. They can just upload the test. It blocks those questions on our platform for that period of time. Thus far, it's going reasonably well. I mean, we always wish more educators would interact with the platform … *But it's our way of saying, hey. We want students on our platform to be here to be learning, not to be cheating.*

247.   The statements in ¶246 were materially false and misleading, and omitted material facts when made. *First*, Honor Shield did not "block the test for the period of time that the test is going." Indeed, one administrator at a university stated a faculty member at her university found exam questions being answered on Chegg during the exam period despite the faculty member utilizing Honor Shield.

248.   *Second*, Honor Shield was not a legitimate effort by Chegg to "help" universities prevent cheating on the platform, but a façade the Company implemented to address public concern in the wake of a growing number of cheating scandals involving Chegg.  Indeed, one professor interviewed by Lead Counsel stated the Company was acting in "bad faith" with respect to Honor Shield, knowing that the program was completely ineffective and was not going to work. Moreover, university and professor accounts uniformly described how, despite Honor Shield purportedly blocking professors' exams from being posted, professors routinely discovered "entire tests" of theirs posted on Chegg's platform—including those who had utilized Honor Shield—and

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

that, despite these professors' direct pleas to Chegg to take these materials down, Chegg instead encouraged cheating by refusing to do so and erecting numerous "hurdles[s] for faculty" to identify and discipline student cheaters.  As a result, one professor stated "[t]hese guys are full of it," adding that she did not want to take part in the Honor Shield program at all because she did not want to provide Chegg with her exam content.  Former Chegg employees similarly confirmed that Chegg "didn't really put any effort into stopping [cheating] because it was putting money into their pocket."  And, while Defendants held out Honor Shield as "fairly easy" to implement, there were many other steps that would have been far easier for Chegg to implement and that also would have been far more effective in stopping cheating – in particular, simply requiring students to register for Chegg with their school email address – that Defendants refused to take despite receiving repeated pleas from university faculty to do so.  Instead, Defendants put the onus on professors to prevent students from using Chegg to cheat by handing over their exams to Chegg, while falsely representing to investors that Chegg was firmly against cheating and was proactively implementing effective technologies to stop it.

**N.    September 2021 False Statements**

249.    Only two months before the truth would be revealed, Defendants continued to claim that Chegg would "continue to do extraordinarily well post-pandemic" and that its exponential growth during remote learning was sustainable.  For example, on September 3, 2021, Defendant Rosensweig was interviewed on the Barron's Streetwise podcast.  During the podcast, Rosensweig attempted to distance Chegg from other companies that saw dramatic, but only temporary, growth during the pandemic, stating "Peloton, Netflix, Disney+, all those companies, they accelerated their growth.  Chegg is different. We were doing phenomenally well before the pandemic, we did incredibly well through the pandemic, and ***we will continue to do extraordinarily well post-pandemic because what we do isn't dependent on where you are physically. What we do depends on whether or not you need help with learning.***"

250.    The statements in ¶249 were materially false and misleading, and omitted material facts when made. In contrast to Rosensweig's statement that Chegg's business "isn't dependent on where you are physically," Chegg's revenue and subscriber growth during the pandemic was fueled

1    by cheating during online learning and such cheating would be curtailed once students returned to

2    in-person school and it became more difficult to use Chegg to cheat.

3            251.    On September 14, 2021, Chegg presented at the Jefferies Virtual Software

4    Conference.  During the conference, an analyst asked Defendants whether Chegg's "massive surge"

5    and "great growth" during the pandemic was sustainable, noting "there's been this overhang and

6    concern of the back-to-school boogeyman," and inquired specifically about "what you're seeing

7    straight of what's actually happening on the demand side in a world that's reopening, and we're

8    starting to see obviously everyone is going back to campus"?  In response, Defendant Brown stated

9    that education was "clear[ly]" becoming a "hybrid model" on in-person and online learning, and

10   noted that Chegg would continue to grow as students returned to school as a result of its purportedly

11   successful initiative to stop account sharing:

12           Well, yes, it seems that way, the vast majority are going back to campus. I think
             it's becoming clear that it's going to be more of a hybrid model from a learning
13           standpoint. Even if you're back on campus, some of those classes may be remote.
             The thing that we saw in our business, *and it really was driven by us*, really 2
14           things. *And the first one, we've talked about this many times, and that is the
             account sharing issue that we've had for many years. That is something that, to
15           your point, if we haven't solved the technological problem there as far as creating
             it very hard to do account sharing, that may have been an issue going back into
16           the fall. But one of the things we did about a year, I guess it was right about a
             year ago where we implemented technologies around device management and
17           then MFA [multi-factor authentication] technologies.*

18           252.    The statements in ¶251 were materially false and misleading, and omitted material

19   facts when made. Chegg's growth was not "driven" by the Company's "account sharing" efforts,

20   but a sharp increase in cheating during remote learning.  Lead Counsel's investigation confirmed

21   that the Company's efforts to curb account sharing were not the "drive[r]" behind the Company's

22   significant growth.   In truth, Chegg's growth was predicated upon rampant cheating that

23   "absolutely" increased during the pandemic.  This was borne out by the fact that, at the Class Period

24   end after students returned to in-person learning, Chegg's subscriber growth sharply declined even

25   though Defendants had implemented permanent measures to prevent account sharing.

26

27

28

## VI.    LOSS CAUSATION

253.    During the Class Period, shares of Chegg's common stock were publicly traded on the NYSE.   The market for shares of Chegg's common stock was open, well-developed and efficient at all relevant times.

