**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Dr., Suite #180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

**MOTLEY RICE LLC**
Max N. Gruetzmacher (*pro hac vice*)
mgruetzmacher@motleyrice.com
Christopher F. Moriarty (*pro hac vice*)
cmoriarty@motleyrice.com
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

*[Additional Counsel Listed on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN LEVENTHAL, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CHEGG, INC., DANIEL L. ROSENSWEIG, ANDREW J. BROWN, and NATHAN SCHULTZ, <br><br> Defendants. | Case No.: 5:21-cv-09953-EJD <br><br> **CLASS ACTION** <br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> **DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................................... 1

II.     FACTUAL BACKGROUND .................................................................................... 4

III.    LEGAL STANDARD................................................................................................ 8

IV.     ARGUMENT ............................................................................................................ 9

A.      Defendants Made Materially False and Misleading Statements and Omissions……........ 9

      i.      Defendants Falsely Represented that the Rampant Student Cheating on Chegg was Inconsequential and the Company's "Fantastic" Results were In No Way Attributable to Cheating ................................................................. 9

      ii.     Contrary to Defendants' Contentions, the Complaint Pleads Detailed, Extensive Facts Showing that Chegg Facilitated Widespread Cheating ............... 11

      ii.     Defendants' Attacks on Lead Counsel's Empirical Investigation Fail................... 14

      iii.    Defendants' Attacks on the Former Employee Allegations Fail ........................... 15

      iv.     Defendants' Attacks on the Over 100 University Sources Fail .............................. 17

      v.      Defendants' Remaining Arguments Are Without Merit ....................................... 17

B.      Plaintiffs Adequately Plead Scienter ...................................................................... 20

      i.      Abundant Facts Support a Strong Inference of Scienter ....................................... 20

      ii.     The Individual Defendants' Insider Trading Reinforces Scienter ......................... 23

C.      The Complaint Adequately Pleads Loss Causation.............................................. 24

D.      The Complaint Adequately Alleges Claims Under Sections 20(a) and 20(A) ................. 25

V.      CONCLUSION ....................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) .......................................................................................... 19

*Azar v. Yelp Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ...................................................................... 23, 24

*Baker v. SeaWorld Ent., Inc.*,
423 F. Supp. 878 (S.D. Cal. 2019)............................................................................................. 15

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008)............................................................................... 24

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................................. 9, 23

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018).................................................................................. 10, 16

*Ernst & Haas Mgmt. Co., Inc. v. Hiscox, Inc.*,
23 F.4th 1195 (9th Cir. 2022) ...................................................................................................... 9

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) .................................................................................................... 12

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019)......................................................................................... 25

*Fadia v. FireEye, Inc.*,
2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ............................................................................ 13

*Ferraro Fam. Found., Inc. v. Corcept Therap. Inc.*,
2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ............................................................................ 19

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ................................................................................... 9, 11, 14, 18

*Hampton v. Aqua Metals, Inc.*,
2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) ............................................................................ 24

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015)..................................................................................... 16, 22

*In re Amylin Pharm., Inc., Sec. Litig.*,
2003 WL 21500525 (S.D. Cal. May 1, 2003) ............................................................................. 19

*In re ArthroCare Corp. Sec. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010) ...................................................................................... 21

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) .................................................................................................... 18

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ....................................................................................... 19

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002).......................................................................................................13

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................................................... 24

*In re CytRx Corp. Sec. Litig.*,
  2015 WL 5031232 (C.D. Cal. July 13, 2015)..............................................................................9

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ........................................................................................... 23, 24

*In re EQT Corp. Sec. Litig.*,
  504 F. Supp. 3d 474 (W.D. Pa. 2020)....................................................................................... 10

*In re HD Supply Holdings, Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018).............................................................................. 13, 15

*In re Imperial Credit Indus., Inc.*,
  2000 WL 1049320 (C.D. Cal. Feb. 22, 2000) .......................................................................... 22

*In re Intuitive Surgical Sec. Litig.*,
  2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ......................................................................... 24

*In re LendingClub Sec. Litig.*,
  254 F. Supp. 3d 1107 (N.D. Cal. 2017)..................................................................................... 17

*In re Molycorp, Inc. Sec. Litig.*,
  157 F. Supp. 3d 987 (D. Colo. 2016)......................................................................................... 14

*In re Nuvelo, Inc. Sec. Litig.*,
  668 F. Supp. 2d 1217 (N.D. Cal. 2009) ..................................................................................... 19

*In re Ocera Therapeutics, Inc. Sec. Litig.*,
  806 F. App'x 603 (9th Cir. 2020) .............................................................................................. 25

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) .................................................................................................... 20

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ..................................................................................... 24

*In re Plantronics, Inc. Sec. Litig.*,
    2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) .............................................................. 11

*In re Qualcomm Inc. Sec. Litig.*,
    2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ................................................................ 21

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ................................................................................... 16, 21

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) .......................................................................................... 24

*In re Terayon Commc'ns Sys., Inc.*,
    2002 WL 989480 (N.D. Cal. Mar. 29, 2002) .................................................................. 23

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ...................................................................... 24, 25

*In re Verifone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) .......................................................................................... 21

*In re WageWorks, Inc., Sec. Litig.*,
    2020 WL 2896547 (N.D. Cal. June 1, 2020) .................................................................. 24

*In re Wash. Mut., Inc. Secs., Derivative & ERISA Litig.*,
    694 F. Supp. 2d 1192 (W.D. Wash. 2009) ...................................................................... 16

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ........................................................................................... 20

*Jaeger v. Zillow Grp., Inc.*,
    2022 WL 17486297 (W.D. Wash. Dec. 7, 2022) ........................................................... 14

*Karinski v. Stamps.com, Inc.*,
    2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ................................................................... 24

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ....................................................................................... 9, 11

*Lamartina v. VMware, Inc.*,
    2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ............................................................... 25

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ........................................................................................ 25

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ............................................................................................... 25

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ................................................................................................. 24

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................................... 18

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ............................................................................................... 21

*Oh v. Hanmi Fin. Corp.*,
2022 WL 3405975 (C.D. Cal. Aug. 15, 2022) ....................................................................... 18

*Omnicare, Inc. v. Laborers Dis. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ................................................................................................................ 18

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
432 F. Supp. 3d 131 (D. Conn. 2019) ..................................................................................... 18

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*,
2019 WL 3336119 (D. Minn. July 25, 2019) ........................................................................ 10

*Robb v. Fitbit Inc.*,
2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ..................................................................... 12, 15

*Robbins v. Altopa, Inc.*,
2023 WL 2484827 (E.D.N.C. Mar. 13, 2023) ....................................................................... 12

*Roberti v. OSI Sys. Inc.*,
2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ..................................................................... 9, 22

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ............................................................................................ 20, 21

*S. Ferry v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009) .............................................................................. 22

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) ............................................................................................ 18, 20

*Shaev v. Baker*,
2017 WL 1735573 (N.D. Cal. May 4, 2017) .......................................................................... 20

*Sharenow v. Impac Mortg. Holdings, Inc.*,
385 F. App'x 714 (9th Cir. 2010) .......................................................................................... 24

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................................ 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .............................................................................................................. 8, 20

*Weston v. DocuSign, Inc.*,
   2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) .................................................................... Passim

*Zelman v. JDS Uniphase Corp.*,
   376 F. Supp. 2d 956 (N.D. Cal. 2005) ................................................................................ 16

**Statutes**

15 U.S.C. § 78u-5(c)(i) .............................................................................................................. 19

## I.     INTRODUCTION[1]

Throughout the Class Period, Chegg reported "fantastic" and "unprecedented" financial results that Defendants specifically attributed to students legitimately using the Company's online "learning platform" to "master their subjects" and "better understand their course material."  Given that Chegg's explosive growth coincided with the campus shutdowns imposed during the COVID-19 pandemic, however, analysts and financial media were extremely concerned that Chegg's "record" results were actually the result of students opportunistically flocking to the Company's platform to cheat on distance learning exams, and that, once in-person instruction resumed, Chegg's financial results would suffer. Defendants, in an effort to quell these concerns, repeatedly and vehemently denied that students were using Chegg to cheat, or that cheating was in any way responsible for the Company's "tremendous" financial performance. To the contrary, Defendants repeatedly assured investors that Chegg's dramatic growth was "sustainable"; that the Company's financial results were fueled by legitimate business factors, including a crackdown on password sharing; that any misuse of Chegg's platform was "***very isolated***" and "***represent[ed] an extremely small portion*** of the activity on our services"; and that Defendants had implemented measures to curb even the "***tiny fraction***" of student cheating that was taking place on the platform.

