COOLEY LLP
PATRICK E. GIBBS (183174)
(pgibbs@cooley.com)
BRETT H. DE JARNETTE (292919)
(bdejarnette@cooley.com)
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone:    +1 650 843 5000
Facsimile:    +1 650 849 7400

HEATHER M. SPEERS (305380)
(hspeers@cooley.com)
10265 Science Center Drive
San Diego, CA 92121
Telephone:    +1 858 550 6000
Facsimile:    +1 858 550 6420

FENWICK & WEST LLP
DEAN S. KRISTY (157646)
(dkristy@fenwick.com)
JENNIFER C. BRETAN (233475)
(jbretan@fenwick.com)
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:    +1 415 875 2300
Facsimile:    +1 415 281 1350

FELIX S. LEE (197084)
(flee@fenwick.com)
801 California Street
Mountain View, CA 94041
Telephone:    +1 650 988 8500
Facsimile:    +1 650 938 5200

Attorneys for Defendants Chegg, Inc., Daniel L. Rosensweig, Andrew J. Brown, and Nathan Schultz

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN LEVENTHAL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHEGG, INC., DANIEL L. ROSENSWEIG, ANDREW J. BROWN, and NATHAN SCHULTZ,<br><br>Defendants. | Case No. 5:21-cv-09953-EJD<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:     June 29, 2023<br>Time:     9:00 a.m.<br>Dept:     Crt. Rm. 4<br>Judge:    Edward J. Davila<br>Trial Date: TBA<br>Date Action Filed: December 8, 2022<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ........................................................................................... 1

II.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE FALSITY ........................................ 2

       A.    No Particularized Facts Show "Rampant" Cheating Across Chegg's
             Platform. ............................................................................................. 2

       B.    No Particularized Facts Show Cheating Drove Subscriber or Revenue
             Growth. ............................................................................................... 7

       C.    Plaintiffs Do Not Dispute That Many Statements Are Inactionable. ...................... 9

III.   PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER ................ 10

IV.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD LOSS CAUSATION ..................... 14

V.     CONCLUSION ......................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple Comput. Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989)........................................................................ 12

*In re Cerner Corp. Sec. Litig.*,
   425 F.3d 1079 (8th Cir. 2005)......................................................................... 3

*In re Connetics Corp. Sec. Litig.*,
   542 F. Supp. 2d 996 (N.D. Cal. 2008) .......................................................... 10

*In re Dot Hill Sys. Corp. Sec. Litig.*,
   2007 WL 935469 (S.D. Cal. Mar. 15, 2007) ................................................. 10

*Eminence Cap., LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003)........................................................................ 10

*Fadia v. FireEye, Inc.*,
   2016 WL 6679806 (N.D. Cal. Nov. 14, 2016)................................................ *passim*

*In re Fastly, Inc. Sec. Litig.*,
   2021 WL 5494249 .............................................................................................. 9

*Ferraro Family Found., Inc. v. Corcept Therapeutics Inc.*,
   501 F. Supp. 3d 735 (N.D. Cal. 2020) ............................................................. 8

*Glazer Cap. Mgmt. v. Forescout Techs.*,
   63 F.4th 747 (9th Cir. 2023)........................................................................ 1, 3

*Greenberg v. Cooper Companies, Inc.*,
   2013 WL 2403648 (N.D. Cal. May 31, 2013) .................................................. 5

*Haideri v. Jumei Int'l Holding Ltd.*,
   2021 WL 4170791 (N.D. Cal. Sept. 14, 2021) ............................................... 14

*Hampton v. Aqua Metals, Inc.*,
   2020 WL 6710096 (N.D. Cal. Nov. 16, 2020).................................................. 13

*Hershewe v. JOYY Inc.*,
   2021 WL 6536670 (C.D. Cal. Nov. 5, 2021).................................................... 8

*Huang v. Avalanche Biotech., Inc.*,
   2016 WL 6524401 (N.D. Cal. Nov. 3, 2016).................................................. 4, 5

*Inchen Huang v. Higgins*,
   2019 WL 1245136 (N.D. Cal. Mar. 18, 2009).............................................. 14, 15

**DEFENDANTS' REPLY ISO MOTION TO DISMISS**
**5:21-CV-09953-EJD**

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Lamartina v. VMware, Inc.*,
2021 WL 4133851 (N.D. Cal. Sept. 10, 2021) ........................................................ 13

*In re Metawave Commc'ns Corp. Sec. Litig.*,
298 F. Supp. 2d 1056 (W.D. Wash. 2003) ............................................................... 12

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .................................................................................. 4

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ............................................................................. 8, 14

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ................................................................................... 4

*In re Ocera Therapeutics, Inc. Sec. Litig.*,
806 F. App'x 603 (9th Cir. 2020) ..................................................................... 14, 15

*Omnivision Techs., Inc. Sec. Litig.*,
937 F. Supp. 2d 1090 (N.D. Cal. 2013) ................................................................... 5

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp.*,
774 F.3d 598 (9th Cir. 2014) ................................................................................. 14

*Pittleman v. Impac Mortg. Holdings, Inc.*,
2008 WL 4809962 (C.D. Cal. Oct. 6, 2008) .......................................................... 10

