IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| LEVENTHAL, | ) | CV-21-9953-PCP |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | DECEMBER 7, 2023 |
| | ) | |
| CHEGG, INC. ET AL, | ) | PAGES 1-52 |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE P. CASEY PITTS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:      **BY:  CHRISTOPHER FRANCIS MORIARTY**
                             **MAX NIKOLAUS GRUETZMACHER**
                        MOTLEY RICE LLC
                        28 BRIDGESIDE BLVD.
                        MT. PLEASANT, SC 29464


FOR THE PLAINTIFF:      **BY:  EMILY R. BISHOP**
                        SAXENA WHITE P.A.
                        505 LOMAS SANTA FE DRIVE
                        SUITE 180
                        SOLANA BEACH, CA 92075


APPEARANCES CONTINUED ON THE NEXT PAGE


OFFICIAL COURT REPORTER:      SUMMER FISHER, CSR, CRR
                              CERTIFICATE NUMBER 13185


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES CONTINUED:

FOR THE DEFENDANT:        **BY:   PATRICK EDWARD GIBBS**
                                  **BRETT HOM DE JARNETTE**
                          COOLEY LLP
                          3175 HANOVER STREET
                          PALO ALTO, CA 94304

SAN JOSE, CALIFORNIA                    DECEMBER 7, 2023

P R O C E E D I N G S

(COURT CONVENED AT 10:00 A.M.)

THE CLERK:  CALLING CASE NUMBER 21-CV-9953.
LEVENTHAL VERSUS CHEGG INCORPORATED, ET AL,.  ON FOR THE MOTION
TO DISMISS AND THE MOTION STRIKE.

WILL THE PARTIES PLEASE APPROACH AND STATE YOUR
APPEARANCES FOR THE RECORD, BEGINNING WITH PLAINTIFF'S COUNSEL.

MR. MORIARTY:  GOOD MORNING, YOUR HONOR.
CHRISTOPHER MORIARTY FROM MOTLEY RICE ON BEHALF OF THE
LEAD PLAINTIFFS.  AND I'M JOINED BY MY COLLEAGUE,
MAX GRUETZMACHER, AND MY CO-COUNSEL EMILY BISHOP.

THE COURT:  GOOD MORNING.

MR. GIBBS:  GOOD MORNING, YOUR HONOR.
PATRICK GIBBS FROM COOLEY ON BEHALF OF THE DEFENDANTS.
AND WITH ME AT COUNSEL TABLE IS MY PARTNER BRETT DE JARNETTE,
ALSO FROM COOLEY.

THE COURT:  GOOD MORNING.
SO WE ARE HERE ON BOTH THE MOTION TO STRIKE AND THE MOTION
TO DISMISS, PLAINTIFF'S MOTION TO STRIKE AND DEFENDANT'S MOTION
TO DISMISS.

I WILL TAKE THE MOTION TO STRIKE UNDER SUBMISSION AND
ADDRESS THAT IN THE WRITTEN OPINION THAT I ISSUE, SO THERE'S NO
NEED FOR ARGUMENT THIS MORNING ON THAT MOTION TO STRIKE.  SO WE
SHOULD FOCUS THIS MORNING ON THE DEFENDANT'S MOTION TO DISMISS,

WHICH IS THE MAJOR SUBSTANTIVE ISSUE BEFORE US.

THIS IS DEFENDANT'S MOTION, SO I WOULD INVITE DEFENSE COUNSEL TO START.

MR. GIBBS:  THANK YOU, YOUR HONOR.

AND AGAIN, PATRICK GIBBS FROM COOLEY ON BEHALF OF THE DEFENDANTS.

AND YOUR HONOR, WE SUBMITTED A SET OF SLIDES AND PROVIDED A COPY TO PLAINTIFF'S COUNSEL AND ALSO TO THE COURT.  HOPEFULLY WE HAVE GIVEN YOU ENOUGH COPIES, BUT WE INTEND TO USE THAT AS A GUIDE FOR MY DISCUSSION, AND THEN IT ALSO PULLS OUT SOME OF THE MATERIALS FROM SOME OF THE EXHIBITS, JUST FOR EASE OF REFERENCE.

YOUR HONOR, CHEGG IS A LEADING PROVIDER OF ONLINE EDUCATIONAL SERVICES.  THE COMPANY WENT PUBLIC IN 2013, AND FROM 2013 THROUGH THE END OF 2019, THE COMPANY SAW SUBSTANTIAL GROWTH, PARTICULARLY IN ITS SUBSCRIPTION SERVICES, INCLUDING ITS EXPERT Q & A SERVICE WHERE STUDENTS WOULD SUBMIT QUESTIONS AND GET BACK ANSWERS GENERATED BY TENS OF THOUSANDS OF EXPERTS ALL AROUND THE WORLD IN VARIOUS SUBJECT MATTERS.

BY THE END OF 2019, CHEGG'S SUBSCRIPTION SERVICES HAD MILLIONS OF USERS AND WAS GENERATING REVENUE MEASURED IN THE HUNDREDS OF MILLIONS OF DOLLARS.

WITH THE ONSET OF THE PANDEMIC IN EARLY 2020, CHEGG SAW INCREASED, AND IN FACT SOMETIMES EXPLOSIVE GROWTH IN ITS SERVICES BUSINESS AS STUDENTS WERE FORCED TO STUDY FROM HOME

AND ATTEND CLASSES FROM HOME, AND THEY CONTINUED TO SEE THAT GROWTH FOR THE NEXT 18 MONTHS.

IN THE THIRD QUARTER OF 2021, SO FALL OF 2021, THE COMPANY RAN INTO SOME HEADWINDS AND THE GROWTH SLOWED.  BUT THIS IS AN IMPORTANT POINT, THE COMPANY'S BUSINESS DIDN'T RETRACT, IT DIDN'T SHRINK, THE GROWTH SLOWED DOWN, THE STOCK PRICE DROPPED AND THIS LAWSUIT ENSUED.

WE MOVED TO DISMISS THE COMPLAINT ON THREE INDEPENDENT GROUNDS, EACH OF WHICH IS SUFFICIENT TO DISMISS THE COMPLAINT, FAILURE TO PLEAD FALSITY, FAILURE TO PLEAD SCIENTER, AND THE FAILURE TO PLEAD LOSS CAUSATION.  I WILL WALK THROUGH EACH OF THOSE ELEMENTS SEPARATELY.

AS TO FALSITY, AS WE HAVE NOTED IN THE BRIEFING, THE PSLRA REQUIRES PLAINTIFFS TO PLEAD FALSITY WITH PARTICULARITY.  AND SINCE AT LEAST 1999, THE NINTH CIRCUIT HAS BEEN VERY CLEAR THAT THAT STATUTORY COMMAND REQUIRES PLAINTIFFS TO PROVIDE A LIST OF ALL RELEVANT CIRCUMSTANCES IN GREAT DETAIL.  THAT'S THE SILICON GRAPHICS CASE.

PLAINTIFFS CITED A MORE RECENT NINTH CIRCUIT CASE, GLAZER CAPITAL MANAGEMENT, AND SEEM TO BE SUGGESTING THAT THAT CASE SOMEHOW LOWERED THE STANDARD THAT WAS SET BY THE STATUTE AND OR BY THE SILICON GRAPHICS CASE.  THAT'S CLEARLY NOT THE CASE.

THE COURT:  ALTHOUGH GLAZER DID MAKE THE POINT THAT THE PRIOR DECISIONS, I'M NOT SURE INCLUDING SILICON GRAPHICS, THEY DID KIND OF ERR IN CONFLATING THE SCIENTER AND FALSITY

STANDARD RIGHTS.  AND I COULD SEE THOUGH, IF THE COURT WAS DOING THAT BEFORE, THE NINTH CIRCUIT MADE CLEAR THAT THOSE ARE DIFFERENT STANDARDS, THAT THERE WOULD BE -- YOU KNOW, THE PRIOR CASES, THERE'S AN ISSUE, BECAUSE IF THEY ARE ANALYZING THEM TOGETHER THEN THEY ARE REQUIRING A STRONG INFERENCE OF FALSITY, ARGUABLY REQUIRING A STRONG INFERENCE OF FALSITY, AS WELL AS A STRONG INFLUENCE OF SCIENTER, AND THIS DECISION MAKES IT CLEAR THAT STRONG INFERENCE STANDARD ONLY APPLIES TO THE SCIENTER ELEMENT.  WHEN WE ARE TALKING ABOUT FALSITY, ALL THAT WE REQUIRE IS THE STANDARD IQBAL TWOMBLY PLAUSIBILITY THEORY.

SO THERE IS A WAY IN WHICH I THINK THEY ARE RIGHT, THAT THIS DECISION DOES CLARIFY THOSE STANDARDS.  IT MAKES CLEAR, WE STILL REQUIRE PARTICULARITY, THERE'S NO QUESTION THAT PARTICULARITY WAS REQUIRED, BUT CERTAINLY TO THE EXTENT THAT IF THE PRIOR DECISIONS WERE SUGGESTING THE LACK OF PARTICULARITY GAVE RISE TO A -- FAILED TO SATISFY A STRONG -- CREATE A STRONG INFERENCE OF FALSITY, THOSE DECISIONS ARE JUST -- THAT'S NOT GOOD LAW ANYMORE, CORRECT?

MR. GIBBS:  IT IS CLEAR IN GLAZER, THE NINTH CIRCUIT CLARIFIED THE POINT, THAT FALSITY AND SCIENTER NEED TO BE ANALYZED SEPARATELY AND THAT THE STRENGTH OF THE INFERENCE REQUIRED IS DIFFERENT.  I COMPLETELY AGREE WITH THAT.

I DON'T READ GLAZER TO SUGGEST THAT ANY PRIOR OPINION HAD COME OUT WRONG BY REQUIRING THE WRONG LEVEL OF INFERENCE FOR FALSITY.  I THINK AS AN ANALYTICAL MATTER, GLAZER WAS JUST

MAKING THE POINT THAT YOU NEED TO ANALYZE THEM SEPARATELY BECAUSE YOU DO NEED TO TEST THEM AGAINST A DIFFERENT STANDARD FOR THE STRENGTH OF THE INFERENCE.

BUT THE KEY POINT IS THE ONE YOUR HONOR MADE WHICH IS EVEN THOUGH IT IS NOT REQUIRED TO PLEAD A STRONG INFERENCE, THEY DO HAVE TO MEET THE PARTICULARITY STANDARD, NOT JUST THE IQBAL TWOMBLY PLAUSIBILITY STANDARD, AND IT IS A HIGH STANDARD, THAT I DON'T READ GLAZER TO LOWER IT ONE BIT.  IN FACT, IN GLAZER THERE WERE FOUR DIFFERENT CATEGORIES OF STATEMENTS THAT WERE CHALLENGED AND THE COURT SUSTAINED THE COMPLAINT AS TO TWO OF THEM AND AFFIRMED THE DISMISSAL AS TO TWO OF THEM FOR LACK OF DETAIL.

AND SO --

THE COURT:  I MEAN, BUT IT WASN'T REALLY A LACK -- THE PROBLEM HERE IS GLAZER WASN'T REALLY A LACK OF DETAIL, IT WAS THAT THERE WERE REALLY NO FACTS CONSISTENT WITH THE THEORY OF LIABILITY THAT WAS PLEADED.

THE ISSUE HERE WAS THEY WERE TRYING TO SUGGEST, THEY WERE TRYING TO DRAW AN INFERENCE IN THE ABSENCE OF ANY SPECIFIC FACTS THAT WOULD SUPPORT THAT, AND THAT WAS THE PROBLEM WITH THIS THEORY.

AND THEY POINT OUT THE SAME ISSUE IN THE TWITTER CASE THAT I KNOW YOU'VE CITED TO THE COURT AS WELL, THAT THERE WAS NO FACTS THAT WOULD ESTABLISH THE TIMING AT ISSUE.  THEIR CLAIM OF FALSITY THERE WAS DEPENDENT UPON THE PARTICULAR TIME THAT

SOMETHING HAPPENED, AND THE COURT SAID YOU HAVEN'T PLED ANY SPECIFIC FACTS THAT GIVE US A REASON TO THINK THAT IT HAPPENED THEN AS OPPOSED TO AFTER THE STATEMENT HAD BEEN MADE, IN WHICH CASE THE STATEMENT COULDN'T -- WOULDN'T HAVE BEEN FALSE, RIGHT.

AND SO IT SEEMS TO ME THAT THE REAL QUESTION HERE IS -- I UNDERSTAND YOUR ARGUMENT IS THAT THEY HAVE -- YOUR CLAIM, AS I UNDERSTAND IT, IS THE PLAINTIFFS HAD TO HAVE -- THEY HAD TO HAVE SHOWN THAT IN THE CONTEXT OF YOUR OVERALL NUMBER OF SUBSCRIBERS, HOW MANY OF THOSE SUBSCRIBERS WERE CHEATING AND ALSO THAT IT WAS THIS CHEATING WAS DERIVING GROWTH, AND THAT THEY HAVE TO SHOW THAT BY VIRTUE OF SPECIFIC FACTS ABOUT YOUR SUBSCRIBER BASE, ABOUT THESE TWO ISSUES, THE PREVALENCE OF CHEATING AND THE RELATIONSHIP TO THE SUBSCRIBER GROWTH.

I'M NOT CERTAIN THAT'S RIGHT.  YOU KNOW, ALL THAT THE STATUTE SAYS IS TO THE EXTENT THEY ARE RELYING ON INFORMATION AND BELIEF, THEY HAVE TO PLEAD WITH PARTICULARITY THAT THE FACTS THAT THEY THINK SUPPORT THOSE CLAIMS, AND WHY HAVEN'T THEY DONE ENOUGH HERE?

MR. GIBBS:  THEY HAVEN'T DONE ENOUGH HERE.

