# EXHIBIT A

**EFiled: Feb 17 2023 02:22PM EST**
**Transaction ID 69176352**
**Case No. 2023-0180-PAF**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRIAN STANSELL, individually and on behalf of all other similarly situated, | : : : | |
| Plaintiff, | : : | |
| v. | : : | C.A. No. _____ |
| DANIEL ROSENWEIG, RICHARD SARNOFF, RENEE BUDIG, SARAH BOND, PAUL LEBLANC, MARNE LEVINE, MARCELA MARTIN, TED SCHLEIN, MELANIE WHELAN, JOHN E. YORK, and DELOITTE & TOUCHE LLP, | : : : : : : : : : | **Original Version Filed:** **February 14, 2023** **Public Version Filed:** **February 17, 2023** |
| Defendants. | : | |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff Brian Stansell (the "Plaintiff"), on behalf of himself and similarly situated stockholders of Chegg, Inc. ("Chegg" or the "Company"), brings this Class Action Complaint asserting breach of fiduciary duty claims and/or aiding and abetting of such breaches of fiduciary duty against (i) the members of Chegg's board of directors, namely: nonemployee directors Daniel Rosenweig ("Rosenweig"), Richard Sarnoff ("Sarnoff"), Renee Budig ("Budig"), Sarah Bond ("Bond"), Paul Leblanc ("Leblanc"), Marne Levine ("Levine"), Marcela Martin ("Martin"), Ted Schlein ("Schlein"), Melanie Whelan ("Whelan"), John E. York ("York") (collectively referred to as the "Board" or "Director Defendants"); and (ii) Deloitte

& Touche LLP ("Deloitte"), in its capacity as Chegg's independent auditor. Plaintiff's allegations are based upon his own knowledge as to those facts concerning himself and otherwise upon information and belief as to allegations developed through the investigation conducted by his undersigned attorneys, including but not limited to a review of corporate books and records produced pursuant to 8 *Del. C.* § 220, news reports, documents filed with the U.S. Securities and Exchange Commission ("SEC"), and other public information.

## **INTRODUCTION**

1.      This is a direct stockholder class action brought against Chegg's Board and Deloitte in connection with material misstatements and omissions made pertaining to Chegg's primary business model when seeking the vote of Plaintiff and other members of the Class (defined below) on pertinent issues such as electing the Director Defendants and appointing Deloitte as the independent auditor, who are the breaching parties. As detailed herein, each of the Defendants violated applicable law by directly breaching and/or abetting the Director Defendants' breaches of their fiduciary duties owed to Plaintiff and the Class, including their duties of disclosure and loyalty in connection with these material misstatements and omissions.

2.      Chegg is a provider of online research tools, tutoring services, textbook rentals and other educational resources and touts itself to be a "leading student-first interconnected learning platform." In reality, Chegg's business model revolves

around the business of selling textbook, exam, and homework answers, through its service called "Chegg Study." It does not seek permission from appropriate copyright holders prior to publishing these answers and infringes on copyright protections, including rights of production, preparation of derivative works, and distribution, and it has been embroiled in cheating scandals across colleges and universities in the United States.

3.     Instead of making appropriate disclosures about the true state of Chegg's business, the Board misled Plaintiff and the Class by knowingly omitting material facts about Chegg's primary business model in the proxy soliciting votes for the election of the directors and the appointment of Deloitte. For instance, in the proxy statement dated April 14, 2022 filed for the 2022 Annual Stockholder meeting ("2022 Proxy"), the Board hid the truth behind statements such as "We are extremely proud to offer an integrated platform for learning that has helped so many learners on their education journey by providing them with the type of help they need, when they need it, in the format they want to receive it." The Board omitted to mention that this "help" involves facilitating cheating. The Board also boasted that "We hold ourselves to the highest ethical standards and strive for full compliance with applicable laws and regulations". Nothing could be further from the truth.  The 2022 Proxy also referred to Chegg's Code of Business Conduct and Ethics (the "Code of Ethics"), which is also rife with omissions and misstatements, such as "We seek to

strengthen our nation's academic system by helping students learn, but we will not support or profit from unethical academic behavior. We will not promote plagiarism, sell pirated books, or provide materials designed to aid cheating." As detailed herein, none of those statements are true.