254.    Throughout the Class Period, the price of Chegg's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above. Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Chegg common stock, by failing to disclose and misrepresenting the adverse facts detailed herein.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Chegg common stock fell precipitously as the prior artificial inflation dissipated.   As a result of their purchases of Chegg common shares during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

255.    By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Chegg's business. Defendants' false and misleading statements had the intended effect and caused Chegg's common stock to trade at artificially inflated levels throughout the Class Period.  Indeed, Chegg's stock price traded at a record high of $113.51 on February 12, 2021.

256.    On November 1, 2021, after the markets closed, Chegg reported significant declines in subscriber growth and revenue growth compared to the previous quarter—the first such declines in over five years—and dramatically lowered full-year 2021 revenue guidance and postponed issuance of 2022 revenue guidance. While Defendants attributed the decline in subscriber and revenue growth, and the lowering of 2021 revenue guidance and postponement of 2022 revenue guidance to a variety of factors, securities analysts and media reports rejected and discredited Defendants' excuses, and attributed the poor performance to waning demand for Chegg's platform as the end of remote learning made it much more difficult for students to use Chegg to cheat.  *See supra* Section IV.F.



$100 Investment in Chegg Shares
Relative to Industry Peer Group* and S&P 500

Class Period: 5/5/2020 to 11/1/2021

× Corrective Disclosure    —— S&P 500 Index    ---- Peer Group

*S&P 1500 Education Services Sub Industry GICS Level 4 Index

257.    The drastic decline in Chegg's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct, as provided below.

## VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

258.    Numerous facts, including those detailed above, demonstrate that Chegg and the Individual Defendants knew they were making the above-detailed materially false and misleading statements and omissions of material fact, or, at minimum, acted recklessly in making those statements and omissions.  Certain allegations reflecting Chegg's and the Individual Defendants' scienter are summarized below.[27]

---

[27] The cumulative knowledge of all members of the Company's management team, including, but not limited to, the Individual Defendants, is properly imputed to Chegg.

A.    **Defendants Meticulously Tracked User Engagement Across Chegg's Online Platform, Including Expert Q&A**

259.    Chegg and the Individual Defendants knew throughout the Class Period that the Company's explosive growth during the pandemic was predicated upon ever-increasing numbers of students using Chegg's Expert Q&A tool to cheat rather than for any legitimate educational purposes because the Company meticulously tracked usage of its online platform.

260.    Throughout the Class Period, Defendants specifically assured investors that the user trends they were observing were "sustainable" because they closely tracked students' usage of each of the various services offered in its Chegg Study Pack in excruciating detail, including the names, locations, and IP addresses of users; the date, time, nature, and subject matter of service accessed or viewed; amount of content accessed or viewed; and the university, college, or school the user attended.  Chegg's careful monitoring of student usage included, specifically, Chegg Study and its featured "Expert Q&A" tool.

261.    For example, Defendant Rosensweig touted how Chegg closely monitored and tracked student use of its platform.  As he explained during a February 2020 conference, "we own the customer, we own the data," and "we know exactly what [students] use…. We can watch everything they use, that's how we know over 2 million pieces of content are viewed in that one service every day of Chegg."  Defendant Rosensweig admitted during another conference that Chegg "track[s] every single action," and "we do track not only by the country, we do track by the school and by the subject in the school."

262.    Similarly, Defendant Brown stressed during a March 2021 conference call that "it's not just how many people come on per day," but that "[w]e actually measure it by what are they engaging with."  Defendant Brown drilled down into Chegg's close tracking of user engagement across Chegg's platform, stating: "Are they engaging with expert Q&A, are they engaging with textbook solutions, are they engaging on assessments or practice tests, are they engaging on video, ding, ding, ding, ding, right?  So, we do that …."  and, emphasizing how "absolutely well instrumented" Chegg was.  During a June 2020 conference, Defendant Brown boasted that "[w]e have daily metrics" and even "hourly metrics"—which, he explained, was absolutely critical in understanding the Company's "core levers."

263.    Moreover, the Company stated that its ability to monitor and analyze its customers' habits was so key to Chegg's operations that Defendants described "data and data analytics" as "the core of the company."  As Defendant Rosensweig emphasized during a February 2021 conference, "[w]e know what to build before the masses want it because we see the signals come in. We know how to differentiate the user experience based on somebody is more likely to watch videos versus going through Q&A. So all of those things are now core to what Chegg does …."

264.    Accounts of former Chegg employees confirm Defendants had access to, monitored, and analyzed metrics showing usage of its platform.  FE 8, for instance, stated that Chegg used an Oracle system to closely track user data and consumption in order to analyze, among other things, how to best attract new customers.  According to FE 8, approximately 70% of the 120 different metrics Chegg tracked related to how users consumed Chegg's products.  She explained that the reporting metrics were made available in a dashboard that was accessible by all director-level employees and above, including the C-suite.  Further, as FE 5 explained, Company executives not only "always had access to data," but Rosensweig and Schultz also "knew everything, they were micromanagers."

265.    There is no question that, throughout the Class Period, Defendants had access to the actual names of its users, including the overwhelming number of students who used Chegg to cheat. As detailed in an enforcement action filed against Chegg by United States Federal Trade Commission ("FTC") on October 31, 2022, since at least September 2017, Chegg has collected a host of "sensitive personal information from users" including, their "first and last names," "email addresses," "passwords," as well as credit card information and physical/billing addresses. Moreover, for certain users, Chegg collects highly sensitive personal data including "religious denomination, heritage, date of birth, parents' income range, sexual orientation, and disabilities." The FTC's enforcement action also asserts that, in connection with its online tutoring services, Chegg "recorded videos of tutoring sessions that included Chegg users' images and voices."