Analysts and financial media credited these assurances, and Chegg's stock price skyrocketed, nearly tripling from the start of the Class Period to reach an all-time high of over $113 per share on February 12, 2021. Just days later, Defendants capitalized on their fraud, conducting a ***$1 billion*** SPO in which CEO Rosensweig alone sold ***over $30 million*** in stock. All told, Chegg insiders reaped nearly ***$100 million*** in proceeds during the Class Period from insider sales that were

---

[1] "¶_" references are to paragraphs of the Complaint (ECF 115); all emphasis is added; and all defined terms have the same meanings as in the Complaint. References to "Mem. _" are to Defendants' Memorandum of Points and Authorities (ECF 122). With this brief, Plaintiffs are also filing an opposition to Defendants' Request for Judicial Notice (ECF 123) and a motion to strike certain "facts" in the supporting Declaration of Heather Speers (ECF 122-1). Unless otherwise noted, all internal citations and punctuation are omitted.

highly suspicious in timing and magnitude, with Rosensweig and Schultz (Chegg's President of Learning Services) collectively pocketing a ***staggering $74 million***.

As was ultimately revealed, Defendants' statements were false. Once students widely returned to in-person learning in the fall of 2021 and could no longer easily use Chegg's platform to cheat, Chegg's business and financial performance declined. On November 1, 2021, Chegg reported disastrous Q3 2021 results—including a sudden 10% ***decline*** in subscribers, a dramatic reversal from the "unprecedented" subscriber growth Chegg had reported throughout the Class Period. Chegg also slashed its fourth quarter guidance and entirely postponed issuing guidance for 2022. On this news, Chegg's stock price plunged by nearly 50% in a single day, from $62.76 to $32.12 per share—erasing $4 billion in shareholder value. Tellingly, while Defendants attempted to blame Chegg's poor results on students purportedly suddenly dropping out of school, analysts emphatically rejected this claim, noting that "***the enrollment excuse makes no sense*** . . . enrollment declines this year were smaller than they were last year" and succinctly concluding: "***most students use Chegg to cheat on exams, quizzes and homework***," and "***[n]ow that students are back in the classroom, they can't easily use Chegg to cheat***." In the wake of these revelations, Chegg's stock price has never recovered, and today trades below $20—roughly one-sixth of its Class Period-high.

Plaintiffs' allegations are supported by substantive factual allegations that are exceptionally detailed and robust for a securities fraud pleading. The Complaint includes firsthand accounts from numerous deans, professors, and high-level officials at many of the nation's top universities, who universally describe how Chegg was single-handedly responsible for an explosion of student cheating cases at their schools during the pandemic, that Chegg thwarted efforts to catch the cheaters, and that even after Defendants were directly informed of the problem, Chegg stubbornly refused to implement even the most basic changes to prevent cheating on its platform. Moreover, a trove of documents produced by these institutions (including emails sent directly to Chegg's most senior officers), the eyewitness accounts of numerous former Company employees, and Plaintiffs' own empirical analysis of archived data on Chegg's platform further confirm that cheating was a "severe issue" throughout the Class Period, that Defendants' representations concerning Chegg's rapid growth were false, and that Defendants were loathe to kill the "cheating business" because it

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

was "***putting money into their pocket***."

Defendants contend that the Complaint lacks "a single well pled fact" to support Plaintiffs' allegations, but this is nonsense. As an initial matter, Defendants concoct a new pleading standard, claiming that Plaintiffs are required to quantify the exact amount of cheating that occurred on the Chegg platform before, during, and after the Class Period. Of course, that is not the law. Defendants also ignore the accounts of over 100 university faculty from across the country who describe how the vast majority of students who used Chegg did so to cheat, that cheating on Chegg exploded during the pandemic, and that many of these university faculty were not aware of ***any*** student who used Chegg for educational purposes. Defendants also mischaracterize the FE accounts by claiming they do not show that cheating boosted Chegg's revenues. However, the FE's unequivocally confirmed that cheating "***absolutely accelerated***" during remote learning, and that it was well-known at the Company that Chegg's growth was the direct result of the "***cheating business***."

Defendants' attacks on scienter also fail. The notion that Defendants honestly believed that Chegg's dramatic growth was completely legitimate and sustainable is neither credible nor plausible. Indeed, the Complaint is replete with strong scienter facts, including ***numerous emails by officials and faculty at UCLA, Purdue***, ***Georgia Tech***, ***Nebraska, Boston University, Air Force Academy and other universities directly informing Chegg management about the extensive cheating***, and articles published by the nation's foremost newspapers and business publications that indisputably put Defendants on notice that massive numbers of students nationwide were using Chegg to cheat—so much so that "Chegging" became synonymous for cheating. While vehemently denying these claims, Defendants consistently touted their meticulous monitoring of student usage of the platform—they "***track[ed] every single action***," and "***could watch everything***"—attended meetings where cheating was openly discussed; and internally circulated articles that discussed extensive cheating on the platform. At the same time, Defendants Rosensweig and Schultz reaped nearly $75 million through insider trading.

Defendants' loss causation arguments fare no better. In the Ninth Circuit, loss causation is sufficiently alleged when, as here, a price drop follows an earnings miss and analysts and media reports directly connect the miss to the hidden truth. Nothing more is required at the pleading stage.

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

Plaintiffs respectfully submit that Defendants' motion should be denied in its entirety.

## II.    FACTUAL BACKGROUND

Chegg purports to be a provider of educational study services. ¶32. Its primary business segment, "Chegg Services," consists of online subscription products and comprised about 90% of the Company's revenues during the Class Period.  ¶33. Within Chegg Services, "Chegg Study" is the Company's featured product and includes its flagship tool—"Expert Q&A"—which allows subscribers to search for exam answers in a massive database and, if a question has not yet been asked, upload the questions by photo or text to a pool of tens-of-thousands of Chegg "experts" located overseas for "step-by-step solutions" with an "almost immediate" response time. ¶¶36-38.

As the COVID pandemic shut down schools and students transitioned to distance learning, Chegg Study subscriptions suddenly exploded by 70%, from 3.9 million in 2019 to 6.6 million in 2020; Chegg's annual revenues surged by 60%, from $411 million in 2019 to over $640 million in 2020; earnings nearly doubled, from $68 million in 2019 to approximately $128 million in 2020; and Defendants repeatedly raised Chegg's financial forecasts. ¶¶40, 48-49. On the strength of this dramatic growth, Chegg's stock price soared by more than *150%* in under one year. ¶50.

Defendants repeatedly assured investors that this "unprecedented growth" was attributable to legitimate and sustainable factors—namely, the "inevitable" adoption of online learning, expansion into international markets, and "increased success" limiting account (password) sharing, which purportedly led to a surge in new subscriptions. ¶¶41-46, 52, 173, 179, 184, 187, 193, 197-98, 200, 202-03. Rosensweig boasted that, once Chegg restricted account sharing, "what ended up happening was all these students that have been using it suddenly started to pay for it and we grew organically 58% year-over-year in the second quarter which is insane." ¶193.