*In re Pixar Sec. Litig.*,
450 F. Supp. 2d 1096 (N.D. Cal. 2006) .................................................................. 13

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) .......................................................... 3

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ................................................................................ 12

*Robb v. Fitbit Inc.*,
2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ............................................................. 3

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .................................................................................. 13

*Sakkal v. Anaplan Inc.*,
557 F. Supp. 3d 988 (N.D. Cal. 2021) .................................................................... 12

*Sgarlata v. Paypal*,
409 F. Supp. 3d 846 (N.D. Cal. 2019) ..................................................................... 5

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Sharenow v. Impac Mortg. Holdings, Inc.*,
  385 F. App'x 714 (9th Cir. 2010) ................................................................. 13

*In re Siebel Sys., Inc. Sec. Litig.*,
  2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) .......................................... 4

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999)................................................................. 1

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).............................................................................. 13

*United States v. Dunkel*,
  927 F.2d 955 (7th Cir. 1991)................................................................. 8

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002)............................................................... 6

*In re Wash. Mut., Inc. Secs., Derivative & ERISA Litig.*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009)............................................. 3

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................... 8

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022)................................................................. 7

*Weston v. DocuSign, Inc.*,
  2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) ................................... 3, 14

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007)................................................. 11

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017)................................................................. 3

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021)............................................................... 10

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009)................................................. 7, 8, 11, 12

iv

## I.      INTRODUCTION

The Opposition confirms that Plaintiffs fail to plead falsity, scienter, and loss causation—each an independent basis for dismissal of the entire Complaint.

Plaintiffs' core theory is that Chegg misled investors by failing to disclose that Chegg's revenue and subscriber growth between May 5, 2020, and November 1, 2021 (the "class period") was "fueled" entirely by "rampant" cheating on Chegg's platform, driven by remote learning during the pandemic. The Complaint, however, alleges no particularized facts to support either part of this theory: (1) no facts that cheating was "rampant" during the class period; and (2) no facts that cheating drove subscriber and revenue growth. In fact, Plaintiffs make no attempt whatsoever to quantify the amount of cheating on Chegg's platform before, during, or after the class period—even in general terms. Yet, without some sense as to the number of users who cheated, it is impossible to infer that cheating was "rampant," much less that it drove growth.

Plaintiffs have no credible response. They admit that the anecdotal accounts of cheating from certain university officials relate to only a "small portion" of Chegg's user base. They are unable to explain how their "empirical analysis" sheds any light on the number of Chegg users who may have cheated. The accounts of former employees ("FEs")—none of whom worked in finance—are largely irrelevant and otherwise conclusory and unreliable. And the vast majority of the allegations have nothing to do with whether any purported cheating drove growth.

Instead, Plaintiffs attempt to avoid the PSLRA's heightened pleading standards by arguing that they "need not provide this level of detail." The case they cite for this proposition, however, held the opposite, explaining that "Plaintiffs' claim [ ] *fails for lack of detail*." *Glazer Cap. Mgmt. v. Forescout Techs.*, 63 F.4th 747, 778 (9th Cir. 2023).[1] Plaintiffs' attempt to invoke a lower pleading standard, moreover, flies in the face of long-standing Ninth Circuit precedent requiring particularized facts pled in "great detail." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974, 984 (9th Cir. 1999), *abrogated on other grounds*. Under these standards, this Court has rejected allegations that were unsupported by "*concrete and readily verifiable figures or explanations*."

---

[1] Unless otherwise noted, emphasis is added and internal quotation marks and citations are omitted.

1

**DEFENDANTS' REPLY ISO MOTION TO DISMISS**
**5:21-CV-09953-EJD**

*Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *13 (N.D. Cal. Nov. 14, 2016) (Davila, J.).

Plaintiffs also fail to plead a strong inference of scienter. They identify no facts showing that any Defendant believed cheating was "rampant," let alone drove growth. Instead, they fixate on a few executives' stock sales during the class period but ignore that such sales are legally insufficient on their own to create a strong inference of scienter. That is especially true here, where Defendants' stock sales are entirely consistent with their prior trading history.

Finally, Plaintiffs fail to plead loss causation. They allege no particularized facts suggesting that Chegg's subscriber decline in Q3 2021 and reduced full year 2021 guidance was because students were no longer able to use Chegg to cheat.

## II.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE FALSITY

Plaintiffs' Opposition confirms that their core falsity theory is that Defendants misled investors by failing to disclose that Chegg's revenue and subscriber growth during the class period was "fueled" by "rampant" cheating. (*See* Opp. at 1.) This theory necessarily requires Plaintiffs to allege particularized facts that (1) there was rampant cheating on Chegg during the class period ***and*** (2) such cheating "fueled" subscriber and revenue growth. Plaintiffs have done neither.