AND JUST BACKING UP, CERTAINLY THE PLAINTIFFS IN GLAZER WOULD DISAGREE THAT THEY HAD FAILED TO PLEAD ANY FACTS THAT RELATED TO THE TIMING OF THE CONDITIONS OR THE EVENTS THAT WERE KEY TO THEIR THEORY OF FALSITY.

I THINK THE LESSON IN GLAZER IS IN ASSESSING WHAT LEVEL OF DETAIL IS REQUIRED AND WHAT DETAILS ARE NECESSARY TO MEET THE

PARTICULARITY STANDARD, YOU HAVE TO FOCUS CAREFULLY ON WHAT IS THE PLAINTIFF'S THEORY OF FALSITY.

AND TO ME, THE DISTINCTION BETWEEN THE CLAIMS THAT WERE DISMISSED IN GLAZER AND THE CLAIMS THAT WERE SUSTAINED IN GLAZER IS THE AMOUNT OF DETAIL AND HOW THAT RELATES TO THE PLAINTIFF'S FALSITY THEORY.  THAT'S THE KEY PART AND THE KEY LESSON, IN OUR VIEW, FROM GLAZER.

AND SO HERE, THE ARGUMENT THAT WE ARE ASKING THEM TO PLEAD THE PRECISE NUMBER OF SUBSCRIBERS WHO WERE CHEATING OR THE PRECISE AMOUNT OF CHEATING, THAT'S A STRAW MAN, THAT'S NOT THE ARGUMENT WE ARE MAKING.  WE ARE NOT SAYING THEY HAVE TO QUANTIFY IT TO THE PERSON OR TO THE PENNY, WE ARE SAYING THEY HAVE TO PLEAD WITH PARTICULARITY, FACTS THAT SUPPORT THEIR THEORY.  SO THE KEY QUESTION IS WHAT IS THEIR THEORY?  THAT'S HOW YOU CAN ASSESS THE REQUIRED LEVEL OF DETAIL.

AND SO HERE, WE'VE PULLED OUT PARAGRAPH 234 FROM THE COMPLAINT, IT'S ON OUR SLIDE 4, AND THE ELEMENTS OF THE THEORY ARE THAT WITH THE ONSET OF REMOTE LEARNING AT THE BEGINNING OF THE PANDEMIC, THERE WAS A SHARP UPTICK IN CHEATING ON CHEGG'S PLATFORM, THAT'S ONE ELEMENT.  THE NEXT ELEMENT IS THAT IT WAS THIS SHARP UPTICK IN CHEATING AND NOT ANY LEGITIMATE USES OF THE PLATFORM, AND DROVE ALL OF THE SUBSCRIBER AND REVENUE GROWTH DURING THE CLASS PERIOD.

THE COURT:  THAT'S GOING A LITTLE FARTHER THAN WHAT THEY ARE SAYING HERE THOUGH, CORRECT?

THEY ARE SAYING IT COULD HAVE BEEN FUELED BY CHEATING. MAYBE OVERALL PERCENTAGES, IT'S THE SAME AMOUNT OF PEOPLE, BUT MAYBE THERE IS A LOT MORE PEOPLE WHO ARE INTERESTED, WHO HEAR ABOUT THIS IN THE CONTEXT OF, ALL THE SUDDEN WE HAVE THIS SITUATION OF REMOTE LEARNING, SO PEOPLE ARE STARTING TO THINK ABOUT THIS IN A WAY THEY HADN'T BEFORE.  MAYBE THE PEOPLE WHO WERE USING IT BEFORE WERE ALSO WISE TO THE FACT THAT IT COULD BE USED FOR CHEATING, BUT IT MAY BE THAT THE PANDEMIC CREATED CIRCUMSTANCES WHERE A LOT MORE PEOPLE WERE EXCITED ABOUT THE OPPORTUNITY OF USING CHEGG'S SERVICES FOR CHEATING.

SO THAT WOULD BE CONSISTENT WITH IT BEING FUELED BY CHEATING, EVEN IF IN FACT THERE'S NOT A CHANGE IN THE AMOUNT OF CHEATING THAT'S HAPPENING ON THE PLATFORM.

AND THEN SECONDLY, I'M NOT SURE THEY ARE SAYING -- YOU SEEM TO BE SAYING, AND I NOTICE A LOT OF TIMES, THEY FAILED TO SHOW THAT THESE PEOPLE JOINED SOLELY TO CHEAT.  AND I'M NOT SURE THAT'S THE STANDARD OR THE CLAIM EITHER.

CERTAINLY THE POSSIBILITY TO CHEAT USING THE PLATFORM WAS ENTICING, IT'S ONE OF THE FEATURES THAT ENTICED THEM TO THE PLATFORM, THAT WOULD SEEM TO BE SUFFICIENT, EVEN IF -- THEY MAY HAVE SAID, OH WELL WE COULD USE IT FOR THESE OTHER PURPOSES TOO, BUT WE ARE EXCITED ABOUT THE CHEATING POSSIBILITY.

I THINK THERE ARE WAYS IN WHICH IT SEEMED TO ME LIKE YOU WERE PUSHING FARTHER THAN THEIR THEORY OF FALSITY IN ORDER TO SAY THAT THEY HAVEN'T ADEQUATELY SATISFIED YOUR STANDARD, YOUR

CLAIM.

MR. GIBBS:  WELL I TAKE THE POINT ON WHETHER PEOPLE JOINED SOLELY TO CHEAT, THAT'S FAIR, I THINK THAT'S DEBATABLE. I THINK THE COMPLAINT IS UNCLEAR, FRANKLY.

AND BY THE WAY, THEY USE THE WORD "FUELED," I DON'T KNOW WHAT THE WORD FUELED MEANS.  I THINK THAT'S ANOTHER PROBLEM WITH THE COMPLAINT BECAUSE FUELED COULD MEAN ANY NUMBER OF THINGS.

THE COURT:  I MEAN, THEIR CLAIM WOULD BE IN PART, RIGHT, IS CERTAINLY THE LEADERSHIP WAS SAYING VERY MUCH THE OPPOSITE.  THEIR THEORY WOULD BE THAT, YOU KNOW -- MAYBE THAT'S A FACTUAL ISSUE WE WILL ULTIMATELY HAVE TO RESOLVE IN THIS CASE ABOUT THE QUESTION OF REALLY HOW MISLEADING WAS IT WHEN THE LEADERSHIP WAS SAYING THAT CHEATING WAS MINIMAL, THAT IT WAS LIMITED AND THAT IT WASN'T IMPACTING THE GROWTH OF THE SERVICES.  I MEAN, THAT'S THEIR CLAIM.  WE CAN DECIDE WHETHER THAT'S ENOUGH, BUT THAT'S REALLY THE ULTIMATE CLAIM HERE.

MR. GIBBS:  WELL, BUT TO ANSWER THE COURT'S OTHER QUESTION, THERE'S NO QUESTION IN THEIR COMPLAINT THAT THEY ARE TYING THE EXPLOSIVE GROWTH IN SUBSCRIBERS AND REVENUE TO WHAT THEY CLAIM WAS AN INCREASE IN CHEATING.  IT'S ALL THROUGHOUT THEIR COMPLAINT.  THEY ARE CLAIMING THAT THE LEVEL OF CHEATING INCREASED DURING THE CLASS PERIOD.

SO I THINK THAT IS UNDENIABLY PART OF THEIR THEORY.  I'VE GOT HERE AT SLIDE 6, A QUOTE FROM THE PARAGRAPH I REFERENCED

EARLIER WHERE THEY SAY, "CHEGG'S EXPLOSIVE SUBSCRIBER GROWTH WAS IN FACT DIRECTLY ATTRIBUTABLE TO STUDENTS' INCREASING USE OF CHEGG'S PLATFORM TO CHEAT, WHICH WAS MADE EASIER BY THE TRANSITION TO REMOTE LEARNING."

THAT'S ONE EXAMPLE, BUT THE ALLEGATION ABOUT AN INCREASE IN CHEATING IS THROUGHOUT THEIR COMPLAINT.

THE COURT:  RIGHT.

I GUESS THE PROBLEM IS THAT COULD BE STUDENTS ARE CHEATING AND THEY'VE DISCOVERED THAT CHEGG IS A GOOD TOOL FOR THAT, AS OPPOSED TO NECESSARILY SAYING THE STUDENTS WHO ARE ON CHEGG ARE USING IT FOR MORE CHEATING.  THOSE ARE DISTINCT POSSIBILITIES, AND I THINK YOU CAN READ THE STATEMENTS EITHER WAY, EITHER ONE WOULD BE CONSISTENT WITH THEIR THEORY.

MR. GIBBS:  I'M NOT SURE IT WOULD, THOUGH, BECAUSE THE FUNDAMENTAL POINT HERE IS THAT CHEGG SAW THIS MASSIVE GROWTH IN SUBSCRIBERS.  INCREASING CHEATING BY PEOPLE WHO ARE ALREADY SUBSCRIBERS CAN'T BE THE THING THAT FUELED OR DROVE THAT INCREASE IN SUBSCRIBERS, IN REVENUE.  AND SO IT HAS TO BE THAT THE NEW PEOPLE COMING ON TO THE PLATFORM ARE COMING ON TO THE PLATFORM, AT LEAST TO SOME EXTENT, TO CHEAT.  OTHERWISE --

THE COURT:  RIGHT.

I GUESS WHAT I'M SAYING THOUGH, IS THIS IS THE -- SAY BEFORE THE PANDEMIC, 25 PERCENT OF USERS WERE CHEATING, WERE USING IT TO CHEAT.  YOU KNOW, BUT THAT'S A HUNDRED PEOPLE.  900 MORE PEOPLE FIND OUT ABOUT IT AND 25 PERCENT OF THOSE PEOPLE

ARE INTERESTED IN CHEATING, RIGHT.

THEY FIND OUT THAT THERE IS THIS ABILITY TO USE IT TO CHEAT, WE HAVE OBVIOUS GROWTH AS A RESULT.  I MEAN THAT'S -- YOU DON'T HAVE -- THE PERCENTAGE OF CHEATING IS THE SAME, BUT THE GROWTH IS DRIVEN AT LEAST IN PART BY THE POSSIBILITY OF ITS USE AS A TOOL FOR CHEATING.

MR. GIBBS:  OKAY.  I TAKE THE COURT'S POINT.

LET ME MOVE TO A SLIGHTLY DIFFERENT ANGLE BECAUSE I ACTUALLY THINK THERE'S A FAIRLY SIMPLE WAY TO CUT THROUGH THIS.

REGARDLESS OF WHETHER IT'S AN INCREASE IN THE PERCENTAGE OF CHEATING OR JUST A LARGER NUMBER OF PEOPLE CHEATING AT THE SAME RATE, REGARDLESS OF THAT, IF IT WERE THE CASE THAT THIS MASSIVE GROWTH IN SUBSCRIBERS AND REVENUE STARTING IN EARLY 2020 WAS DRIVEN BY OR FUELED BY AN INCREASE IN CHEATING, HOWEVER WE DEFINE AN INCREASE IN CHEATING, THE REST OF THEIR THEORY IS THAT THAT WAS ARTIFICIALLY INFLATING THE COMPANY'S FINANCIAL PICTURE AND IT WAS INEVITABLY GOING TO CRASH WHEN STUDENTS RETURN TO CAMPUS, RIGHT, THE REMOTE LEARNING PIECE OF THIS IS CRITICAL TO THEIR THEORY.

AND IN FACT, IN THEIR COMPLAINT AND IN THEIR BRIEF, AS WE HAVE LAID OUT IN SLIDE 9, THEY REPEATEDLY ALLEGE THAT THAT'S EXACTLY WHAT HAPPENED, THAT STUDENTS RETURNED TO CAMPUS IN THE FALL OF 2021, AND THE FINANCIAL RESULTS WERE GOING TO CRATER, THAT THEY PLUMMETED, THAT DEMAND FOR CHEGG WOULD DECLINE ONCE STUDENTS RETURNED TO CAMPUS, THAT CHEGG'S RESULTS WERE ALMOST

CERTAIN TO CRATER.  THAT'S THE THEORY.

THE FACTS ALLEGED IN THE COMPLAINT AND FACTS SUBJECT TO JUDICIAL NOTICE DON'T COME CLOSE TO BEARING THAT OUT, IN FACT, THEY PROVE EXACTLY THE OPPOSITE.

SO AS WE HAVE LAID OUT HERE IN SLIDES 10, 11 AND 12, THE CLASS PERIOD STARTS AT THE END OF Q1 2020.  2.9 MILLION SUBSCRIBERS, REVENUE OF A LITTLE OVER A HUNDRED MILLION DOLLARS.

SLIDE 11.  Q3 '21.  THIS IS THE POINT WHERE THE PLAINTIFFS CLAIM STUDENTS HAVE GONE BACK TO CAMPUS, THEY CAN NO LONGER CHEAT BECAUSE THEY ARE NOT IN REMOTE LEARNING, AND THE BUSINESS HAS CRATERED, CRASHED, COLLAPSED, WHATEVER WORD YOU WANT TO CHOOSE.

THAT'S CLEARLY NOT THE CASE.  AT THIS POINT, THEY HAVE 4.4 MILLION SUBSCRIBERS, SUBSTANTIALLY MORE THAN THEY HAD BEFORE THE ONSET OF REMOTE LEARNING, AND REVENUE OF 146.8 MILLION, AGAIN, SUBSTANTIALLY MORE THAN THEY HAD BEFORE THE ONSET OF REMOTE LEARNING.

THIS IS THE POINT AFTER WHICH PLAINTIFFS CLAIM THE BUSINESS CRASHED BECAUSE STUDENTS WERE BACK ON CAMPUS, BUT THAT RHETORIC CAN'T BE SQUARED WITH THE FACTS.