4.      The reason for such omissions and misstatements is obvious. Director Defendants are profiting from the Company's improper business model, as they receive most of their compensation through stock.  While their compensation for serving on the Board amounts to $40,000 annually, in contrast, their compensation from stock options is much larger. They each receive a Restricted Stock Unit ("RSU") Award which has a fair market value on the date of grant equal to $200,000. If Director Defendants disclosed all material facts pertaining to Chegg's primary business model, the value of the RSU Award would plummet because the fair market value would drop after such a disclosure.

5.      Director Defendants have a fiduciary duty to disclose fully and fairly all material information within the Board's control when seeking stockholder action, including when soliciting votes for election of the Board and appointment of the independent auditor. In addition to this duty, Director Defendants are also under a duty to avoid misleading partial disclosures. Here, Director Defendants failed in their fiduciary duty to accurately describe Chegg's primary business model and how it "helps" students.

4

6.      Deloitte aided and abetted these breaches of fiduciary duty by carrying the Board's misstatements forward and knowingly failing to report the true Chegg business model in Chegg's annual audit.   That failure rendered Chegg's audit a material misstatement that affirmed to Plaintiff and the Class that Chegg's primary business model was not cheating, when, in fact, it was. In return for assisting Chegg and the Board in perpetrating their breaches of fiduciary duties, Deloitte enjoyed a financially beneficial relationship with Chegg. Deloitte, through its affiliates, provided other services to Chegg which totaled $5,591,237 in 2021 alone. Of that, $2,278,928 accounted for other services beyond the audit of Chegg's consolidated financial statements for the fiscal year ending December 31, 2021.

7.      As a result of the misconduct alleged herein, Plaintiff and the Class participated in uninformed votes.

## PARTIES

8.      Plaintiff Brian Stansell is a holder of Chegg common stock. Plaintiff has continuously held shares of Chegg common stock since at least January 2017.

9.      Defendant Rosensweig has at all relevant times served as the Company's Chief Executive Officer ("CEO"), President, and Co-Chairperson. Rosensweig has been the President, CEO, and Chairperson of Chegg since 2010. As recorded in the 2022 Proxy, Rosensweig owns approximately 1.3% of the Company's outstanding shares.

5

10.    Defendant Sarnoff has been a director at the Company since August 2012 and has served as a Co-Chairperson of the Board since July 2018. Much of the misconduct complained of herein occurred while Defendant Sarnoff served as a director.

11.    Defendant Bond has served as a director at the Company since December 2020 and serves as a member of the Compensation Committee. Much of the misconduct complained of herein occurred while Defendant Bond served as a director.

12.    Defendant Budig has been a director at the Company since January 2021 and chairs the Audit Committee. Much of the misconduct complained of herein occurred while Budig served as a director.

13.    Defendant LeBlanc has served as a director at Chegg since July 2019 and serves as a member of the Governance and Sustainability Committee. Much of the misconduct complained of herein occurred while Defendant LeBlanc served as a director.

14.    Defendant Levine has served as a director at Chegg since May 2013, serves as a member of the Compensation Committee and chairs the Governance and Sustainability Committee. Much of the misconduct complained of herein occurred while Defendant Levine served as a director.

15.     Defendant Martin has served as a director at Chegg since September 2021 and serves as a member of the Audit Committee. Much of the misconduct complained of herein occurred while Defendant Martin served as a director.

16.     Defendant Schlein has served as a director at Chegg since December 2008 and serves as a member of the Audit Committee and the Governance and Sustainability Committee. Much of the misconduct complained of herein occurred while Defendant Schlein served as a director.

17.     Defendant Whelan has served as a director at Chegg since June 2019 and chairs the Compensation Committee. Much of the misconduct complained of herein occurred while Defendant Whelan served as a director.

18.     Defendant York has served as a director at Chegg since June 2013 and serves as a member of the Compensation Committee and the Governance and Sustainability Committee. Much of the misconduct complained of herein occurred while Defendant York served as a director.

19.     The 2022 Proxy was signed by Woody Dixon Jr., General Counsel and Corporate Secretary, under the authorization of Director Defendants.

20.     Chegg is a Delaware corporation with principal executive offices located in Santa Clara, California. Chegg purports to be a technology company. The Company's stock is traded on the New York Stock Exchange under the ticker symbol "CHGG."