266.    Defendants' detailed access to and meticulous monitoring of user engagement, including a wide variety of highly specific usage metrics, when combined with the fact that Defendants were repeatedly told by schools that its platform was being used to cheat (*see supra*

106

Sections IV.D.1-2 and IV.D.3.b.), confirm that Defendants Rosensweig, Schultz, and Brown were aware that Chegg's rapid growth during the pandemic was not based on students' increasing need for legitimate learning tools or their efforts to limit account sharing, but rather students widely using "Chegg Study" and its Expert Q&A tool to cheat.

### B.    Chegg Study And The Expert Q&A Service Constituted Chegg's Core Operations And "Flagship Service"

267.    Expert Q&A was critically important to Chegg throughout the Class Period. Defendants said as much, telling investors Expert Q&A was the Company's "core focus," provided the Company a "giant moat" as a competitive advantage and highlighting the resources the Company dedicated to the service. That Chegg Study constituted Chegg's core operation further supports an inference of the Individual Defendants' knowledge of the falsity of their Class Period statements.

268.    For example, on August 27, 2020, Defendant Brown stated that Chegg Study was the Company's "flagship service." On August 24, 2021, Defendant Brown reiterated "our core focus is Chegg Study." Defendants further emphasized that Expert Q&A provided the Company a vital competitive advantage, repeatedly describing Expert Q&A as the Company's "giant," "huge," and "actually massive" competitive "moat." Defendant Rosensweig specifically highlighted the Expert Q&A service database as a "giant moat" during a March 4, 2020, conference, explaining that roughly seven to nine million new questions are asked a year and, as a result, "every year we're going to be a bigger moat." Similarly, about a year later, during an investor conference on March 1, 2021, Defendant Brown hyped the Company's "90,000-plus independent contractors" that formed the backbone of the Expert Q&A tool as a "huge moat" and a "massive moat relative to [its] market." And, as Defendant Brown emphasized on February 8, 2021: "it's real simple, a vast majority of our CapEx actually goes to expert Q&A, right."

269.    Numerous additional facts confirm Expert Q&A was Chegg's core operation. For example, during the Class Period, Chegg Services, the business segment that included the Expert Q&A, accounted for nearly 85% of the Company's revenue. *See* ¶33, *supra*. Former Chegg employees confirmed that the Expert Q&A service was the Company's most popular product and

its main source of revenue.  As FE 1 explained, Homework Help was "the main moneymaker" and "the main reason for people to subscribe, it was driving [growth]."  FE 3 similarly stated that Chegg's Exam Prep business "did not contribute much to subscriber growth" and "was not a main driver for revenues"—rather, it was "the cheating business" through Chegg's Expert Q&A that caused the growth.  FE 2 described Expert Q&A as "absolutely number one" in terms of the most popular product.

270.     Moreover, Expert Q&A was the primary way the Company acquired customers.  As Defendant Brown explained on September 14, 2021, "when we look at … how we acquire students, it's primarily through actually our Expert Q&A which is the other 60 million questions."  During the same conference, Defendant Brown reiterated in regard to "customer acquisitions," that "[m]ost of them come through the Expert Q&A."  FE 2 confirmed as much, reporting that the "number one way that students found Chegg was by looking for a particular question, so Q&A is what drove the most traffic."

271.     Because Chegg Services, and, in particular, Chegg Study and the Expert Q&A service, were the bedrock of Chegg's business and critical to Chegg's financial results, the Individual Defendants were particularly focused on the extent Chegg Services was used to cheat, or were deliberatively reckless in not knowing about this fundamental use of the Company's core service and competitive advantage.

C.     **Throughout the Class Period, Defendants Were Repeatedly Informed of Cheating Scandals Involving Chegg At Universities Across the Country**

272.     The Individual Defendants' knowledge that Chegg's growth during the pandemic was predicated on student cheating is strongly supported by the mountain of reports directed to the Company highlighting the improper use of Chegg.  As demonstrated in Sections IV.D.1. and IV.D.2., *infra*, throughout the Class Period, Defendants were inundated with complaints that the number of students cheating using Chegg, or "Chegging," skyrocketed during remote learning.

273.     Volumes of university documents informing Chegg of rampant student cheating, Chegg's responses, and Lead Counsel's collection of confirmatory information from more than one hundred university professors, deans, and high-level officers demonstrate that, from the outset of

the Class Period, prominent universities from across the nation repeatedly notified Chegg in writing that students were using Chegg to cheat. Examples of the written notice provided to the Company include the UCLA Associate Dean sending Chegg more than ten letters in May 2020 (¶72); and the University of Nebraska sending numerous letters between April 24 and May 12, 2020. Further, nearly two dozen faculty and academic administrators interviewed by Lead Counsel described how they contacted Chegg directly during the Class Period to inform the Company of specific uses of Chegg to cheat at their school or in their class. For example, the Purdue professor of Mechanical Engineering explained she communicated with the Company once a week to report the use of Chegg to cheat in her class (¶111). Likewise, following a cheating incident involving Chegg in the Fall of 2020, a "fed up" former Texas A&M Director of the Honor System Office went so far as to *email Defendant Rosensweig directly*. (¶99). Indeed, FE 4 directly linked the Defendants' knowledge of their student customers' nefarious use of the Chegg platform to universities and colleges reporting of cheating scandals.

274.     Even beyond these overwhelming direct requests that Chegg help curb the eruption of online cheating as schools transitioned to distance learning, several prominent newspapers and media outlets published articles detailing the rise of online cheating scandals during the pandemic, including *The Washington Post*, *The New York Times*, *The Boston Globe*, and *The Atlanta Journal Constitution*, and *Forbes*.[28] As discussed below, in response to these and other reports that cropped up during the Class Period, Chegg held itself out as fully knowledgeable as to the use of its online platform, while issuing specific, detailed, and vehement responses denying any meaningful cheating by its users.