As Defendants continued to hail the Company's "unprecedented," "tremendous," and "record" results, investors began to question the legitimacy and sustainability of Chegg's growth. ¶188.  Numerous media outlets, including *The Washington Post*, *The New York Times*, *The Boston Globe*, *The Atlanta Journal Constitution*, and *Inside Higher Ed*, began reporting on a rising tide of student cheating scandals; academic journals, like the *International Journal for Educational Integrity* ("IJEI"), observed it "appear[ed] highly likely that students [were] using [Chegg] as an

4

easy way to breach academic integrity"; and *Forbes* ran a Chegg exposé based on interviews with over fifty students titled, "This $12 Billion Company is Getting Rich Off Students Cheating Their Way Through Covid." ¶¶53-55, 58, 209. Recognizing the threat that this adverse reporting posed to their business, Defendants responded by adamantly denying that Chegg's growth was in any way based on cheating, asserting that "Chegg is not built for [cheating]," the "vast majority of Chegg users are honest," and there was no "relative increase in Honor Code issues since the COVID-19 crises began." ¶¶56-58. Rosensweig underscored that the "*overwhelming majority* [of] students who use us" do so "whether they have a test or have a quiz or not." ¶213. Chegg's CFO, Brown, similarly emphasized that there were only "*very isolated cases [of cheating]*," and Chegg was a "learning site" where cheating "*doesn't happen*." ¶188. Chegg twice updated its Honor Code to confirm that "[t]he *vast majority* of Chegg students use our services to help them learn" and "misuse of our platform represents an *extremely small portion* of the activity on our services." ¶¶191, 236. In response to the media reports, Defendants maintained that "reporters don't understand what Chegg does and the way we do it," that authors "mistakenly imply . . . that increased usage of Chegg has correlate[d] to an increase in cheating," and that an in-depth academic study into Chegg cheating was unreliable as it was funded by a Company competitor. ¶¶57, 209, 213, 281.

Despite these repeated assurances, midway through the Class Period Chegg rolled out "Honor Shield," an initiative that supposedly "blocks people" from asking "specific questions" during exams. ¶¶59-61. Even then, Defendants stressed that Honor Shield applied to only "*a small number of students*" who "*potentially cheat*" on the platform. ¶¶59, 235. Defendants reassured Chegg was "*100% committed*" to preventing cheating, and that the Company "work[ed] with faculty, administrators, and students . . . in protecting the integrity of the online evaluation process." ¶¶207, 209. Given the supposed legitimate reasons for Chegg's growth, Defendants declared that "whether you are on-campus or not on-campus, [it] didn't matter to Chegg's growth" and the "take rates for Chegg Study" were "*agnostic to geography*" and a "*permanent situation*."[2] ¶¶196, 219.

Analysts credited Defendants' denials, noting that "the vast majority of students" use Chegg

---

[2] Rosensweig stated Chegg had "built all the technology to block [account sharing], so that's why even when [some students] went back to campus, the growth rate accelerated even more." ¶198.

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

appropriately with only "some" "mis[using] the platform . . . during quizzes/exams," and that Chegg's commitment to academic integrity should "assuage[] bear concerns around cheating." ¶62. With Chegg shares trading at record highs, Defendants capitalized on their fraud through massive insider sales. ¶¶163-66. Rosensweig and Schultz collectively unloaded nearly *$75 million* of their personal shares during the Class Period, including nearly *90%* of Schultz's holdings. ¶296. And, in February 2021, only days after Chegg's stock price reached its all-time-high, Defendants conducted a *$1 billion* SPO pursuant to which Rosensweig alone pocketed *over $30 million*. ¶164.

Contrary to Defendants' representations, in reality, Chegg's dramatic growth was the direct result of widespread student cheating on its platform. ¶¶47, 63-65. Indeed, cheating on the Company's site was so rampant and pervasive that the term "*Chegging*" became synonymous with cheating at college campuses across the nation. ¶12. Responses to FOIA requests from world-renowned public universities and military academies, along with interviews with dozens of school officials, confirm "widespread use of Chegg" by students to cheat during distance learning. ¶¶66-125. These accounts from faculty across the nation—including high-level university and compliance officials at UCLA, Texas A&M, Virginia Tech, Georgia Tech, Purdue, North Carolina State—show that, far from isolated incidents, cheating via Chegg *exponentially* increased during the Class Period, and that these officials directly attributed this explosion in cheating during the pandemic directly to Chegg. *See, e.g.*, ¶¶68, 75-82, 99-101; 103; 109 114.

These professors and academic integrity officers explained that the "*vast majority of students using Chegg did so for illegitimate reasons*"; "the main use [of Chegg] was . . . for *answers on exams*"; "*[e]very use of Chegg . . .* has been clearly an *academic-integrity violation*"; and many were unaware of any "*any legitimate purposes*" of Chegg. ¶¶100, 102-03, 105, 119; *see also* ¶¶103-05, 111-12, 114-17, 122-24 (similar accounts by officials at 11 other universities). Indeed, internal investigations uncovered scores of incidents where significant portions of entire classes, including at Duke University and North Carolina State, were compromised by widespread cheating using Chegg's platform. ¶¶69, 73, 76-78, 84, 87, 92, 105, 109, 113.

Significantly, these FOIA productions, which included Chegg's internal documents, also confirm that senior officials at universities directly contacted Chegg management to report the

"raining cases" of academic integrity violations involving Chegg. ¶¶68, 72.[3] For example, the former Director of the Honor System Office at Texas A&M directly emailed Rosensweig at "danlr@chegg.com" to express cheating concerns and received responses from the Company (falsely) claiming her experience was an "anomaly." ¶99. Nonetheless, Chegg brazenly refused to implement even the most basic safeguards to prevent cheating, and flatly refused to provide basic information (e.g., names and emails) allowing schools to identify suspected cheaters, while erecting "hurdle[s] for faculty" who attempted to address the rampant cheating. *See* ¶¶70-74, 79-80, 85, 87-89, 91, 93, 101, 103, 107, 112-13, 117, 138 (examples of Chegg protecting cheating and cheaters).

FEs further confirm that student cheating was the main driver for Chegg's success. The FEs described how Chegg's Expert Q&A service was "the main reason for people to subscribe," and that "the cheating business" drove growth. ¶128. Chegg even launched an internal initiative dubbed the "Big Egg" project to make Chegg's Expert Q&A tool more efficient for cheating (or as executives put it, to "create a better experience" for users) by allowing students to search for exam answers using their exact college and course. ¶130. FEs also confirmed that Defendants were well aware of the widespread cheating using Chegg. ¶¶131-37. FE1 recounted how "CEO [Rosensweig] would sometimes talk about [cheating] during all-hands [meetings]"; FE2 explained that cheating "absolutely … accelerated" during distance learning; and FE5 and FE8 described how executives "always had access to data," including cheating metrics maintained through Chegg's Oracle system. ¶¶132-33, 135. Executives even distributed a *Forbes* exposé on Chegg and cheating. ¶134. Despite this ubiquitous internal awareness, the FEs reported that Defendants did nothing to curb cheating as it "was putting money into their pocket," and further confirmed that the purported account sharing initiative "was not the driver" behind the subscriber growth. ¶¶138, 141-42.

---

[3] *See* ¶¶70-73 (multiple UCLA faculty contacting Chegg, including the Associate Dean who sent more than ten letters); ¶¶79-80 (Georgia Tech reporting multiple cheating incidents directly to Chegg); ¶85 (University of Nebraska sending five letters to Chegg's Honor Code e-mail address); ¶88 (Cal State Fullerton sending multiple letters); ¶91 (Air Force Academy sending multiple letters); ¶121 (professor sent over thirty "takedown notices" advising Chegg of cheating).

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

Plaintiffs' empirical analysis of thousands of questions submitted to Chegg's Expert Q&A during the Class Period further confirms rampant student cheating. Plaintiffs' review of archival data demonstrates that students submitted *twice* as many questions to "Chegg Experts" in April 2020 as they had during the same exam period in 2019, and ***four times*** as many questions by the end of May 2020, during exam season. ¶¶148-49. Moreover, a random sample of 6,000+ questions from Chegg's database found that approximately ***one-quarter*** of questions submitted on Expert Q&A during the Class Period contained clear and blatant indicia of cheating, including screenshots of countdown clocks showing the remaining time on the exam, headers noting "graded assignment," and instructions explaining "please solve this question urgently its exam questions." ¶¶151, 153.