### A.    No Particularized Facts Show "Rampant" Cheating Across Chegg's Platform.

Plaintiffs do not dispute that the Complaint fails to quantify—even in general terms—the amount of purported cheating on Chegg's platform before, during, or after the class period. (Opp. at 11–12; Mot. at 11.) Nor do they contest their failure to identify a single report, metric, student interview, or analysis that specifies the amount of Chegg users who cheated at any particular time, let alone the amount of new subscribers who signed up solely to cheat (if any). (*Id.*)

Nonetheless, Plaintiffs argue that Defendants lied when they said, "there were only a 'very isolated' number of cheating cases, cheating 'represents an extremely small portion of the activity on our services,' and that Chegg was committed to eradicating cheating." (Opp. at 10.) But, without quantifying (even generally) how many of Chegg's ***millions*** of subscribers cheated, and when, there is nothing to support Plaintiffs' conclusory allegations that cheating increased, "exploded," or was "rampant" during the class period. For example, if 1,000 students used Chegg to cheat (which Plaintiffs have not pled), that amounts to only ***0.002%*** of Chegg's subscriber base—far from

"rampant." And even if 250,000 students cheated (which is simply not plausible from the facts alleged), only 5% of Chegg's user base cheated, meaning 95% of subscribers did not.

Defendants cited several cases dismissing similar complaints for failure to quantify this kind of information. (*See* Mot. at 11 (citing *Fadia*, 2016 WL 6679806, at *10, *13; *Williams v. Globus Med., Inc.*, 869 F.3d 235, 245 (3d Cir. 2017); *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085–86 (8th Cir. 2005).) Not surprisingly, Plaintiffs do not even attempt to address these authorities.

Recognizing that they cannot meet this standard of specificity, Plaintiffs instead argue they "need not provide this level of detail" under the Ninth Circuit's recent decision in *Glazer.* (Opp. at 11.) This is perplexing, as *Glazer* actually rejected a similar argument:

> Plaintiffs confuse ***particularity*** (the level of detail required in the allegations) with ***plausibility*** (the strength of the inference that an element of the claim is satisfied based upon the facts alleged). Thus, while it may be plausible (under the reasonable inference standard of *Twombly/Iqbal*) that the channel partner losses occurred prior to [defendant's] statements, Plaintiffs' claim nonetheless ***fails for lack of detail***.

63 F.4th at 778. The only statements that survived were supported by detailed quantifications of lost sales, including repeated delays of an $80 million deal, sales representatives meeting only 25% of quotas, and a practice of characterizing deals with a 50% chance of success as "committed." *Id.*

Plaintiffs' other authorities involved detailed and quantifiable allegations that could be extrapolated to the business as a whole. *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *3, *12 (N.D. Cal. Aug. 17, 2022) (detailed allegations of channel stuffing, including reports from 100 employee interviews, meetings, and data showing that major customers carried up to six months of inventory at a time); *Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *6, *21 (N.D. Cal. Apr. 18, 2023) (claiming internal sales database allegedly showed user engagement rates decreased 30% during the class period); *Robb v. Fitbit Inc.*, 2017 WL 219673, at *4–5 (N.D. Cal. Jan. 19, 2017) (accounts from former employees that "heart rate monitoring products that accounted for 80% of Fitbit's revenue" had accuracy issues); *In re Wash. Mut., Inc. Secs., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1212 (W.D. Wash. 2009) ("expert analysis quantifying . . . the amount by which WaMu failed to provision its Allowance"). Unlike these cases, the Complaint here is devoid of any specific facts quantifying cheating across Chegg's user base during the class period.

Plaintiffs also cite (1) information from universities with no association with Chegg, (2) an

"empirical analysis," and (3) accounts from eight FEs. But none of these allegations quantify what portion of Chegg's user base cheated at any particular point in time. Instead, Plaintiffs identify isolated accounts of *suspected* cheating and ask the Court to extrapolate these instances across Chegg's *millions* of users. Such a sweeping inference, however, is neither warranted nor appropriate. *In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *3 (N.D. Cal. Dec. 28, 2005) ("[T]hat some customers were having problems using the program because it was too slow or took too many steps does not make the program a 'highly inaccurate' forecasting tool.").

*University Accounts*. Plaintiffs argue that "the accounts of dozens of university faculty confirm that students across the nation, including at upwards of 30 schools, turned to Chegg to cheat during distance learning." (Opp. at 12.) But these accounts—which are heavy on adjectives and accusations—contain no details from which to quantify (specifically or generally) the amount of cheating purportedly taking place on Chegg's platform.[2] *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020) ("strong rhetoric is not a substitute for particular facts"). In fact, Plaintiffs do not dispute that, of the 26 schools identified in the Complaint, only *five* provide any numbers whatsoever. (*See* Mot. at 17.) These five only report that cheating increased during the pandemic, speculating that Chegg was largely to blame. (¶¶ 68, 90, 99, 100, 103.) But these accusations are meaningless without knowing the total number of students at each university who subscribed to Chegg. For example, if 50 students cheated at a university with 2,000 Chegg users (UCLA has more than 40,000 students), then just *2.5%* of those users cheated, negating Plaintiffs' claims. (*See* Mot. at 17.) The Opposition even concedes that cases identified by university personnel "reflect a *small portion* of Chegg's overall users," while merely speculating that many cheaters were not "caught by their schools." (Opp. at 17.) This, of course, is pure conjecture, unsupported by any particularized facts, and falls far short of the PSLRA's strict pleading requirements. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008) (rejecting allegations that alleged issues at some schools meant that the issue was pervasive at all schools); *Huang v.*

---

[2] Plaintiffs claim the universities' FOIA productions "included Chegg's internal documents" (Opp. at 6), but that must be a mistake as no such documents are cited in the Complaint or Opposition.