ONE OTHER FACTUAL POINT THAT'S REALLY --

THE COURT:  JUST TO BE CLEAR, YOUR ARGUMENT IS THAT THE INFORMATION ABOUT THE VALUE OF THE COMPANY POST-CLASS PERIOD IS ALL JUDICIALLY NOTICEABLE, IS THAT HOW THIS COMES IN

ON THIS MOTION?

MR. GIBBS:  WELL THE Q3 '21 RESULTS ARE ACTUALLY REFERENCED IN THE COMPLAINT, SO WE ARE NOT IN THE POST-CLASS PERIOD, THIS IS -- THE ALLEGED CORRECTED DISCLOSURE IS EXACTLY THIS EARNINGS RELEASE, IT'S REFERENCED IN PARAGRAPHS 167 AND 256 OF THE COMPLAINT.

THE COMPLAINT SORT OF TRIES TO MASK THIS ISSUE BECAUSE IT TALKS ABOUT A TEN PERCENT DECLINE, THAT'S IN THE ABSOLUTE NUMBER OF SUBSCRIBERS, BUT THE COMPANY'S BUSINESS -- THEY DON'T MEASURE QUARTER TO QUARTER CHANGES, THEY MEASURE YEAR OVER YEAR, RIGHT.  SO WHEN THEY WANT TO BE KNOW WHETHER THEIR BUSINESS IS GROWING OR NOT, THEY COMPARE Q3 '21 TO Q3 '20, AND ON THAT BASIS, Q3 '21 WAS SEVEN PERCENT HIGHER THAN Q3 OF '20.

THE COURT:  RIGHT.

AND ONE THING THOUGH IS YOU DID START BY REFERENCING THE EXPLOSIVE GROWTH THAT HAPPENED AT THE START OF THE PANDEMIC.

AND I THINK, OBVIOUSLY, WHAT DO WE DO WITH THE POSSIBILITY THAT INVESTORS -- YOU KNOW, WHEN INVESTORS ARE INVESTING IN A COMPANY, THEY ARE NOT JUST INVESTING ON AN EXPECTATION THAT THE BUSINESS MAY REMAIN VIABLE FOR THE FOLLOWING YEAR, BUT THEIR EXPECTATIONS ABOUT FUTURE GROWTH, AND THAT'S WHAT'S AT ISSUE.

AND OBVIOUSLY, I THINK AT LEAST THEY ALLEGE THAT THERE WAS A SLOW DOWN IN TERMS OF GROWTH ON THE PLATFORM FOLLOWING THE RETURN TO WORK; ISN'T THAT RIGHT?

MR. GIBBS:  WELL, THAT'S NOT -- WELL WHAT THEY SAY IS

THE BUSINESS CRATERED.  THAT'S NOT WHAT ACTUALLY HAPPENED.

THERE WAS A TEMPORARY PULLBACK IN GROWTH, ALTHOUGH AS WE NOTE ON THE NEXT SLIDE AND IN THE REST OF OUR EXHIBIT 29, THE COMPANY ACTUALLY CONTINUED TO GROW SUBSTANTIALLY IN THE ENSUING YEARS.  AND I DO BELIEVE THAT THOSE RESULTS, JUST THE BARE FACT OF THOSE RESULTS ARE JUDICIALLY NOTICEABLE, AND WE HAVE LAID OUT THE BASIS FOR THAT IN THE BRIEFING.

BUT AGAIN, THE FACT THAT THE COMPANY CONTINUED TO ADD NEW SUBSCRIBERS TO THE PLATFORM AT A SIGNIFICANT RATE, IT WAS NOT AS HIGH A RATE AS THE VERY BEGINNING OF THE PANDEMIC, BUT THEY ARE STILL ADDING SUBSCRIBERS AT A RATE THAT WOULD MAKE MOST COMPANIES QUITE HAPPY, THAT'S IRRECONCILABLE WITH THE IDEA THAT THEY WERE ONLY GROWING BEFORE BECAUSE OF CHEATING AND THAT CHEATING WAS SOMEHOW CURTAILED BY THE RETURN TO CAMPUS.

SO LET ME -- WE HAVE LAID IT OUT AND THE COURT IS OBVIOUSLY VERY FAMILIAR WITH THE BRIEFING.  LET ME MOVE TO A SLIGHTLY DIFFERENT ISSUE WHERE I THINK THERE'S REALLY NO ROOM FOR ARGUMENT WHICH IS SCIENTER, WHERE THEY DO HAVE TO PLEAD PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE.  AND SO HERE --

THE COURT:  LET ME ASK YOU ONE MORE QUESTION ON THIS.

MR. GIBBS:  OF COURSE.

THE COURT:  ONE THING THAT IS JUST CONCERNING TO ME, YOU KNOW, I UNDERSTAND YOUR ARGUMENT FOR SOME DEGREE OF SPECIFICS ABOUT THE SOURCE OF -- YOU KNOW, TYING THE SPECIFIC

SUBSCRIBER NUMBERS TO CHEATING AND THIS RELATIONSHIP.

YOU KNOW, IS THERE ANY WAY, ABSENT INCREDIBLY WELL-INFORMED CONFIDENTIAL INFORMANTS OR INTERNAL WITNESSES, THAT ANY SECURITIES CLASS -- YOU COULD EVER PURSUE A SECURITIES CLASS ACTION UNDER THAT STANDARD?  YOU KNOW, I SUPPOSE -- ABSENT -- SIMPLY THAT THEY PUT OUT ALL THE FALSITY IN IT, IN THE SUBSEQUENT DISCLOSURE.  BUT IN A CASE LIKE THIS, I MEAN, IS THERE ANY WAY, ABSENT HAVING SOMEONE INSIDE THE COMPANY, BEYOND THE PEOPLE WHO THEY HAVE ALREADY RELIED UPON, SORT OF LEAK ALL THAT INFORMATION TO THEM THAT YOU COULD EVER SATISFY THE PARTICULARITY REQUIREMENT, AS YOU HAVE ARTICULATED IT?

MR. GIBBS:  WELL, IT'S HARD TO SAY.  EVERY CASE IS DIFFERENT.  I WOULD SAY ABOUT HALF THESE CASES SURVIVE THE PLEADINGS, AND SO IT'S NOT LIKE THE PSLRA HAS BECOME SOME ABSOLUTE BAR TO PLAINTIFFS MEETING THE STANDARD, I DISAGREE WITH THE OUTCOME OF LOTS OF THOSE CASES, BUT THEY HAPPEN.

BUT HERE, I DON'T KNOW HOW THEY MIGHT GO ABOUT PLEADING FALSITY WITH PARTICULARITY.  I MAY BE THE WRONG PERSON TO ASK THAT QUESTION BECAUSE I DON'T THINK THE STATEMENTS WERE FALSE TO BEGIN WITH SO I DON'T THINK THERE'S ANYTHING THERE TO GO FIND.

BUT HYPOTHETICALLY, YES, I MEAN, THIS IS A FRAUD CASE, THEY ARE CLAIMING THE COMPANY AND ITS TOP EXECUTIVES WENT OUT AND KNOWINGLY LIED TO SHAREHOLDERS.

AND SO NORMALLY, THE WAY THEY PLEAD FALSITY -- AND THIS IS

THE REASON THE NINTH CIRCUIT HAS TENDED TO ANALYZE THESE ISSUES TOGETHER IS BECAUSE THEY USUALLY RELY ON THE SAME FACTS. NORMALLY PLAINTIFFS COME IN AND THEY HAVE SOMEONE INSIDE THE COMPANY, FORMER EMPLOYEE, WHATEVER, WHO SAYS YEAH, THERE WERE THESE REPORTS, THEY WENT TO THE CEO AND THE REPORT SAID, YOU KNOW WHAT, ALL THIS GROWTH IS BEING DRIVEN BY CHEATING, IT'S GOING TO CRASH WHEN THE STUDENTS GO BACK TO CAMPUS.

THAT TYPE OF ALLEGATION IS INVOLVED IN ALL SORTS OF THESE CASES.  BUT THE QUESTION OF WHETHER IT'S FEASIBLE OR NOT FOR THEM TO MAKE THEIR SHOWING, DOESN'T RELIEVE THEM OF THE OBLIGATION TO MAKE THEIR SHOWING.  CONGRESS MADE A DECISION TO ALLOW A NUMBER OF THESE CASES TO GET DISMISSED WITHOUT GETTING TO DISCOVERY.

THE COURT:  ALTHOUGH AS THE NINTH CIRCUIT SAYS THE POINT OF THE STANDARD IS NOT TO KICK MERITORIOUS CASES OUT OF COURT, IT IS TO -- CONGRESS'S GOAL WAS TO PREVENT UNMERITORIOUS CASES FROM MOVING FORWARD.  AND I THINK OBVIOUSLY WE HAVE TO CONSIDER, AND AS THE NINTH CIRCUIT HAS INSTRUCTED US, TO APPLY THIS STANDARD IN LIGHT OF THAT PURPOSE, I THINK, YOU KNOW, IN UNDERSTANDING ITS TERMS.

SO A CONSTRUCTION THAT WOULD OVERLY RESTRICT MERITORIOUS CASES FROM GOING FORWARD WOULD BE CONTRARY TO WHAT THE NINTH CIRCUIT HAS TOLD US CONGRESS WAS TRYING TO DO.

MR. GIBBS:  I DON'T DISAGREE IN CONCEPT, BUT I DO DISAGREE THAT THE FACT THAT IT MIGHT BE DIFFICULT TO GET THE

PIECE OF INFORMATION THAT SHOWS THAT THEY HAVE A MERITORIOUS CASE IS NOT A REASON TO LOWER THE BURDEN.  I THINK THAT'S COMPLETELY INCONSISTENT WITH THE STATUTORY SCHEME.

IT'S SUPPOSED TO BE DIFFICULT, RIGHT.  THE METHOD CONGRESS CHOSE TO WEED OUT NON-MERITORIOUS CLAIMS WAS TO ERECT A SIGNIFICANTLY HIGH BARRIER FOR PLEADING, AND THEY SPECIFICALLY IMPOSED A DISCOVERY STAY PRECISELY TO KEEP THAT BURDEN HIGH. SO THE FACT THAT IT MIGHT BE HARD TO IMAGINE WHERE THEY WOULD GET THE FACTS IS NOT A REASON TO LOWER THE BURDEN.

AND AGAIN, I WANT TO BE CLEAR, I WANTED TO MOVE TO SCIENTER, BUT ON THE FALSITY POINT, WE ARE NOT CLAIMING THEY HAVE TO SPECIFY DOWN TO THE USER OR DOWN TO THE DOLLAR, BUT THEY DO HAVE TO ALLEGE PARTICULARIZED FACTS, NOT GENERALIZATIONS, NOT CONCLUSIONS, NOT UNINFORMED SPECULATION, BUT SPECIFIC FACTS, DETAILS THAT WOULD ALLOW THE COURT TO INFER THE FACT THEY WANT YOU TO INFER WHICH IS THAT IT WAS CHEATING AND NOT LEGITIMATE USE OF THE PRODUCT THAT FUELED THIS MASSIVE GROWTH.

THE COURT:  OR THAT CHEATING WAS PART OF WHAT FUELED THE MASSIVE GROWTH.

I THINK THE PROBLEM I'M HAVING HERE IS I DO THINK THEY CERTAINLY SEEM TO HAVE, WITH PARTICULARITY, PLEADED A REASONABLE -- FOR OUR PURPOSES, A PLAUSIBLE CASE THAT THERE WAS A LOT OF CHEATING.  WE DON'T NEED TO KNOW PERCENTAGE-WISE, BUT THERE WAS A FAIR AMOUNT OF CHEATING THAT WAS HAPPENING, THAT

UNIVERSITIES WERE IDENTIFYING AND OTHER INTERNAL WITNESSES IDENTIFIED IT WAS HAPPENING ON THIS PLATFORM DURING THIS TIME PERIOD, AND THAT PLAUSIBLY, THEY HAVE CREATED A PLAUSIBLE CLAIM THAT EXECUTIVES, IN THE STATEMENTS THEY IDENTIFIED, WERE SUBSTANTIALLY DOWNPLAYING THAT, THEY HAD REASON TO KNOW THAT THERE WAS A LOT OF -- THERE WAS CHEATING HAPPENING, THAT WAS AT LEAST IN SOME ABSOLUTE SENSE, SIGNIFICANT, EVEN IF THEY WOULD SAY, THERE ARE ALL THESE OTHER PEOPLE USING IT FOR LEGITIMATE PURPOSES, BUT A LOT OF UNIVERSITIES WERE HAVING AN EXPERIENCE OF HAVING CHEATING HAPPEN.

SO IF WE TAKE THAT THEY HAVE PLAUSIBLY MADE THAT CASE, THE QUESTION THEN, YOU KNOW, WHAT DO THEY HAVE TO DO TO GO TO THE FURTHER ELEMENT WHICH IS THAT THEY THINK THAT IT WAS THIS CHEATING THAT WAS DRIVING THE GROWTH OF THE COMPANY DURING THIS TIME PERIOD AS OPPOSED TO -- AND THAT RENDERS THEIR MISSTATEMENTS RELEVANT FOR OUR PURPOSES, WHICH IS WE ARE HERE ON A SECURITIES CLASS ACTION, WE ARE NOT HERE AS A GENERAL QUESTION OF WHETHER THEY WERE ENTIRELY TRUTHFUL TO THE PUBLIC WITH RESPECT TO THAT ISSUE.

MR. GIBBS:  SURE.

AND I DON'T WANT TO ARGUE WITH THE COURT, I DISAGREE WITH SOME OF THE CONCLUSIONS BUT I WON'T BELABOR THE POINT, I THINK THAT -- I DO THINK THAT YOU NEED TO TAKE THE PIECES SEPARATELY, RIGHT.