7

21.     Defendant Deloitte is a Delaware corporation with principal executive offices located in New York.  Since 2018, Deloitte has served as Chegg's principal independent registered public accounting firm to perform the audit of its consolidated financial statements for each fiscal year.

### SUBSTANTIVE ALLEGATIONS

#### A.     Background

22.     Chegg was launched in 2005 as an affordable textbook rental company for college students.

23.     In 2012, with the decline of textbook rentals and competitors offering cheaper and faster shipping, Chegg CEO Daniel Rosensweig, in an interview with *Forbes*, prophesized that "the textbook as we know it will someday no longer exist".[1] With this realization, Chegg, under his leadership, made a desperate attempt to reinvent itself by trying to be "a site where students will buy everything they need for school."[2]

24.     As a part of this attempted reinvention, in 2015, Chegg Study, the first of Chegg's many online subscription services, was launched. Chegg Study purports to help students master challenging concepts on their own by providing homework

---

[1]     Helen Coster, Chegg's New Chapter, FORBES, (Jan. 15, 2012, 6:00PM), https://www.forbes.com/forbes/2012/0213/technology-books-dan-rosensweig-chegg-new-chapter.html.

[2]     *Id.*

help. The Chegg Study service costs $14.95 a month, with subscribership surging to 6.6 million in 2020.

25. After the launch of Chegg Services, which includes Chegg Study and several other subscription services, Chegg rebranded itself as a provider of online educational services and tools, billing itself as the "leading student-first interconnected learning platform, which is on-demand, adaptive, personalized, and backed up by a network of human help."[3]

26. Chegg describes Chegg Study on its website as a "learning resource...to help students better understand their schoolwork" with 37 million expert Q&As, 6 million step-by-step textbook solutions, video walkthroughs, practice sets, and more. Further, in a 2021 meeting comprised of the Nominating and Corporate Governance Committee of The Board (the "Committee"), the Committee adopted the Code of Ethics which states under "Academic Integrity" that Chegg seeks "to strengthen our nation's academic system by helping students learn, but we will not support or profit from unethical academic behavior. We will not promote plagiarism, sell pirated books, or provide materials designed to aid cheating."[4] Chegg also noted that

---

[3]    CHEGG, INC., HUMAN RIGHTS POLICY, https://s21.q4cdn.com/596622263/files/doc_downloads/governance_docs/Code_of_Business_Conduct_and_Ethics.pdf (last visited Feb 13, 2023).

[4]    CHEGG, INC., CODE OF BUSINESS CONDUCT AND ETHICS, https://s21.q4cdn.com/596622263/files/doc_downloads/governance_docs/Code_of_Business_Conduct_and_Ethics.pdf (last visited Feb 13, 2023).

"[it]does not use, copy, or distribute third party intellectual property without permission or arranging with the legal department to obtain appropriate rights."

27.     However, in truth, it appears that Chegg is in the business of selling textbook, exam, and homework answers through Chegg Services.  Chegg Services involves hiring a staggering 70,000 freelancers to prepare answers to textbook questions and then systematically publishing these answer sets through the Chegg Study service, where they are organized by the titles of the corresponding textbooks—using precisely the same unit, chapter, and topic orders and naming conventions for the questions employed in the textbooks—so that students can easily search for and find answers to the textbook questions they have been assigned.

28.     Today, Chegg boasts of having "millions of homework answers" to end-of chapter questions from 9,000 textbooks located on Chegg Study. Indeed, Chegg Study has comprehensive answer sets that together comprise 6 million answers to end-of-chapter textbook questions from these 9,000 textbooks.

29.     Chegg does not create its own textbooks or end-of-chapter questions and has no original content or its own copyrights to any of the materials on its site. So, as part of this business model, Chegg wholly relies on the textbooks and end-of-chapter questions created by publishers and authors, then sells answers to those questions to students for profit, without seeking any permission from the appropriate copyright holders before publishing these answers. This is contrary to its public

10

claims made in its Code of Ethics that "it does not use, copy, or distribute third party intellectual property without permission or arranging with the legal department to obtain appropriate rights."[5] In fact, Pearson, as a major publisher of these textbooks and copyright holder, filed a lawsuit against Chegg in 2021 and that action remains pending as of the date of this complaint.[6]

30.    Further, Chegg also tries to help students cheat in other ways.  Chegg has created forums to attempt to circumvent Turnitin, an academic integrity software. Within Chegg Study, the platform answers the question of whether answers garnered from Chegg will show up on Turnitin. It says that Turnitin will not detect Chegg answers that are not readily visible on the internet, thus promoting cheating in different ways.