### D.     Defendants Made Highly Specific Statements Minimizing And Denying Student Use Of The Platform To Cheat In Response To Repeated Analyst Questioning

275.     As set forth above, as the Class Period progressed, Chegg found itself at the center of a growing number of cheating scandals, which were reported in major media outlets as well as regional and local press. In addition, several published studies were issued accusing Chegg of

---

[28] Defendants even distributed a *Forbes* article discussing widespread student cheating using Chegg to employees in January or February 2021.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

cheating, and securities analysts issued reports criticizing Chegg as a cheating website and calling the Company's entire business model into question.  However, at every turn, the Company strongly and falsely assured investors that it was focused on providing legitimate educational support, and flatly and vehemently denied that any widespread cheating was occurring on its site, claiming over and over again that it was only a "very small number" of students who used Chegg's platform to cheat.  Defendants further falsely and staunchly assured investors that the Company took any instances of cheating extremely seriously, worked with schools to address cheating, and implemented various measures to prevent cheating.

276.    The Individual Defendants' repeated, specific statements strongly denying that rampant cheating was occurring on Chegg's platform amidst these reports, including in direct response to specific questions by analysts, support a strong inference that the Individual Defendants were aware of or, at the very least, were reckless in not knowing about, the extent of cheating on the platform and the true reasons behind the growth of Chegg Services.

277.    During the Class Period, a growing number of media outlets reported on cheating scandals at major universities during remote learning, Chegg responded with specific vehement denials and strong assurances that no rampant cheating was occurring and that the Company was working with schools to address cheating incidents.  For example, in April 2020, *The Boston Globe* reported on a cheating scandal at Boston University.  In response, Company spokesman Marc Boxser stated that Chegg "strongly support[ed] academic integrity" and "partner[ed]" with institutions to address cheating and dispelled the notion that remote learning facilitated cheating through Chegg by flatly denying that Chegg had seen any relative increase in honor code issues since the COVID-19 crisis began.

278.    On June 12, 2020, Defendant Rosensweig was quoted in an interview with *The New York Times* discussing cheating, unequivocally stating in response to the interviewer's question that "[m]any teachers believe that their students are using Chegg as a means by which to cheat" by stating that "Chegg is not built" for cheating.

279.    Less than two months later, on August 7, 2020, *The Washington Post* published an article titled "Another problem with shifting education online: A rise in cheating."  The article noted

that Chegg had responded by again claiming that "the company supports academic integrity," and by strongly and flatly asserting that Chegg "hasn't seen 'any relative increase in honor code issues since the covid-19 crises began.'"  Significantly, just after these reports, Chegg updated its publicly posted "Honor Code" in early September 2020 to specifically emphasize that it was only "an extremely small portion" of students who were using Chegg to cheat, while the "vast majority" used it as a legitimate learning tool.

280.    In January 2021, after a spate of cheating scandals at schools like Texas A&M, Princeton, and North Carolina State, Chegg launched its Honor Shield program.  While discussing the program, Defendant Brown firmly reiterated that "it's a very small group of folks that would potentially want to cheat on the platform," and that the Company only experienced "some issues regarding cheating."  Defendant Rosensweig similarly emphasized that the "overwhelming majority" of users did not cheat on Chegg's platform.  Rosensweig underlined how Chegg was aware of other websites that facilitate cheating, but that "we're not one of the ones that does that because that's not what we're for."

281.    Chegg also responded to academic papers that discussed cheating on the platform. For example, in February 2021, after a study was published in the *IJEI* stating it was "highly likely that students are using [Chegg] as an easy way to breach academic integrity by obtaining outside help," the Company responded with a strongly worded denial.  Chegg's Director of Academic Relations stated that the authors of the study had "mistakenly impl[ied]—without any evidence— that increased usage of Chegg has correlate[d] to an increase in cheating," and that Chegg's dramatic growth in subscribers during the pandemic was purportedly due instead to students' legitimate need for Chegg to "provide[] much needed learning support" due to the loss of "valuable on-campus and faculty support services" as a result of the pandemic.  *See* ¶¶57, 209, *supra*.

282.    Defendants' highly specific statements, strongly denying that students were using Chegg's platform to cheat, including in direct response to equally specific analyst questing, media reports, academic studies, and a rising tide of college cheating scandals directly implicating Chegg in student cheating, supports a strong inference of scienter.

### E.     Chegg Designed Expert Q&A To Make Cheating Faster And Easier

283.     Defendants' scienter is further demonstrated by the fact that Chegg's flagship Expert Q&A product was specifically designed to enable students to cheat—and to do so faster and easier. Chegg designed Expert Q&A so that students had two ways of submitting questions to Chegg Experts: (1) manually typing questions from "homework," quizzes, and exams on their personal computers, laptops, or mobile devices and then submitting them through Chegg's website or app; or (2) simply taking a photo of the question on the student's mobile phone and uploading it over the app.  Defendants knew that giving students the ability to submit photos of exam questions through their phones greatly increased their ease, speed, and effectiveness with which they could cheat—such as by submitting exam questions (including the entire exam) in rapid-fire fashion, evading detection by professors and proctors, and ensuring the ability to get answers within an exam's allotted time.



284.     FE 2 confirmed that changes made to the Chegg Study Pack enhanced students' ability to cheat. She explained the Big Egg project allowed students to search for Chegg Expert answers by a particular university course, rather than by searching across an entire subject, which could make cheating easier.  *See* ¶130, *supra*.