As was ultimately revealed, Chegg was a house of cards—a Company whose success during the pandemic was predicated on allowing students to cheat with abandon. On November 1, 2021, Chegg reported its Q3 2021 financial results—the first quarter after students widely returned to campus—which revealed a sudden ***decline*** in subscribers for the first time in the Class Period, prompting Chegg to lower its full-year 2021 guidance and postpone issuance of 2022 guidance. ¶167. Chegg's stock price plummeted nearly 50% in response. ¶168. Analysts immediately connected these poor results with the return of on-campus learning, which made it more difficult to cheat with Chegg. ¶¶169-71. As *Forbes* reported, "***[n]ow that students are back in the classroom, they can't easily use Chegg to cheat***." ¶169. While Defendants attempted to blame the subscriber decline on students dropping out of school en masse, multiple analysts rejected the excuse. For example, *Forbes* reported that "***the enrollment excuse makes no sense*** . . . enrollment declines this year were smaller than they were last year, when Chegg's revenue and stock were soaring," and BNP Paribus similarly noted that "official data actually show that the rate of decline in U.S. college enrollment ***eased*** in Fall 2021 vs. 2020." ¶¶170-71. Chegg's stock price has never recovered.

## III.    LEGAL STANDARD

In assessing a motion to dismiss, a court must "accept all factual allegations . . . as true" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). "Dismissal is affirmed only if it appears beyond doubt that [the] plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Ernst &*

*Haas Mgmt. Co., Inc. v. Hiscox, Inc.*, 23 F.4th 1195, 1199 (9th Cir. 2022). The Court should reject a defendant's competing factual narrative. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). "[C]ourts must be careful not to set hurdles so high that even meritorious actions cannot survive a motion to dismiss. Such a regime would defeat the remedial goals of the federal securities laws." *Roberti v. OSI Sys. Inc.*, 2015 WL 1985562, at *6 (C.D. Cal. Feb. 27, 2015).

## IV. ARGUMENT

### A. Defendants Made Materially False and Misleading Statements and Omissions

A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Plaintiffs need not prove absolute, incontrovertible falsity; rather, the relevant question is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *3 (C.D. Cal. July 13, 2015). Moreover, as the Ninth Circuit recently instructed, courts must not "impute the strong inference standard of scienter to the element of falsity; we do not require a 'strong inference of fraud.'" *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). Instead, "[f]alsity is subject to a particularly requirement and the *reasonable inference* of plausibility set out in *Twombly* and *Iqbal*." *Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *17 (N.D. Cal. Apr. 18, 2023) (emphasis in original).

#### i. Defendants Falsely Represented that the Rampant Student Cheating on Chegg was Inconsequential and the Company's "Fantastic" Results were In No Way Attributable to Cheating

As Chegg's business exploded during the pandemic, investors were laser-focused on whether the Company's growth was sustainable, and in particular, whether Chegg's success was actually due to reports of rampant cheating on the Company's platform. Indeed, some of the most prominent media outlets in the country, including *Forbes*, investigated and found cheating on Chegg, with the IJEI finding "students are using this site as an easy way to breach academic integrity" by getting "answers completed quickly by a tutor . . . within the short time frame which matches an exam." ¶¶53-54. Analysts were similarly concerned about the "negative media stories about how students might have been abusing the Chegg product" and short-seller reports calling

Chegg "the poster child for institutionalized academic cheating." ¶¶188, 213. In response to these concerns, Defendants falsely claimed there were only a "*very isolated*" number of cheating cases, cheating "*represents an extremely small portion* of the activity on our services," and that Chegg was committed to eradicating cheating. ¶¶182, 188-89, 191, 205, 207, 209, 213, 235-36, 246.[4]

Defendants' statements were materially false. Indeed, as documents obtained from numerous universities and military academies confirm, and as corroborated by the firsthand accounts from *two dozen* university faculty, professors struggled to teach under a "raining" number of Chegg cheating cases in which the "vast majority" of students who used Chegg did so to cheat. ¶¶66-125. In addition, numerous internal sources, including the FEs and Plaintiffs' own empirical analysis, further corroborate the widespread student cheating on Chegg during the Class Period. ¶¶127-154; *see In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 491 & n.13 (W.D. Pa. 2020) (falsity supported by plaintiffs' forensic analysis of "knowable, quantifiable facts at the time Defendants made their representations"). Moreover, rather than eradicating cheating, university officials uniformly described how Chegg erected "hurdle[s] for faculty" to identify and discipline cheaters, and the FEs confirmed that Chegg "didn't really put any effort into stopping [cheating]" because it "was putting money into their pocket." ¶¶70-74, 79-81, 87-89, 91, 138; *see City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1040-42 (N.D. Cal. 2018) (crediting accounts from confidential witnesses to show falsity).

In addition, Defendants falsely claimed that Company efforts at limiting account sharing sufficiently explained the explosive subscriber growth, and that Chegg's success was "not a COVID case" and "not a result of people being on campus or not being on campus." *See* ¶¶215, 230; *see also* ¶216 ("the [growth factor] that has had the most immediate impact is account sharing"); ¶¶173-

---

[4] While Defendants claim Chegg's Honor Code was merely "aspirational" (Mem. 19), the Honor Code's specific claims that the "vast majority" of Chegg's usage was legitimate and that "misuse of [the] platform represents an extremely small portion" thereof were factual, actionable statements. *See Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2019 WL 3336119, at *16 (D. Minn. July 25, 2019) (factual statement of facts in a code of ethics are actionable) (collecting cases).

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

80, 184, 193, 196-203, 217-29, 233, 239-42, 249, 251. These assertions were likewise false. As FE1 confirmed, internal Company data that she personally reviewed during the Class Period confirmed efforts to limit account sharing were "***not the driver***" behind Chegg's growth, but rather accelerated cheating—an account that FE3 corroborated, stating it was "***the cheating business***" that drove Chegg's growth. ¶¶128, 133, 141, 143; *see In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *10, 14 & n.9 (N.D. Cal. Aug. 17, 2022) (finding statements attributing growth to specific factors misleading for omitting unsustainable sales practices as a contributing factor). Thus, Defendants' statements concealed that student demand for Chegg would decline once students returned to campus and could no longer easily use Chegg to cheat. ¶¶66-126, 128-40, 178, 185; *see DocuSign*, 2023 WL 3000583, at *14, *17 (finding actionable statements about post-pandemic sustainability, such as "the value propositions . . . we're delivering are sustainable, whether it's a work-from-home environment or not," when defendants omitted known demand risks). This is precisely in fact what occurred—Chegg Study subscriptions plummeted ***the moment*** the majority of schools resumed in-person teaching, as students could no longer "easily use Chegg to cheat." ¶169.[5]

### ii. Contrary to Defendants' Contentions, the Complaint Pleads Detailed, Extensive Facts Showing that Chegg Facilitated Widespread Cheating

In arguing that Chegg's platform was not widely used by students to cheat, Defendants ignore the Complaint's well-pled facts, recast Plaintiffs' "theory of falsity," and advocate legal standards that plainly have no application at the pleading stage. Specifically, Defendants contend that for falsity, Plaintiffs must "quantify the number or percentage of subscribers that used Chegg to cheat before, during, or after the class period." Mem. 11. But the Ninth Circuit has recently held that Plaintiffs ***need not*** provide this level of detail; rather, Plaintiffs need only provide "facts supporting each of their beliefs as to why the challenged statements were false or misleading," which ***should not "impose an impossibly high burden on securities actions plaintiffs***." *Glazer*, 63 F.4th at 769; *see Robb v. Fitbit Inc.*, 2017 WL 219673, at *8 (N.D. Cal. Jan. 19, 2017) ("The

---

[5] Defendants' proposed counter-narrative, that most students returned to campus in the fall of 2020 (Mem. 6), contradicts the Complaint's allegations (¶¶48, 167-69, 171) and must be rejected for "undermining the usual pleading burden." *See Khoja*, 899 F.3d at 998-99.

specificity that Fitbit defendants seek, such as the frequency of alleged failures and the precise level of inaccuracy, crosses into territory better evaluated on a motion for summary judgment"). Instead, as here, a complaint is sufficient when it provides a "narrative of the fraud" which "substantiate[s] an explanation at least as plausible as a nonfraudulent alternative." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016).