*Avalanche Biotech., Inc.*, 2016 WL 6524401, at *6 (N.D. Cal. Nov. 3, 2016) (declining to "connect[] the dots"); *see also Greenberg v. Cooper Companies, Inc.*, 2013 WL 2403648, at *10 (N.D. Cal. May 31, 2013) (improper to ask court to make "inferential leaps").

***Lead Counsels' Empirical Analysis***. Next, Plaintiffs argue their "empirical analysis"—which purports to "analyze" a "random" sample of over 6,000 questions submitted through Chegg's Expert Q&A service for "indicia of cheating" (¶¶ 146–154)—demonstrates "rampant cheating" during the class period. (Opp. at 8.) Defendants identified myriad problems with both the reliability and results of this analysis, none of which Plaintiffs credibly rebut.

First, Plaintiffs do not even attempt to address the statistical reliability of this analysis or provide any basis for extrapolating the results to Chegg's user base as a whole. Instead, they argue that such analysis and extrapolation "does not require 'expertise' in statistics (or any other field)." (Opp. at 14.) But that argument only further underscores Defendants' point—the analysis is not based on any scientific methodology to support its reliability, much less to extrapolate the results across Chegg's entire user base. (*See* Mot. at 12 (discussing science surrounding random sampling and extrapolation).) And tellingly, Plaintiffs do not even address—much less credibly distinguish—*Sgarlata v. Paypal*, 409 F. Supp. 3d 846, 860 (N.D. Cal. 2019) or *Omnivision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1108 (N.D. Cal. 2013), both of which required particularized facts demonstrating the reliability and applicability of analyses included in a complaint. (*See* Mot. at 12.)

Second, Plaintiffs concede (either expressly or by leaving unaddressed) that the analysis itself was limited in both its inputs and outputs. With respect to inputs, Plaintiffs do not dispute that the analysis included questions from only five subject areas despite Expert Q&A covering over twenty subjects, and that the questions reviewed comprised only 0.009% of the alleged 70 million questions in Chegg's database. (Mot. at 12–13.) Additionally, although Plaintiffs dispute the premise that their sample—comprised solely of photo submissions—is not "representative of any broader population," they do so only in a conclusory fashion with no details as to how the sample set was, in fact, representative. (Opp. at 15.) Aside from a few examples, Plaintiffs also fail to explain the parameters they used to determine whether photos contained "indicia of cheating." (*Id.* at 14–15.) Nor do they dispute that a photo may be from a prior year's exam that a student is using

for legitimate study purposes. (Mot. at 13.) With regard to outputs, Plaintiffs admit that the analysis does not quantify "how much purported cheating occurred" on Chegg's platform. (*Id.* at 15.) They also do not contest that a disproportionately large number of questions may have been submitted by a small number of students, skewing Plaintiffs' results. (Mot. at 13.)

Finally, Plaintiffs do not credibly address the fact that the "empirical analysis" shows a decrease in "the rate of cheating" during the class period. (Opp. at 15.) Nor do Plaintiffs dispute that a decrease in cheating during the class period would eviscerate their theory of fraud. Indeed, the Complaint presents two analyses. The first one includes questions submitted in May 2020 (the beginning of the class period), December 2020, and May 2021 and purportedly shows that 26% of questions had "indicia" of cheating. (¶ 151.) The second one includes questions from a later period of time—December 2020 through May 2021—and purportedly shows only 24.3% of questions had "indicia" of cheating. (¶ 152.) Thus, taken together (and at face value), the analyses show that the rate of cheating *declined* during the class period. (Mot. at 14.)

*Former Employees*. Plaintiffs argue that accounts from FEs support that "Chegg's Expert Q&A service was overwhelmingly used to cheat and that cheating increased dramatically during the pandemic." (Opp. at 16.) Beneath the rhetoric, however, the Complaint alleges no such thing. These FEs say *only* that Chegg knew about cheating "at some level" and that cheating issues were "understood." (*Id*. at 16.) Such allegations do not speak to how pervasive cheating was on Chegg's platform, let alone what percentage of Chegg's users cheated at any particular time. Awareness that some students cheated is entirely consistent with Chegg's public statements that cheating "represents an extremely small portion of the activity on our services," and that Chegg was committed to eradicating cheating. *In re Vantive Corp. Sec. Litig*., 283 F.3d 1079, 1087 n.7 (9th Cir. 2002), *abrogated on other grounds* (rejecting FE allegations that were not "necessarily" inconsistent with the challenged statements). Limited instances of cheating are also consistent with Chegg's acknowledgement throughout the class period that "[w]e are not naive that [cheating] is a problem." (Mot. at 7.) And while Plaintiffs argue Chegg designed its products to enable cheating (Opp. at 16), they cannot dispute that Chegg's honor code prohibited cheating, nor that Chegg offered professors free access to Honor Shield to prevent cheating. (Mot. at 7–8; Ex. 13 at 1.)

DEFENDANTS' REPLY ISO MOTION TO DISMISS
5:21-CV-09953-EJD

Moreover, the Opposition relies most heavily on FE 2, who supposedly said the "Big Egg" project (related to Expert Q&A) was designed to help cheating. (Opp. at 16.) FE 2 said no such thing. She said that the Big Egg project "***could*** make cheating easier," but never said that was the goal. To the contrary, she said executives told her the intent of the project was to "create a better experience" for users, not to enable cheating. (¶ 130; Mot. at 15.)