SO I THINK THEY HAVE PLAUSIBLY ALLEGED THAT THERE WAS

CHEATING ON THE PLATFORM, I DO AGREE WITH THAT.  I DON'T THINK THAT GETS THEM ANYWHERE NEAR A FALSE STATEMENT UNDER THE PSLRA BECAUSE THE COMPANY DIDN'T SAY THERE WAS NO CHEATING, THE COMPANY ACKNOWLEDGED THAT THERE WAS CHEATING, THEY EXPRESSED A VIEW ABOUT --

THE COURT:  THEY MINIMIZED IT.

MR. GIBBS:  WELL THEY EXPRESSED A VIEW ABOUT HOW MUCH IT WAS RELATIVE TO THE PLATFORM AS A WHOLE.

AND JUST TO PUT THAT IN PERSPECTIVE, YOU KNOW, YOUR HONOR REFERENCED THE NOTION THAT MAYBE IT WAS FUELLING THE GROWTH IN PART.  AND I THINK ONCE YOU START WITH THE "IN PART," YOU REALLY ARE ERODING THE PARTICULARITY STANDARD AND YOU ARE ALLOWING THEM TO USE A RELATIVELY FUZZY TERM, "FUELED," TO MASK THE DEFICIENCIES IN THEIR COMPLAINT.

BUT I THINK IT'S IMPORTANT TO KEEP IN MIND WE ARE TALKING ABOUT A PLATFORM THAT HAS, DURING THE CLASS PERIOD, THAT HAS SOMEWHERE BETWEEN THREE AND FIVE MILLION SUBSCRIBERS, RIGHT. AND SO YOU COULD HAVE AS MANY AS 250,000 STUDENTS CHEATING AND IT WOULD BE A TINY PERCENTAGE.  AND SO MEASURED AGAINST THAT --

THE COURT:  THERE'S SOMETHING THAT NEITHER PARTY REALLY RAISED BUT WHAT I THOUGHT ABOUT, IS THAT WHAT WE DON'T KNOW IS ACTIVE USERS, WHAT IS THE PERCENTAGE OF SORT OF WHO IS ACTIVE, WHO IS INACTIVE.

NOW MAYBE THE POSITION IS IT DOESN'T MATTER, AS LONG AS THEY ARE PAYING THEIR SUBSCRIPTION FEE, WE DON'T CARE WHETHER

THEY USE THE PLATFORM OR NOT, BUT THAT WOULD BE ONE THOUGHT I HAD IS THAT IT COULD BE RELEVANT TO KNOW ACTUALLY WHAT IS THE PERCENTAGE AMONGST PEOPLE ACTUALLY USING THE PLATFORM.  AND I GUESS THEY TRIED TO DO THAT THROUGH THEIR ANALYSIS OF A PARTICULAR SUBSTANTIVE QUESTION, CORRECT?

MR. GIBBS:  I SUPPOSE SO.  BUT TO THE EXTENT ACTIVE USERS IS RELEVANT TO THEIR CLAIM, THE BURDEN WOULD BE ON THEM TO PLEAD THE FACTS AND TO EXPLAIN WHY THEY GET THERE ON THAT. THEY HAVEN'T.

YOU KNOW, CERTAINLY FROM A REVENUE STANDPOINT, IT DOESN'T MATTER.  I DO THINK THE COMPANY OBVIOUSLY PROVIDES THE SERVICE BECAUSE THEY WANT PEOPLE TO USE IT, SO THEY ARE NOT IN THE BUSINESS OF COLLECTING SUBSCRIPTIONS FOR NOTHING, THEY ARE ACTUALLY TRYING TO PROVIDE A VALUABLE SERVICE, AND I THINK THEY DO.

I DON'T KNOW WHETHER THERE'S ANY WAY TO TEASE OUT WHAT PERCENTAGE ARE ACTIVE OR NOT, BUT I DO KNOW WITH NUMBERS THAT LARGE, TO SUSTAIN AN INFERENCE THAT THIS WAS CHEATING RATHER THAN LEGITIMATE USE OF THE PRODUCT THAT FUELED OR DROVE THE GROWTH, YOU WOULD NEED TO BELIEVE THAT THERE WAS A VERY, VERY LARGE NUMBER OF USERS WHO WERE USING IT TO CHEAT AND NOT USING IT FOR LEGITIMATE LEARNING PURPOSES.

AND I DON'T BELIEVE HERE THEY COME ANYWHERE CLOSE TO PLEADING PARTICULARIZED FACTS, SPECIFIC DETAILS THAT SUPPORT THAT INFERENCE.  I THINK AT MOST, YOU'VE GOT SOME ANECDOTES,

YOU'VE GOT A LOT OF ADJECTIVES AND HYPERBOLE.  YOU HAVE NUMBERS THAT ON THEIR FACE ARE NOT VERY LARGE, THEY ARE MEASURED IN THE DOZENS OR MAYBE A HUNDREDS AGAINST A USER BASE THAT'S MEASURED IN THE MULTIPLE MILLIONS.  AND THE OTHER THING YOU DON'T HAVE HERE IS ANY BASIS TO TAKE THE ANECDOTES OR THE RELATIVELY SMALL NUMBERS THAT ARE IDENTIFIED IN THE COMPLAINT AND EXTRAPOLATE THAT ACROSS THE ENTIRE USER BASE.

AND SO WHEN THE COURT SAYS THAT THEY WERE MINIMIZING THE AMOUNT OF CHEATING, THAT SORT OF ASSUMES A CERTAIN LEVEL OF CHEATING, BUT I DON'T THINK THEY PLEAD PARTICULARIZED FACTS TO SHOW THE AMOUNT OF CHEATING THAT'S INCONSISTENT WITH THE WAY THE EXECUTIVES CHARACTERIZED IT.

THE COURT:  WHAT IS THE -- OBVIOUSLY PART OF WHAT WE ARE TALKING ABOUT, AND I THINK THIS IS JUST A QUESTION OF PLAUSIBLE INFERENCES, BUT THEIR CLAIM IS THAT THE EXPLANATION FOR THE RELATIONSHIP BETWEEN THE GROWTH OF THE SUBSCRIBER BASE FOLLOWING THE ONSET OF THE PANDEMIC AND AT-HOME LEARNING, THAT KIND OF CHEATING IS THE ONLY EXPLANATION.

I MEAN, IS THE CLAIM THAT -- AND TRYING TO THINK WHAT IS IT ABOUT THAT THAT WOULD -- WHAT OTHER ASPECTS OF AT-HOME LEARNING WOULD DRIVE GROWTH?  SO WHAT OTHER INFERENCE SHOULD WE DRAW FROM THAT RELATIONSHIP?

MR. GIBBS:  WELL I DON'T THINK THE PSLRA PERMITS ONE TO SAY, WELL IT HAS TO BE CHEATING.  THEY HAVE TO PLEAD FACTS TO SHOW WHY IT HAS TO BE CHEATING.

YOU KNOW, WE ALL LIVED THROUGH THE PANDEMIC, I HAD KIDS AT HOME AND I WATCHED REMOTE LEARNING, AND THE COMPANY GAVE A NUMBER OF VARIED EXPLANATIONS, MEANING THERE WERE LOTS OF FACTORS THAT THEY BELIEVE WERE DRIVING THE GROWTH.  REMOTE LEARNING WAS PART OF IT, AND WHAT I WOULD SAY IS IT'S A PERFECTLY PLAUSIBLE REASON WHY THIS ABRUPT SHIFT TO REMOTE LEARNING WHICH HAD LITERALLY NEVER HAPPENED BEFORE IN THE WORLD, WOULD CAUSE A GREAT DEAL OF ANXIETY ON THE PART OF STUDENTS.  THEY NO LONGER HAVE ACCESS TO THE SERVICES THEY USED TO HAVE ON CAMPUS, THEY DON'T HAVE THE SAME ACCESS THEY USED TO HAVE TO THEIR PEERS, ALL KINDS OF UPHEAVAL.

I COULD EASILY IMAGINE STUDENTS CONCLUDING, I NEED MORE HELP THAN I HAD BEFORE AND CHEGG IS ONE WAY THAT I COULD GET IT.  THAT'S AT LEAST AS PLAUSIBLE AS THE IDEA THAT MILLIONS OF STUDENTS FLOCKED TO CHEGG JUST SO THEY COULD CHEAT.

I DON'T THINK THE COURT IS PERMITTED TO ASSUME THE WORST WITHOUT FACTS THAT ACTUALLY SUPPORT THAT WORST INFERENCE AS OPPOSED TO JUST ASSUMING THIS WAS A SERVICE, IT GAVE PEOPLE A LEG UP, IT GAVE THEM SOME HELP AT A POINT WHERE PEOPLE WERE DEALING WITH JUST UNBELIEVABLE AND UNPRECEDENTED UNCERTAINTY.

I THINK THAT'S THE MOST OBVIOUS AND MOST PLAUSIBLE EXPLANATION.  THAT DOESN'T MEAN NOBODY JOINED THE PLATFORM TO CHEAT.  THEY PROBABLY DID.  STUDENTS CHEAT, THEY'VE ALWAYS CHEATED, THEY ARE ALWAYS GONNA CHEAT, THE QUESTION HERE IS HAVE THEY ALLEGED SPECIFIC FACTS THAT SUPPORT A REASONABLE INFERENCE

THAT IT WAS CHEATING AND NOT LEGITIMATE USE THAT DROVE OR FUELED, WHATEVER VERB ONE WANTS TO USE, THIS SPECTACULAR GROWTH.  AND IT WAS SPECTACULAR GROWTH, THE COMPANY SAID SO AT THE TIME, THERE'S NO DENYING IT.

I DON'T THINK HERE YOU'VE GOT DETAILED FACTS ENOUGH TO SUPPORT THAT FAIRLY DRAMATIC INFERENCE THAT THEY ARE ASKING YOU TO DRAW.

I ALSO THINK, JUST TO COME BACK TO IT, IF THAT WERE THE CASE, IF ALL THAT GROWTH HAD BEEN DRIVEN JUST BY PEOPLE FLOCKING TO THE PLATFORM BECAUSE THEY REALIZED THEY COULD USE IT TO CHEAT, THEN THERE SHOULD BE SOMETHING AT THE BACK END THAT'S CONSISTENT WITH THAT TOO.

THE WHOLE THEORY IS THE PROBLEM WITH REPORTING THIS EXPLOSIVE GROWTH AND NOT TELLING INVESTORS THAT IT'S DRIVEN BY CHEATING IS THAT IT WAS BOUND TO END, IT WAS BOUND TO COLLAPSE, THE BUBBLE WAS BOUND TO BURST.

AND PLAINTIFFS HAVE USED LOTS OF COLORFUL LANGUAGE TO DESCRIBE WHAT HAPPENED AT THE END, BUT I THINK THAT LANGUAGE IS MASKING WHAT ACTUALLY HAPPENED WHICH WAS A TEMPORARY AND RELATIVELY MODEST CUTBACK IN A RATE OF GROWTH, BUT IT'S STILL A GROWING BUSINESS.

SO IN THE FALL OF 2021 WHEN PLAINTIFFS CLAIM THE BOTTOM DROPPED OUT, EVERYONE IS BACK ON CAMPUS, THEY CAN'T CHEAT ANYMORE, THE BUBBLE IS BURST, RIGHT.  IN THAT QUARTER, THEY REPORTED 17 PERCENT INCREASE IN SUBSCRIBERS OVER THE SAME

QUARTER THE PRIOR YEAR WHICH WAS IN THE HEART OF THE PANDEMIC, THE SORT OF PEAK OF REMOTE LEARNING, FALL OF 2021.

HOW ON EARTH IF THE GROWTH DURING 2020 WAS DRIVEN BY CHEATING, AND CHEATING WAS OVER BY THE FALL OF 2021, HOW ON EARTH DID THEY INCREASE THEIR SUBSCRIBER NUMBERS, NEW SUBSCRIBERS BY 17 PERCENT?  IT MAKES NO SENSE, IT COMPLETELY UNDERCUTS THEIR THEORY.

THE COURT:  OKAY.

I WANT TO GIVE THEM AN OPPORTUNITY AND THEN WE ACTUALLY HAVE ANOTHER MOTION TO ARGUE, BUT I WILL GIVE YOU, IF YOU WANT TO TAKE JUST A FEW MINUTES TO ADDRESS SCIENTER AND LOSS CAUSATION, WHICH ARE THE OTHER PRIMARY ISSUES BEFORE US TODAY.

MR. GIBBS:  YES.  I APPRECIATE THAT, YOUR HONOR.

JUST BRIEFLY, THE MOST COMMON WAY OF TRYING TO PLEAD SCIENTER IS TO SHOW THAT THE EXECUTIVES WHO SPOKE DID SO AT A TIME WHEN THEY HAD INFORMATION IN THEIR HANDS THAT WAS INCONSISTENT WITH WHAT THEY SAID.  THEY KNEW THAT WHAT THEY WERE SAYING WAS FALSE.

WE DON'T HAVE ANYTHING LIKE THAT HERE.  WE HAVE NO ONE WHO WAS PUTTING ANY SPECIFIC INFORMATION IN THE HANDS OF THE EXECUTIVES WHO SPOKE THAT IS IN ANY WAY INCONSISTENT WITH WHAT THEY SAID, THAT IN ANY WAY SUGGESTS THAT WHEN THEY SPOKE, THEY WERE TRYING TO MISLEAD THEIR SHAREHOLDERS, NONE, ZERO, CERTAINLY NOT ENOUGH TO PLEAD A STRONG INFERENCE OF SCIENTER.