31.    The Board disclosed to stockholders certain "Risk Factors" in its Annual Report for the fiscal year ended December 31, 2021, which listed the risk that colleges and certain government regulations may restrict access to the Chegg platform, but it did not disclose **why** these restrictions may be applied.

32.    Chegg insiders, including Defendants, understand that the primary business model, which enables cheating, is the reason why colleges and government entities may restrict access to the Chegg platform.  This is evidenced by Chegg's

---

[5]    *Id.*

[6]    *Pearson Educ., Inc.* v. *Chegg, Inc.*, 2:21-cv-16866 (D. N.J. 2021).

insider selling behavior.  Although the Board continually disclosed encouraging financial results after the launch of Chegg Study, Chegg insider selling rapidly increased.  Insider selling did not even halt when the Board disclosed record numbers to Chegg stockholders for the 2020 fiscal year.

33.    Although the Board is aware that the Chegg Services platform enables cheating, the Board will not fix this problem because this is Chegg's main revenue source.  In 2020, 80% of Chegg's $644 million total revenue came from Chegg Services.  In 2021, Chegg's total revenue increased by 20% to $776.3 million, 86% of the 2021 total revenue came from Chegg Services, and textbook and eTextbook revenue fell by 13.6%.  Further, in 2021, Chegg reported that in its first quarter alone, Chegg Study received 356 million content views.  In 2022, the Board boasted in Chegg's third quarter earnings report that 97% of its revenue is derived from Chegg Services, making its print textbook and eTextbook business almost obsolete.  The Board also announced in 2022 that Chegg was promoting Nathan Schultz to Chief Operating Officer. Schultz built the Services platform that enables this cheating.

**B.    Public Reveal of Chegg's Primary Business Model that Promotes Cheating**

34.    Chegg's primary business model of selling answers to students has been widely reported in the news and social media, and Chegg has been implicated in cheating scandals at colleges and universities across the United States.

35.    Professors at the University of Oregon, according to the university's

student-run newspaper, have expressed concerns as they describe students getting real-time answers to exam questions from Chegg. Professor Alan Kelly, Senior Instructor for Biology at the University of Oregon, submitted a request to Chegg for user information when he found his original exam question on Chegg's website and found that the information Chegg provided him (including User IDs, personal email addresses and IP addresses) were "unhelpful" in identifying these students.[7] In criticizing Chegg, Kelly further says: "Why couldn't Chegg just give me names?...It seems to me that they're really just covering the tracks of students who misuse this service."[8]

36.     Professor Shannon Boetcher, also from the University of Oregon, reported that when he searched for his exams on Chegg, he found that Chegg contains "every single question from every single test bank he has ever seen."[9]

37.     Professor Selim Ünlü, a member of the engineering faculty at Boston University, reported to the school's student-run newspaper that the entirety of one

---

[7]     Claire Warner, *Students cheat with online learning service, professors hope to identify users,* DAILY EMERALD (Jan. 19, 2021), https://www.dailyemerald.com/news/students-cheat-with-online-learning-service-professors-hope-to-identify-users/article_552d56f4-5a31-11eb-98ae-879264ec0299.html.

[8]     *Id.*
[9]     *Id.*

of his midterms was posted to Chegg within the eight to ten hours the test was available for download and submission.[10]

38.    Then, on March 31, 2021, an investigation by Forbes magazine described Chegg as a "superspreader" of cheating, with 48 of the 52 students interviewed by the magazine saying that they used Chegg Study to cheat.[11]  The article also reported that the term "Chegging" has become synonymous with cheating.[12]

---

[10]    Angela Yan, *In era of online exams, concerns over cheating develop new nuances,* THE DAILY FREE PRESS (Dec. 9, 2020), https://dailyfreepress.com/2020/12/09/in-era-of-online-exams-concerns-over-cheating-develop-new-nuances/.

[11]    *See* Susan Adams, *This $12 Billion Company Is Getting Rich Off Students Cheating Their Way Through Covid*, FORBES (Jan. 28, 2021, 6:30AM). https://www.forbes.com/sites/susanadams/2021/01/28/this-12-billion-company-is-getting-rich-off-students-cheating-their-way-through-covid/.