285.     Chegg's website confirms Expert Q&A's emphasis on speed and convenience. Upon logging in, the center of Chegg's home screen reads "Study time, crunch time, anytime" /

"Experts by your side" / "Have millions of explanations at your fingers. Plus, snap a pic to get an expert solution."[29] Promotional material on the Chegg Study tab during the Class Period included a tweet reading "Shoutout to Chegg Study for allowing me to knockout [sic] my homework in 30 min."

286. In essence, the entire Expert Q&A system was designed and marketed so that a student could "post" test questions as fast and easily as possible using cellphone cameras and pay someone else to take the exam for them. The fact that the most essential part of Chegg's platform was designed to enhance a user's ability to cheat strongly reinforces Defendants' scienter.

F.    **The Gross Disparity Between The Individual Defendants' Words And Reality Reinforces Scienter**

287. Evidence of the disparity between Defendants' words to the market and the actual state of affairs within Chegg further supports a strong inference of scienter. Here, the Individual Defendants consistently misled investors by reassuring them about the reasons for Chegg's growth, falsely attributing it to legitimate factors rather than rampant cheating facilitated by remote learning and Chegg's Expert Q&A tool.

288. Specifically, Chegg created the false narrative that COVID-19 somehow made it harder for students to share their accounts. For example, Rosensweig claimed during a CNBC interview on October 27, 2020 on the television program "Closing Bell," that "[w]hen COVID came and students had to leave campus, it was much harder for them to share. We've been the beneficiary of that."

289. However, former Chegg employees have attested that, contrary to Defendants' Class Period statements, account sharing was in fact not the driver behind the Company's revenue growth during the Class Period. FE 1, a member of the team tasked with addressing account sharing, confirmed that while cracking down on account sharing was "increasing revenues," Chegg's overall increase in subscribers was not "a result of the mitigating account sharing efforts." Moreover, Chegg implemented measures to address account sharing in 2019, well before the Class Period

---

[29] Also during the Class Period, Chegg's home page similarly emphasized speed and convenience, stating: "Get Textbook Solutions" and "Stuck on a Homework Problem? / Over 10 million answered questions / Solved by Chegg subject experts / Get solution 24/7."

began.  According to FE 1, the "major effort" to reduce account sharing occurred in 2019—before the COVID-19 pandemic and the Class Period.  Public statements made by the Company similarly indicate that the Company implemented account sharing measures in 2019.[30]  However, the Company's rapid growth did not begin until mid-March 2020, when students shifted to remote learning, giving rise to increased opportunities for students to cheat.  Nonetheless, Defendant Rosensweig continued to attribute Chegg's rapid growth to the Company's efforts to limit account sharing for the next two-and-a-half years.

290.    In addition to account sharing efforts, Defendants also falsely attributed Chegg's "record" subscriber growth to students' demand for legitimate online teaching aids to help them "master their subject matters" as students switched to online learning—which the Individual Defendants described as "inevitable."  Indeed, the Individual Defendants repeatedly stated that "it was inevitable that learning was going online," and that the pandemic had merely accelerated the adoption of Chegg's legitimate online "direct-to-student learning platform."   For instance, Defendant Rosensweig boasted that Chegg's record "numbers" reflected students "hav[ing] an even greater need for high-quality, low-cost, personalized, and adaptive online education to help them learn and master their curriculum."

291.    The patent inconsistencies between Defendants' public pronouncements about the reasons for the Company's rapid growth and what was known internally within Chegg is highly probative of Defendants' scienter.

**G.    Lead Counsel's Empirical Analysis Confirmed The Existence of Widespread, Blatant Cheating On Chegg's Website**

292.    Lead Counsel's empirical analysis—consisting of a review of a random sampling of 6,200 submitted questions during the Class Period from Chegg's archives across five different subjects (biology, chemistry, physics, calculus and statistics)—further confirms widespread and obvious cheating by students using Chegg in the midst of taking their college exams.  For example, of those submissions for which students submitted photos of the questions they were asking, approximately 25% evidenced clear indicia of cheating on the face of the submission itself—such

---

[30] For example, on February 11, 2021 Defendant Rosensweig stated "we started working" on account sharing measures "over a year-and-a-half ago."

as the phrase "Final Exam" written on the top of the sheet, that it was a "graded assignment," a countdown of how much time was left to complete the exam, point values assigned to each submitted question, and/or blatant commentary from students submitting the questions stating things such as *"please solve this question urgently as its exam questions."*

293.    If Lead Counsel's random sampling of just a few thousand of the millions of archived Expert Q&A questions during the course of the Class Period across several different subject matters revealed that one-fourth of students were blatantly using Chegg to cheat—such that several indicia of cheating were clear from the face of the submissions themselves (not to mention the thousands of other submissions from this sampling that likely also involved cheating but did not include as clear indicia)—there is no question that Defendants were aware that it was far more than an "extremely small portion" of Chegg's users who were using its services to cheat during the Class Period, as they had represented to investors. The stark, obvious reality of students' clear rampant use of Chegg to cheat—and Defendants' repeated statements stating the exact opposite—is highly probative of Defendants' scienter.