Defendants argue that because the Complaint does not provide the precise number of students who cheated—a virtually unknowable figure even with the benefit of full discovery—Plaintiffs' claims amount to a mere "assumption" that should be dismissed.[6] *Id.* In so arguing, Defendants blatantly ignore the Complaint's abundant sources evidencing that Chegg-facilitated cheating not only existed but increased dramatically during remote learning. Far from an "assumption," documents obtained from FOIA productions and the accounts of dozens of university faculty confirm that students across the nation, including at upwards of 30 schools, turned to Chegg to cheat during distance learning and were supported by a "very professional cheating operation." ¶87; *see* ¶¶66-125. Significantly, many university faculty stated that they were unaware of *any* students who used Chegg for legitimate educational purposes. ¶¶100, 102-03, 114-16, 122. Further, reports from well-placed FEs reveal the "cheating business" was "***absolutely well understood***" as a business driver internally at Chegg, and the empirical analysis of Chegg's internal data confirms that at least ***one quarter*** of all questions submitted were to cheat and that such submissions ballooned during the Class Period. ¶¶128, 133-34, 138-39, 141, 150-52.

Furthermore, the Complaint recites statistics from a host of universities quantifying the significant increase in cheating that occurred. *See, e.g.*, ¶99 (Texas A&M's academic misconduct cases doubled in 2020-21, with an estimated ***80-85%*** of the increase ***attributable to Chegg***); ¶100

---

[6] Defendants know full well that because Chegg bundled its services, identifying the precise number of subscribers and revenues derived from cheating—even if quantifiable—requires access to Chegg's internal user engagement data.  *See, e.g.*, *Robbins v. Altopa, Inc.*, 2023 WL 2484827, at *2 (E.D.N.C. Mar. 13, 2023) ("[T]he PSLRA does not require plaintiffs to set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants").

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

(Virginia Tech's cheating nearly doubled with staff attributing "*the rise in [cheating] cases largely to Chegg*"); ¶101 (University of Rochester academic integrity issues increased *70%* due to students *use of Chegg*); ¶103 (Macquarie University saw a *fivefold* increase in cheating cases *from Chegg*); *see also* ¶¶109, 113-14, 122 (all describing increased cheating on Chegg during the pandemic). These figures are concrete, verifiable, and were derived directly from the universities themselves. *Compare In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1356 (N.D. Ga. 2018) (plaintiffs need not "specifically quantify how false the statements were when made" as "[t]his will be made clear through discovery"), *with Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *13 (N.D. Cal. Nov. 14, 2016) (Davila, J.) (dismissing claims where the "CWs entirely fail to support their allegations with concrete and readily verifiable figures or explanations"). Multiple university sources also confirmed that cheating via Chegg ceased upon return to campus. ¶¶99, 105, 120. Defendants simply ignore these allegations.

Defendants next assert that Plaintiffs must cite to "guidance model[s], internal report[s], email[s], revenue analysis, or valuation" directly linking rapid revenue growth to increased cheating. Mem. 11. Not so. The PSLRA does "not require a plaintiff to plead evidence," and "Defendants' argument that even more detail be required, before there is any discovery, . . . amounts to requiring plaintiffs to plead evidence." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002). Here, analysts and prominent financial media readily drew the link between the increased number of students using Chegg's platform to cheat and the resulting increase in the Company's revenues. ¶¶169-71. FE3 specifically confirmed that it was "the cheating business" that drove revenue growth, and that Chegg's Exam Prep business "did not contribute much to subscriber growth" and "was not a main driver for revenues." ¶128.

Defendants argue that Plaintiffs failed to show that Defendants knew Chegg's revenue would slide once students returned to in-person learning. Mem. 11. However, the Complaint details that Defendants were well aware that cheating on Chegg exploded due to at-home and minimally supervised test taking (¶¶41, 54, 59-60); that rampant cheating during the pandemic fueled Chegg's growth (¶¶128, 133-34, 138, 141-43); and thus, once in-person learning returned, Chegg's results were almost certain to crater. Indeed, FE2 described how Chegg recognized it needed to

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

"radical[ly]" overhaul its business during the pandemic, specifically because it realized that things "would likely not go well [for its business] when students returned to campus." ¶130; *see Jaeger v. Zillow Grp., Inc.*, 2022 WL 17486297, at \*7 (W.D. Wash. Dec. 7, 2022) ("Plaintiff, however, is entitled to the reasonable inferences to be drawn from the factual allegations of the CAC, and in light of those favorable inferences, Plaintiff has plausibly pleaded that Zillow's statements about consumer demand were misleading").

### ii.    Defendants' Attacks on Lead Counsel's Empirical Investigation Fail

Plaintiffs' allegations are also supported by Lead Counsel's empirical analysis of archived data on Chegg's platform, and Defendants' critiques of that analysis fail. "When a complaint contains allegations based on investigation of counsel, the PSLRA 'requires a plaintiff to identify in the complaint specific facts that support the allegations about the misleading nature of the defendant's statements.'" *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1002 (D. Colo. 2016), *as amended* (Jan. 28, 2016). The Complaint easily meets this standard.  In describing Lead Counsel's empirical investigation, the Complaint identifies the source of the data; the number, subjects, and timeframe of unique user questions reviewed; parameters used to identify cheating, with examples; the resulting calculation of percentage of questions containing obvious signs of cheating; and trends in the data before, during, and after the Class Period. ¶¶146-54.

Additionally, the Complaint describes how many of the questions reviewed included brazen language indicative of cheating, such as phrases like "Please help as soon as possible. I have 30 minutes to answer," "please solve this question urgently its exam questions," and "NEED 100 PERFECT ANSWER. GIVE ANSWER IN LESS THAN 20 MINUTES." ¶153. This straightforward analysis of data on Chegg's own platform does not require "expertise" in statistics (or any other field) as Defendants assert, and Defendants' authority to the contrary is wholly irrelevant as it concerns whether expert testimony is ***admissible at trial***. Mem. 12 (citing *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 878 (S.D. Cal. 2019)); *see also Glazer*, 63 F.4th at 769 (rejecting argument that complaint contained "insufficient particularized facts" because it would "impose an impossibly high burden on securities action plaintiffs"). Moreover, the detailed explanation of Lead Counsel's methodology and specific examples uncovered from Chegg's own website (¶151 &

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

n.26), together with the multiple other corroborating sources of the Complaint, completely undermine Defendants' claim that the empirical analysis is merely "conclusory assertions by lawyers with a personal financial stake in the outcome of the case." Mem. 13.

Defendants' argument that the analysis only applies to photographs and only certain subjects, and is therefore not "representative of any broader population," is also meritless. Mem. 13. Indeed, the Complaint undeniably alleges cheating on a broad scale, including through abundant university sources that widely confirm that the vast majority of students used Chegg for illegitimate purposes across many different disciplines, such as life sciences, multiple engineering departments, economics, and medicine. ¶¶70-81, 92, 100-24 (noting lack of legitimate use of Chegg and that "vast majority" of students only used Chegg to cheat). Defendants' distinction between "the number of Chegg subscribers" and the "percentage of questions submitted" (Mem. 13) fails for this same reason—i.e., the Complaint is replete with facts showing that cheating was pervasive.

Defendants' argument that the empirical analysis should be disregarded because it does not quantify precisely "how much purported cheating occurred" (Mem. 14), also fails because Plaintiffs are not required to plead with such specificity. *See Fitbit*, 2017 WL 219673, at *8; *HD Supply*, 341 F. Supp. 3d at 1356. Regardless, the empirical analysis confirms the Expert Q&A database ballooned during the Class Period as compared to pre-pandemic years. ¶¶148-49.