Because Plaintiffs fail to adequately allege that cheating was rampant or "exploded" during the class period, they necessarily fail to support their theory of falsity.

**B.      No Particularized Facts Show Cheating Drove Subscriber or Revenue Growth.**

Even if Plaintiffs could adequately allege "rampant" cheating during the class period (they have not), they still fail to allege facts showing that cheating drove subscriber and revenue growth. They do not identify, even in general terms, the amount of new users who signed up solely to cheat. Nor do they quantify the percentage of revenue generated by this undefined subset of new users. In fact, they identify no financial or user growth data, projections, models, or internal analysis whatsoever. Nor do they recognize the possibility that some cheating (to the extent there was any) was done by users who signed up before the class period. And they do not address how many users remained with Chegg after returning to campus. These unanswered questions directly impact whether alleged cheating impacted growth at all. Lacking concrete facts, Plaintiffs rely entirely on "assum[ptions]" and "implausibl[e] infer[ences]," which are insufficient to meet the requisite pleading standards. *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022).

Plaintiffs' allegations are even weaker with respect to subscriber and revenue growth. They do not rely on their "empirical analysis" or accounts from university personnel, as those allegations have nothing to do with whether cheating drove growth. They are only offered to show (unsuccessfully) that there was "rampant" cheating. (Opp. at 11.) Instead, Plaintiffs rely solely on FE 3 to connect cheating to subscriber and user growth, claiming she said that the "cheating business" drove growth. (*Id.*) But FE allegations must be rejected unless Plaintiffs plead particularized facts showing the allegations are reliable and based on personal knowledge. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009). The allegations attributed to FE 3 do not satisfy either requirement.

**DEFENDANTS' REPLY ISO MOTION TO DISMISS**
**5:21-CV-09953-EJD**

First, Plaintiffs do not actually quote what FE 3 said about user or subscriber growth during the class period. Nor do they explain what the "cheating business" even means, let alone, how it supposedly drove growth, and when. Instead, they paraphrase FE 3's purported statements, which instantly casts doubt on the reliability of such allegations. *See, e.g.*, *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1246 (N.D. Cal. 1998) (rejecting paraphrased FE accounts). Second, FE 3 was a project manager for Chegg Exam Prep—she was not in the finance department, nor responsible for user growth. (¶ 128 n.18.) Nor are there allegations that she even had access to finance or user growth data during the class period. She therefore lacks personal knowledge about Chegg's growth, rendering her unreliable. *See Hershewe v. JOYY Inc.*, 2021 WL 6536670, at *6 (C.D. Cal. Nov. 5, 2021) (discounting FE allegations on topics unrelated to their job responsibilities); *Zucco*, 552 F.3d at 996 (allegations from former "human-resources employee" with "no firsthand knowledge of the workings of the finance or corporate departments" found unreliable). Third, FE 3's purported conclusion that the "cheating business" drove growth is unsupported by any facts whatsoever. She does not identify any data, analysis, or specific information she relied on in arriving at her purported conclusion. In *Fadia*, this Court rejected similar FE allegations that did not quantify information with objectively verifiable figures. 2016 WL 6679806, at *13. It should do the same here.

When FE 3's conclusory assertions are disregarded (as they should be), Plaintiffs are left with **no allegations whatsoever** to support their unfounded conclusion that cheating drove growth. Instead, Plaintiffs ask the court to infer that if cheating was "rampant" it necessarily must have driven growth. The PSLRA demands more. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 832 (9th Cir. 2022) ("Without specific allegations to connect the dots, Plaintiffs' theory fails to plead securities fraud."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Ferraro Family Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 767 (N.D. Cal. 2020) (declining to "manufacture arguments on behalf of Plaintiffs" when they "do not connect … fact[s] to their argument").

Further, the allegations and judicially noticeable facts undermine Plaintiffs' theory that cheating drove growth. If Plaintiffs' theory were true, one would expect Chegg subscriber base and revenue to crater after Q3 2021—when Plaintiffs allege cheating stopped. (Opp. at 2.) But just the

opposite happened. In Q4 2021, subscribers *increased* by 200,000 to 4.6 million. (*Compare* Ex. 24 at 4 *with* Ex. 30 at 4.) This is *1.7 million or 59% more* than at the start of the class period. (*See* Ex. 4 at 4.) Revenue *increased* to $187 million—higher than any quarter in the class period. (Ex. 30 at 4.) And in Q1 2022, subscribers reached an historic high of 5.4 million. (Ex. 29 at 1.) That Chegg experienced such dramatic growth *after* cheating allegedly stopped negates any inference that cheating drove growth, eviscerating Plaintiffs' entire theory of fraud.