SO NOT SURPRISINGLY, THEY RELY VERY, VERY HEAVILY ON STOCK

SALES, BUT THE STOCK SALES DON'T GET THEM THERE EITHER.  ONE OF THE THREE NAMED INDIVIDUAL DEFENDANTS SOLD NO STOCK, AND IN A CASE LIKE THIS WHERE THEY ARE RELYING ON STOCK SALES, THAT SEVERELY UNDERMINES ANY INFERENCE OF SCIENTER.

MR. ROSENSWEIG SOLD THREE TIMES MORE SHARES IN THE 18 MONTHS PRECEDING THE CLASS PERIOD THAN HE DID DURING THE CLASS PERIOD.  THAT DRAMATICALLY UNDERCUTS ANY INFERENCE OF SCIENTER.  MR. SCHULTZ, THEY TRY TO GIN UP A HIGH PERCENTAGE OF STOCKS SOLD BY IGNORING THE STOCK THAT HE ACTUALLY ACQUIRED DURING THE CLASS PERIOD.  AND SO THERE'S NOTHING ABOUT THESE STOCK SALES THAT IS SUGGESTS THAT THIS WAS PART OF A BIG FRAUD.

THE COURT:  I MEAN, THERE'S A COMPLICATED ABOUT WHAT'S ACTUALLY BEFORE ME ON THE STOCK SALES, I THINK, BUT I TAKE THERE IS A REFERENCE TO THE REPORTS, THE FORMS IN THE COMPLAINT, SO I TAKE -- THERE'S A REASONABLE ARGUMENT THAT YOU ARE ENTITLED TO PUT THEM BEFORE THE COURT AS WELL.

IT'S COMPLICATED BECAUSE AS I UNDERSTAND IT, ALL THAT IS IS A REPRESENTATION BY THE INDIVIDUALS.  THE FORM -- IT'S FILED PRESUMABLY UNDER PENALTY OF PERJURY AND ALL THE LIKE, BUT I'M NOT SURE I CAN ACTUALLY, AS A GENERAL MATTER, I COULD TAKE JUDICIAL NOTICE OF THE FACT THAT THEY WERE FILED, BUT WHETHER I CAN TAKE JUDICIAL NOTICE OF THE TRUTH OF THE UNDERLYING STOCK SALES IS A DIFFERENT QUESTION THAT I'M NOT CERTAIN ABOUT.

AND THAT SAID, UNDERSTANDING THAT THEY ARE USING THEM FOR THAT PURPOSE OR AT LEAST A REPRESENTATION ABOUT THAT PURPOSE,

SO THERE'S KIND OF A COMPLICATED QUESTION THERE.  I UNDERSTAND THAT, AND THAT THE FIGHT IS OVER THE DECLARATION THAT TAKES THAT INFORMATION AND TRIES TO GENERATE IT, BUT THE HARDER QUESTION TO ME IS THIS QUESTION OF, TO WHAT EXTENT CAN I ACTUALLY CONSIDER THE TRUTH OF THE REPORTED STOCK SALES AS OPPOSED TO SIMPLY CONSIDERING THIS IS WHAT THEY REPORTED TO HAVE SOLD, RIGHT.  THAT'S A DIFFERENT MATTER, PERHAPS, WHEN I'M THINKING ABOUT WHAT KIND OF INFERENCES I DRAW OR DON'T DRAW WITH RESPECT TO SCIENTER.

MR. GIBBS:  IT IS.

AND THERE ARE LOTS OF COURTS WHO HAVE ACCEPTED THE PURPOSE OF THE SALE ON THE FORM 4 AS TRUE FOR EXACTLY THE REASONS THAT WE HAVE NOTED.  BUT FOR OUR PURPOSES, IT DOESN'T ACTUALLY MATTER.  I THINK THAT IF YOU DO TAKE JUDICIAL NOTICE OF THE FORM 4'S OR FIND THEM TO BE INCORPORATED BY REFERENCE, I DO THINK THAT YOU CAN ALSO ACCEPT AND NEED TO ACCEPT THE PURPOSE.

BUT EVEN IF YOU DIDN'T, THE PURPOSES, I THINK, JUST COMPLETELY ELIMINATE ANY POSSIBILITY THAT THESE SALES ARE SUSPICIOUS.  BUT IT'S NOT OUR BURDEN TO PROVE THAT.  SO IF YOU DECIDED I CAN'T TAKE JUDICIAL NOTICE, I CAN'T DEEM INCORPORATED BY REFERENCE OR TAKE AS TRUE THE STATEMENT THAT A SALE WAS MADE PURSUANT TO A 10B5-1 PLAN, FOR EXAMPLE, IF THE COURT CONCLUDES I CAN'T REACH THAT INFERENCE, I CAN'T ACCEPT THAT FACT, PLAINTIFF STILL WOULDN'T BE THERE BECAUSE IT'S THEIR BURDEN TO PROVE THAT THERE'S SOMETHING SUSPICIOUS ABOUT THE SALES.

AND LARGE DOLLAR AMOUNTS BY THEMSELVES ARE NOT SUSPICIOUS, EVEN LARGE PERCENTAGES BY THEMSELVES ARE NOT SUSPICIOUS, IT'S THEIR BURDEN TO COME IN HERE AND SHOW YOU THE TRADING HISTORY TO SHOW THAT IT'S OUT OF LINE WITH PRIOR PRACTICE.  THEY HAVEN'T EVEN TRIED TO DO THAT HERE BECAUSE THEY KNOW WHAT IT WOULD SHOW IF THEY DID.

THE COURT:  I TAKE THOSE ARGUMENTS THERE.

I MEAN, IN THE GLAZER CASE, I THINK THE NINTH CIRCUIT DID ALSO SAY THAT YOU COULD CREATE AN INFERENCE OF SCIENTER BY VIRTUE OF TESTIMONY THAT THE EXECUTIVES HAD ACCESS TO THE KIND OF INFORMATION THAT WOULD NECESSARILY HAVE -- ALLOWED THEM TO KNOW WHAT WAS GOING ON.  I THINK THAT'S AT 773 IN THE GLAZER CASE, THEY SAY THAT THE INFERENCE OF SCIENTER IS BOLSTERED BY PLAINTIFF'S ALLEGATIONS THAT THE EXECUTIVE HAD ACCESS TO INFORMATION ABOUT THE SALES PIPELINE AND THE STATUS OF DEALS THROUGH INTERNAL REPORTS AND QUERY A REVENUE PLATFORM TO TRACK DEALS.

I MEAN, THIS SEEMS TO SUGGEST THAT YOU DON'T NEED -- TO SATISFY THE REQUIREMENTS OF THE PSLRA, THAT YOU DON'T NEED TO SAY -- YOU DON'T NEED SOMEONE WHO SAID I PUT THIS REPORT IN THE HANDS OF THE EXECUTIVE AND SO I KNOW ON THAT BASIS THAT THEY KNEW.  I THINK YOU COULD SAY MORE GENERALLY, AND THEY WOULD SAY THAT'S WHAT THEY HAVE DONE HERE, THEY SAID THAT THE INFORMATION WAS PROVIDED IN INTERNAL REPORTS SO THAT THEY WOULD NECESSARILY HAVE HAD THAT INFORMATION.

MR. GIBBS:  THIS IS A POINT OF CONTENTION.

I DON'T AGREE WITH THAT READING.  THE LANGUAGE THAT YOUR HONOR JUST QUOTED FROM THE GLAZER OPINION SAYS THE INFERENCE OF SCIENTER CAN BE BOLSTERED BY, IT DOES NOT SAY CAN BE BASED UPON.

AND IN GLAZER IN PARTICULAR, I BELIEVE THAT THE OPINION MAKES CLEAR THAT ONE OF THE KEY FACTS SUPPORTING AN INFERENCE OF SCIENTER THERE WAS THE PLAINTIFFS HAD DETAILED FACTUAL ALLEGATIONS SUPPORTING THE CLAIM THAT THERE WAS A WIDESPREAD PRACTICE UNDER PRESSURE FROM SENIOR MANAGEMENT TO KEEP DEALS IN THE PIPELINE EVEN THOUGH THEY HAD A LESS THAN FIFTY PERCENT LIKELIHOOD OF CLOSING.

AND THE DISCUSSION OF SCIENTER BEGINS WITH THE MERE FACT THAT THE SENIOR MANAGERS WERE FORCING SALES PEOPLE TO KEEP THOSE DEALS IN THE PIPELINE IS PROBABLY ENOUGH TO SUPPORT AN INFERENCE OF SCIENTER.  THE FACT THAT IT'S THEN BOLSTERED BY, AND THEY WOULD HAVE BEEN AWARE OF, THAT'S ALL WELL AND GOOD, BUT WITHOUT THE BEGINNING PART OF THAT, I DON'T THINK YOU CAN SAY ALLEGATIONS ABOUT INTERNAL REPORTS THAT MIGHT HAVE SHOWN THAT THE STATEMENTS WERE FALSE DOES NOT GET YOU THERE.

AND THERE IS NINTH CIRCUIT CASE LAW, PARTICULARLY THE LIPTON DECISION WHICH MAKES CLEAR THAT IF YOUR SCIENTER ALLEGATIONS ARE BASED ON INTERNAL REPORTS, YOU HAVE TO PROVIDE SOME DETAIL ABOUT THE CONTENT OF THOSE REPORTS.

AND SO I THINK THE LANGUAGE YOUR HONOR READ FROM GLAZER IS

TALKING ABOUT BOLSTERING AN INFERENCE THAT'S ALREADY IN PLACE, GIVEN OTHER VERY DETAILED FACTS.  I DON'T THINK THAT'S WHERE WE ARE HERE.

THE COURT:  OKAY.

AND QUICKLY, MAYBE JUST ONE MINUTE ON LOSS CAUSATION IF YOU WANT.

MR. GIBBS:  SURE.  I WILL.

SO HERE -- SO FIRST OF ALL, LOSS CAUSATION HAS TO BE PLED WITH PARTICULARITY, WE CITED NINTH CIRCUIT CAUSE LAW ON THAT. AND SO HERE, THEY NEED TO PLEAD PARTICULARIZED FACTS SHOWING THAT WHATEVER WORD YOU WANT TO USE TO DESCRIBE THE ECONOMIC SITUATION THAT THE COMPANY DISCLOSED IN NOVEMBER OF '21, WAS CAUSED BY A SUDDEN DROP OFF IN CHEATING BECAUSE STUDENTS HAD GONE BACK TO CAMPUS.

THE COMPANY GAVE AN ALTERNATIVE EXPLANATION, IT'S LAID OUT IN THE BRIEFING AND PLAINTIFFS HAVE NOT ALLEGED ANY FACTS, MUCH LESS PARTICULARIZED FACTS, THAT UNDERMINE OR CAST ANY DOUBT ON THAT ACCUSATION.

WE HAVE CITED CASES THAT NOTE THAT AND USE THAT AS A BASIS FOR DISMISSING ON LOSS CAUSATION GROUNDS.  THERE ARE NO PARTICULARIZED FACTS HERE SUPPORTING AN INFERENCE THAT THE ECONOMIC SITUATION THAT PRECEDED THE STOCK DROP WAS CAUSED BY SOME SIGNIFICANT DROP OFF IN CHEATING BECAUSE STUDENTS HAD RETURNED TO CAMPUS, AND THAT KILLS THEIR LOSS CAUSATION ARGUMENT.

THE COURT:  THANK YOU.  I WILL HEAR FROM PLAINTIFFS.

MR. GIBBS:  THANK YOU, YOUR HONOR.  I APPRECIATE YOUR PATIENCE.

MR. MORIARTY:  MAY IT PLEASE THE COURT, CHRISTOPHER MORIARTY OF BEHALF OF THE LEAD PLAINTIFFS.

YOUR HONOR, THIS CASE ISN'T JUST ABOUT SECURITIES FRAUD, THIS CASE IS ABOUT ACADEMIC INTEGRITY.  THIS IS ABOUT A COMPANY THAT SYSTEMATICALLY SOUGHT TO SUBVERT THE EDUCATIONAL SYSTEM IN THIS COUNTRY IN ITS QUEST FOR PROFITS.

ITS MISCONDUCT HAS BECOME SO PREVALENT THAT STUDENTS USE THE TERM "CHEGGING" TO DESCRIBE USING THIS COMPANY'S PLATFORM TO CHEAT ON EXAMS.  THE SOCIETAL IMPLICATION OF HOLDING CHEGG TO ACCOUNT EXTEND FAR BEYOND THE SECURITIES LAWS HERE.

IT FEELS LIKE YOUR HONOR READ A LOT OF MY OUTLINE WITH THE QUESTIONS YOU ASKED TODAY, SO I AM HOPING I CAN CUT THROUGH ON A LOT OF WHAT I WAS GOING TO SAY AND FOCUS ON A FEW EXAMPLES.

I THINK YOU ARE ABSOLUTELY SPOT ON WHEN YOU DISCUSS THE RELEVANT PLEADING STANDARDS HERE, THEY FOCUS HEAVILY ON SILICON GRAPHICS, A CASE FROM THE CLINTON ERA, WHILE IGNORING A LOT OF THE RECENT NINTH CIRCUIT AUTHORITY THAT PREDATES THE BRIEFING IN THIS CASE, LIKE THE FACEBOOK, MR. GIBBS'S NVIDIA CASE FROM THE NINTH CIRCUIT RECENTLY, GLAZER --

THE COURT:  I MEAN, BUT ADDRESS THE POINT THAT I SORT OF RAISED.  YOU KNOW, LET'S TAKE -- LET'S SAY THAT YOU'VE PLEADED PARTICULAR FACTS THAT SUGGEST THAT THERE WAS CHEATING

HAPPENING ON THE PLATFORM.  WHAT PARTICULAR FACTS DEMONSTRATE THAT IT WAS THIS CHEATING ON THE PLATFORM THAT RESULTED IN -- THAT CREATE A PLAUSIBLE INFERENCE THAT THAT CHEATING WAS THE CAUSE OF THE GROWTH DURING THAT TIME PERIOD?