[12]    *Id.*

39.     Meanwhile, in 2021, an Imperial College London study, published in the International Journal for Educational Integrity, concluded that Chegg's purported academic integrity efforts are "not working[.]"[13]  The same study described Chegg's services as "contract cheating[.]"[14]

40.     In 2022, C. Edward Watson, associate Vice-President at the Association of American Colleges and Universities, was interviewed by the Financial Times and said that the use of sites like Chegg to answer course questions had been "normalized" on campus, creating an "existential crisis" in higher education.[15] "It calls into question the qualities of the degree."

41.     On Tik Tok, thousands of videos appear under the search term "chegg" and "chegging." Students, in their Tik Tok videos, joke about cheating and being underprepared for the work force due to Chegg. Students also discuss the risks and benefits of using Chegg.

---

[13]     Thomas Lancaster & Codrin Cotarlan, *Contract Cheating by STEM Students Through a File Sharing Website:  A Covid-19 Pandemic Perspective*, 17 INT. J. EDU. INTEGR. 3(2021), https://edintegrity.biomedcentral.com/articles/10.1007/s40979-021-00070-0.

[14]     *Id.*

[15]     Bethan Staton, *Chegg Learns a Hard Lesson as Virtual Study Boom Falters*, FINANCIAL TIMES (Jan. 13, 2022), https://www.ft.com/content/3f68e3a0-963f-4d1d-99b9-1ed395d43f22.

42.    For example, in one video, students joke that they have to wait to submit their exams because they finished it so quickly by accessing the answers on Chegg.[16]

43.    In other videos, a popular joke among students appears to be that, in the future, buildings and bridges will collapse because STEM majors are not learning how to do their future jobs.[17] Instead, they are relying on Chegg to get through school.

44.    In some videos, students go so far as to warn their peers not to use Chegg, alleging that Chegg provides universities with student's IP addresses, upon university request, in order to discipline them for cheating.[18]

45.    Chegg itself, through its own Tik Tok account, has alluded to its primary business model of selling answers. Several videos posted by Chegg on its account discuss how Chegg is helpful when you have an assignment due in an hour

---

[16]    Julia Williams (@julia_williams121), TIKTOK (March 24, 2022), https://www.tiktok.com/@julia_williams121/video/7078852365239176494?is_copy_url=1&is_from_webapp=v1&lang=en&q=chegging&t=1649789745575.

[17]    Ty Pravong (@teepav), TIKTOK (Dec. 10, 2020), https://www.tiktok.com/@teeprav/video/6904678800584461574?is_copy_url=&is_from_webapp=v1&lang=en&q=chegging&t=1649789745575.

[18]    Maddi Moo (@maddikoch), TIKTOK (Oct. 25, 2020), https://www.tiktok.com/@maddikoch/video/6887700033441991942?is_copy_url=1&is_from_webapp=v1&lang=en&q=chegging&t=1649789745575.

and you haven't begun working on it.[19] This undermines the Company's message that Chegg is a teaching tool and, instead, sells the idea that Chegg is exactly what its critics suggest it is: a good resource for quick, last-minute answers.

46.    While students take to Tik Tok, professors have taken their concerns about Chegg to Twitter. These professors, via their Twitter accounts, discuss how their (often copyrighted) exams are uploaded and answered in real time and also discuss difficulties with reaching out to Chegg to address these issues.

47.    For example, Leo C. Stein, Physics Professor at University of Mississippi (@duettosymmetry), writes: "So, first exam of the term, and students uploaded the problems to Chegg *during the exam*. So disappointed. The cheating culture is terrible. I don't understand how these students don't feel ashamed of themselves."[20]

48.    Meanwhile, Taylor Sparks, Associate Professor of Materials Science and Engineering at University of Utah (@taylordsparks), writes: "I just submitted 150 copyright takedown requests from @Chegg for hosting the custom hw questions I've written over the last 8 years. What an absolute dumpster fire of a website. How'd

---

[19]    Chegg (@Chegg), TIKTOK (Mar. 25, 2022), https://www.tiktok.com/@chegg/video/7077735264650677547?is_from_webapp=1&sender_device=pc&web_id=7085785726597187118.