### H. Chegg's Officers And Directors Capitalized On The Fraud By Selling Nearly $100 Million Of Their Personally Held Shares At Inflated Prices

294.    Defendants were motivated to engage in their fraudulent course of conduct to allow high-level Chegg officers and directors, as well as other Company insiders, to sell their personal Chegg shares at inflated prices, totaling nearly $100 million in gross proceeds. Of this amount, a staggering $74.5 million was realized by Defendants Rosensweig and Schultz *alone*.[31]

295.    With the stock price inflated as a result of the Defendants' false and misleading statements, Defendant Rosensweig sold more than 550,000 shares, or nearly 30% of his Chegg holdings, for proceeds of $49.5 million. Defendant Schultz sold over 340,000 shares, nearly a staggering 90% of his Chegg holdings, for proceeds of nearly $25 million.[32]

---

[31] Lead Counsel relied on publicly-available trading data that Company insiders filed with the SEC on Forms 4 to evaluate their selling activity.

[32] These percentages, and those set forth in the table below, are based on vested holdings of equity-linked securities as reported in Chegg's proxy dated April 17, 2020.

296.    In addition, four other high-level executive and/or director insiders, including the Co-Chairperson of the Board and Presiding Director and the President of Chegg Skills, engaged in significant insider sales, unloading over 550,000 shares of Chegg stock during the Class Period, for proceeds of more than $21 million.  The chart below details the total Class Period insider sales:

| Insider | Class Period Sales | Proceeds from Sales | Total Vested Securities Held as of 4/6/20* | Approx. Pct. Sold |
|---|---|---|---|---|
| **Defendant** | **859,376** | **$74,515,560** | **2,258,318** | **38.1%** |
| 1    Daniel Lee Rosensweig | 552,000 | $49,519,686 | 1,914,874 | 28.8% |
| 2    Nathan Schultz | 307,376 | $24,995,874 | 343,444 | 89.5% |
| **Other Insiders** | **284,544** | **$21,521,998** | **553,190** | **38.2%** |
| 3    John Paul Fillmore | 124,624 | $9,923,962 | 167,032 | 74.6% |
| 4    Richard Sarnoff | 66,666 | $4,339,290 | 263,667 | 25.3% |
| 5    Esther Lem | 41,238 | $3,557,179 | n/a | n/a |
| 6    Robin Tomasello CPA | 32,016 | $2,287,543 | n/a | n/a |
| 7    John York | 20,000 | $1,414,023 | 122,491 | 16.3% |
| **Grand Total** | **1,143,920** | **$96,037,558** | **2,811,508** | **38.1%** |

*As reported in Chegg's Definitive Proxy Statement filed April 17, 2020, which covers all common stock, and options or equity-linked securities that will vest within the next 60 days.

297.    The over 2.2 million shares sold by Defendants Rosensweig and Schultz during the Class Period—for over $74 million in proceeds—were highly unusual in both amount and timing. For instance, on February 18, 2021, mere days after Chegg's stock price reached its Class Period and record high of $113.51 on February 12, 2021, Defendant Rosensweig sold 300,000 shares of Chegg stock for more than $30 million, his largest sale ever.  Similarly, Defendant Schultz sold more than 140,000 shares of Chegg stock between December 2020 and April 2021, when Chegg shares traded above $90 per share. Following these sales, the price of Chegg's common stock steeply declined, falling by approximately 70% to close at $32.12 at the end of the Class Period.

298.    Moreover, at the same time Chegg's insiders were dumping their stock, Defendants caused the Company to repurchase hundreds of millions of dollars' worth of Chegg shares, initiating a $500 million stock buyback on June 16, 2020, which was completed on December 31, 2021, thus further inflating the stock price and Defendants' illicit insider trading profits.

299.    Accordingly, Defendants were highly motivated to perpetuate the fraud to capitalize on Chegg's artificially inflated share price, which they knew was almost certain to plummet once

116

remote learning ended. The extensive insider selling by the Individual Defendants and other senior officers and directors during the Class Periods adds to the strong scienter inference.

*    *    *

300.    Ultimately, when viewed collectively, as required by applicable law, Plaintiffs' allegations support a strong inference of fraudulent intent on the part of the Defendants or, at the very least, the strong inference that Defendants' conduct was highly unreasonable and an extreme departure from standards of ordinary care.  In either case, Lead Plaintiffs have adequately pled scienter.

## VIII.   PRESUMPTION OF RELIANCE

301.    At all relevant times, the market for Chegg's securities was an open, efficient, and well-developed market for the following reasons, among others:

i.    Chegg's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

ii.   As a regulated issuer, Chegg filed periodic reports with the SEC and the NYSE;

iii.  Chegg regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

iv.   Chegg was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

302.    As a result of the foregoing, the market for Chegg's securities reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Chegg's securities. All purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of Chegg's common stock at artificially inflated prices, and a presumption of reliance applies.

303.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Chegg's business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

304.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

305.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Chegg who knew that such statement was false when made.

1

## X.     CLASS ACTION ALLEGATIONS

2      306.    Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a)

3 and 23(b)(3) on behalf of a Class consisting of all persons or entities who purchased, or otherwise

4 acquired Chegg common stock between May 5, 2020, and November 1, 2021, inclusive, and who

5 were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of

6 Chegg at all relevant times, members of their immediate families, and their legal representatives,

7 heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any

8 affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families

9 have or had a controlling interest.

10      307.    The members of the Class are so numerous that joinder of all members is

11 impracticable.  Throughout the Class Period, Chegg shares were actively traded on the NYSE.  As

12 of October 25, 2021, there were nearly 145 million shares of Chegg common stock outstanding.

13 While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only

14 be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least

15 thousands of members of the proposed Class.  Class members who purchased Chegg securities may

16 be identified from records maintained by the Company, or its transfer agent(s), and may be notified

17 of this class action using a form of notice similar to that customarily used in securities class actions.

18      308.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the

19 Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as

20 complained of herein.

21      309.    Lead Plaintiffs will fairly and adequately protect Class members' interests, and have

22 retained competent counsel experienced in class actions and securities litigation.