Defendants also mischaracterize the empirical analysis in asserting that "the rate of cheating declined" over the Class Period. Mem. 14. Indeed, the analysis included questions submitted in specific high usage months throughout the Class Period (including late in the period) and compared that to lower usage months over the same general period. ¶151 (including questions from May 2021); ¶152 (including questions from December 2020 through May 2021). Thus, both analyses cover similar general time frames and therefore undermine the point Defendants seek to make.

### iii.    Defendants' Attacks on the Former Employee Allegations Fail

Defendants mischaracterize some of the FE allegations and ignore others. Mem. 14-16. Contrary to Defendants' assertion that "none of the FEs claim that cheating drove subscriber or revenue growth," (Mem. 15), FE3 specifically explained that Chegg's "cheating business" was what drove the Company's growth, and FE2 also confirmed cheating "accelerated" during the

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

pandemic. ¶¶128, 133. In addition, numerous allegations from FEs demonstrate that Chegg's Expert Q&A service was overwhelmingly used to cheat and that cheating increased dramatically during the pandemic. For example, FE2 stated that "*all [Chegg employees] knew it at some level*" that students used Chegg to cheat, and that she saw evidence of students cheating when "working on campaigns and testing." ¶133. As part of her job responsibilities, FE4 saw students' posts on social media where they admitted to using Chegg to cheat and saw photos of tests being posted to Chegg. ¶131. FE7 confirmed "'*the [cheating] issues were absolutely well understood'*" at Chegg. ¶134. The fact that the FEs provide consistent accounts further demonstrates their reliability. *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015) (upholding complaint when "CWs corroborate one another's statements").

While Defendants argue that statements from FEs who were employed by Chegg prior to the Class Period should be disregarded (Mem. 15), this argument pertains to only three of the eight FEs, and those FEs provided information concerning Chegg's information systems, Defendants' access to cheating data, and universities' experiences with Chegg (¶¶131-32, 135, 137)— information that remained highly relevant during the Class Period. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (pre-class period witness had sufficient knowledge of management's access to reports); *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 971 (N.D. Cal. 2005) ("common sense" dictates that "circumstances preceding the statements … would be among those knowable at the time of the statements"). Furthermore, Defendants boasted of their real-time access to Chegg's data. ¶¶260-64. While Defendants downplay FE2's account that the "Big Egg" project was designed to help cheating by claiming she never shared her concerns with Defendants (Mem. 15), FE2 made clear that this knowledge was well-known and openly discussed throughout Chegg. ¶130; *RH, Inc.*, 302 F. Supp. 3d at 1042 (crediting FE where information "was well known internally and openly communicated at staff meetings").

Contrary to Defendants' assertion, the FE accounts need not "quantify the number of subscribers who used Chegg's platform to cheat." Mem. 15; *see In re Wash. Mut., Inc. Secs., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1222 (W.D. Wash. 2009) ("Plaintiffs are not required to quantify the amount by which the Allowance was understated"). Defendants discredit

FE1's report that account sharing did not drive Chegg's growth as lacking foundation (Mem. 16), but they ignore that FE1 worked on the account sharing initiative and had first-hand knowledge of the number of accounts blocked and reopened, providing a reliable basis for her report. ¶¶141-43.

### iv.    Defendants' Attacks on the Over 100 University Sources Fail

Not surprisingly, Defendants attempt to minimize the numerous, scathing accounts of university faculty confirming that students widely used Chegg to cheat as mere "anecdotal . . . venting" by a "small group" of academics. Mem. 16. Nothing could be further from the truth. These sources are deans, directors, and professors from upwards of thirty colleges and universities, all of whom provided a reliable—not "hyperbolic"—basis for their reports. These individuals also attested to rampant student cheating via Chegg. While Defendants again claim that these sources do not "quantify the amount of cheating on Chegg's platform" (Mem. 16), multiple university officials did, in fact, quantify the Chegg-enabled cheating at their institutions, including references to prior academic quarter(s) and/or year(s). ¶¶68, 77, 90, 99-100, 103, 113. Defendants posit that these numbers reflect a small portion of Chegg's overall users (Mem. 17), but ignore that they only account for users who were caught by their schools, and that Chegg undertook extensive measures to thwart efforts to catch cheaters. ¶¶70-89, 91, 93, 101, 103, 107, 112-13, 117, 138.

### v.    Defendants' Remaining Arguments Are Without Merit

Defendants' remaining falsity arguments may be dispensed with easily.

***First,*** Defendants argue certain statements merely state historical facts without "attribution to the factors driving growth." Mem. 18. But that is not true. For example, Brown falsely attributed the "unprecedented growth" to students "turn[ing] to Chegg" to "help them master their subject," and Rosensweig similarly attributed Chegg's stellar results to Chegg's "learning support services" and a "massive shift to learning online accelerated by the pandemic." ¶¶187, 212. These statements were false and materially misleading for omitting that Chegg's success was driven by widespread student cheating. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1138 (N.D. Cal. 2017) (statements touting growth misleading for omitting averse user engagement); *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) (claims of "organic" growth misleading for omitting true growth factors); *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

432 F. Supp. 3d 131, 165 (D. Conn. 2019) (statements concerning legitimate reasons for growth were misleading "because they neglected to include another significant factor," Teva's "unsustainable" business practices); *see also Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (when providing positive information, defendants are "bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information"). Statements about post-pandemic demand were also materially misleading. ¶¶175, 177, 180, 196, 229-30, 233, 240, 249; *see DocuSign*, 2023 WL 3000583 at *17 (sustaining claims where defendants were "aware multiple red flags indicating the pandemic-generated demand was unsustainable").

***Second***, Defendants contend that "many statements are vague expressions of optimism," or mere "puffery." Mem. 18 (citing ¶¶177, 179, 189, 240). However, materiality is a "fact-intensive assessment[] that [is] more properly left to the jury." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). Only statements that "are generally not capable of objective verification, and lack a standard against which a reasonable investor could expect them to be pegged" can be considered puffery. *See Oh v. Hanmi Fin. Corp.*, 2022 WL 3405975, at *6 (C.D. Cal. Aug. 15, 2022). Here, for example, Chegg's statement that it had not seen "any relative increase in honor code issues since the covid-19 crisis began" (¶189), which Defendants label puffery, is plainly capable of objective verification given Chegg's receipt of numerous reports of increased cheating during remote learning. ¶¶68-73, 76-80, 84-85, 91-92; *see Glazer*, 63 F.4th at 770 ("the challenged statements contravened the unflattering facts in [Defendants'] possession").

***Third***, while Defendants assert that certain statements are mere opinions (Mem. 18-19), the omission of "facts going to the basis for the issuer's opinion" can render an opinion misleading. *Omnicare, Inc. v. Laborers Dis. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). Here, Defendants' omissions regarding cheating render their statements actionable. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017) ("opinion statement did not 'fairly align[] with the information in [CEO's] possession"); *DocuSign*, 2023 WL 3000583 at *18 (opinions actionable as they omitted true customer demand during pandemic). Further, as discussed in §IV.B., because Defendants knew that their statements were misleading, they are actionable. *See*

*Ferraro Fam. Found., Inc. v. Corcept Therap. Inc.*, 2021 WL 3748325, at \*19 (N.D. Cal. Aug. 24, 2021) (opinion actionable where "Defendants did not honestly believe the statement").

**Fourth**, Defendants' statements about future events are not protected under the safe harbor. *See* Mem. 19 (citing ¶¶177, 187, 219, 224, 228, 242, 249). For the "safe harbor" to apply, a statement must be forward-looking, identified as such, and accompanied by "meaningful" cautionary language; and made without actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(i). Many of the cited statements are not forward-looking. For example, Brown's statement that Chegg was raising revenue guidance due to "the efforts we made to . . . reduce account sharing" (¶242) is not "misleading because [he] failed to predict the future" but rather for mispresenting current facts and "conceal[ing] or downplay[ing] known present risks" associated with the widespread use of Chegg to cheat. *See In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1231 (N.D. Cal. 2009); *see also DocuSign*, 2023 WL 3000583 at \*17-18 (statements about post-pandemic demand actionable where they omitted known present risks).