### C.    Plaintiffs Do Not Dispute That Many Statements Are Inactionable.

Even if Plaintiffs could identify particularized facts to support their theory of falsity (they have not), many of the challenged statements remain inactionable as a matter of law. First, Plaintiffs do not dispute that Chegg's disclosure of revenue and subscription growth are inactionable statements of historical fact. (¶¶ 172, 244; *see* Mot. at 18; Opp. at 17–18.) Second, they do not contest that many of the challenged statements are vague statements of corporate optimism. (¶¶ 177, 179, 240; Opp. at 18.) They argue only that the phrase, a "relative increase" (¶ 189), is objectively verifiable and therefore actionable. Tellingly, they provide no legal authority to support this argument, nor attempt to distinguish Defendants' contrary authority. (Opp. at 18; Mot. at 18.) Third, Plaintiffs do not dispute that Chegg's statements about its value proposition reflect its opinions, which are generally inactionable as a matter of law. (¶¶ 174, 175, 180, 184, 187, 200, 202, 224, 233, and 241; Opp. at 18.) Instead, they claim these opinions were misleading because they did not disclose rampant cheating. (Opp. at 18.) As discussed above, Plaintiffs fail to allege particularized facts supporting that proposition. But in any event, opinions about Chegg's value proposition are completely unrelated to cheating and therefore could not trigger any duty to disclose purported cheating. *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *11 (N.D. Cal. Nov. 23, 2021 (no duty to disclose TikTok as a customer when the company "did not represent at any point that TikTok was not a [ ] customer"). Fourth, Plaintiffs do not dispute that many of Defendants' statements are forward-looking.[3] (¶¶ 177, 187, 219, 224, 228, 249.) Yet, they incorrectly articulate

---

[3] Plaintiffs argue that the statement in paragraph 242 is not forward-looking, but it clearly is: that statement addresses guidance and begins: "Moving to the second half of the year…" (¶ 242.)

the standard for the PSLRA safe harbor, arguing that such statements are protected only if accompanied by meaningful cautionary language *and* made without actual knowledge. (Opp. at 19.) Ninth Circuit law, however, is clear that the statute is disjunctive, and statements are protected if *either* prong is satisfied. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189-90 (9th Cir. 2021). While Plaintiffs claim that Chegg's cautionary language was "boilerplate," they fail to explain how three robust risk factors identified in Defendants' motion (Mot. at 7) were not "meaningful." (Opp. at 19.) Nor do they dispute that to plead actual knowledge, they must show that Defendants knew that Chegg would "never" be able to sustain subscriber growth or meet its financial guidance. *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1008 (N.D. Cal. 2008). Yet, they do not even attempt to argue that they meet this standard (because they do not). <u>Finally</u>, Plaintiffs do not dispute their failure to identify the speaker of the statement in paragraph 189. Instead, they cite out-of-circuit case law to argue this is not required. (Opp. at 19.) None of their cases, however, address the PSLRA's requirement that Plaintiffs "identify the speaker" of challenged statements. *Pittleman v. Impac Mortg. Holdings, Inc.*, 2008 WL 4809962, at *3 (C.D. Cal. Oct. 6, 2008).

## III.    PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER

The Opposition also fails to meaningfully address, much less refute, the vast majority of Defendants' scienter arguments. Instead, Plaintiffs simply regurgitate their conclusory allegations that Defendants must have known (or were reckless in not knowing) that cheating increased and that their statements were misleading, as though volume will make up for the lack of any substance. They are wrong. "Redundancy does not help to establish the strong inference necessary to survive a motion to dismiss." *In re Dot Hill Sys. Corp. Sec. Litig.*, 2007 WL 935469, at *4 (S.D. Cal. Mar. 15, 2007). Rather, the "PSLRA requires a plaintiff to plead a complaint of securities fraud with an *unprecedented degree of specificity and detail* giving rise to a strong inference of deliberate recklessness." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). "This is not an easy standard to comply with—it was not intended to be—and plaintiffs must be held to it." *Id.* Here, however, there are no particularized facts that cheating was "rampant" or drove class-period growth, much less that Defendants knew or should have known about either.

*University Complaints.* Plaintiffs argue that multiple universities reported "increases in

Chegg-based cheating" during the class period. (Opp. at 20.) But even as to the limited reports identified in the Complaint (which cannot be extrapolated across Chegg's entire user base), Plaintiffs do not allege that any Individual Defendant was informed of such reports. To the contrary, the *only* email allegedly sent directly to Mr. Rosensweig was answered by other individuals at Chegg. (¶ 99.) And Plaintiffs do not dispute that FE 4—the only FE with any purported knowledge about Individual Defendants' awareness of university complaints (¶ 273)—left Chegg before the class period, and thus, has no insight into Defendants' knowledge of such complaints during the relevant period. (Mot. at 22.) *Zucco*, 552 F.3d at 996 ("[C]onfidential witnesses are not reliable" where they "were not employed by [the company] during the time period in question.").

*Media Reports, Public Statements, & Honor Shield.* Plaintiffs also point to public statements about cheating on Chegg, including media reports and commentary on Chegg's Honor Shield program. (Opp. at 20–22.) But Plaintiffs do not claim that the articles contain particularized facts to substantiate the claims made therein. *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1172 (C.D. Cal. 2007) ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel."). Similarly, Plaintiffs argue that FE 6 and FE 7 reported that Chegg's executive team circulated a *Forbes* article about cheating, (Opp. at 22), but do not allege that the executive team agreed with the conclusions reported therein.