MR. MORIARTY:  YOUR HONOR, I THINK THE BEST WAY TO LOOK AT THAT IS WHAT DID OTHER PEOPLE SAY?  WHAT DID *FORBES* SAY?  *FORBES* SAID AS SOON AS STUDENTS GO BACK TO SCHOOL, THEY CAN'T USE CHEGG TO CHEAT ANYMORE.  MORGAN STANLEY SAID THE SAME THING.

WE PROVIDED YOU -- AND IF YOU TAKE A LOOK AT THE DEMONSTRATIVE, THOSE ACCOUNTS FROM UNIVERSITY PERSONNEL.  THESE AREN'T JUST ANECDOTES, THESE ARE CONSISTENT ACCOUNTS.

THE COURT:  BUT AGAIN, THOSE ALL GO TO WHETHER THE SYSTEM IS BEING USED FOR CHEATING, THEY DON'T GO TO THE QUESTION THAT I THINK THAT THEIR CLAIM IS, THAT YOU -- OBVIOUSLY THEY CHALLENGE THAT TO SOME EXTENT, BUT THE THEORY OF THE CASE IS THAT THE EXPLOSIVE GROWTH OF CHEGG FROM THE START OF THE PANDEMIC THROUGH -- UNTIL Q3 2021, WAS CAUSED BY THE AVAILABILITY OF THE SYSTEM TO BE USED FOR CHEATING.

AND SO IT'S -- AGAIN, YOU KNOW, YOU'VE PUT A LOT OF FACTS THAT DEMONSTRATE THAT THERE WAS CHEATING HAPPENING ON THE PLATFORM, BUT HOW DO I DRAW THE CONNECTION BETWEEN THAT AND THE GROWTH OF THE PLATFORM DURING THAT TIME PERIOD, WHICH AS THEY NOTE CONTINUED AFTER SEPTEMBER 2021, IN A WAY THAT IS THE FIRST POINT WE HAVE TO GET TO BEFORE WE THEN THINK ABOUT THE

STATEMENTS THAT WERE MADE ABOUT THAT.

MR. MORIARTY:  YOUR HONOR, THERE'S A COUPLE OF POINTS IN THERE.

AND I'M GOING TO TAKE THAT POINT YOU SAID ABOUT WHAT HAPPENED AFTER THE CLASS PERIOD FIRST, IF I MAY.

THAT'S NOT IN THE COMPLAINT, THAT'S NOT SUBJECT TO JUDICIAL NOTICE.  EVEN IF IT WAS, IT'S CERTAINLY NOT SUBJECT TO JUDICIAL NOTICE FOR THE TRUTH OF THE MATTER THEY ASSERTED. WHAT HAPPENED MONTHS AND YEARS AFTER THE END OF THE CLASS PERIOD WITH CHEGG SUBSCRIBERS IS ANYBODY'S GUESS.

THE COURT:  I MEAN, I'M SAYING PRESUMABLY, YOU KNOW, THERE ARE CERTAIN THINGS THAT PROBABLY ARE SUBJECT TO -- YOU ARE NOT GOING TO CHALLENGE, THE VALUE OF THE STOCK AT A PARTICULAR POINT, RIGHT, THAT'S SUBJECT TO JUDICIAL NOTICE AT ANY POINT.

MR. MORIARTY:  THE VALUE OF THE STOCK THAT NEVER RECOVERED.  SO I THINK WE HAVE TO BEAR THAT IN MIND AS WELL.

AND I DID WANT -- I WANT TO TURN BACK TO YOUR OTHER POINT ABOUT THE CHEATING.  LOOK AT THE FORMER EMPLOYEE ACCOUNTS, WE'VE GOT EIGHT OF THEM.  ONE OF THEM SAID THAT -- LET ME GIVE YOU THE QUOTES, BECAUSE I DON'T WANT TO MISSTATE ANYTHING.  I'M JUST GOING TO GIVE YOU A COUPLE OF THEM HERE.

WE'VE GOT FORMER EMPLOYEES 1, 2 AND 3, THOSE ARE THE THREE I WOULD FOCUS ON.  THEY SAY THAT IT WAS CRACKING DOWN ON ACCOUNT SHARING IS WHAT DROVE THE PROGRAM.  FORMER EMPLOYEES

SAY THAT WAS ABSOLUTELY NOT THE CASE.  AND I THINK THE KEY THING HERE, YOUR HONOR, WHEN YOU LOOK AT THESE FORMER EMPLOYEE ACCOUNTS, THEY ALL CORROBORATE EACH OTHER.  THEY ALL CORROBORATE WHAT WE SAW IN THE FOIA DOCUMENTS IN UNIVERSITIES FROM NORTH TO SOUTH AND EAST TO WEST, THEY ALL CORROBORATE WHAT THESE PROFESSORS WERE SAYING, SO I DO THINK WE'VE SHOWN --

THE COURT:  AGAIN, THE PROFESSORS IN THE UNIVERSITIES AREN'T -- THEY ARE IN A POSITION TO KNOW WHETHER IT'S BEING USED FOR CHEATING, THEY ARE CERTAINLY NOT IN A POSITION TO KNOW WHETHER IT IS CHEATING AS OPPOSED TO THE GENERAL CONDITIONS OF AT-HOME LEARNING, YOU KNOW, THE PANIC ABOUT CHILDREN FALLING BEHIND AND STUDENTS FALLING BEHIND, THAT I CERTAINLY KNOW MOST PARENTS, IF NOT STUDENTS THEMSELVES, EXPERIENCED AT THE ONSET OF IN-HOME LEARNING WHEN THE PANDEMIC STARTED, AND YOUR BURDEN IS TO PLEAD WITH PARTICULARITY, FACTS THAT DRAW THAT CONNECTION THAT MAKE THAT POINT, RIGHT.

SO I THINK WHAT IS IT IN THE FORMAL -- THE ACCOUNTS FROM FORMER EMPLOYEES THAT SUPPORT THE CLAIM -- THE CONCLUSION NOT JUST THAT THERE IS CHEATING HAPPENING AND PERHAPS THE COMPANY IS MINIMIZING IT, PERHAPS THE COMPANY IS NOT ADEQUATELY RESPONDING TO IT, YOU KNOW, AND IF THE CASE HERE WERE PREMISED ON STATEMENTS THAT THERE IS NOT CHEATING ON THE PLATFORM, YOU KNOW, IF ONE OF THEIR EXECUTIVES HAD MADE THAT FLAT OUT, CHEATING HAS NEVER OCCURRED, OUR PLATFORM HAS NEVER BEEN USED TO CHEAT, AND YOU HAD THIS INFORMATION, THAT WOULD BE YES, I

THINK YOU WOULD HAVE, AT LEAST FOR PURPOSES OF PLEADING PARTICULAR FACTS GIVING RISE TO A REASONABLE INFERENCE, I THINK YOU WOULD HAVE SATISFIED THAT.

BUT YOUR THEORY IS NOT THAT.  YOUR THEORY IS THAT IT WAS THIS CHEATING THAT WAS DRIVING THIS GROWTH, AND I NEED SOMETHING IN PARTICULAR FACTS THAT CONNECTS THAT.

MR. MORIARTY:  SURE.

SO YOUR HONOR, I WOULDN'T BE SO QUICK TO DISCOUNT THE VALUE OF THESE UNIVERSITY PERSONNEL BECAUSE IF YOU LOOK AT OUR EXHIBIT, THEY ARE SAYING THAT THINGS ALONG THE LINES OF, BASICALLY ALL OF THE STUDENTS ARE USING CHEGG TO CHEAT.

SO IF ALL OF THE STUDENTS ARE USING CHEGG TO CHEAT, THAT HAS TO BE DRIVING REVENUES.  I DON'T THINK THAT'S A CONTROVERSIAL POINT.  BUT THEN WHEN WE LOOK TO THE FORMER EMPLOYEES AS WELL, THEY DISCOUNT CHEGG'S EXPLANATION AS THE LIMITING ACCOUNT SHARING THAT IS WHAT'S RESPONSIBLE FOR DRIVING GROWTH.

AND SO AT THE VERY LEAST, I THINK THERE'S AN ISSUE OF DISPUTED MATERIAL FACT HERE THAT WOULD BE APPROPRIATE TO RESOLVE ON A MOTION TO DISMISS.

THE COURT:  AGAIN, I'M STILL -- THERE SEEMS TO BE A HOLE.  SO YOUR BEST CONNECTOR TO PEOPLE IS THAT THEY MADE AN EXPLANATION THAT DOESN'T HOLD WATER?  IS THAT YOUR BEST SORT OF CONNECTION TO SAY SPECIFICALLY THAT IT WAS THIS CHEATING, NOT REDUCING ACCOUNT SHARING OR THE GENERAL CIRCUMSTANCES OF A

PANDEMIC THAT CONNECT THE CHEATING THAT WAS HAPPENING, I THINK YOU'VE ESTABLISHED THAT, TO THE GROWTH DURING THE PANDEMIC.

MR. MORIARTY:  SO I THINK THERE'S TWO KEY WORDS HERE, HOLISTICALLY AND CORROBORATIVE.  WE'VE GOT THE ALLEGATIONS FROM EXTREMELY WELL PLACED FORMER EMPLOYEES WHO MAKE THE DIRECT LINK THAT I THINK YOUR HONOR IS LOOKING FOR.  BUT WE ALSO HAVE ALL OF THAT CORROBORATED BY EVERYTHING ELSE.  WE HAVE THE ANALYSTS, WE HAVE *FORBES*, THEY ARE ALL SAYING THE SAME THING.

THE COURT:  I MEAN, I GUESS THE ANALYST IN *FORBES*, IT'S PRETTY -- I DON'T KNOW, AGAIN, THEY ARE LOOKING AT IT FROM THE OUTSIDE, THEY ARE SPECULATING, UNLESS THERE'S SOME REASON TO THINK THEY LOOKED AT THE BOOK, DID THEY EXAMINE ALL THE INTERNAL BOOKS AND RECORDS AT THE COMPANY BEFORE THEY ISSUED THOSE STATEMENTS?  I COULDN'T SAY ONE WAY OR THE OTHER, THAT WOULD BE SOMETHING WE WOULD PROBABLY LOOK TO SUBPOENA THEM FOR IF THE CASE PROCEEDS INTO DISCOVERY.

COURTS REGULARLY CREDIT NEWSPAPER REPORTS, ANALYST REPORTS, THESE ARE PEOPLE IN POSITIONS -- THEY ARE REPUTABLE PUBLICATIONS, SO I WOULDN'T BE IN A RUSH TO DISCOUNT THEM TOO MUCH.

BUT AGAIN, ARE THEY SAYING THE SAME THING EVERYBODY ELSE IS SAYING?  ARE THEY SAYING THE SAME THING THE FORMER EMPLOYEES ARE SAYING?  ARE THEY SAYING THE SAME THING THAT THE UNIVERSITY PERSONNEL ARE SAYING?  AND YOUR HONOR, WE LOOKED AT THIS OURSELVES, MY COLLEAGUES LOOKED TO THIS, WE WENT ON THEIR

ARCHIVES AND LOOKED AT IT, AND WE TOOK A REALLY CONSERVATIVE APPROACH.  I KNOW THEY DON'T LIKE HOW WE DID IT, BUT WE USED RANDOM NUMBER GENERATORS.  WE PULLED OUT EXAMPLES, AND WE SAW AT LEAST A QUARTER OF THE EXAMPLES WE SAW WERE BLATANT INDICIA OF CHEATING.  SO THAT AGAIN SHOWS --

THE COURT:  YOU KNOW, I THINK IF WE DIDN'T HAVE THE PSLRA, WE WOULD BE IN A DIFFERENT STANDARD HERE.

AND YOU KNOW, I THINK WHAT I'M STRUGGLING WITH IS THE REQUIREMENT FOR PARTICULAR FACTS THAT DRAW THE CONNECTION, AND YOU KNOW, THAT'S -- TO BE PERFECTLY FRANK, I THINK THAT'S THE HARD PART, AND UNDERSTANDING THAT THERE'S A LIMIT ON WHAT YOU ARE ABLE TO DO AS SOMEONE OUTSIDE THE COMPANY SEEKING TO HOLD THE COMPANY LIABLE FOR PURPORTED MISREPRESENTATIONS.

BUT THE COURT -- YOU KNOW, CONGRESS HAS SAID THAT WE NEED PARTICULARIZED FACTS, AND ON THE THEORY HERE OF FALSITY, WHICH IS THE THEORY ABOUT THE SOURCE OF THE COMPANY'S GROWTH DURING THIS TIME PERIOD.

MR. MORIARTY:  SO I THINK A POINT TO KEEP IN MIND WITH THIS, YOUR HONOR, IS THE PARTICULARITY STANDARD AND FALSITY AS YOU DISCUSSED WITH MR. GIBBS, IS LOWER THAN SCIENTER.  THE QUESTION IS --

THE COURT:  I MEAN, IT'S THE SAME PARTICULARITY STANDARD, RIGHT, IT'S JUST HOW STRONG THE INFERENCE THAT'S DRAWN FROM THEM IS.  I THINK THAT'S THE DIFFERENCE.  THAT'S A STRONG SCIENTER, WE NEED A STRONG INFERENCE, WHEREAS JUST A

REASONABLE INFERENCE, THE SMALLER IQBAL TWOMBLY STANDARD APPLIES.

MR. MORIARTY:  YOU JUST HIT THE NAIL ON THE HEAD, I WAS JUST ABOUT TO SAY, YOUR HONOR JUST NEEDS TO ASK YOURSELF, ARE THERE FACTS SUFFICIENT TO SUPPORT A REASONABLE BELIEF?