[20]    Leo C. Stein (@duetosymmetry), TWITTER (Feb. 18, 2021, 1:42 P.M.), https://twitter.com/duetosymmetry/status/1362472598530125825.

your afternoon go?"[21] In response to several replies to this tweet, Sparks further wrote: "Totally! I'm all for them providing worked examples. That's a great idea, but intentionally building a tool that allows students to upload copyrighted work from ongoing classes so other students can copy it is a total scumbag move."

49.    Andrea Armani, Vice Dean & Professor of Engineering at University of Southern California (@ProfArmani), similarly accuses Chegg of copyright violations, tweeting: "About #chegg: Can faculty/universities sue them? They are posting exams with answers. My exams are copyrighted. This is a serious question for all the #lawyers out there, by the way. #classaction #copyright #legal #AcademicTwitter."[22]

50.    To date, the Board has not disclosed to Chegg's stockholders its primary business model. The Board has always been aware of the cheating allegations. In an interview in 2020, Defendant Rosensweig was asked about his response to allegations from teachers who believed that students used Chegg to cheat. Defendant Rosensweig responded by stating that "It's always been a problem for colleges. Let's face it: Students have always found a way, whether it's in

---

[21]    Taylor Sparks (@taylordsparks), TWITTER (Dec. 7, 2021, 8:58 P.M.), https://twitter.com/taylordsparks/status/1468399676042854401.

[22]    Prof. Andrea Armani (@ProfArmani), TWITTER (May 20, 2020, 12:36 P.M.), https://twitter.com/ProfArmani/status/1263146699997888512.

fraternities, or whether they go to Google. *But Chegg is not built for that*." [23] Similarly, in a written statement, Chegg's President Nathan Schultz also responded to these allegations, by stating that "We are not I that [cheating] is a problem. And the mass move to remote learning has only increased it. We remain 100% committed to addressing it, and are investing considerable resources to do so. We cannot do it alone and are working with faculty and institutions, and will continue to do more, including educating students."[24]

51.    In fact, Chegg has doubled down. It updated its honor code policy on August 8, 2022, and announced that upon receiving a request from a university, it will only provide time and date stamp of the question posted and time and date stamp of the solution posted. To protect "the privacy of its users", it will not share personal information as part of honor code investigations. It appears that the Board aims to continue facilitating cheating and make that Chegg's primary business model, unlike its public affirmations to the contrary.

---

[23]    David Gelles, *For Online Learning, Business Has Never Been Better,* N.Y. TIMES (June 12, 2020), https://www.nytimes.com/2020/06/12/business/chegg-dan-rosensweig-corner-office.html

[24]    Adams, *supra* note 11.

**C.    Multiple Director Elections Are Put To An Uninformed Stockholder Vote**

52.    Prior to the reveal of Chegg's primary business model, the Board solicited stockholder votes on numerous pertinent matters, without informing them of Chegg's primary business model, *i.e.* it facilitates cheating.

53.    On June 5, 2019, Chegg held its 2019 Annual Meeting of Stockholders (the "2019 Meeting"). In the proxy statement filed on April 26, 2019, the Board informed stockholders of Chegg's Code of Ethics and re-affirmed its commitment to it. However, as mentioned above, the Code of Ethics fails to account for Chegg's primary business model. At the 2019 Meeting, while being complete unaware of Chegg's primary business model, stockholders elected one Class III director and ratified the appointment of Deloitte as Chegg's independent registered public accounting firm for the fiscal year ending December 31, 2019. Defendant York was up for re-election at the time and gained proceeds worth approximately $1.4 million in insider trading through 2021.

54.    On June 3, 2020, Chegg held its 2020 Annual Meeting of Stockholders (the "2020 Meeting"). In the proxy statement filed on April 17, 2020, the Board again informed stockholders of Chegg's Code of Ethics and re-affirmed its commitment to adhere to it. At the 2020 Meeting, while being complete unaware of Chegg's primary business model, stockholders elected three Class I directors and

20

ratified the appointment of Deloitte as Chegg's independent registered public accounting firm for the fiscal year ending December 31, 2020. Defendants Budig, Rosensweig and Schlein were up for re-election, who have all benefitted from the lack of revelation of Chegg's primary business model. Defendant Rosensweig gained proceeds of approximately $48.8 million in insider selling from May 2020 through February 2021.