23      310.    Common questions of law and fact exist as to all Class members and predominate

24 over any questions solely affecting individual Class members.  Among the questions of fact and

25 law common to the Class are:

26      i.      whether the federal securities laws were violated by Defendants' acts and

27              omissions, as alleged herein;

28

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

ii.    whether the Defendants made statements to the investing public during the Class
Period that were false, misleading or omitted material facts;

iii.    whether Defendants acted with scienter; and

iv.    the proper way to measure damages.

311.    A class action is superior to all other available methods for the fair and efficient
adjudication of this action because joinder of all Class members is impracticable. Additionally, the
damage suffered by some individual Class members may be relatively small so that the burden and
expense of individual litigation make it impossible for such members to individually redress the
wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF

### A.    COUNT I

**For Violations Of Section 10(b) Of The Exchange Act,
And SEC Rule 10b-5 Promulgated Thereunder**

**(Against All Defendants)**

312.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if
fully set forth herein.

313.    This Count is asserted on behalf of all members of the Class against Chegg and the
Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and
Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

314.    During the Class Period, Defendants disseminated or approved the false statements
specified above, which they knew were, or they deliberately disregarded as, misleading in that they
contained misrepresentations and failed to disclose material facts necessary in order to make the
statements made, in light of the circumstances under which they were made, not misleading.

315.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated
thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue
statements of material facts or omitted to state material facts necessary in order to make the
statements made, in light of the circumstances under which they were made, not misleading; and/or
(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead

1    Plaintiffs and other investors similarly situated in connection with their purchases of Chegg
2    common stock during the Class Period.

3         316.   Defendants, individually and in concert, directly and indirectly, by the use of means
4    or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a
5    continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other
6    members of the Class; made various untrue and/or misleading statements of material facts and
7    omitted to state material facts necessary in order to make the statements made, in light of the
8    circumstances under which they were made, not misleading; made the above statements
9    intentionally or with a severely reckless disregard for the truth; and employed devices and artifices
10   to defraud in connection with the purchase and sale of Chegg common stock, which were intended
11   to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the
12   Class, regarding, among other things, Chegg's business and operations; (b) artificially inflate and
13   maintain the market price of Chegg stock; and (c) cause Lead Plaintiffs and the other members of
14   the Class to purchase the Company's common stock at artificially inflated prices, and to suffer
15   losses when the true facts became known.

16        317.   Defendants are liable for all materially false and misleading statements made during
17   the Class Period, as alleged above.

18        318.   As described above, Defendants acted with scienter throughout the Class Period, in
19   that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.
20   The misrepresentations and omissions of material facts set forth herein, which presented a danger
21   of misleading buyers or sellers of Chegg common stock, were either known to the Defendants, or
22   were so obvious that the Defendants should have been aware of them.

23        319.   Lead Plaintiffs and the other members of the Class have suffered damages in that,
24   in direct reliance on the integrity of the market, they paid artificially inflated prices for Chegg
25   common stock, which inflation was removed from its price when the true facts became known.
26   Lead Plaintiffs and the other members of the Class would not have purchased Chegg common stock
27   at the prices they paid, or at all, if they had been aware that the market price had been artificially
28   and falsely inflated by these Defendants' misleading statements.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

320.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Chegg common stock during the Class Period.

**B.    COUNT II**

**For Violations Of Section 20(a) Of The Exchange Act**
**(Against The Individual Defendants)**

321.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

322.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

323.    During their tenures as officers and/or directors of Chegg, each of these Individual Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶25-27.  By reason of their positions of control and authority as officers and/or directors of Chegg, these Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by Chegg during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

324.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company.  Defendants Rosensweig and Brown signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Chegg during the Class Period.  The Individual Defendants were also directly involved in providing false information, and they certified and approved the false statements disseminated by Chegg during the Class Period. As a result of the

foregoing, the Individual Defendants, together and individually, were controlling persons of Chegg within the meaning of Section 20(a) of the Exchange Act.

325. As set forth above, Chegg violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

326. By virtue of their positions as controlling persons of Chegg, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class, who purchased or otherwise acquired Chegg common stock. As detailed above in ¶¶25-31, during the respective times these Individual Defendants served as officers and/or directors of Chegg, each of these Individual Defendants was culpable for the material misstatements and omissions made by the Company.

327. As a direct and proximate result of these Individual Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or other acquisition of Chegg common stock.

## C.    COUNT III

### For Violations Of Section 20A Of The Exchange Act
### (Against Defendants Rosensweig And Schultz)

328. Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

329. This Count is asserted pursuant to Section 20A of the Exchange Act against Defendants Rosensweig and Schultz, on behalf of all persons who purchased Chegg common stock contemporaneously with any sales of Chegg common stock by Defendants Rosensweig and Schultz during the Class Period.

330. As set forth in the charts below, Defendants committed underlying violations of Section 10(b) and Rule 10b-5 thereunder by selling Chegg common stock while in the possession of material, adverse, nonpublic information about, among other things, that Chegg facilitated

widespread cheating during remote learning, which drove the Company's revenue and subscriber growth during the Class Period. This conduct violated Section 20A of the Exchange Act.