Even if certain of Defendants' statements are deemed forward-looking, they were not accompanied by meaningful cautionary language that "discredit[ed] the [allegedly misleading statement] so obviously that the risk of real deception drops to nil." *DocuSign*, 2023 WL 3000583 at \*15. Defendants fail to point to any cautionary language that satisfies the safe harbor. The generic statement that Chegg's "growth may not be sustainable" (Mem. 7) does not adequately disclose the significant risks associated with the rampant cheating on the platform. *See DocuSign*, 2023 WL 3000583 at \*17 (safe harbor does not apply where the risks have "already come to fruition"); *In re Amylin Pharm., Inc., Sec. Litig.*, 2003 WL 21500525, at \*7 (S.D. Cal. May 1, 2003) ("Vague or boilerplate disclaimers are insufficient to invoke safe harbor protection"); *see* § IV.B.

**Finally**, Defendants quibble that Plaintiffs did not identify a spokesperson who made the false statement in paragraph 189. *See* Mem. 19. However, a corporation is the "maker" of a statement if it controls the content of and how and when to disseminate it or the statement is attributed to it. *See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 238 (E.D. Pa. 2021) (statement by spokespersons are actionable against company); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 663-64 (S.D.N.Y. 2017) (same).

### B.    Plaintiffs Adequately Plead Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705.[7] The test is simply "whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter," which "need not be irrefutable . . . or even the most plausible" and no "smoking gun" is required. *Tellabs*, 551 U.S. at 323-26. Under *Tellabs*' "holistic" approach, courts "consider the totality of the circumstances" and "need not close their eyes to circumstances that are probative of scienter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

### i.    Abundant Facts Support a Strong Inference of Scienter

***First***, Chegg was repeatedly informed by numerous educational institutions of increases in Chegg-based cheating, whose representatives emphatically declared they were "fed up" with the spiraling number of cheating cases involving Chegg. ¶¶66-116, 272-73. The numerous cheating scandals focused on Chegg were so important that Defendants issued public statements assuring that Chegg was overwhelmingly used by students for legitimate purposes and the Company undertook extensive efforts to eradicate all cheating. ¶¶58-61; *see Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 269-70 (3d Cir. 2009) (false denials suggests at least recklessness).

***Second***, Defendants were obviously on notice of the cheating from the numerous media outlets—including *Forbes*, *The New York Times*, IJEI, and respected newspapers across the country—that published detailed articles and exposés regarding myriad instances of Chegg-facilitated cheating, and Defendants even circulated such articles internally. ¶¶53-58, 134, 209, 213, 277. Defendants issued repeated public denials in response, and even went so far as to institute "Honor Shield" as a response to this bad press, further indicating Defendants' awareness of the cheating problem. ¶¶59, 61, 207, 213, 235, 246; *see Shaev v. Baker*, 2017 WL 1735573, at *12 (N.D. Cal. May 4, 2017) (crediting an investigative article in the *Los Angeles Times* as indicative

---

[7] A defendant "is reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010).

of scienter); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 718 (W.D. Tex. 2010) ("red flags in the media" are strong indicia of scienter).

**Third**, Defendants admitted that they closely monitored students' usage of the platform, including meticulous tracking of user engagement in near real-time. ¶¶259-66. "The most direct way" to show scienter is through allegations of "contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). In fact, allegations of "actual access to the disputed information" "may independently satisfy the PSLRA." *S. Ferry*, 542 F.3d at 785-86 (finding scienter based on "allegations that defendants actually did monitor the data that were the subject of the allegedly false statements). Here, Rosensweig emphasized that Defendants "***track every single action***," "***know exactly what [students] use***," and had "***looked at all of the data***." ¶¶45, 229, 261. Brown stated Chegg precisely monitored "what [students] [are] engaging [] with" through "***daily metrics***" and even "***hourly metrics***." ¶262; *see DocuSign*, 2023 WL 3000583 at *20 ("that company executives told investors they had real-time access to, and knowledge of, sales information further support[s]" scienter). FE8 confirmed that Chegg monitored cheating, including by "look[ing] at web logs." ¶137.[8] In addition, FE1 confirmed Chegg executives not only "always had access to data," but Rosensweig and Schultz also "knew everything, they were micromanagers." ¶¶15, 132, 264; *see In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012) ("[defendants] were hands-on managers with respect to operational details and financial statements"). Defendants are thus wrong (Mem. 21) that Plaintiffs do not allege "*what* the data showed" and "*how* it could possibly 'show students used Chegg to cheat.'"

**Fourth**, the specificity of Defendants' statements, including in direct response to analysts, faculty, and in mainstream media, reinforce scienter. *See, e.g.*, ¶¶275-82; *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) ("specific denials" support scienter).

---

[8] That FE8 left pre-Class Period is of no consequence. *See supra* at 16; *Quality Sys.*, 865 F.3d at 1145 ("Although CW6 was not at QSI during the Class Period, [she] had personal knowledge of executive-level management's real-time access to Salesforce reports forecasting quarterly sales.").

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

Rosensweig touted that the "overwhelming majority" of students used Chegg for purely educational purposes; Brown avowed that cheating was "very isolated" and involved only "a very small group of folks"; and Schultz claimed that only a "small number of students have misused our platform in ways it wasn't designed for." ¶¶59, 188, 191, 213, 235; *see Roberti*, 2015 WL 1985562, at *12 ("scienter can be established by the fact that Defendants touched on the specific issue"). In addition, Defendants' false explanation at the end of the Class Period attributing Chegg's poor results to students purportedly suddenly dropping out of school—which *Forbes* rejected out of hand as an "***enrollment excuse [that] makes no sense***"—buttresses scienter. ¶171. Moreover, even if Defendants did not know of rampant cheating—which the Complaint establishes they clearly did— "it would be at least actionably reckless to reassure the public about these matters at all" without knowledge on the subject. *S. Ferry v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009).

*Fifth*, the FEs confirm scienter. For example, FE1 and FE5 emphasized that cheating via Chegg was discussed during weekly meetings of Chegg executives and at "all-hands [meetings]," and FE1 confirmed that Rosensweig specifically discussed the topic. ¶132. FE6 and FE7 each described how a *Forbes* article discussing rampant cheating on Chegg was circulated by Chegg's executive team, and FE7 recounted that "people weren't surprised" because "the [cheating] issues were absolutely well understood." ¶134. Moreover, FE2 confirmed that rather than taking meaningful steps to curb cheating, the Company launched secret projects, such as the "Big Egg," to enhance students' ability to use Chegg to cheat. ¶284. Defendants' attempt to dismiss these allegations as "speculation" (Mem. 20) ignores the scores of academics who described how Chegg not only made it easier for students to cheat, but also implemented systemic policies that prevented users from being caught. ¶¶155-62. The reason is simple—Defendants knew Chegg depended on cheating, and if they addressed the "problem," it would quash growth. *See In re Imperial Credit Indus., Inc.*, 2000 WL 1049320, at *3 (C.D. Cal. Feb. 22, 2000) (scienter where defendants "misrepresented [company's] value" "before the company fell apart entirely").

*Sixth*, Chegg's "Expert Q&A" was the heart of Chegg Services, which accounted for 85% of its revenue. ¶269; *see Hatamian*, 87 F. Supp. 3d at 1162 (scienter where fraud implicated "the critical core operation" of the company). Defendants emphasized Expert Q&A was Chegg's

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

"flagship" product and "core focus," which provided an "actually massive" competitive "moat." ¶¶268-69. That Defendants oversaw and devoted the "vast majority of [Chegg's] CapEx" to this service further strengthens the core operations inference. *Id.*; *see Berson*, 527 F.3d at 988.