*Access to Data & Meetings.* Plaintiffs' reliance on Defendants' access to user data is equally flawed. Although they concede such allegations must include detailed allegations about the *contents* of such user data to show how it contradicts Defendants' statements (Opp. at 21; Mot. at 21), they misapply this standard. They argue that it is sufficient to plead that Defendants "track every single action," review "daily [and] hourly metrics," and had access to "web logs." (Opp. at 21.) But this says nothing about the *contents* of the data, and thus, provides no basis to infer it was inconsistent with Defendants' statements. Likewise, Plaintiffs argue that FE 1 and FE 5 said cheating was discussed at weekly meetings. (*Id.* at 22.) But they identify no facts about *what* specifically was discussed or whether it was at odds with Defendants' public statements. (Mot. at 21.) Without such details, there is no basis to infer scienter. *See Fadia*, 2016 WL 6679806, at *16.

*Expert Q&A.* Plaintiffs also attempt to invoke the core operations doctrine, arguing that

**DEFENDANTS' REPLY ISO MOTION TO DISMISS**
5:21-CV-09953-EJD

Expert Q&A "was the heart of Chegg Services." (Opp. at 22–23.) But again, they identify no **facts** about Expert Q&A that are inconsistent with Defendants' statements, which is necessary to plead scienter. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062–63 (9th Cir. 2014). Plaintiffs also argue that FE 2 believed the "Big Egg" project made it easier to cheat, and that "scores of academics" held similar views. (Opp. at 22.) But the opinions of FE 2 and unidentified academics provide no insight about **Defendants'** knowledge or beliefs, and thus, fail to support scienter. *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1070 (W.D. Wash. 2003) ("[A] shared opinion among confidential witnesses does not necessarily indicate . . . a strong inference of scienter if the allegations themselves are not specific enough.").

**Stock Sales.** Finally, Plaintiffs argue that the fact executives sold stock "reinforce[s]" scienter. (Opp. at 23–24.) But Plaintiffs do not dispute that stock sale allegations, alone, are insufficient to plead a strong inference of scienter. *See Zucco*, 552 F.3d at 989–91; *Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (N.D. Cal. 2021) ("allegations of insiders' stock sales, even if suspicious, cannot on their own provide sufficient evidence of scienter"). Nor do they dispute that stock sales do not support **any** inference of scienter unless they were "suspicious" and "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005. This requires Plaintiffs to "provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Id.* Here, however, Plaintiffs attempt to exclude this trading history from the motion to dismiss record because it cuts against them. (Opp. at 23 n.9.)

<u>First</u>, Mr. Rosensweig's sales do not support an inference of scienter. His Forms 4 unequivocally show that he sold three times more stock in the 18 months class before the class period than he did during the 18-month class period (Mot. at 23; Ex. 32), negating any inference of scienter. *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989). And while Plaintiffs focus on Mr. Rosensweig's February 2021 sale of 300,000 shares in Chegg's SPO when the stock was near its all-time high, they cannot dispute that he routinely sold up to 165,000 shares monthly in the 18 months before the class period. (Speers Decl., ¶ 35.) *Fadia*, 2016 WL 6679806, at *16 (stock sales at prices near "all-time high" are not, alone, sufficient to plead scienter).

Second, despite alleging that Messrs. Rosensweig and Schultz sold 29% and 90% of their holdings, respectively, Plaintiffs admit these percentages are incorrect, yet fail to present the correct figures for the Court's consideration. (Opp. at 23 & n.10.) In any event, without trading history, sales as high as 98% of a defendants' holding have been found inadequate to support scienter. *Ronconi v. Larkin,* 253 F.3d 423, 436 (9th Cir. 2001), *abrogated on other grounds*.

Third, Plaintiffs concede that Mr. Brown sold no shares during the class period but argue this should not undercut scienter. (Opp. at 24 (citing *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 717 n.2 (9th Cir. 2010).) They are wrong. In *Sharenow*, the plaintiffs did not put stock sales at issue. In contrast, Plaintiffs here rely heavily on stock sales to establish scienter, so "the absence of insider trading by a defendant is highly relevant and undermines any inference of scienter." *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1107 (N.D. Cal. 2006); *see also Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *16 (N.D. Cal. Nov. 16, 2020).

Finally, Plaintiffs argue that non-defendant stock sales support scienter. (Opp. at 24.) But that is only true if there are "allegations explaining why those non-defendants' sales are related to defendants' scienter." *Lamartina v. VMware, Inc.*, 2021 WL 4133851, at *13 (N.D. Cal. Sept. 10, 2021) (Davila, J.) (collecting cases). Here, Plaintiffs provide no explanation. (Opp. at 24.)

***Holistic Analysis.*** Viewed holistically, the facts alleged (as well as those noticeably absent) fail to raise a strong inference of scienter—or indeed any inference of scienter. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007) (noting requirement to "assess all the allegations holistically" and that in doing so, "omissions and ambiguities count against inferring scienter"). For example, Plaintiffs insist that Chegg had robust user data, but plead no facts from which one could infer the data was inconsistent with Defendants' representations that the data showed only a small portion of Chegg's millions of subscribers used to Chegg to cheat, and that students continued to use Chegg after returning to campus. Plaintiffs also admit that Chegg invested resources to create Honor Shield, which is fundamentally inconsistent with an intent to ***increase*** cheating. Instead, they harp on the fact that Chegg failed to do ***even more***—*i.e.*, disclose its subscribers' personal information—without any regard to the privacy laws that Chegg must also comply with. And Plaintiffs blatantly ignore that despite Defendants' well-founded optimism that

growth would continue, they warned that the pandemic created many uncertainties that could negatively impact Chegg's business. In short, the far more compelling inference is that Defendants did not intend to mislead, nor were they deliberately reckless, in making the challenged statements.