THE COURT:  WELL NO, THAT'S THE IQBAL TWOMBLY STANDARD AND I NEED PARTICULARIZED FACTS, WHICH IS A DIFFERENT STANDARD.

THAT'S THE PROBLEM.  I MEAN, IT'S AN ODD STANDARD.  IT'S TRYING TO FIGURE OUT WHAT THAT MEANS IN THIS -- IT'S A LITTLE BIT, I DON'T KNOW, IT'S A STRANGE WORD.

MR. MORIARTY:  I CAN TELL YOU WHAT IT MEANS, IT'S REGULARLY HELD TO MEAN WOULD A REASONABLE INVESTOR RECEIVE A MISLEADING IMPRESSION FROM THE STATEMENTS MADE?

AND HERE, WHY DON'T WE JUXTAPOSE WHAT THE DEFENDANTS SAID. THINGS LIKE, IT'S ONLY A TINY FRACTION OF CHEATING ON THE PLATFORM, BUT WHAT DO ALL THE FACTS THAT WE'VE ALLEGED SHOW? AND I THINK THAT REALLY GETS US THERE.

THE COURT:  OKAY.

WHAT ABOUT THEIR CLAIM THAT YOU HAVEN'T ADEQUATELY PLEADED SCIENTER, WHICH YOU ACKNOWLEDGE IS SUBJECT TO A HIGHER STANDARD, YOU NEED TO -- THERE NEEDS TO BE A STRONG INFERENCE CREATED HERE, AND THEY HAVE MADE -- I DO THINK THAT -- IF IT'S BEFORE ME, WHICH IS A QUESTION WE HAVE TO DECIDE, BUT THEY CERTAINLY MAKE AN ARGUMENT THAT THE STOCK SALES ARE NOT

PARTICULARLY HELPFUL IN TERMS OF THINKING ABOUT THAT.

MR. MORIARTY:  SURE.

SO LET'S JUST TAKE A STEP BACK.

AND THIS STOOD OUT TO ME, MR. GIBBS'S ARGUMENT, HE SAID WE HADN'T PLEADED THAT THEY KNOWINGLY MISLEAD SHAREHOLDERS.

THAT'S NOT THE STANDARD, DELIBERATE RECKLESSNESS IS THE STANDARD, KNOWLEDGE WOULD OF COURSE SATISFY THAT AS WELL.

THE KEY POINT, YOUR HONOR, FOR ADDRESSING SCIENTER, IS A COMPARATIVE INQUIRY BETWEEN PLAINTIFF'S FRAUDULENT INFERENCE AND DEFENDANT'S NON-CULPABLE INFERENCE.  AND IF THERE ARE INEQUITIES, PLAINTIFFS WIN, THAT'S BLACK LETTER LAW UNDER TELLABS.

AND WHEN YOU LOOK AT THE SCIENTER REQUIREMENTS, IT'S REALLY IMPORTANT YOU LOOK AT THEM WITH A COMMON SENSE PERSPECTIVE.  ON THEIR DEMONSTRATIVE, THEY HAVE A CASE CALLED NGUYEN, AND DO YOU KNOW WHAT THAT CASE SAYS?  IT SAYS SCIENTER ALLEGATIONS SHOULD BE VIEWED FROM "A PRACTICAL AND COMMON SENSE PERSPECTIVE."

THE ISSUE FOR YOUR HONOR IS DO THESE ALLEGATIONS MAKE SENSE FROM A COMMON SENSE PERSPECTIVE?  THAT NGUYEN CASE ALSO SAYS THE PSLRA NEITHER "ALLOWS NOR REQUIRES US TO CHECK OUR DISBELIEF AT THE DOOR."

PLAINTIFFS DON'T HAVE TO PLEAD ONE SPECIFIC SMOKING GUN UNDER TELLABS THAT DEMONSTRATES SCIENTER, IT'S HOLISTIC.  SO THEY FOCUS A LOT ON STOCK SALES, STOCK SALES IS JUST ONE OF

MANY ALLEGATIONS.  LET ME GIVE YOU A GOOD EXAMPLE.

FALL 2020, THE DIRECTOR AT TEXAS A&M E-MAILS ROSENSWEIG DIRECTLY TO COMPLAINT ABOUT CHEATING.  NOW THEY SAY WELL, WE DON'T KNOW IF HE READ HIS E-MAIL, WE DON'T KNOW IF SOMEONE ELSE RESPONDED, ARE YOU NUTS?  THAT'S NOT REALLY PROPERLY BEFORE US TODAY, BUT IT DOESN'T MATTER ANYWAY BECAUSE THE ISSUE IS DID HE HAVE ACCESS TO INFORMATION THAT IS CONTRARY TO WHAT HE'S SAYING IN PUBLIC.

WHAT DOES HE SAY IN PUBLIC AFTER HE RECEIVES THAT E-MAIL? HE GOES AROUND SAYING THAT IT DOESN'T MATTER TO CHEGG'S GROWTH IF STUDENTS ARE REMOTE OR IF THEY ARE IN CLASSROOMS.  HE SAID THE LIMITING ACCOUNT SHARING WAS MORE THAN ANYTHING ELSE WHAT DROVE GROWTH.

AND AGAIN, THIS IS CONSISTENT WITH THE FORMER EMPLOYEE ACCOUNTS.  FORMER EMPLOYEE 1 WAS IN MEETINGS WITH ROSENSWEIG WHERE CHEATING WAS DISCUSSED.  CORROBORATIVE.

WE ALSO HAVE A *FORBES* ARTICLE THAT WAS DISTRIBUTED COMPANY-WIDE WHERE CHEATING IS DISCUSSED, AND THAT *FORBES* ARTICLE SAYS THAT 42 OUT OF 46 STUDENTS INTERVIEWED ADMITTED THEY USED CHEGG FOR CHEATING.  AGAIN, ACCESS TO INFORMATION, THAT WAS PROVIDED TO ALL OF THEM.

THE COURT:  AND AGAIN, I MEAN, WHAT WE PROBABLY HAVE IS THAT THERE IS STILL A BLACK HOLE, RIGHT.  THIS IS -- I THINK, AGAIN, YOU'VE CERTAINLY CREATED A STRONG CASE THAT IF THE STATEMENT HAD BEEN MADE, CHEATING IS NOT HAPPENING ON

CHEGG, THAT THERE WAS -- THAT WAS NOT ONLY A FALSE STATEMENT BUT ALSO A STATEMENT THAT WE WOULD DRAW A -- THERE'S A STRONG INFERENCE OF KNOWLEDGE OF ITS FALSITY OR AT LEAST RECKLESS INDIFFERENCE TO ITS TRUTH.

BUT HERE, THE SEPARATE QUESTION ABOUT THE SOURCE OF GROWTH.  AND AGAIN THAT'S -- IT'S A DISTINCT QUESTION.  AND IT'S POSSIBLE, CERTAINLY, THAT THEY DID -- THAT THERE WAS CHEATING HAPPENING, THAT THEY WERE MAYBE NOT ADEQUATELY CONCERNED ABOUT IT, BUT THAT THE ULTIMATE GROWTH OF THE COMPANY WAS -- MAYBE THEY WERE BEING OVERLY OPTIMISTIC, BUT MAYBE SOMETHING NOT RISING TO THE LEVEL OF RECKLESSNESS IN TERMS OF THINKING THAT THERE WAS ALL THESE OTHER MILLIONS OF PEOPLE, NUMBERS-WISE, WHO THEY WEREN'T HEARING ABOUT CHEATING ALLEGATIONS FROM.

I MEAN, I GUESS YOUR STRONGEST POINT IS THIS PURPORTED *FORBES* ARTICLE; IS THAT RIGHT?

MR. MORIARTY:  I THINK *FORBES* IS JUST ONE OF THE MANY ALLEGATIONS THAT CAN BE CONSIDERED HOLISTICALLY.

LET'S BE CLEAR ON WHAT THEY SAID, THEY SAID TINY FRACTION, THEY SAID THIS TO THE MARKET, THEY SAID THIS TO ANALYSTS. ANALYSTS RELIED ON THIS.  ANALYSTS ACCEPT THIS TO BE TRUE.

THE COURT:  I MEAN, THERE IS A PROBLEM.  THE POINT IS THERE AREN'T PARTICULARIZED ALLEGATIONS IN THE COMPLAINT ABOUT, OTHER THAN THE ANALYSIS YOU'VE TAKEN, WHICH IS LIMITED IN WHAT IT -- IT DOESN'T REALLY SPEAK TO USERS AT ALL, I DON'T THINK,

IT SPEAKS TO A CERTAIN PERCENTAGE OF QUESTIONS.  THAT EXPERT Q&A, IT DOESN'T PROVIDE THE DENOMINATOR THAT WE ARE OPERATING ON, RIGHT.  WE DON'T HAVE PARTICULARIZED ALLEGATIONS ABOUT THAT DENOMINATOR OTHER THAN WHAT THEY DISCLOSED IS THEIR TOTAL SUBSCRIBER BASE.

MR. MORIARTY:  SO AGAIN, YOUR HONOR, I THINK WE ARE GETTING CLOSE TO RAISING THE PLEADING PARTICULARITY STANDARD TO AN INSURMOUNTABLE HURDLE STANDARD, WHICH IS NOT THE CASE.  AS I SAY, IT'S WOULD A REASONABLE INVESTOR HAVE TAKEN -- WOULD THEY HAVE BEEN MISLEAD BY THESE STATEMENTS?

THE COURT:  THAT'S THE ULTIMATE STANDARD, RIGHT, THAT'S NOT THE QUESTION OF PARTICULARITY, WHICH IS THE ISSUE HERE, THAT'S THE ULTIMATE IN LIABILITY FOR THE STATEMENT.  I DON'T KNOW THAT THAT GOES TO WHAT YOU HAVE TO PLEAD IN ORDER TO MOVE FORWARD TO TRY AND PROVE THAT, RIGHT?

MR. MORIARTY:  RIGHT.

THE COURT:  THOSE ARE DISTINCT.

MR. MORIARTY:  SURE.

THE COURT:  OKAY.

WHAT ABOUT LOSS -- WHAT ABOUT THEIR ARGUMENT ABOUT LOSS CAUSATION?  IT SEEMS LIKE YOUR BEST RESPONSE IS THAT ANALYSTS ON THE OUTSIDE SAID THAT THIS WAS THE CAUSE, AND THAT'S KIND OF WHERE WE ARE.

MR. MORIARTY:  WELL YOUR HONOR, I WOULDN'T SAY IT WAS MY BEST ONE, IT'S ONE OF MY ARGUMENTS.

I WOULD SAY THAT THE NINTH CIRCUIT HAS MADE CLEAR THAT IT'S A FACT INTENSIVE INQUIRY THAT'S BEST RESOLVED BY THE TRIER OF FACT.  THE NINTH CIRCUIT IN <u>FIRST SOLAR</u> MADE CLEAR THAT THERE'S A VARIETY OF WAYS TO PLEAD LOSS CAUSATION.  AND IN THIS CASE, WE HAVE PLEADED IT THE WAY IT'S PLEADED IN NUMEROUS SECURITIES FRAUD CASES.

YOU KNOW, AND THEY TAKE ISSUE WITH IT'S ANALYST SPECULATION.  IT'S NOT JUST ANALYST SPECULATION, *FORBES* SAID THE SAME THING, AND MORGAN STANLEY, CORROBORATIVE.

SO AT VERY BEST, THERE'S A DISPUTE OF FACT HERE THAT WOULD MAKE RULING ON THIS IMPROPER AT THIS STAGE.

THE COURT:  I GUESS WHAT I'M TRYING TO -- WE ARE IN AN ODD SITUATION HERE, CORRECT, BECAUSE THE EASIEST FORM OF THIS QUESTION IS, YOU KNOW, THERE ARE REPRESENTATIONS TO SOME END AND THEN THERE IS A SUBSEQUENT REVELATION CONTRARY TO THAT --

MR. MORIARTY:  SURE.

THE COURT:  -- THAT THE OPPOSITE IS TRUE.

MR. MORIARTY:  YEAH.

THE COURT:  AND THAT WE CAN DRAW LOSS CAUSATION, IF STOCK PRICE DROPS AFTER THAT REPORT COMES OUT, THAT'S NOT THE WORLD WE ARE IN HERE, RIGHT?  THEY DIDN'T SAY IN SEPTEMBER 2021, OH, CHEATING WAS RAMPANT AND DRIVING OUR GROWTH.  WHAT HAPPENED IN 2021 IS THEY CHANGED THEIR REVENUE PREDICTIONS BECAUSE THEY HAD A SLOW DOWN IN SUBSCRIBER GROWTH,

RIGHT?

SO THAT'S THE ISSUE, SO WE CAN'T RELY JUST ON THE CHANGE IN STOCK PRICE AND THE DISCLOSURE AT THAT TIME TO INFER LOSS CAUSATION FROM THE PURPORTED MISSTATEMENTS, RIGHT?  AND THAT'S THE CONNECTION I HAVE TO MAKE -- THAT WE HAVE TO MAKE FOR PURPOSES OF THIS MOTION.

MR. MORIARTY:  YOUR HONOR, IF THE STANDARD WAS -- IF THEY CAME OUT AND ABSOLUTELY CORRECTED IT WORD-FOR-WORD, WE WOULDN'T HAVE ANY SECURITIES FRAUD CASES BECAUSE DEFENDANTS DON'T DO THAT.  IT'S THE MARKET THAT ANALYZES WHAT'S HAPPENED. AND IN THIS CASE, DEFENDANTS ARE SAYING, AND I QUOTE, THE REASON THE STOCK DROPPED WAS "SIGNIFICANTLY FEWER ENROLLMENTS THAN EXPECTED THIS SEMESTER."  ANALYSTS DISCREDIT THAT.