55.    On June 2, 2021, Chegg held its 2021 Annual Meeting of Stockholders (the "2021 Meeting"). In the proxy statement filed on April 16, 2021, the Board made several statements that misled investors, such as "We put learners first and seek to help every student achieve their best, in school and beyond. We strive to improve the overall return on investment in education by helping students learn more in less time and at a lower cost." The Board omitted to mention how Chegg helps students, which is by facilitating cheating. The Board also boasted that "We hold ourselves to the highest ethical standards and strive for full compliance with applicable laws and regulations." Such vague statements misled investors to believe that Chegg values academic integrity, which is not the case. The Board also informed stockholders of Chegg's Code of Ethics and again re-affirmed its commitment to it. As set forth above, the Code of Ethics is replete with various misstatements and omissions.

21

████████████████████████████████████████████

████

56.    At the 2021 Meeting, while being completely unaware of Chegg's real primary business model, stockholders elected three Class II directors and ratified the appointment of Deloitte as Chegg's independent registered public accounting firm for the fiscal year ending December 31, 2021. Defendants Levine, Sarnoff and LeBlanc were up for re-election.  They have all materially benefitted from omissions in the 2021 Proxy, either through their RSU Awards and/or their insider selling.

57.    On June 1, 2022, Chegg held its 2022 Annual Meeting of Stockholders (the "2022 Meeting").  Like before, the 2022 Proxy is rife with misstatements and partial disclosures.  These include:

> We put learners first and seek to improve their outcomes in school and beyond. We strive to improve the overall return on investment in education by helping students learn more in less time and at a lower cost…
>
> We help students each step of the way to improve the outcome of their education. To do this, we focus on listening to their needs, elevating and amplifying their voice, and taking action to provide real life solutions…
>
> We understand students at a deep level and anticipate their needs at every step…
>
> We hold ourselves to the highest ethical standards and strive for full compliance with applicable laws and regulations…

22

We are extremely proud to offer an integrated platform for learning that has helped so many learners on their education journey by providing them with the type of help they need, when they need it, in the format they want to receive it…

Chegg is a student's ride-or-die, 24/7, always-answers-when-you-call partner.

Supporting students in their learning journey.[25]

58.     The above statements hide the kind of help that Chegg provides students. By affirming that it follows "the highest ethical standards," the Board misstates its primary business model, i.e. it helps students cheat.

59.     At the 2022 Meeting, while being completely unaware of the primary business model, stockholders re-elected four Class III directors and ratified the re-appointment of Deloitte as Chegg's independent registered public accounting firm for the fiscal year ending December 31, 2022. Defendants Bond, Martin, Whelan and York were again nominated to be re-elected as directors. Defendants let stockholders remain in dark about the Company's true business model and caused the vote to occur.

60.     Instead of allowing its stockholders to be able to make informed choices about its leadership, Defendants kept stockholders in the dark and failed to disclose

_____

[25]     Chegg, Proxy statement (Schedule 14a) (April 14, 2022), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001364954/9488f846-55a2-418e-a7e2-ab88dd6fa869.pdf

its primary business model. Further, Deloitte's appointment as Chegg's independent accountant aided and abetted Director Defendants' breaches of their fiduciary duties. These meeting therefore caused stockholders to unwittingly appoint the breaching parties who had created this subterfuge.

## CLASS ACTION ALLEGATIONS

61.    This class action is brought on behalf of all Chegg stockholders, except Defendants and their affiliates, who were eligible to vote at the 2022 Meeting (the "Class").

62.    The Class is so numerous that joinder of all members is impracticable. Chegg mentioned in the 2022 Proxy that, as of April 4, 2022, the Company had 126,681,792 shares of common stock issued and outstanding, and all were entitled to vote for directors and the independent auditor. While the exact number of Class members is unknown to Plaintiff currently, Plaintiff believes that Class members number in the thousands.

63.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class sustained damages because of the Defendants' conduct as complained of herein.

64.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and

24

securities litigation. Plaintiff has no interests that are adverse or antagonistic to the Class.

65. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable.

66. Questions of law and fact are common to the Class, including, among others, (i) whether Director Defendants owed fiduciary duties to Plaintiff and the Class; (ii) whether Director Defendants breached their fiduciary duties to Plaintiff and the Class; (iii) whether Deloitte aided and abetted any breaches of fiduciary duties owed by Director Defendants to the Plaintiff and the Class; (iv) the existence and extent of any injury to the Class or Plaintiff; and (v) the proper measure of the Class's damages.