### Sales by Defendant Rosensweig

| Sale Date | Shares Sold | Sale Price | Proceeds |
|---|---|---|---|
| 02/18/21 | 300,000 | $102.00 | $30,600,000 |
| 01/07/21 | 4,423 | $90.08 | $398,424 |
| 01/07/21 | 23,477 | $91.34 | $2,144,389 |
| 01/07/21 | 100 | $91.93 | $9,193 |
| 12/11/20 | 28,000 | $81.33 | $2,277,240 |
| 11/19/20 | 28,000 | $70.64 | $1,977,920 |
| 10/12/20 | 28,000 | $82.24 | $2,302,720 |
| 09/22/20 | 28,000 | $66.26 | $1,855,280 |
| 08/05/20 | 28,000 | $84.61 | $2,369,080 |
| 07/07/20 | 28,000 | $70.83 | $1,983,240 |
| 06/29/20 | 28,000 | $64.84 | $1,815,520 |
| 05/14/20 | 28,000 | $63.81 | $1,786,680 |
| **Total** | **552,000** | | **$49,519,686** |

### Sales by Defendant Schultz

| Sale Date | Shares Sold | Sale Price | Proceeds |
|---|---|---|---|
| 04/26/21 | 30,000 | $95.26 | $2,857,800 |
| 04/23/21 | 19,027 | $92.08 | $1,752,006 |
| 04/23/21 | 10,673 | $92.80 | $990,454 |
| 04/23/21 | 300 | $93.70 | $28,110 |
| 12/21/20 | 82,458 | $90.20 | $7,437,712 |
| 07/31/20 | 82,459 | $80.34 | $6,624,756 |
| 06/22/20 | 35,083 | $70.19 | $2,462,476 |
| 05/05/20 | 47,376 | $60.00 | $2,842,560 |
| **Total** | **307,376** | | **$24,995,874** |

331.    Lead Plaintiffs purchased shares of Chegg common stock contemporaneously with sales of Chegg common stock made by Defendants Rosensweig and Schultz, while each Defendant was in possession of material, adverse, nonpublic information. These sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act, as shown in the charts below.

| Rosensweig's Contemporaneous Sales | | | | |
|---|---|---|---|---|
| **Defendant** | **Sale Date** | **Shares Sold** | **Sale Price** | **Proceeds** |
| Rosensweig | 08/05/20 | 28,000 | $84.61 | $2,369,080 |
| Rosensweig | 02/18/21 | 300,000 | $102.00 | $30,600,000 |

| Lead Plaintiffs' Contemporaneous Purchases (Rosensweig) | | | | |
|---|---|---|---|---|
| **Lead Plaintiff** | **Purchase Date** | **Shares Purchased** | **Purchase Price** | **Cost** |
| Pompano | 08/07/20 | 980 | $87.89 | $86,134 |
| KBC | 02/19/21 | 571 | $108.78 | $62,113 |

| Schultz's Contemporaneous Sales | | | | |
|---|---|---|---|---|
| **Defendant** | **Sale Date** | **Shares Sold** | **Sale Price** | **Proceeds** |
| Schultz | 07/31/20 | 82,459 | $80.34 | $6,624,756 |

| Lead Plaintiff Pompano's Contemporaneous Purchases (Schultz) | | | | |
|---|---|---|---|---|
| **Lead Plaintiff** | **Purchase Date** | **Shares Purchased** | **Purchase Price** | **Cost** |
| Pompano | 08/06/20 | 850 | $84.39 | $71,729 |
| Pompano | 08/07/20 | 980 | $87.89 | $86,134 |

332.    Numerous other Class members also purchased Chegg common stock contemporaneously with Defendants' sales of stock during the Class Period based on material, adverse, nonpublic information.

333.    By virtue of their knowledge of material, adverse, nonpublic information, Defendants Rosensweig and Schultz were duty bound not to benefit therefrom, a duty which they violated by selling their shares at inflated prices.

334. Accordingly, under Section 20A of the Exchange Act, Defendants Rosensweig and Schultz are liable to Lead Plaintiffs and the Class for all profits gained and losses avoided by them as a result of their stock sales.

## XII. PRAYER FOR RELIEF

335. WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a. Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## XIII. JURY DEMAND

336. Lead Plaintiffs hereby demand a trial by jury.

Dated: December 8, 2022

Respectfully submitted,

*/s/ David R. Kaplan*
David R. Kaplan

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
Hani Y. Farah (SBN 307622)
(*pro hac vice* forthcoming)
Emily R. Bishop (SBN 319383)
505 Lomas Santa Fe Dr.
Suite #180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
hfarah@saxenawhite.com
ebishop@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Jonathan Lamet (*pro hac vice* forthcoming)

7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone.: 561.394.3399
Facsimile: 561.394.3382
msaxena@saxenawhite.com
jlamet@saxenawhite.com

Steven B. Singer (*pro hac vice* forthcoming)
Kyla Grant (*pro hac vice* forthcoming)
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
ssinger@saxenawhite.com
kgrant@saxenawhite.com

*Counsel for Lead Plaintiff Pompano Beach Police and Firefighters' Retirement System, and Lead Co-Counsel for the Class*

**MOTLEY RICE LLC**
Max N. Gruetzmacher (*pro hac vice*)
mgruetzmacher@motleyrice.com
Christopher F. Moriarty (*pro hac vice*)
cmoriarty@motleyrice.com
Neli Traykova Hines (*pro hac vice*)
ntraykova@motleyrice.com
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Tel. 843.216.9000

*Counsel for Lead Plaintiff KBC Asset Management NV, and Lead Co-Counsel for the Class*

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:21-CV-09953-EJD

1

## <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify under penalty of perjury that on December 8, 2022, I authorized the

3  electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which

4  will send notification of such filing to all counsel or parties of record.

5  Dated:  December 8, 2022                    **SAXENA WHITE P.A.**

6                                                        */s/ David R. Kaplan*
                                                         David R. Kaplan
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

128                                  CONSOLIDATED CLASS ACTION COMPLAINT
                                        CASE NO. 5:21-CV-09953-EJD