### ii.    The Individual Defendants' Insider Trading Reinforces Scienter

"Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005); *DocuSign*, 2023 WL 3000583, at *22. During the Class Period, Rosensweig and Schultz reaped nearly ***$75 million*** in proceeds from their stock sales. ¶¶295-96. Rosensweig sold ***$49.5 million*** (29% of his holdings), including ***$30 million*** in Chegg's SPO, his largest sale ever, days after Chegg's stock price hit its record high after reporting "unprecedented" and "record" results. ¶¶164-66; *see Azar v. Yelp Inc.*, 2018 WL 6182756, at *19 (N.D. Cal. Nov. 27, 2018) ("temporal proximity" of sales and positive information "could support an inference of scienter").[9] Schultz sold ***$25 million***, nearly ***90%*** of his holdings. ¶296; *see In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *4 (N.D. Cal. Sept. 29, 2017) (40% and 30% of sales support scienter).[10]

---

[9] Defendants' argument concerning Rosensweig's prior trading improperly relies on information outside the pleadings and should be rejected. Mem. 23. Moreover, when, as here, the timing of the insider sales is suspicious, prior trading history is not dispositive. *See In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, 2002 WL 989480, at *12 (N.D. Cal. Mar. 29, 2002).

[10] *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) cited by Defendants (Mem. 23), instructed that stock sales should be compared to the "volume of shares" available for sale. Here, Schultz sold 307,376 shares—more than the total volume Defendants claim he reported at both the start (236,830) and end (199,829) of the Class Period; accordingly, Schultz sold 100% of any additional shares he acquired—shares Defendants' misleading calculation overlooks. Even under Defendants' calculation, Rosensweig's and Schultz's sales are sizable, *i.e.*, 24% and 15% of their holdings. *See Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14 (C.D. Cal. July 1, 2008) (7% sale for $210,000 supported scienter); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ($78 million profit is "massive by any measure").

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

Defendants' attempts to minimize the insider trading fail. *First*, while Defendants' purported use of 10b5-1 trading plans (Mem. 23) "may ultimately provide the basis of an affirmative defense at a later stage of the litigation," it is irrelevant "at the pleading stage." *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 979 n.16 (N.D. Cal. 2009).[11] Further, 10b5-1 plans do "not preclude a finding of fraud" where "at the time the plans were adopted . . . the individual defendants were allegedly aware" that their statements were false. *Yelp*, 2018 WL 6182756, at *18. *Second*, the absence of sales by Brown does not undercut scienter. Mem. 22; *see Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 717 n.2 (9th Cir. 2010) (courts "do not draw a negative inference from the absence of stock sales").[12] *Third*, courts do consider stock sales by non-defendant insiders when evaluating scienter. Mem. 23; *see Daou*, 411 F.3d at 1024 (sales by non-defendant executives support scienter); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *15-*16 (C.D. Cal. Jan. 17, 2020) (same). *Finally*, Chegg's institution of a share buyback plan while management unloaded stock "contribute[s] to a strong inference of scienter." *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1188 (C.D. Cal. 2008).

## C.    The Complaint Adequately Pleads Loss Causation

Loss causation does not impose a high burden at the pleading stage. *See In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020) ("low bar" for pleading loss causation). For example, "plaintiffs may show loss causation by showing that [the company's] stock price fell upon the revelation of an earnings miss." *DocuSign*, 2023 WL 3000583 at *23 (citing *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018)). Here, Chegg reported its Q3 2021 results on November 1, 2021, revealing a reversal in subscriber growth, revenue guidance below market expectations for 2021, and the postponement of 2022 guidance. ¶¶167, 256. Chegg's stock price fell nearly 50% in response. ¶¶168, 257. Analysts and major media

---

[11] Similarly, that some sales were ostensibly made to pay taxes (Mem. 23), is a factual issue not dispositive at this early stage, particularly given the substantial financial benefit from such sales.

[12] *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) is inapposite (Mem. 22), as no defendant there sold more than 10% of his stock.

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
                                                                    CASE NO. 5:21-CV-09953-EJD

outlets expressly rejected Defendants' excuse of fewer college enrollments and instead linked Chegg's declining growth, financial outlook, and stock price plunge to the widespread resumption of on-campus learning which limited Chegg's utility as a cheating tool. ¶¶169-71; *see Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210-11 (9th Cir. 2016) (loss causation alleged where "analysts noted a probable connection" between a stock drop and alleged fraud).[13]

### D. The Complaint Adequately Alleges Claims Under Sections 20(a) and 20(A)

Since the Complaint adequately alleges violations under Section 10(b), Plaintiffs have pled a claim under Section 20(a). *See, e.g.*, *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 (N.D. Cal. 2019). While Defendants argue that the Section 20(a) claim should be dismissed as to Schultz, he had the requisite power and authority to direct the Company and is thus a control person of Chegg. ¶¶323, 326; *see, e.g.*, *UTStarcom*, 617 F. Supp. 2d at 979 (sustaining Section 20(a) claim as defendant "had the power to, and did, direct the affairs of" the company).

Defendants contend that neither Schultz nor Rosensweig's trades were sufficiently "contemporaneous" for purposes of Section 20A because they were not made on the "same day" as Plaintiffs' purchases. Mem. 25. That is not the law. *See Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *18 (N.D. Cal. Mar. 31, 2023) (Davila, J.) (noting that the Ninth Circuit has not "delineated the boundaries of contemporaneity" and "declin[ing] Defendants' invitation to do so by requiring a same-day or next-day trade"). Plaintiffs' purchases were within one or two days of Rosensweig's sales and within five trading days of Schultz (¶¶330-31); they are contemporaneous. *Id.* at *19 (collecting cases finding a five-day gap, or more, is contemporaneous).

## V. CONCLUSION

Plaintiffs respectfully submit that Defendants' motion should be denied in its entirety.[14]

---

[13] *In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 F. App'x 603, 605 (9th Cir. 2020), cited by Defendants (Mem. 25), is inapt as *Ocera* did not involve an "analyst opinion why the stock price dropped" and did not address whether analyst opinions are sufficient to plead loss causation.

[14] If the Court grants Defendants' motion to dismiss, or any part of it, Plaintiffs respectfully request leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

Dated:  April 27, 2023

Respectfully submitted,

/s/ David R. Kaplan
David R. Kaplan

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
Hani Y. Farah (SBN 307622) (*pro hac vice* forthcoming)
Emily R. Bishop (SBN 319383)
505 Lomas Santa Fe Dr.
Suite #180
Solana Beach, CA  92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
hfarah@saxenawhite.com
ebishop@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Lester R. Hooker (SBN 241590)
Jonathan Lamet (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone.: 561.394.3399
Facsimile: 561.394.3382
msaxena@saxenawhite.com
jlamet@saxenawhite.com

Steven B. Singer (*pro hac vice* forthcoming)
Kyla Grant (*pro hac vice* forthcoming)
10 Bank Street, 8th Floor
White Plains, NY  10606
Telephone: (914) 437-8551
ssinger@saxenawhite.com
kgrant@saxenawhite.com

*Counsel for Lead Plaintiff Pompano Beach Police and Firefighters' Retirement System, and Lead Co-Counsel for the Class*

**MOTLEY RICE LLC**
Max N. Gruetzmacher (*pro hac vice*)
mgruetzmacher@motleyrice.com
Christopher F. Moriarty (*pro hac vice*)
cmoriarty@motleyrice.com
Neli Traykova Hines (*pro hac vice*)
ntraykova@motleyrice.com

28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone: 843.216.9000
Facsimile: 843.216.9450

*Counsel for Lead Plaintiff KBC Asset Management NV, and Lead Co-Counsel for the Class*

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on April 27, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel or parties of record.

Dated:  April 27, 2023                              **SAXENA WHITE P.A.**

                                                         */s/ David R. Kaplan*
                                                         David R. Kaplan

MEM. OF LAW IN OPP'N TO MOT. TO DISMISS
CASE NO. 5:21-CV-09953-EJD