**IV.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD LOSS CAUSATION**

Plaintiffs treat loss causation as an afterthought, arguing it "does not impose a high burden at the pleading stage." (Opp. at 24.) That may be true elsewhere, but the Ninth Circuit is clear that "Rule 9(b) applies to all elements of a securities fraud action, ***including loss causation***." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp.*, 774 F.3d 598, 605 (9th Cir. 2014). As a result, courts in this circuit routinely dismiss securities class actions for failure to plead loss causation with particularity. *See id.*; *In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 F. App'x 603, 605 (9th Cir. 2020); *Nektar*, 34 F.4th at 838; *Haideri v. Jumei Int'l Holding Ltd.*, 2021 WL 4170791, at *24 (N.D. Cal. Sept. 14, 2021); *Inchen Huang v. Higgins*, 2019 WL 1245136, at *15 (N.D. Cal. Mar. 18, 2009).

Grasping at straws, Plaintiffs misleadingly suggest that an "earnings miss" is sufficient in itself to plead loss causation. (Opp. at 24.) Not so. Putting aside that Chegg did not actually miss earnings in Q3 2021, the cases Plaintiffs cite make clear that an earnings miss only supports loss causation where the complaint contains particularized facts showing the miss was caused by the alleged fraud. In *DocuSign*, for example, the plaintiffs alleged both that the company had missed guidance and had supposedly attributed the miss "to waning demand . . . as businesses return to in-person work, specifically stating that he had underestimated the impact in the post-COVID sort of demand acceleration and maybe how dramatic that was." 2023 WL 3000583, at *23.

Here, conversely, there was no miss, and Plaintiffs identify no statements from Chegg attributing the decline in subscribers or reduction to guidance to waning demand as students returned to campus and cheating purportedly stopped. (Opp. at 24.) Nor do they identify any facts—not a single email, financial model, document, report, or piece of data—demonstrating a causal connection between cheating on the one hand and Chegg's subscriber decline and reduced guidance on the other. They do not, for example, identify any particularized facts about how many students supposedly cancelled their Chegg subscriptions when cheating allegedly stopped in the Q3 2021. Nor any facts that cheating—as a general matter or on any platform—decreased in the Q3 2021.

Plaintiffs also fail to identify a single particularized fact undermining Chegg's explanation that its Q3 2021 results were driven by "significantly fewer enrollments than expected this semester"—which took the entire industry by surprise—***not*** cheating. (Ex. 25 at 4; Mot. at 24.) Nor do they even attempt to distinguish *Inchen*, which is particularly instructive. 2019 WL 1245136, at *8, *15. There, the court granted dismissal on loss causation grounds because plaintiff did not allege particularized facts showing that a reduction in off-label prescription sales was responsible for defendant's revenue guidance revision, as opposed to the publicly disclosed reason of declining market conditions. *Id*. As in *Inchen*, here, there are no facts casting doubt on Chegg's explanation.

Moreover, ***none*** of Plaintiffs' core allegations—university accounts, the "empirical analysis," or FE allegations—purport to show why Chegg had less subscribers or why Chegg revised its guidance. Instead, Plaintiffs argue that "analysts and major media outlets expressly rejected Defendants' excuse of fewer college enrollments and instead linked Chegg's declining growth, financial outlook, and stock price plunge to the widespread resumption of on-campus learning which limited Chegg's utility as a cheating tool." (Opp. at 25 (citing ¶¶ 169–171).) But those paragraphs identify only ***one*** article that even mentions cheating—a Forbes article published in 2021 (¶ 169)—and Plaintiffs do not dispute that neither the article itself nor the Complaint contains the necessary particularized facts to support the speculation therein. (Mot. at 25.) Instead, Plaintiffs incorrectly argue that *Ocera* "did not involve an analyst opinion about why the stock price dropped and did not address whether analyst opinions are sufficient to plead loss causation." (Opp. at 25.) But *Ocera* expressly states:

> The suggestion that the analysts' opinions of what the shares might be worth were different from what was actually received, let alone that they represented the shares' true value, is too speculative to plead with particularity that shareholders experienced losses—or to plead with particularity that the required causal relationship existed between Ocera's purported misrepresentations or omissions and those losses.

806 F. App'x at 605. The same is true here: Plaintiffs fail to substantiate analyst speculation about cheating and growth with particularized facts, which compels dismissal on loss causation grounds.

## V.    CONCLUSION

The Complaint should be dismissed with prejudice.

**DEFENDANTS' REPLY ISO MOTION TO DISMISS**
**5:21-CV-09953-EJD**

Dated: June 8, 2023

COOLEY LLP

By: */s/ Patrick E. Gibbs*
 Patrick E. Gibbs (183174)

Attorneys for Defendants
Chegg, Inc., Daniel L. Rosensweig, Andrew J.
Brown, and Nathan Schultz

DEFENDANTS' REPLY ISO MOTION TO DISMISS
5:21-CV-09953-EJD