FIRST OFF, IT'S AN IMPROPER COUNTERFACTUAL OF WITH WHY THEY DID IT.  WE NEED TO LOOK AT WHAT DID PLAINTIFFS PLEAD. THE ANALYSTS SAID, "THE ENROLLMENT EXCUSE MAKES NO SENSE."  SO WE HAVE AN OBJECTIVE NONPARTY TO THIS SAYING THAT THE VERY ARGUMENT THEY ARE MAKING ON LOSS CAUSATION MAKES NO SENSE.

AGAIN, I APPRECIATE THIS IS THE PSLRA, BUT IT HAS NO -- THE PSLRA IN NO WAY CHANGES THE STANDARDS ABOUT WHO GETS THE BENEFITS OF THE INFERENCE AT THE MOTION TO DISMISS STAGE.

LOSS CAUSATION ISSUES, THAT'S SOME OF THE MOST HOTLY LITIGATED ISSUES IN SECURITIES FRAUD CASES, AND THEY ARE EXPERT ISSUES, GENERALLY.

THE COURT:  OKAY.

I DO HAVE ANOTHER MOTION PENDING, SO ANYTHING ELSE YOU WOULD LIKE TO CLOSE UP BEFORE WE --

MR. MORIARTY:  I THINK THERE'S JUST ONE KEY PRINCIPLE WE NEED TO BEAR IN MIND WHEN WE CONSIDER THE MOTION TODAY, AND THAT'S THE NINTH CIRCUIT'S COMMAND THAT PLAINTIFF NEED NOT PROVE ITS CASE AT THE OUTSET.  WE HAVE TO PROVIDE THE NARRATIVE OF FRAUD AND FACTS WHICH, IF TRUE, SUBSTANTIATE AN EXPLANATION AT LEAST AS PLAUSIBLE AS A NON FRAUDULENT INFERENCE.

I WOULD ENCOURAGE YOUR HONOR TO LOOK AT THE GLAZER AND THE FACEBOOK AND NVIDIA CASES THAT POSTDATE THE BRIEFING IN THIS CASE, THEY WILL SHOW YOU THE STANDARDS REALLY MUCH BETTER THAN I CAN DO STANDING IN FRONT OF YOU TODAY.  AND I THINK ONCE YOU'VE READ THEM, AND YOU LOOK AT THIS COMPLAINT HOLISTICALLY AND YOU LOOK AT THE LEVEL OF CORROBORATION, THE LEVEL OF DETAIL, THE RELIABILITY OF THESE ACCOUNTS, THEN THE PLAINTIFFS HAVE MORE THAN MET THEIR BURDEN.

THE COURT:  LET ME ASK ONE FINAL QUESTION.

YOU KNOW, WOULD YOU -- I KNOW WE HAVE SORT OF BEEN THROUGH VARIOUS VERSIONS OF THIS COMPLAINT, I THINK, CORRECT?  THERE'S BEEN -- PRIOR TO MY BECOMING INVOLVED, THERE WAS A DESIGNATION, WE CONSOLIDATED AND ISSUED -- THERE WAS A CONSOLIDATED COMPLAINT; IS THAT RIGHT?

MR. MORIARTY:  SO IT MIGHT BE EASIER TO KIND OF EXPLAIN HOW IT WORKS.

A PLAINTIFF FILES WHAT WE CALL A SORT OF BARE BONES

COMPLAINT UNDER THE PSLRA, AND THEN MOVANTS HAVE 60 DAYS TO MOVE TO SERVE AS LEAD PLAINTIFF.  AND THE COURT, JUDGE DAVILA APPOINTED KBC, AND POMPANO AS LEAD PLAINTIFFS, AND THIS IS THEIR FIRST COMPLAINT.

SO THIS IS REALLY THE FIRST COMPLAINT IN THE ACTION.  THE ONE THAT WAS FILED BY MR. LEVENTHAL WHO IS ON THE COMPLAINT, HE HAS NO ROLE IN THIS CASE, THAT WAS JUST TO GET THE PROCESS STARTED.  THIS IS THE FIRST PROPER COMPLAINT.

THE COURT:  OKAY.  SO ARE THERE OTHER FACTS THAT COULD BE ADDED TO THIS COMPLAINT IF I CONCLUDE THAT YOU HAVEN'T SATISFIED THE PSLRA STANDARD?

MR. MORIARTY:  YOUR HONOR, I COULDN'T SAY, WE WOULD HAVE TO DO ANOTHER INVESTIGATION.  I DON'T THINK WE NEED TO GET THERE, BUT AGAIN, I THINK STANDING AT THE LECTERN HERE TODAY WITHOUT THE BENEFIT OF DOING ANY ADDITIONAL RESEARCH THAT MAY BE NECESSARY, IT WOULD BE PREMATURE TO SAY.  I DON'T THINK THAT'S FAIR.

THE COURT:  OKAY.

MR. MORIARTY:  THANK YOU, YOUR HONOR.

THE COURT:  I WILL GIVE TWO MINUTES TO REBUTTAL AND THEN WE WILL MOVE ON.

MR. GIBBS:  THANK YOU, YOUR HONOR.  I APPRECIATE THAT.

SO FIRST OF ALL ON THE QUESTION OF WHAT YOU CAN AND CAN'T CONSIDER AND THE SORT OF POST CLASS PERIOD ISSUE, YOU CAN

IGNORE POST Q3, YOU CAN IGNORE 2022 IF YOU ARE NOT COMFORTABLE, ALL YOU HAVE TO DO IS LOOK AT THE NOVEMBER 2021 EARNINGS RELEASE WHICH IS ALLEGED IN THEIR COMPLAINT.  YOU HAVE TO LOOK PAST THE RHETORIC THAT PLAINTIFFS USE, BUT IF YOU LOOK AT THE ACTUAL DOCUMENT ITSELF, AND IT'S REFERENCED IN OUR SLIDES, IT'S REFERENCED IN OUR BRIEFING, IT SHOWS 17 PERCENT YEAR OVER YEAR GROWTH.  THAT IS ENOUGH TO UNDERMINE THEIR ARGUMENT BOTH AS TO FALSITY AND AS TO LOSS CAUSATION.

ON THE SCIENTER POINT, JUST BRIEFLY, I DID USE KNOWINGLY AS A SORT OF CATCH ALL, I DON'T THINK THERE'S ANY MEANINGFUL DIFFERENCE BETWEEN THAT AND DELIBERATE RECKLESSNESS.  THERE'S NOTHING HERE SUGGESTING THAT ANY OF THE DEFENDANTS BELIEVED THAT THEY WERE SAYING SOMETHING FALSE OR WERE DELIBERATELY RECKLESS IN SAYING WHAT THEY SAID.

AND THE FACT THAT WE ARE TALKING ABOUT A SINGLE PROFESSOR AT A SINGLE UNIVERSITY COMPLAINING ABOUT A SINGLE TEST AND SOME STUDENTS WHO CHEATED, E-MAILING THE CEO, IT'S ABSURD TO SUGGEST THAT THAT PUTS THE CEO ON NOTICE THAT THIS MASSIVE --

THE COURT:  YOU KNOW, BUT IF *FORBES* WRITES AN ARTICLE THAT THEY TALKED TO STUDENTS, UNLIKE 42 OUT OF 46 REPORTED THEY WERE USING THE PLATFORM FOR CHEATING, IF I WERE A CEO, I WOULD BE CONCERNED ABOUT THAT.  AS A REASONABLE CEO, THAT'S OUT IN THE PUBLIC AS TO THE SOURCE, YOUR COMPANY'S IMAGE IS GOING TO BE TARNISHED BY THAT, CORRECT?

MR. GIBBS:  A HUNDRED PERCENT, BUT THAT DOESN'T MEAN

THE *FORBES* ARTICLE IS TRUE, IT DOESN'T MEAN IT'S WELL FOUNDED, IT DOESN'T MEAN *FORBES* KNOWS WHAT THEY ARE TALKING ABOUT.

*FORBES* IS IN THE BUSINESS OF SELLING MAGAZINES AND GETTING CLICKS, AND OF COURSE THEY ARE GOING TO SENSATIONALIZE A STORY LIKE THAT.

THE COURT:  WAS THERE ANY ACTION TAKEN TO CONTEND THAT THEY WERE FALSE, JUST THAT SURVEY PIECE WAS FALSELY REPORTED?

MR. GIBBS:  I'M NOT SAYING THAT *FORBES* LIED ABOUT THE PEOPLE THEY TALKED TO, I'M SAYING THERE'S NO REASON FOR THEM TO MAKE A COMPLETE INVESTIGATION, TO PRESENT A BALANCED VIEW.  I DON'T WHO THEY TALKED TO, I DON'T KNOW HOW THEY DECIDED WHO TO TALK TO.  WE ARE TALKING ABOUT 42 PEOPLE ON A PLATFORM WHERE THERE'S 4 MILLION PLUS USING THE PLATFORM.  AND YOU CANNOT JUST TAKE A REPORTER'S WORK, MAYBE A PERFECTLY FINE REPORTER, BUT THAT REPORTER IS NOT PICKING A REPRESENTATIVE SAMPLE, AND IT'S CERTAINLY NOWHERE NEAR ENOUGH PEOPLE OR A BASIS TO ASSUME WHAT'S GOING ON WITH THE COMPANY AS A WHOLE.

AND SO I JUST -- YOU KNOW, ONE ARTICLE IN *FORBES*, ONE PROFESSOR FROM AT&T -- TEXAS -- SORRY -- THESE ARE THIN LITTLE THREADS, AT MOST.  THERE'S NOTHING HERE SUBSTANTIAL, AND CERTAINLY NOTHING HERE TO SUPPORT THE STRONG INFERENCE, WHICH IS THE HIGHEST PLEADING BURDEN I'M AWARE OF IN FEDERAL LAW, THAT THIS WAS A MATTER OF FRAUD.

I'M NOT EVEN SURE THEY'VE ALLEGED PARTICULARIZED FACTS

SHOWING THAT THE STATEMENTS WERE WRONG, BUT THEY CERTAINLY HAVEN'T ALLEGED PARTICULARIZED FACTS SHOWING THAT THEY WERE KNOWINGLY WRONG.

AND I WOULD -- JUST BRIEFLY ON LOSS CAUSATION. AGAIN, *FORBES* AND MORGAN STANLEY ARE FINE INSTITUTIONS, THEY HAVE NO IDEA, NO IDEA WHAT ACTUALLY CAUSED THE COMPANY'S BUSINESS TO SLOW DOWN A LITTLE BIT, THE GROWTH TO SLOW DOWN A LITTLE BIT IN THE FALL OF 2020. THEY ARE REPORTERS, THEY ARE ANALYSTS, THEY ARE OUTSIDE THE COMPANY, THEY HAVE NO ACCESS TO THE INFORMATION THAT'S AVAILABLE TO THE EXECUTIVES WHO ARE ACTUALLY RUNNING THE ORGANIZATION.

AND WE HAVE CITED A CASE TO YOUR HONOR, IN RE OCERA THERAPEUTICS, IT'S ON PAGE 25 OF OUR OPENING BRIEF, IT'S SQUARELY ON POINT ON THIS ISSUE.

TO YOUR HONOR'S QUESTIONS TO COUNSEL ON THIS, THE COMPANY GAVE A VERY SPECIFIC EXPLANATION FOR WHAT DID CAUSE THE SLOW DOWN, AND PLAINTIFFS HAVE ALLEGED NO FACTS THAT UNDERMINE THAT EXPLANATION. THAT IS A BASIS TO DISMISS ON LOSS CAUSATION GROUNDS. THE NINTH CIRCUIT AFFIRMED A DISMISSAL ON EXACTLY THAT BASIS IN THE OCERA CASE.

SO THIS IS NOT A MATTER OF WHO GETS THE BENEFIT OF THE INFERENCE, I'M NOT ASKING YOU TO DRAW INFERENCES IN OUR FAVOR, I'M JUST SAYING THERE ARE CASES WHERE COMPANIES MAKE A DISCLOSURE THAT SOMETHING THEY SAID PREVIOUSLY IS INCORRECT AND THE FIGHT IS ABOUT WHETHER THAT WAS FRAUD OR WHETHER IT WAS

SORT OF NEW INFORMATION TO THEM.

SO I DISAGREE WITH COUNSEL THAT THAT NEVER HAPPENS.  THERE ARE LOTS OF SECURITIES CASES WHERE THE CORRECTIVE DISCLOSURE IS ACTUALLY A CORRECTION OF SOMETHING.  HERE, IT'S NOT THAT, AND GIVEN THAT FACT, THEY NEED TO PLEAD FACTS THAT LINK UP THE TWO THINGS.  BECAUSE THE COMPANY'S DISCLOSURE ABOUT WHAT HAPPENED DOESN'T ESTABLISH A PREDICATE ABOUT THAT, THEY HAVE TO FILL IN THE GAP WITH FACTS, PARTICULARIZED FACTS, AND THEY HAVEN'T DONE IT HERE.

THE COURT:  THANK YOU.  IT'S WELL BRIEFED AND WELL ARGUED.  WE WILL TAKE BOTH MOTIONS UNDER SUBMISSION AND WE WILL AIM TO GET A DECISION OUT FORTHWITH, UNDERSTANDING THAT EVERYONE IS WAITING ON THAT FOR THIS CASE TO EITHER GO AWAY OR MOVE FORWARD OR NEITHER, POTENTIALLY, DEPENDING ON WHAT I DO.

SO THANK YOU VERY MUCH.

MR. MORIARTY:  THANK YOU, YOUR HONOR.

MR. GIBBS:  THANK YOU, YOUR HONOR.

(THE PROCEEDINGS WERE CONCLUDED AT 11:09 A.M.)

**CERTIFICATE OF REPORTER**

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
SUMMER A. FISHER, CSR, CRR
CERTIFICATE NUMBER 13185          DATED: 12/13/23