## COUNT I
**(Direct Claim for Breach of Fiduciary Duty Against Director Defendants)**

67. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

68. Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of care and loyalty, which includes an obligation to act in good faith, with candor, and to provide accurate material disclosures to stockholders.

25

69. Stockholders are entitled to rely upon their elected directors to always discharge their fiduciary duties. The duty of disclosure is, and always has been, a specific application of the general fiduciary duty owed by directors. The duty of disclosure obligates directors to provide stockholders with accurate and complete information material to any request for stockholder action, including, voting, and as such, is an aspect of the duties of good faith and loyalty.

70. Stockholders are entitled to rely upon the truthfulness of all information disseminated to them by the directors they elect to manage the corporate enterprise. In the context of a request for stockholder action, the protection afforded by Delaware law is a judicially recognized equitable cause of action by stockholders against directors. Inaccurate material information disseminated in a proxy in connection to a stockholder vote violates the fiduciary duties of disclosure and loyalty.

71. Inaccurate information in a proxy is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote. It does not require the stockholder to provide proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder.

72.     Director Defendants violated and breached their fiduciary duty of disclosure and loyalty they owe to Plaintiff and the Class by either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties regarding prudently disclosing Chegg's primary business model prior to multiple director elections.

73.     In fact, due to these omissions, Director Defendants were unknowingly re-elected by stockholders, unaware that these were the same Director Defendants who had breached their fiduciary duties and were going to continue to do so.

74.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Plaintiff and the Class have sustained significant damages.

<u>**COUNT II**</u>
**(Direct Claim for Aiding and Abetting Breach of Fiduciary Duty Against Deloitte)**

75.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

76.     Aider and abettor liability can attach to an agent who knowingly causes a breach of a fiduciary duty by a director.

77.     As Chegg's independent auditor, Deloitte was aware of the Director Defendants' fiduciary duties of disclosure and loyalty, as set forth above, which required that such Defendants ensure that stockholders had all material information

27

prior to the stockholder vote. However, to maintain its lucrative financial relationship with Chegg and Director Defendants, Deloitte failed to reveal that Chegg's business model omitted to provide Chegg's role in facilitating cheating.

78. Deloitte therefore knowingly participated in the other Defendants' breaches of their duties (and any exculpated care breaches by the Director Defendants), including by affirming Chegg's financial statements, since it impliedly affirmed to stockholders that Chegg's business model revolved around providing educational tools. In this way, Deloitte acted as an intermediary by building stockholder trust towards Chegg and causing the appointment of Director Defendants to take place, knowing that Director Defendants were actively trying to omit and hide Chegg's true business purpose.

79. Further, the knowing failure of Deloitte to properly employ appropriate risk auditing standards violated its statutory duties. Deloitte failed to correct material misstatements relating to Chegg's business model in the consolidated financial statements of Chegg for the year ended December 31, 2021, and is also in violation of other applicable requirements of the Public Company Accounting Oversight Board, including regarding Deloitte's independence from Chegg.

80. Deloitte is a knowing participant in, and aider and abettor of, the aforesaid breach of the fiduciary duties of disclosure and loyalty owed by Director Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and relief in his favor and in favor of the Class, and against Defendants, as follows:

A.  Declaring that this Action is properly maintainable as a class action;

B.  Finding Director Defendants liable for breaching their fiduciary duties owed to Plaintiff and the Class;

C.  Finding Deloitte liable for aiding and abetting the breaches of fiduciary duties owed to Plaintiff and the Class by Director Defendants;

D.  Certifying the proposed Class;

E.  Directing the Board to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Chegg and its stockholders from a repeat of the damaging events described herein;

F.  Declaring that the 2022 Proxy is misleading;

G.  Requiring Director Defendants to correct the 2022 Proxy and provide stockholders with an opportunity to revote on the election of directors and the appointment of Deloitte;

H.  Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, costs, and expenses; and

I.  Granting such other and further relief as the Court deems just and proper.

29

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

*/s/ Kurt M. Heyman*
Kurt M. Heyman (#3054)
Gillian L. Andrews (#5719)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
*Attorneys for Plaintiff*

OF COUNSEL:

POMERANTZ LLP
Gustavo F. Bruckner
Samuel J. Adams
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100


Dated:  February 14, 2023