**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Dr., Suite #180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

**MOTLEY RICE LLC**
MAX N. GRUETZMACHER (*pro hac vice*)
mgruetzmacher@motleyrice.com
CHRISTOPHER F. MORIARTY (*pro hac vice*)
cmoriarty@motleyrice.com
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN LEVENTHAL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CHEGG, INC., DANIEL L. ROSENSWEIG, ANDREW J. BROWN, and NATHAN SCHULTZ,<br><br>Defendants. | Case No.: 5:21-cv-09953-PCP<br><br>CLASS ACTION<br><br>JOINT DECLARATION OF DAVID R. KAPLAN AND CHRISTOPHER F. MORIARTY IN SUPPORT OF: (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES<br><br>Date:      April 24, 2025<br>Time:     10:00 A.M.<br>Dept:     Courtroom 8<br>Judge:   Hon. P. Casey Pitts |

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ............................................................................2

II.    BRIEF SUMMARY OF LEAD PLAINTIFFS' CLAIMS ................................8

III.   RELEVANT PROCEDURAL HISTORY .........................................................9

      A.     Commencement of the Action and Appointment of Lead Plaintiffs ......................9

      B.     Lead Counsel's Initial Investigation, Continuing Investigation, and Filing of the Consolidated Complaint .........................................................9

      C.     Defendants' Repeated Challenges to the Complaint ...............................................11

      D.     Lead Plaintiffs' Extensive Discovery Efforts ........................................................13

           1.     Rule 26(f) Report, Initial Disclosures, and Protective Order ...................... 15

           2.     Lead Plaintiffs' Discovery Propounded on Defendants ............................. 15

           3.     Non-Party Discovery .......................................................................... 17

           4.     Pre-Mediation Discovery ...................................................................... 18

IV.    MEDIATION AND SETTLEMENT .................................................................20

V.     RISKS FACED BY LEAD PLAINTIFFS IN THE ACTION CONFIRM THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE ......................................21

      A.     Risks Relating to the Class Certification .................................................22

      B.     Risks Concerning Falsity, Scienter, and Loss Causation / Damages .....................22

      C.     Collectability Risk .........................................................................25

      D.     The Settlement is Reasonable in Light of the Potential Recovery in the Action ....................................................................................26

VI.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER .................................................................27

VII.   PLAN OF ALLOCATION .......................................................................28

VIII.  LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES .................................................30

      A.     The Requested Attorneys' Fees Are Reasonable .....................................30

           1.     The Excellent Outcome is the Result of Significant Time and Labor that Lead Counsel Devoted to the Action ...................................... 30

           2.     Lead Plaintiffs Support the Fee Application ............................................. 33

           3.     The Unique Complexities of the Litigation ............................................. 33

           4.     Standing and Expertise of Lead Counsel ................................................. 36

      B.     Request for Litigation Expenses .........................................................37

C.    Lead Plaintiffs Should be Reimbursed Pursuant to the PSLRA ............................ 39

D.    The Reaction to Date of the Class to the Fee and Expense Application ................ 40

IX.    CONCLUSION .................................................................................................................. 40

**EXHIBIT LIST**

| Exhibit | Description |
|---------|-------------|
| A | Declaration of Bart Elst of KBC Asset Management NV in Support of: (1) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("KBC Declaration" or KBC Decl.") |
| B | Declaration of Paul O'Connell in Support of: (1) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Pompano P&F Declaration" or "Pompano P&F Decl.") |
| C | Declaration of Kathleen Brauns Regarding: (A) Mailing Of The Postcard Notice; (B) Publication Of The Summary Notice; (C) The Settlement Website; (D) Contact Center Services; and (E) Report On Exclusions And Objections ("Brauns Declaration" or "Brauns Decl.") |
| D | Declaration of Christopher F. Moriarty in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Motley Rice Declaration" or "Motley Rice Decl.") |
| E | Declaration of David R. Kaplan in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Saxena White Declaration" or "Saxena White Decl.") |
| F | Cornerstone Research, *Securities Class Action Settlements: 2023 Review and Analysis* ("Cornerstone Report") |
| G | NERA, *Recent Trends In Securities Class Action Litigation: 2024 Full-Year Review* ("NERA Report") |

We, David R. Kaplan and Christopher F. Moriarty, declare as follows:

1.      David R. Kaplan is an attorney duly licensed to practice in this District and before all courts of the State of California.  Mr. Kaplan is Director of the law firm of Saxena White P.A. ("Saxena White"), and counsel for Lead Plaintiff Pompano Beach Police and Firefighters' Retirement System ("Pompano P&F").[1]  Christopher F. Moriarty is an attorney duly licensed to practice before all courts of the State of South Carolina and has been admitted *pro hac vice* in this Action.  Mr. Moriarty is a Member of the law firm of Motley Rice LLC ("Motley Rice"), and counsel for Lead Plaintiff KBC Asset Management NV ("KBC," and together with Pompano P&F, "Lead Plaintiffs").  Together, Saxena White and Motley Rice have been appointed as Lead Counsel for Lead Plaintiffs and the Settlement Class. We have been actively involved in the prosecution and resolution of this Action, are familiar with its proceedings, and have personal knowledge of the matters set forth herein based on our active participation in and supervision of all material aspects of the Action.

2.      We respectfully submit this declaration in support of (I) Lead Plaintiffs' Notice of Motion and Motion for Final Approval of Class Action Settlement and Plan of Allocation, and Memorandum of Law in Support Thereof (the "Final Approval Motion" or "Final Approval Memorandum"); and (II) Lead Counsel's Notice of Motion and Motion for An Award Of Attorneys' Fees and Reimbursement of Litigation Expenses and Memorandum of Law in Support Thereof (the "Fee Motion" or "Fee Memorandum"), both filed contemporaneously herewith.

3.      As set forth in the Final Approval Memorandum, Lead Plaintiffs seek final approval of the $55 million Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

4.      As set forth in the Fee Memorandum, Lead Counsel seek an award of attorneys' fees in the amount of 25% of the Settlement Fund (i.e., $13,750,000, plus interest earned at the same rate as the Settlement Fund), reimbursement of Lead Counsel's out-of-pocket Litigation

---

[1] All capitalized terms that are not defined herein have the same meanings as set forth in the Stipulation of Settlement (ECF No. 189-2) (the "Stipulation" or the "Settlement Agreement"). Unless otherwise noted, all emphasis is added, and citations are omitted. All references to "Ex. _" are to the exhibits hereto.

Expenses in the total amount of $261,602.23 (plus interest accrued thereon), and $4,900 to Lead Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs incurred in connection with their representation of the Settlement Class.

5.      On December 19, 2024, the Court granted preliminary approval of the Settlement and directed notice of the Settlement to be disseminated to the Class. ECF No. 192 (the "Preliminary Approval Order").

6.      Since then, the Court-approved Claims Administrator, A.B. Data Ltd. ("A.B. Data" or the "Claims Administrator"), has directly notified potential Settlement Class Members of the Settlement by mail and email in accordance with the Preliminary Approval Order.  Summary Notice was also published through *Investor's Business Daily*, over *PR Newswire*, and provided via an official website for the Settlement maintained by the Claims Administrator at www.CheggSecuritiesLitigation.com (the "Settlement Website").

7.      Between January 9, 2025, and February 6, 2025, Defendants caused the $55 million Settlement Amount to be deposited into an escrow account for the benefit of the Settlement Class. At Lead Counsel's instruction, the funds deposited in the escrow account have been invested in Treasury Bills, are earning interest, and will be ready and available for distribution to the Settlement Class upon the Court's approval of the Final Approval Motion and the Claims Administrator's completion of claims processing and the Court's entry of a distribution order.

8.      Given the Court's familiarity with the litigation, this Declaration does not seek to detail every event during the Action.  Rather, the Declaration provides the Court with a summary of the prosecution of the Action, highlights of the events leading to the Settlement, and the basis upon which Lead Counsel and Lead Plaintiffs recommend the approval of the $55 million Settlement, as well as the approval of the request for attorneys' fees and litigation expenses.

## I.      PRELIMINARY STATEMENT

9.      Following nearly three years of extensive investigation and litigation efforts, culminating in a September 2024 in-person, full-day mediation session conducted by former United States District Court Judge Layn R. Phillips ("Judge Phillips") and two of his colleagues, Lead Counsel secured an outstanding recovery of $55,000,000 on behalf of a class consisting of

1   all persons or entities who purchased, or otherwise acquired Chegg common stock between May

2   5, 2020, and November 1, 2021, inclusive, and who were damaged thereby (the "Settlement Class"

3   or "Class"). The Settlement is an extraordinary result for the Class, which faced the risk of a much

4   smaller recovery—or no recovery at all—had the case continued through class certification,

5   summary judgment, trial, and inevitable appeals.

6       10.     Under all relevant measures, the $55 million Settlement Amount greatly exceeds

7   the typical settlement in securities class action settlements. If approved, the Settlement will exceed

8   by nearly four times the median $14 million settlement in securities class actions in 2024, exceed

9   by over five times the $10 million median settlement in securities class actions between 2014-

10  2022, and exceed by nearly seven times the $9 million median recovery in securities class action

11  settlements in the Ninth Circuit from 2014-2023. Further, the Settlement would have ranked in

12  the top 15% of all securities class action settlements between 2014-2022, and the top 20% of all

13  securities class action settlements in 2023.[2] Similarly, in percentage terms, the Settlement Class's

14  recovery of between approximately 4% and 6% of the maximum trial damages is two-to-three

15  times the median recovery in securities class actions with over $1 billion in potential damages.[3]

16  Thus, the Settlement provides an outstanding benefit for the Settlement Class that far surpasses

17  the normal recovery in similar securities class action cases.

18      11.     The size and extent of the recovery is particularly notable given that, when reached,

19  the Settlement Amount represented over one-third of Chegg's entire market capitalization, over

20  twelve times its net cash, and nearly all of the funds available in the Company's Directors' and

21  Officers'("D&O Insurers") liability insurance policies.

22      12.     This outstanding benefit for the Settlement Class was the product of extensive work

23  by Lead Plaintiffs and Lead Counsel. Indeed, before agreeing to settle this Action, Lead Plaintiffs

24

25  [2] See Ex. G, NERA Report, at 22, 23 fig.22. These figures exclude settlements of $1 billion or
    higher, merger objections, crypto unregistered securities, and settlements recovering $0 for the
26  class.

27  [3] See Ex. F, Cornerstone Report, at 6, 8 (finding that the median recovery for settlements in 2023
    with over $1 billion in damages was 2.0%, and noting the figure was only slightly higher (2.6%)
    from 2014 to 2022; the median recovery for settlements from 2014 to 2022 with $500-$999 million
28  in damages was 3.3% and 4.6% in 2023; and median recovery of 4.5%-4.8% of "simplified tiered
    damages" for Rule 10b-5 Class Actions).

and Lead Counsel undertook extensive efforts to advance the Class's claims and ensure that Lead Plaintiffs were well-positioned to maximize the Class's recovery. Lead Plaintiffs' and Lead Counsel's litigation efforts included, among other things, conducting a comprehensive legal and factual investigation into the events underlying the Class's claims, including, *inter alia*, (i) a rigorous review and analysis of Chegg's public securities filings, conference call transcripts, and other public statements; (ii) review and analysis of over 1,000 pages of documents produced by multiple prominent institutions of higher learning in response to public records requests; (iii) review and analysis of news articles, securities analyst reports, and social media posts about Chegg; (iv) locating and interviewing dozens of former Chegg employees and university deans, professors, and administrators concerning various topics relating to Chegg's online platform and the key issues in this Action; and (v) conducting an empirical analysis of Chegg's archived "Expert Q&A" feature (the alleged cheating tool) and historical subscriber levels—which culminated in the preparation of the highly detailed, 126-page Consolidated Complaint.

13.     After filing the Complaint, Lead Plaintiffs successfully opposed Defendants' motion to dismiss and subsequent motion for reconsideration, which challenged all core elements of Lead Plaintiffs' securities fraud claims. Thereafter, Lead Plaintiffs aggressively pursued extensive discovery, including (i) propounding on Defendants multiple sets of document requests, interrogatories, and requests for admission, and obtaining Defendants' responses thereto; (ii) serving and negotiating over 30 non-party subpoenas issued to relevant universities, securities analysts, and media outlets; and (iii) reviewing and analyzing approximately 124,000 pages of documents obtained from both Defendants and non-parties. Critically, Defendants' document production occurred as part of a highly negotiated pre-mediation process, which targeted the key issues, metrics, and Chegg personnel (including each of the Individual Defendants) at issue in the Action so that Lead Plaintiffs could be well-informed of the strengths and weaknesses of their claims prior to engaging in any mediation/settlement discussions. Accordingly, leading up to the September 26, 2024 mediation, the Parties each submitted detailed mediation briefs setting forth their positions on hotly disputed issues in the case, which incorporated numerous highly relevant documents produced during the pre-mediation discovery process (over 85 exhibits in total).

Throughout the case, Lead Plaintiffs consulted with industry and financial experts, including on issues pertaining to academic integrity, Chegg's online "learning platform," market efficiency, loss causation, and damages.

14.    Lead Plaintiffs undertook these diligent and extensive efforts against a background of significant risks, both legal and practical. From a legal standpoint, while Lead Plaintiffs believe they had credible responses to Defendants' arguments relating to falsity, scienter, loss causation, and damages, the risk remained that Defendants' arguments could have been accepted by the Court on class certification, summary judgment, or by a jury at trial, which could have reduced or entirely eliminated the Class's potential recovery. Furthermore, even a favorable jury verdict would have been subjected to inevitable appeals, the results of which would have been uncertain and lengthy. In addition, from a practical standpoint, Chegg's precarious financial position, operational challenges, and uncertain future posed a significant collectability risk that operated as an overhang on the entire Action. For example, on September 26, 2024, the date the Settlement was reached, Chegg's stock price closed at only $1.63 per share, giving the Company a market capitalization of approximately $170 million. The Settlement Amount represents nearly one third of the Company's entire market capitalization on that date. Moreover, as reported by Chegg on August 5, 2024 (less than two months before the Settlement was reached), the Company ended the second quarter of 2024 with only approximately $133 million in cash and cash equivalents and total outstanding debt of approximately $601 million—including $357 million in convertible notes maturing in 2025. Furthermore, Chegg suffered a net loss of $617 million in the second quarter of 2024. As a result, the Company had a net cash balance of only about $4.5 million heading into the mediation.[4]

15.    The Company's rapidly deteriorating performance and precarious financial position made it virtually certain that it would be judgment proof if this Action were to proceed to verdict, even under the most conservative of Lead Plaintiffs' expert's damages measures. Accordingly,

---

[4] Notably, the Company's stock price, financial condition, and operational challenges have not improved since the Settlement was reached. For example, Chegg reported net losses of approximately $213 million and $6.1 million in the third and fourth quarters of 2024, and as of the date of this filing, its stock price trades for around $1.00 per share.

1  Defendants' D&O Insurers were the only secure source of funding, but they are wasting policies
2  that would have been steadily depleted as the Action continued, possibly for years.

3       16.     Due to their extensive investigatory and litigation efforts, supported by the
4  evidentiary record at the time of Settlement, Lead Plaintiffs and Lead Counsel had a thorough
5  understanding of the strengths and weaknesses of the Parties' positions concerning liability and
6  damages, their respective abilities to prove or defend the claims at trial, and Defendants' ability to
7  pay a substantial (or any) judgment.

8       17.     As set forth in their moving papers, Lead Plaintiffs and Lead Counsel respectfully
9  submit that the Settlement represents an outstanding recovery for the Class that is supported by
10 each of the factors that the Ninth Circuit advises courts to consider in the final approval process,
11 as set forth in Rule 23(e)(2) of the Federal Rules of Civil Procedure, *Hanlon v. Chrysler Corp.*,
12 150 F.3d 1011, 1026 (9th Cir. 1998), and *In re Bluetooth Headset Products Liability Litigation*,
13 654 F.3d 935, 946-47 (9th Cir. 2011).

14      18.     In addition to seeking the Court's final approval of the Settlement, Lead Plaintiffs
15 also seek approval of the proposed Plan of Allocation as fair and reasonable.  To prepare the Plan
16 of Allocation, Lead Plaintiffs engaged Dr. Matthew Cain, Ph.D., a highly experienced economic
17 expert with extensive experience in preparing similar settlement plans of allocation, which have
18 been accepted by numerous courts.  Under the proposed Plan of Allocation, the Net Settlement
19 Fund will be distributed on a *pro rata* basis to members of the Settlement Class who timely submit
20 valid proofs of claim based on their "Recognized Loss Amount" as calculated pursuant to the Plan
21 of Allocation.  This methodology is standard in securities fraud class action settlements and has
22 been approved by courts nationwide.

23      19.     Lead Counsel also request an award of attorneys' fees for their extensive efforts
24 and the extraordinary recovery obtained for the benefit of the Settlement Class, and reimbursement
25 of their Litigation Expenses.  Lead Counsel litigated this Action on a wholly contingent basis,
26 advancing and incurring litigation expenses, charges, and costs over several years without any
27 guarantee of recovery.  The requested fee of 25% of the Settlement Fund is fair, reasonable, and
28 warrants the Court's approval.  Indeed, the requested fee seeks *no* enhancement on the benchmark

fee award established by the Ninth Circuit and is consistent with (or below) fee awards regularly awarded by courts in comparable securities class action settlements. The reasonableness of Lead Counsel's request is further supported by a lodestar cross-check, which results in an extremely modest multiplier of 1.4 on Lead Counsel's lodestar through February 21, 2025.[5]

20.    Lead Counsel also seek payment of $261,602.23 (plus interest accrued thereon) for expenses, costs, and charges reasonably and necessarily committed to the litigation of this Action over the last three years. These expenses, charges, and costs are the type typically incurred by plaintiffs in similar cases (and, indeed, virtually any litigation), including online legal and factual research, e-discovery services, expert witness and consultant fees, travel expenses, and mediation fees. These expenses were reasonable and necessary in order to achieve the Settlement.

21.    Both the Settlement and Lead Counsel's fee request have been approved by Lead Plaintiffs KBC and Pompano P&F, each sophisticated institutional investors with significant financial interests in the outcome of the case. *See* KBC Decl. at ¶¶ 5-9; and Pompano P&F Decl. at ¶¶ 7-14. Because institutional investors are precisely the type of lead plaintiff envisioned by Congress in enacting the PSLRA, Lead Plaintiffs' strong endorsement of the Settlement here is entitled to significant weight by the Court in considering whether to grant final approval of the Settlement and Lead Counsel's requested fee and expense award.

22.    Finally, in accordance with the PSLRA, Lead Plaintiffs seek reimbursement of their reasonable costs incurred directly in connection with their representation of the Settlement Class. Collectively, Lead Plaintiffs seek the modest sum of $4,900, in the amounts of $3,500 for KBC and $1,400 for Pompano P&F. Lead Plaintiffs together expended considerable time and effort in actively supervising the litigation over a multi-year period, and the requested service awards reflect only a portion of their time and efforts, as detailed in the accompanying Lead Plaintiff Declarations. *See* Exs. A & B.

---

[5]    Lead Counsel's calculation of the lodestar multiplier excludes time associated with their request for an award of attorneys' fees and reimbursement of expenses.

## II.    BRIEF SUMMARY OF LEAD PLAINTIFFS' CLAIMS

23.    Lead Plaintiffs' claims in the Action are stated in the Complaint, which alleges, among other things, that Defendants violated Sections 10(b) (and Rule 10b-5 promulgated thereunder), 20(a), and 20A of the Exchange Act.

24.    Lead Plaintiffs' claims center on whether Defendants knowingly or recklessly misled investors during the Class Period regarding the extent to which Chegg's growth during the COVID-19 pandemic was driven by students using the Company's platform to cheat during the period of distance learning, as opposed to legitimate educational support services.  The Complaint alleges that Chegg misled investors by claiming that the Company's pandemic-era growth was attributable to legitimate and sustainable factors, such as the inevitable adoption of online learning, accelerating expansion into international markets, and the Company's success in limiting account (password) sharing.  The Complaint alleges that, contrary to Defendants' representations, Chegg's dramatic growth during the pandemic was driven by students widely using Chegg to cheat on homework, quizzes, and exams during the fleeting period of distance learning.

25.    The Complaint further asserts that Defendants' allegedly false and misleading statements artificially inflated and/or maintained the price of Chegg's common stock during the Class Period.  As a result, Settlement Class Members that purchased Chegg common stock during the Class Period (including Lead Plaintiffs) suffered damages when that artificial inflation was removed from Chegg's stock price when the truth about Chegg's business was revealed.  Specifically, the Complaint alleges that the artificial inflation in the price of Chegg's stock was removed in direct response to information made public on November 1, 2021, when Chegg reported poor Q3 2021 financial results and lowered its full year guidance after students widely returned to campus for in-person classes, making it more difficult to cheat using Chegg, which in turn caused in a sudden decline in Chegg subscribers for the first time in the Class Period.

26.    Defendants have denied and continue to deny that they engaged in any wrongdoing or committed any act or omission giving rise to any liability and/or violation of law.  Defendants have asserted numerous defenses to liability (which they would likely raise at summary judgment and trial), including, among others, that no material misstatements or omissions were made, that

Lead Plaintiffs would not be able to establish that Defendants acted with the requisite scienter, and that the post-Class Period revelations did not cause the loss. Defendants further assert that Lead Plaintiffs face particularly significant obstacles in proving damages, and that Defendants would have vigorously opposed class certification.

## III.    RELEVANT PROCEDURAL HISTORY

27.    On December 22, 2021, Steven Leventhal filed the original securities class action complaint, thereby commencing this Action. ECF No. 1.

### A.    Commencement of the Action and Appointment of Lead Plaintiffs

28.    On February 22, 2022, KBC and Pompano P&F moved for appointment as Lead Plaintiffs. ECF No. 40. Several other investors also moved for appointment as Lead Plaintiff. ECF Nos. 60, 84, 87. The Honorable Edward J. Davila heard oral argument on the competing lead plaintiff motions on August 29, 2022.

29.    On September 7, 2022, Judge Davila appointed KBC and Pompano P&F as Lead Plaintiffs and approved Motley Rice and Saxena White as Lead Counsel. ECF No. 105.

### B.    Lead Counsel's Initial Investigation, Continuing Investigation, and Filing of the Complaint

30.    Prior to the filing of the initial complaint, Lead Counsel had begun an exhaustive investigation into the facts underlying the Action. This investigation included a comprehensive review and analysis of: (i) Chegg's public filings with the SEC and materials posted on Chegg's website; (ii) press releases and other public statements issued by Chegg, including during earnings calls and conference calls with analysts and investors; (iii) research reports by securities analysts covering Chegg; (iv) publicly available news articles, press releases, documents, and other information regarding Chegg and the broader industry in which Chegg operates; and (v) data and other information regarding Chegg securities.

31.    After KBC and Pompano P&F's appointment as Lead Plaintiffs, Lead Counsel continued investigating the claims eventually alleged in the Complaint. For instance, Lead Counsel dedicated substantial time and resources to locating and interviewing numerous former Chegg employees with potentially relevant information, as well as dozens of university professors,

deans, and other faculty who experienced students using Chegg during the pandemic firsthand and often engaged with the Company about widespread student cheating via Chegg. Lead Counsel included detailed information provided by eight former Chegg employees in the Complaint, as well as the accounts of over twenty professors, deans, and university officials, which described in detail how cheating via Chegg increased exponentially during the Class Period, and that the explosion in cheating was directly attributable to Chegg. Complaint, ¶¶ 96-145.

32.    Lead Counsel also obtained, reviewed, and analyzed over 1,000 pages of documents produced by many of the nation's most respected institutions of higher learning in response to public records requests. In particular, Lead Counsel included in the Complaint detailed information provided by four prominent universities and the United States Air Force Academy. Based on those productions, the Complaint describes in detail rampant student cheating on Chegg during the Class Period, as well as pleas from professors and university faculty to Chegg and the Individual Defendants to eliminate widespread cheating enabled by Chegg. Complaint, ¶¶ 66-91.

33.    Additionally, Lead Counsel conducted a detailed empirical analysis of Chegg's archived Expert Q&A database, which included analyzing thousands of questions and answers submitted to Chegg's Expert Q&A before, during, and after the Class Period. Through this empirical analysis, Lead Counsel were able to confirm that student usage of the tool for instantaneous answers surged during remote learning, with students submitting twice as many questions to "Chegg Experts" during key parts of the Class Period (e.g., final exams) as they had during the same period prior to the pandemic. Lead Counsel's empirical analysis further showed that questions submitted to Chegg during remote learning contained clear indicia of student cheating, and that Chegg failed to implement effective measures to prevent obvious cheating. Complaint, ¶¶ 146-54.

34.    In connection with their investigation and in preparing the Complaint, Lead Counsel also consulted extensively with various financial and industry experts to evaluate, among other things, academic integrity standards and practices, usage and operation of Chegg's online "learning" platform, as well as issues related to market efficiency, loss causation, and damages.

35.    Lead Counsel's investigation significantly bolstered the strength of Lead Plaintiffs' claims.  In our experience litigating securities actions under the federal securities laws, plaintiff's counsel typically lacks access to such key documentary evidence until after the complaint survives dismissal and the PSLRA's automatic discovery stay is lifted.  Here, based on Lead Counsel's thorough investigation and research, Lead Plaintiffs filed a 126-page Complaint on December 8, 2022 replete with highly particularized facts supporting the underlying securities fraud claims drawn from numerous documents and eyewitness accounts.  ECF No. 115.  The Complaint alleged in great detail Defendants' violations of Sections 10(b), 20(a), and 20A of the Exchange Act, including by making materially false and misleading statements and omissions concerning the extent of cheating on Chegg's platform during the pandemic, and the true reasons behind the Company's unprecedented subscriber growth.

### C.    Defendants' Repeated Challenges to the Complaint

36.    On February 16, 2023, Defendants moved to dismiss all of Lead Plaintiffs' claims (the "Motion to Dismiss").  ECF No. 122.  In their Motion to Dismiss, Defendants challenged all core elements of Lead Plaintiffs' securities fraud claims, including falsity, scienter, and loss causation.  For example, Defendants argued in the Motion to Dismiss that the Complaint should be dismissed in its entirety because:  (i) it failed to plead any materially false or misleading statements with particularity under the exacting pleading requirements of the PSRLA and Rule 9(b); (ii) several alleged misstatements were "forward-looking" and thus protected under the PSLRA's safe harbor provision; (iii) many of the statements at issue were non-actionable opinions under the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015); (iv) it failed to plead any facts giving rise to the requisite "strong inference" of scienter for any Defendant; and (v) it failed to plead loss causation because the Complaint did not adequately allege that information revealed in the November 1, 2021 corrective disclosure related to, or revealed any, relevant truth concealed by the alleged misstatements.  *Id.*

37.    Lead Counsel reviewed and analyzed Defendants' Motion to Dismiss, the legal authority cited therein, and the thirty-three exhibits attached to the accompanying declaration of

Heather Speers (the "Speers Declaration") ECF No. 122-1. Lead Counsel conducted extensive legal research into Defendants' arguments and potential responses thereto. On April 27, 2023, Lead Plaintiffs filed their opposition to Defendants' Motion to Dismiss and filed a motion to strike certain paragraphs of the Speers Declaration (the "Motion to Strike"). ECF Nos. 128, 129.

38.     The Parties finished fully briefing the Motion to Dismiss and the Motion to Strike as of June 8, 2023. ECF Nos. 131, 132, 133. On August 18, 2023, with the motions still pending, this case was reassigned to the Honorable P. Casey Pitts. ECF No. 138.

39.     On December 7, 2023, the Court heard over an hour of oral argument on the Motion to Dismiss and the Motion to Strike. On March 4, 2024, the Court issued an Order denying in its entirety Defendants' Motion to Dismiss and denying Lead Plaintiffs' Motion to Strike. ECF No. 150; published at *Leventhal v. Chegg, Inc.*,721 F. Supp. 3d 1003 (N.D. Cal. 2024) (the "Motion to Dismiss Order"). In sustaining the sufficiency of Lead Plaintiffs' allegations, including under the PSLRA and Rule 9(b), the Court specifically noted in the Motion to Dismiss Order that "the evidence cited in plaintiffs' complaint, including plaintiffs' empirical analysis, former employee testimony, university interviews, and faculty statements, provides sufficient factual support for plaintiffs' allegations of falsity" and "present[ed] compelling empirical evidence of substantial cheating during the class period." *Id.* at 1012. The Court also found a strong inference of scienter, based on allegations regarding "various reports sent to Chegg by universities and faculty members about rampant cheating on the platform." *Id.* at 1016. Finally, the Court found that "in light of the evidence presented" in the Complaint, Lead Plaintiffs adequately alleged loss causation under the heightened pleading requirements of Rule 9(b). *Id.* at 1017-18 (noting that "Rule 9(b) applies to all elements of a securities fraud action, including loss causation"). Thus, as exhibited by the Court's Motion to Dismiss Order, Lead Counsel's comprehensive investigation provided highly valuable benefits to the Class.

40.     On April 22, 2024, Defendants moved for leave to file a motion for reconsideration of the Court's Motion to Dismiss Order, or in the alternative, to certify the order for interlocutory appeal (the "Motion for Reconsideration"). ECF No. 155. Defendants again challenged falsity, scienter, and loss causation. Two days later, on April 24, 2024, Defendants filed their Answer to

Lead Plaintiffs' Complaint. ECF No. 156. On April 29, 2024, the Court granted Defendants' request for leave to seek reconsideration. As of May 20, 2024, the Parties had fully briefed Defendants' Motion for Reconsideration. ECF Nos. 158, 160, 163. Additionally, Defendants filed a statement of recent decision on June 13, 2025, which Lead Plaintiffs moved to strike on procedural grounds. ECF Nos. 167, 168.

41.     On July 17, 2024, the Court denied in full Defendants' Motion for Reconsideration. ECF No. 172; published at *Leventhal v. Chegg, Inc.*, 2024 WL 3447516 (N.D. Cal. July 17, 2024) ("Motion for Reconsideration Order"). Specifically citing to the Complaint's allegations "that Chegg received a plethora of reports from universities and faculty members about rampant cheating on the platform"—including, for example, that "one university administrator 'emailed Rosensweig directly' about cheating on Chegg's platform, after which three high-level Chegg representatives responded'" and that each of the Individual Defendants "attended meetings where widespread student cheating was discussed"—the Court denied the reconsideration motion thereby sustaining its earlier ruling denying the Motion to Dismiss. *Id.* at *2. In light of its ruling, the Court denied Lead Plaintiffs' motion to strike as moot. *Id.* at *3. Thus, as further exhibited by the Court's Motion for Reconsideration Order, Lead Counsel's comprehensive investigation provided highly valuable benefits to the Class.

### D.     Lead Plaintiffs' Extensive Discovery Efforts

42.     Following the Court's Motion to Dismiss Order (and while awaiting the Court's ruling on Defendants' Motion for Reconsideration), Lead Plaintiffs began aggressive discovery efforts. Among other things, Lead Plaintiffs propounded multiple sets of written discovery on Defendants, including approximately sixty-three document requests, fifteen interrogatories, and fifty-nine requests for admission. In addition, Lead Plaintiffs served document subpoenas on over thirty relevant nonparties, including financial media and market analysts that reported on Chegg, dozens of universities and colleges that reported systemic cheating on Chegg, and Chegg's ESI vendor regarding document preservation issues. In connection with this discovery, and as discussed in further detail below, the Parties negotiated a protective order to govern the confidentiality of discovery materials ("Protective Order") and an order to govern the production

of electronically stored information ("ESI Protocol").  Counsel to the Parties also held a lengthy conference pursuant to Rule 26(f) and engaged in extensive follow-up meet and confer correspondence over the ensuing weeks—including regarding an apparent failure by Defendants to preserve relevant emails and other internal communications companywide for nearly all of the Class Period—thus prompting Lead Plaintiffs to pursue early and extensive discovery from non-parties (including Chegg's e-discovery vendor) to avoid the prospect of a total (or near total) absence of documentary evidence on key issues.

43.    While Lead Plaintiffs' written discovery requests to Defendants remained outstanding, the Parties agreed to engage in mediation.  However, as a condition for the mediation, Lead Plaintiffs required Defendants to provide expedited discovery targeting the principal issues, individuals, data, and conduct underlying Lead Plaintiffs' claims.  The Parties negotiated the parameters of such discovery, including search terms, custodians, and time period, as well as Defendants' production of specific categories of documents and user engagement and subscriber metrics for Chegg's online platform.  In total, Defendants produced approximately 21,000 documents spanning over 77,000 pages as part of the agreed-upon pre-mediation discovery.  By employing a technology assisted review platform ("TAR") that prioritized the documents most relevant to Lead Plaintiffs' claims after applying human learning (which was frequently updated and optimized by Lead Counsel as discovery progressed), Lead Counsel efficiently and effectively reviewed the overwhelming majority of the pages produced by Defendants and non-parties in the weeks leading up to the mediation.

44.    In negotiating pre-mediation discovery, Defendants agreed to respond to Lead Plaintiffs' outstanding written discovery.  This condition was essential to Lead Plaintiffs' ability to continue the effective and efficient prosecution of the Action if the mediation failed. Accordingly, Lead Counsel carefully reviewed and analyzed all of Defendants' written discovery responses and were prepared to meet-and-confer with counsel to Defendants, and file any necessary motions to compel, if the mediation proved unsuccessful.

45.    These extensive yet targeted discovery efforts provided Lead Plaintiffs and Lead Counsel with a thorough understanding of the strengths and weaknesses of their claims and

Defendants' defenses and assisted Lead Counsel in engaging in an informed mediation process with Defendants and evaluating the fairness of the Settlement.

### 1. Rule 26(f) Report, Initial Disclosures, and Protective Order

46. As noted above, on April 23, 2024, after the Court's denial of Defendants' motion to dismiss, the Parties convened a Rule 26(f) conference. During these discussions, Defendants disclosed that certain potentially relevant documents may no longer be accessible due to Chegg's document retention policy and circumstances surrounding the implementation of its litigation hold. In the weeks and months after the Rule 26(f) conference, Lead Counsel exchanged correspondence with Defendants concerning the preservation issues.

47. Lead Plaintiffs served their Rule 26(a)(1) Initial Disclosures on April 25, 2024, and Defendants served their Rule 26(a)(1) Initial Disclosures on May 29, 2024.

48. On May 7, 2024, the Parties filed a Joint Case Management Statement, advising the Court that they had been unable to reach agreement on certain fundamental case management issues, including whether discovery should be further stayed pending Defendants' Motion for Reconsideration. ECF No. 159. The Parties requested the Court set an initial case management conference, including to resolve this threshold issue.

49. Over the ensuing months, the Parties negotiated the Protective Order and ESI Protocol. The Parties exchanged multiple rounds of edits to each draft document and met and conferred on numerous occasions to resolve their disputes on particular terms, provisions, and concepts. On August 2, 2024, the Parties submitted the agreed-upon Protective Order and ESI Protocol to the Court. ECF Nos. 173, 174. The Court approved the Protective Order and ESI Protocol with modifications on August 5, 2024. ECF Nos. 177, 178.

### 2. Lead Plaintiffs' Discovery Propounded on Defendants

50. On April 25, 2024, Lead Plaintiffs served on Defendants their First Requests for Production of Documents ("First RFPs"), their First Set of Interrogatories ("First Interrogatories"), and their Rule 26(a)(1) Initial Disclosures. The First RFPs included sixty-one individual requests. In general, Lead Plaintiffs requested that Defendants produce documents concerning, among other things: (i) subscriber and user engagement metrics for Chegg's online "learning" platform and

Defendants' monitoring thereof; (ii) the drivers of Chegg's subscriber and revenue growth; (iii) student cheating using Chegg's platform and the Company's efforts to mitigate cheating, such as its Honor Shield" policy; (iv) communications with third parties such as university officials, professors, media, and analysts concerning cheating, Honor Shield, and other relevant topics; (v) Chegg's policies for responding to complaints of cheating on the platform; (vi) Board documents concerning cheating and other relevant topics; (vii) Defendants' compensation and trading in Chegg securities; and (viii) Chegg's document retention policies.

51.     The First Interrogatories likewise sought key information concerning the merits of Lead Plaintiffs' claims, including, among other things: (i) Chegg's user engagement data concerning key metrics indicating legitimate versus illegitimate use of the platform; (ii) allegations of student cheating using Chegg's online platform, and any actions taken in response; (iii) violations of Chegg's policies regarding the answering of questions containing indicia of cheating; (iv) violations of Honor Code; and (v) Defendants' bases for the alleged false and misleading statements.

52.     On May 24, 2024, Lead Plaintiffs served their Second Set of Requests for Production of Documents to Defendants ("Second RFPs").   The Second RFPs focused on documents concerning Chegg's communications with the SEC.

53.     On May 31, 2024, Lead Plaintiffs served on Defendants their Second Set of Interrogatories ("Second Interrogatories"), their First Set of Requests for Admissions ("First RFAs") and Second Sets of Requests for Admissions ("Second RFAs"), and their Third Set of Requests for Production of Documents ("Third RFPs").

54.     The Second Interrogatories focused on facts and information concerning the potential spoliation of documentary evidence, including, among other things: (i) the litigation hold implemented in this Action; (ii) communications with Exterro, Inc. ("Exterro"), the e-discovery vendor Chegg engaged to implement litigation holds in this case and other cases; (iii) sources of relevant ESI; and (iv) Chegg's efforts to preserve such information.   The Third RFPs likewise concerned preservation issues, including documents relating to the timing and scope of litigation hold(s) implemented by Chegg.

55.     The First RFAs and Second RFAs targeted, respectively, key facts relevant to class certification and spoliation.

56.     Given the Parties' dispute regarding whether discovery was stayed pending the Motion for Reconsideration, Defendants did not timely respond to any of Lead Plaintiffs' written discovery requests.  Defendants did, however, substantively respond to Lead Plaintiffs' written discovery requests during the heavily negotiated pre-mediation discovery process.

### 3.     Non-Party Discovery

57.     Lead Plaintiffs did not sit idle while awaiting the Court's decision on Defendants' Motion for Reconsideration.  In addition to corresponding and meeting-and-conferring with Defendants regarding the issues raised at the Rule 26(f) conference, including Defendants' firm position that the PSLRA's discovery stay remained in effect until their Motion for Reconsideration was decided, Lead Plaintiffs served document subpoenas in May and June 2024 on dozens of non-parties, including:  (i) key media outlets that reported on alleged student cheating using Chegg, including *The Boston Globe*, *The Washington Post*, *The New York Times*, *The Hechinger Report*, and *Barron's*; (ii) Exterro; (iii) approximately two dozen colleges, universities, and service academies across the United States, including universities referenced in the Complaint and other colleges and universities where extensive student cheating using Chegg was reported to have occurred; and (iv) certain securities analysts that issued reports on Chegg during the Class Period.

58.     Lead Plaintiffs met and conferred with many of these non-parties to negotiate, among other things, the scope of the subpoenas, categories of responsive documents, search protocols, and claims of privilege over certain of the requested documents.

59.     Ultimately, after months of meet-and-confers and written correspondence between Lead Counsel and the subpoenaed non-parties, Lead Plaintiffs obtained over 47,000 pages of documents pursuant to the non-party subpoenas.  Many of these documents proved highly relevant to Lead Plaintiffs' claims.  For instance, documents produced in response to Lead Plaintiffs' subpoenas to universities showed widespread cheating by students using Chegg, bolstering the evidence already collected by Lead Plaintiffs in support of their claims, particularly regarding the falsity of Defendants' statements.

### 4. Pre-Mediation Discovery

60. After the Court denied the Motion for Reconsideration and while Lead Plaintiffs continued to pursue documents and other written discovery from Defendants, the Parties agreed to an in-person mediation on September 26, 2024 in San Francisco, California. As discussed above, the Parties agreed to exchange certain significant and core discovery materials in advance of the mediation, as part of a pre-mediation discovery process. Over the course of four weeks, Lead Counsel engaged in extensive negotiations with Defendants' Counsel over the appropriate scope of pre-mediation document production, including lengthy efforts to reach agreement on search terms to be employed by Defendants, custodians whose documents would be searched by Defendants, the applicable timeframe, and the search and production of documents from non-custodial sources. Ultimately, Lead Plaintiffs required, and Defendants agreed, that relevant documents from key document custodians—including the Individual Defendants—responsive to Lead Plaintiffs' document requests be produced on an expedited basis prior to the mediation, as well as highly relevant non-custodial documents, including Board materials and detailed subscriber and user engagement metrics. Defendants also agreed to provide substantive responses to Lead Plaintiffs' Interrogatories and Requests for Admissions. In turn, Lead Plaintiffs agreed to provide Defendants with certain documents relevant to Lead Plaintiffs' claims, including documents produced by universities and other institutions of higher learning in response to public records requests.

61. As of the conclusion of the pre-mediation discovery, Defendants had produced approximately 77,000 pages of documents in separate productions between July and August 2024. In addition, Chegg served its Responses to Lead Plaintiffs' First RFAs and its Responses to Lead Plaintiffs' Second RFAs on August 30, 2024.

62. In sum, during the pendency of discovery and prior to the mediation, Lead Plaintiffs: (i) corresponded with Defendants regarding the right to move forward with discovery pending the Motion for Reconsideration; (ii) corresponded with Defendants on numerous occasions via written letters and meet-and-confer conferences concerning document preservation issues; (iii) served dozens of document subpoenas on non-parties and negotiated with those non-

parties and their counsel concerning their responses and document productions; (iv) after the Motion for Reconsideration was denied, met and conferred with Defendants about the search terms and protocols to be used to collect documents and data responsive to the discovery requests; (v) received and reviewed over 31,000 documents (totaling over 124,000 pages) from Defendants and numerous non-parties; (vi) produced to Defendants 6,800 documents, totaling over 40,000 pages; and (vii) engaged and consulted with multiple industry and financial experts.

63.    To facilitate an economical and time-efficient document review process, the majority of documents produced in the litigation were stored and organized in the Reveal electronic database and document review platform. To identify the most relevant documents in advance of the mediation efficiently, Lead Counsel leveraged the Reveal platform's software and predictive tools whereby documents predicted via machine learning as potentially important were ranked and prioritized for review. Attorneys on the litigation team prepared and continuously updated a highly detailed document review instruction manual and protocol. Document reviewers were trained to code documents for their level of responsiveness or importance to the case (e.g., "Hot," "Highly Relevant," "Relevant," "Irrelevant"), for case issues (for example, internal assessment of cheating, third-party allegations of cheating, Chegg's Honor Shield initiative, and scienter), for review by experts, and for potential use with specific deponents. Lead Counsel also developed and continuously updated reference resources to aid members of the document review team, including chronologies of significant events, lists of key players, and a glossary of technical terms and acronyms used by Chegg. Throughout document discovery, senior attorneys monitored the efficiency and quality of the document review, met regularly with more junior and staff attorneys, and discussed key facts uncovered by the review. In addition, Lead Counsel held weekly calls with the supervising attorneys and the document review teams to discuss the status of discovery, the ongoing document review, and litigation status and strategy. Lead Counsel discussed important and/or potentially "hot" and "highly relevant" documents, discovery preparation efforts, and overall strategy for the prosecution of the Action.

## IV.    MEDIATION AND SETTLEMENT

64.    On September 26, 2024, the Parties and Defendants' D&O Insurers participated in a full-day, in-person mediation in San Francisco, California.  Judge Phillips, a former federal judge with extensive experience mediating complex securities and shareholder litigation, led the mediation.  Judge Phillips was assisted by two of his associates, Michele Yoshida and Caroline Cheng, both highly accomplished attorneys with decades of experience specific to alternative dispute resolution in both the public and private sectors.  Prior to the mediation, the Parties submitted comprehensive and detailed mediation statements outlining their respective positions and supported by voluminous exhibits.  Lead Plaintiffs further submitted a response to Defendants' mediation statement before the session.

65.    After a full day of negotiations, Judge Phillips issued a mediator's proposal, accepted by the Parties on a double-blind basis, to settle all claims in the Action for $55 million in cash.  On that same date, the Parties filed a Joint Case Management Statement to inform the Court that the Parties had participated in mediation and had reached an agreement in principle to settle the Action.  ECF No. 179.

66.    Thereafter, the Parties engaged in further negotiations over the non-financial terms of the Settlement and executed the Stipulation on November 5, 2024.  While negotiating the terms of the Stipulation, Lead Counsel began working on various documents to be submitted with Lead Plaintiffs' motion for preliminary approval of the Settlement.  During this time, Lead Counsel also requested and reviewed detailed bids from five different firms specializing in class action notice and claims administration.  As a result of this bidding process, Lead Counsel selected A.B. Data to serve as the claims administrator for the Settlement.  Lead Counsel also worked closely with Lead Plaintiffs' economic expert, Dr. Cain, and his professional staff to develop the proposed Plan of Allocation.

67.    On November 6, 2024, Lead Plaintiffs filed the Unopposed Motion for Preliminary Approval of Class Action Settlement and Memorandum of Points and Authorities in Support Thereof ("Preliminary Approval Motion").  ECF No. 189.  Defendants filed their Non-Opposition to the Preliminary Approval Motion on November 20, 2024.  ECF No. 190.

68.     On December 19, 2024, the Parties appeared before the Court to answer its questions about the proposed Settlement, including the scope of release contained in the Stipulation, the timing of notice to be disseminated to the Settlement Class, and the timeframe for briefing of the Final Approval Motion and for Settlement Class members to file claims to participate in, request exclusion from, or object to the Settlement.

69.     Also on December 19, 2024, the Court entered the Preliminary Approval Order, preliminarily approving the Stipulation and the Settlement as being fair, reasonable, and adequate for purposes of Rule 23 of the Federal Rules of Civil Procedure, subject to further consideration at the Settlement Hearing.  ECF No. 192.  The Court scheduled the Settlement Hearing for April 24, 2025, at 10:00 a.m., to determine whether:  (a) the proposed Settlement on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate to the Settlement Class, and should be approved by the Court; (b) the Judgment attached as Exhibit B to the Stipulation should be entered dismissing the Action with prejudice against Defendant Releasees; (c) the proposed Plan of Allocation for the proceeds of the Settlement is fair and reasonable and should be approved; and (d) the motion by Lead Counsel for an award of attorneys' fees and reimbursement of Litigation Expenses should be approved.

## V.     RISKS FACED BY LEAD PLAINTIFFS IN THE ACTION CONFIRM THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

70.     Based on documents obtained through Lead Counsel's extensive informal and formal discovery, and consultation with industry and economic experts, Lead Plaintiffs believe that they have gathered substantial evidence to support their claims and, barring settlement, were preparing to proceed to trial.  Lead Plaintiffs also realized, however, that they faced credible arguments from Defendants which the Court at class certification or summary judgment, a jury after trial, or an appellate court could have accepted.  Likewise, Chegg's precarious financial condition, uncertain future, and wasting insurance policies presented a severe collectability risk that further supports approval of the Settlement.

### A.     Risks Relating to the Class Certification

71.     Lead Plaintiffs believed there was credible risk that the Court could narrow the Class's claims at a later stage of the case.  For example, Lead Plaintiffs had not yet moved for class certification.  In opposition to Lead Plaintiffs' motion for class certification, Defendants would likely have argued that the Class Period should have been truncated to begin on February 8, 2021— nearly one year after the operative Class Period start date of May 5, 2020—when Defendant Rosensweig directly addressed and refuted media reports about academic cheating fueling Chegg's growth.  Had the Court accepted Defendants' argument, the Class Period, and resulting Class damages, would have been dramatically reduced.

72.     Also, Defendants would have likely contested "price impact" at the class certification stage.  To show reliance in securities fraud class actions, plaintiffs often rely on the fraud-on-the-market presumption, which is premised on the notion that because stock prices incorporate material information, material fraudulent statements will affect stock prices.  To invalidate this presumption, defendants can show that the false statements did not "impact" the trading price of the relevant stock, including by showing a mismatch between the false statements and the ultimate disclosure.  Here, Defendants had previously argued that the corrective disclosure did not relate to or otherwise reveal that cheating had occurred on Chegg's platform and was therefore disconnected from the allegedly false Class Period statements.  *See* ECF No. 122 at 24; ECF No. 155 at 14.  Defendants would have likely argued that this alleged "mismatch" precluded the class from relying on the fraud-on-the-market presumption, possibly preventing the case from proceeding as a class action.

73.     Even if the Court granted class certification after full briefing, there would remain the risk that the Class could be decertified at a later stage, particularly given that the law in this area is still developing.

### B.     Risks Concerning Falsity, Scienter, and Loss Causation / Damages

74.     Defendants argued throughout this litigation that Lead Plaintiffs cannot demonstrate that any of Defendants' statements were false and misleading or made with scienter.

75.     For instance, Defendants argued, and likely would continue to argue at summary judgment or trial, that Lead Plaintiffs could not quantify the extent of cheating that allegedly occurred on Chegg's platform during the Class Period, much less that such cheating drove Chegg's subscriber and revenue growth during the Class Period. ECF No. 122 at 11; ECF No. 155 at 6-8. Indeed, the Court questioned whether there was a "black hole" regarding the quantification of cheating during the oral argument on the motion to dismiss. *See* Dec. 7, 2023 Hr'g Tr., ECF No. 147 at 41:22-42:16. Defendants would also continue to argue, among other things, that the Company's growth was due to legitimate business initiatives, such as its expansion to international markets and its success in curbing account (password) sharing, and that Chegg took significant steps to prevent cheating on its platform. ECF No. 122 at 15; ECF No. 155 at 8. Defendants also would have likely introduced their own internal analyses, which found that misuse of the platform constituted a very small portion of overall subscribers during the Class Period.

76.     Defendants also maintained that the evidence would demonstrate Chegg's senior management acted without the required fraudulent intent (scienter). Defendants likely would argue during summary judgment, and again at trial, that the Company implemented measures to prevent cheating on its platform, such as its "Honor Shield" software aimed at preventing cheating and supporting academic integrity, and that instances of cheating were not statistically significant compared to the overall user base, such that Defendants believed their statements were true. *See* ECF No. 122 at 20; ECF No. 155 at 10. Additionally, Defendants would continue to argue that, at the time the allegedly false and misleading statements were made, Company executives believed in good faith that Chegg was providing legitimate academic support to students and the pandemic had merely accelerated a growing transition to online learning. ECF No. 122 at 24.

77.     Lead Plaintiffs also faced risks proving loss causation and damages. Defendants previously argued that Lead Plaintiffs did not demonstrate a causal connection between cheating and Chegg's reduced FY'21 guidance because the reduced guidance was due to lower university enrollments rather than any the purported inability to cheat using Chegg once students returned to campus. ECF No. 122 at 24-25; ECF No. 155 at 12-15. Indeed, Defendants would have asserted that the market, including most securities analysts, overwhelmingly accepted Chegg's explanation

that the earning shortfall and reduced guidance were attributable to industrywide and macroeconomic factors, rather than cheating becoming more difficult (and Chegg less useful) when students returned to on-campus learning, as Lead Plaintiffs had alleged. Further, as Defendants had previously asserted, Lead Plaintiffs' theory that Chegg reported disappointing financial results, declining subscribership, and reduced guidance because students began to return to campus in Q3 2021, and could no longer easily use Chegg to cheat on exams, was undermined by the data showing that: (i) college students began returning to campus over a year earlier without impacting Chegg's growth, and (ii) Chegg's subscribers and revenues increased after the end of the Class Period. *See* ECF No. 122 at 24.

78.    Like loss causation, the issue of damages would have been hotly disputed and the subject of competing expert testimony. Defendants would have disputed what portion, if any, of Chegg's stock price decline following the alleged corrective disclosure was attributable to the alleged fraud, as opposed to other factors affecting the Company's business. This presented a critical "disaggregation" issue on which Lead Plaintiffs bear the burden of proof. Defendants also would likely have presented evidence from an expert who would opine that the Settlement Class's damages were vastly less than what Lead Plaintiffs' expert calculated or were non-existent. This "battle of the experts" would create an additional litigation risk because the reaction of a trier of fact to such expert testimony is highly unpredictable, creating uncertainty regarding how much weight a judge or jury will accord the analysis of the Parties' competing experts. Furthermore, where, as here, the damage theories rest primarily on the testimony and reports of experts, the plaintiff faces serious risks of having its damage theories rejected by the court on a *Daubert* motion.

79.    In sum, there was distinct possibility that the Court or a jury could have found that Lead Plaintiffs' inability to quantify the precise level of cheating on Chegg's platform precluded a finding that the alleged statements were false or misleading, that all or some of the Defendants lacked scienter, or that the alleged corrective disclosure did not correct the alleged false statements, such that Lead Plaintiffs could not establish liability, price impact, or damages. Without the Settlement at this time, the Parties potentially faced years of litigating this Action, including

1  through class certification, further discovery, summary judgment, pre- and post-trial motions, trial,
2  and likely post-trial appeals.

3      **C.**    **Collectability Risk**

4      80.    Even if Lead Plaintiffs had fully prevailed on every issue and secured a judgment
5  for the full measure of damages calculated by their expert, Lead Plaintiffs recognized a substantial
6  risk that they would be unable to collect more than the Settlement Amount—and possibly nothing
7  at all— due to Chegg's weak financial condition, balance sheet constraints, uncertain future, and
8  the limitations of its D&O liability insurance.

9      81.    On September 26, 2024, the date the Settlement was reached, Chegg's stock price
10  closed at only approximately $1.63 per share (compared to a Class Period-high of over $110 per
11  share), giving the Company a market capitalization of approximately $170 million—a small
12  fraction of Lead Plaintiffs' maximum potential damages.  The Settlement Amount therefore
13  represents nearly a third of the Company's entire market capitalization at the time of the
14  Settlement.[6]  Lead Plaintiffs were and are also cognizant of the fact that the Company has
15  practically no ability to fund a substantial (or even nominal) settlement or judgment.  Indeed, on
16  June 17, 2024, Chegg announced a restructuring plan that included mass layoffs, the closure of
17  two offices, and other severe cost-cutting measures.  On August 5, 2024, Chegg reported only
18  approximately $133 million in cash and cash equivalents as of June 30, 2024, a net loss for the
19  three months ended June 30, 2024 of approximately $617 million, and total outstanding debt of
20  approximately $601 million (including $357 million in convertible notes maturing in 2025)—
21  leaving the Company with a net cash balance of only $4.5 million.  On November 12, 2024, the
22  Company announced "additional restructuring," including a further 21% workforce reduction.  As
23  a practical matter, the only funds realistically available to fund the Settlement were therefore the
24  proceeds from Chegg's D&O insurance policies—and these funds were all wasting assets which
25  would be vastly, if not entirely, depleted were the Action to proceed through trial and appeals.

26
27
28

---

[6] As of February 26, 2025, Chegg's stock price and market capitalization has further decreased to $1.03 per share and $108 million, respectively, further highlighting the prudence of the Settlement.

### D.    The Settlement is Reasonable in Light of the Potential Recovery in the Action

82.    In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages.  Indeed, the $55 million Settlement Amount would have ranked in the top 20% of all securities class action settlements in 2023 and the top 15% of all securities class action settlements between 2014-2022.[7]  Moreover, this Settlement far exceeds (i) the median recovery size of $15.0 million for all securities class action settlements in 2023; (ii) the $10.4 million median recovery for securities class action settlements between 2014-2022 nationwide; and (iii) the $9 million median recovery in securities class action settlements in the Ninth Circuit from 2014 through 2023.[8]

83.    Lead Plaintiffs' expert, Dr. Cain, has calculated the maximum possible value of the recovery if Lead Plaintiffs were to prevail fully on all of their claims.  Dr. Cain calculated the maximum damages for the full proposed class period and the truncated class period that Defendants likely would have advocated—assuming that Lead Plaintiffs succeed on every issue and offsetting gains on pre-class period holdings sold into the alleged fraud at artificially inflated prices—to range from approximately $893 million to $1.4 billion.  *See* Cain Decl., ECF No. 189-3 at ¶¶ 6, 17-18.[9]  Dr. Cain also estimated that the Settlement Class includes over 84 million damaged shares.

84.    Therefore, the $55 million recovery is two to three times the 2% median percentage of similar recoveries in cases exceeding $1 billion in damages (as it represents a recovery of 4% to 6% of maximum damages recoverable at trial), and is consistent with the 4.5% median recovery for all securities fraud class actions.[10]  Courts have routinely approved similar settlements as fair and reasonable.

85.    Given the meaningful litigation risks, severe collectability risk, and the immediacy and size of the $55,000,000 recovery for the Settlement Class, Lead Plaintiffs and Lead Counsel

---

[7] *See* Ex. F, Cornerstone Report, at 4.

[8] *Id.* at 4, 20.

[9] *Id.* at 6, 8.

[10] *Id.*

believe that the Settlement is fair, reasonable, and adequate, and is in the best interest of the Settlement Class.

## VI.   LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER

86.    Pursuant to the Preliminary Approval Order, the Court approved the form and content of the Postcard Notice, Notice, and Summary Notice (collectively, the "Settlement Notices"). The Court also appointed A.B. Data as the claims administrator in the Action and instructed it to disseminate copies of the Postcard Notice to all Settlement Class Members who can be identified with reasonable effort, as well as to nearly 5,000 brokerage firms, banks, and other entities that regularly act as "nominees" for beneficial purchasers of stock. A.B. Data was also instructed to post the Notice and Claim Form on the Settlement Website and further to publish Summary Notice in *Investor's Business Daily* and over *PR Newswire*.

87.    Lead Plaintiffs fully complied with the Court's order. The Summary Notice was published in *Investor's Business Daily* and transmitted over *PR Newswire* on January 6, 2025. Beginning on January 8, 2025, the Postcard Notices were emailed or mailed to all known potential Class Members as well as to the institutions on A.B. Data's proprietary database of over 4,900 banks, brokers, and other nominees who hold shares on behalf of beneficial purchasers. *See* Brauns Decl. ¶¶ 4-12. The letter sent to the entities on A.B. Data's propriety list of nominees notified the nominees of the Settlement and requested that within seven days, they either (i) request additional copies of the Postcard Notice to send to the beneficial owners of the securities (which they would then provide to the beneficial owners within seven days of receipt), or (ii) provide to A.B. Data the names and addresses of such beneficial owners so that A.B. Data could provide the Postcard Notice directly.

88.    In the aggregate, as of February 26, 2025, A.B. Data has disseminated 91,343 copies of the Postcard Notice to potential Class Members and their nominees. *See* Brauns Decl. ¶ 11.

89.    The Settlement Website, which allows for Settlement Class Members to submit online claim filings, went live on January 6, 2025, and included downloadable copies the

Stipulation, the Preliminary Approval Order, the Settlement Notices, the Claim Form, and other relevant documents. *See* Brauns Decl. ¶ 13-15.

90.     The Settlement Notices, previously approved by the Court, advise Settlement Class Members of the essential terms of the Settlement, set forth the procedure for objecting to or opting out of the Settlement, and provide specifics on the date, time, and place for the Settlement Hearing. The Settlement Notices also contain information regarding Lead Counsel's fee and expense application and the proposed Plan of Allocation. As explained in the Final Approval Memorandum and as previously noted by the Court, this notice program "is the best notice practicable under the circumstances," is "reasonably calculated" to inform Settlement Class Members of their rights, "constitutes due, adequate, and sufficient notice" and "satisfies the requirements of Rule 23 . . . the United States Constitution (including the Due Process Clause), [and] the Private Securities Litigation Reform Act." *See* Preliminary Approval Order at ¶ 8.

91.     Pursuant to the terms of the Preliminary Approval Order, the deadline for Class Members to submit objections to the Settlement, the Plan of Allocation, or the fee and expense application, or to request exclusion from the Class is March 27, 2025. To date, Lead Counsel have received no objections to the Settlement and only one request for exclusion from the Class from an individual claiming to have purchased a *de minimis* number of Chegg shares during the Settlement Class Period. *See* Brauns Decl. ¶ 19.

92.     Should any objections to the Settlement or additional requests for exclusion be received, Lead Plaintiffs will address them in their reply papers, which will be filed on April 10, 2025.

## VII.     PLAN OF ALLOCATION

93.     In the Court-approved Notice, Lead Plaintiffs proposed a plan to allocate the Net Settlement Fund among Settlement Class Members who submit valid proofs of claim. The objective of the proposed Plan of Allocation is to distribute the Settlement proceeds equitably, on a *pro rata* basis, to those members of the Settlement Class who suffered economic losses as a result of Defendants' alleged misrepresentations and omissions.

94.   The Plan of Allocation is based on the premise that the decrease in Chegg's common stock on November 2, 2021—the trading date after the corrective disclosure—may be used to measure the alleged artificial inflation in the price of Chegg common stock prior to the disclosure.

95.   Lead Plaintiffs engaged Dr. Cain to assist in formulating the Plan of Allocation. Dr. Cain calculated the amount of estimated artificial inflation in the per share closing price of Chegg common stock that was allegedly proximately caused by Defendants' false and misleading statements.  In so doing, Dr. Cain considered price changes in Chegg common stock in reaction to the alleged corrective disclosure, adjusting for any price changes attributable to market or industry forces.  Calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

96.   An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including when the Claimant purchased or acquired Chegg common stock during the Settlement Class Period, in what amounts, and if any common stock was sold, when it was sold and in what amounts, as well as the number of valid claims filed by other Claimants.

97.   If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Claimant.  Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose payments are $10.00 or greater.  In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.

98.   The Notice set forth and explained the proposed Plan of Allocation to Settlement Class Members.  It was prepared in consultation with Lead Plaintiffs' expert, tracks a theory of damages asserted by Lead Plaintiffs, is substantially similar to numerous other plans that have been approved in this District and around the country, and is fair, reasonable, and adequate to the

Class as a whole.  To date, there have been no objections to the proposed Plan of Allocation, further underscoring its fairness.

## VIII.   LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

99.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees of 25% the Settlement Fund or $13,750,000, plus interest earned at the same rate as the Settlement Fund.  Lead Counsel also requests reimbursement of the out-of-pocket expenses that Lead Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $261,602.23, plus interest earned at the same rate as the Settlement Fund.  Finally, Lead Counsel requests reimbursement to Lead Plaintiffs in the amounts of $3,500 for Lead Plaintiff KBC and $1,400 for Lead Plaintiff Pompano P&F, for costs incurred directly related to their representation of the Class pursuant to 15 U.S.C. § 78u-4(a)(4).  The legal authorities supporting a 25% fee award and expense reimbursement are set forth in the accompanying Fee Memorandum, filed contemporaneously herewith.

### A.    The Requested Attorneys' Fees Are Reasonable

#### 1.    The Excellent Outcome is the Result of Significant Time and Labor that Lead Counsel Devoted to the Action

100.    The work undertaken by Lead Counsel in investigating and prosecuting the Action and arriving at the Settlement in the face of substantial risks has been time-consuming and challenging.  At all times throughout the pendency of the Action, for a period of over three years, Lead Counsel's efforts were driven and focused on advancing the Action to bring about the most successful outcome for the Settlement Class.

101.    Attached hereto as Exhibits D & E are declarations from Motley Rice and Saxena White, respectively, in support of an award of attorneys' fees and reimbursement of litigation expenses.  The declarations show that Lead Counsel have expended more than 13,110 hours in the prosecution of this Action and set forth tables reflecting the lodestar of each individual who worked on this case from its inception and their position, through and including February 21, 2025, a summary of hours by category, and attaches the firm resumes.  The tables in the exhibits to the

declarations from Motley Rice and Saxena White were prepared from contemporaneous daily time records regularly prepared and maintained by Lead Counsel. Time expended in preparing the application for fees and reimbursement of expenses has been excluded.

102. Accordingly, the recovery obtained for the Class was the result of thorough and diligent prosecutorial and investigative efforts, motion practice, extensive discovery efforts, and hard-fought settlement negotiations. As a result of this Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery (or a significantly lower recovery) in the absence of a settlement.

103. Aside from showing the significant effort involved in reaching this result, the exhibits to the declarations from Motley Rice and Saxena White confirm that a lodestar cross-check fully supports the requested award. A lodestar cross-check can be performed by multiplying the number of hours expended in the litigation by the hourly rates of the attorneys. While a lodestar cross-check is often a useful tool in determining the reasonability of a fee request, the decision of whether or not to perform one is within the Court's discretion.

104. Under the lodestar cross-check method, a court engages in a two-step analysis: first, the court multiplies the number of hours each attorney spent working on the case by each attorney's reasonable hourly rate to determine the lodestar; and second, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained, and the quality of the attorney's work.

105. Lead Counsel believes that the time of Lead Counsel attorneys and staff was reasonable and necessary for the effective and efficient prosecution and resolution of the Action. Indeed, the prosecution of this case was undertaken with a focus on efficiency and the avoidance of duplication. Despite the duration of the case and the time-intensive nature of the work, the knowledge and experience of the personnel who worked the most on the matter was utilized to optimize the outcome for the Class. Additionally, numerous attorneys contributed to the successful prosecution of the case in many significant ways. For example, several senior attorneys at Motley Rice and Saxena White, including the undersigned, were intimately involved in litigating, mediating, and ultimately resolving the case. Lead Counsel took steps to avoid duplication of

efforts (both as between lawyers at Motley Rice and Saxena White and internally at each firm), including breaking out specific research and drafting of the Complaint and oppositions to Defendants' Motion to Dismiss and Motion for Reconsideration to specific attorneys, assigning a single attorney to negotiate the terms of and preconditions for the mediation (including the parameters and timeframe of the pre-mediation discovery), and assigning a single attorney from one firm to handle negotiations with each non-party subpoena recipient.

106.    The hourly rates of Lead Counsel in this Action are reasonable and have been approved by numerous courts in the Ninth Circuit in awarding fee requests in other securities class action settlements. *See, e.g.*, *In re FibroGen, Inc. Sec. Litig.*, No. 3:21-cv-02623-EMC, ECF No. 252, Ex. E-1 (N.D. Cal. Apr. 4, 2024) and ECF No. 259 at 1-2 (N.D. Cal. Aug. 1, 2024) (approving Saxena White's rates of $1,085 for shareholders, $825-$1,085 for directors, and $400-$795 for attorneys and senior attorneys); *Hayden v. Portola Pharms., Inc.*, No. 3:20-cv-00367-VC, ECF No. 247 at 18 (N.D. Cal. Jan. 26, 2023) (setting forth Saxena White's then-current rates of $775-$1,065 for partners, $830-$890 for of counsel, and $400-$680 for other attorneys, including staff attorneys) and 2023 WL 2375242, at *1 (N.D. Cal. Mar. 6, 2023) and ECF No. 259 at 2 (N.D. Cal. Mar. 6, 2023) (approving fee request); *In re Twitter Sec. Litig.*, No. 4:16-cv-05314-JST, ECF No. 664-1 (N.D. Cal. Oct. 13, 2022) (setting forth Motley Rice's then-current rates of $725-$1,100 for member attorneys, $425-$600 for associate attorneys, and $175-$750 for paralegals and other litigation support professionals) and ECF No. 670 at 1 (N.D. Cal. Nov. 21, 2022) (approving fee request).

107.    Notably, Lead Counsel's rates often fall below those of lawyers employed by Chegg's counsel, which for the first quarter of 2022 ranged from $1,180 to $1,590 for partners, $1,165 to $1,175 for special counsel; and $720 to $1,155 for associates. *See* Sixth Interim Application of Cooley LLP at 4-6, *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Bankr. D. Del. May 17, 2022), ECF No. 7392. *See also Application of the Official Committee of Unsecured Creditors of AIO US, Inc., et al.*, for Entry of an Order Authorizing the Employment and Retention of Cooley LLP as of September 3, 2024 at 6, *In re: AIO US, Inc.*, No. 24-11836 (CTG) (Bankr. D.

Del. Oct. 3, 2024), ECF No. 244 (noting hourly rates of $1,450 to $2,290 for Cooley's partners; $1,205 to $2,375 for "counsel"; and $760 to $1,395 for associates).

108.    Accordingly, as set forth above and in detail in Lead Counsel's Declarations, the requested fee of 25% of the Settlement Fund equals $13,750,000 (plus interest earned at the same rate as the Settlement Fund) and therefore represents an extremely modest multiplier of 1.4 to Lead Counsel's lodestar.  Lead Counsel collectively spent 13,110 hours in connection with the Litigation (3,502.75 hours from Motley Rice, see Ex. 1 to Motley Rice Decl.; 9,607.25 hours from Saxena White (including 25 hours by Gregg Rossman, Pompano P&F's fiduciary counsel), see Ex. 1 to Saxena White Decl.), resulting in a total lodestar of $9,811,027.75.

109.    Moreover, Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval.  Among other things, Lead Counsel will continue working with A.B. Data to resolve any issues with Claims submitted by Settlement Class Members, will draft and file a motion for distribution, and will oversee the distribution process. No additional compensation will be sought for this work.  Thus, the multiplier will be smaller by the time the case ultimately concludes.  As detailed in the Fee Memorandum, this level of multiplier is well within the range of multipliers regularly approved in this Circuit and strongly indicates that the 25% benchmark request is fair and reasonable.

### 2.    Lead Plaintiffs Support the Fee Application

110.    As set forth in their declarations, Lead Plaintiffs have evaluated the Settlement and concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class Members, and the risks of the Action.  *See* KBC Decl. ¶ 8; Pompano P&F Decl. ¶ 10.  Lead Plaintiffs—both institutional investors—have been intimately involved in this case since its earliest stages, and their endorsement of Lead Counsel's fee request supports its reasonableness and should be given weight in the Court's consideration of the fee award.

### 3.    The Unique Complexities of the Litigation

111.    The risks faced by Lead Counsel in prosecuting this Action are highly pertinent to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement.

Here, Defendants adamantly deny any wrongdoing and, if the Action had continued, would have aggressively litigated their defenses through summary judgment, a trial, and the appeals that would likely follow.  As detailed above, Lead Counsel and Lead Plaintiffs faced significant risks to proving Defendants' liability, loss causation, and damages if the Action continued.

112.    These case-specific litigation risks addressed above are in addition to the more typical risks accompanying securities litigation generally, such as the fact that the Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws, and that it was undertaken on a fully contingent basis.  Lead Counsel understood from the outset that they were embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that vigorous prosecution of this case would require.  In undertaking that responsibility, Lead Counsel were required to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the prosecution of the Action, and that funds were available to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on ongoing basis.  Lead Counsel have already dedicated over 13,110 hours in prosecuting this Action for the benefit of Chegg investors without compensation for their efforts.

113.    Lead Counsel also bore the risk that no recovery would be achieved (or that a judgment could not be collected, in whole or in part).  Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as here, is never assured.  Lead Counsel is cognizant that the commencement and ongoing prosecution of a class action does not guarantee a settlement.[11]  To the contrary, it takes hard work and diligence by skilled counsel to develop the

---

[11] For example, there are many appellate decisions affirming summary judgments and directed verdicts for defendants showing that even surviving a motion to dismiss is no guarantee of recovery.  *See, e.g.*, *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) (affirming district court's grant of summary judgment to defendants after eight years of litigation, and after plaintiff's counsel incurred over $6 million in expenses, and worked over 100,000 hours, representing a lodestar of approximately $40 million); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999) (affirming district court's grant of motion for summary judgment); *see also In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68 (1st Cir. 2012) (same); *Phillips v. Scientific-*

1    facts and legal theories that are needed to sustain a complaint or win at trial, or to convince

2    sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

3        114.    Successfully opposing a motion for summary judgment is also not a guarantee that

4    plaintiffs will prevail at trial.  Indeed, several securities fraud cases in this Circuit tried to a jury

5    have been lost in their entirety.  *See In re Tesla Inc. Sec. Litig.*, 2023 WL 4032010, at *1 (N.D.

6    Cal. June 14, 2023) (although the Court granted partial summary judgment on falsity and scienter

7    to plaintiff in securities class action, the jury returned a verdict for defendants); *see also In re JDS

8    Uniphase Corp. Sec. Litig.*, 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (after a lengthy trial

9    involving securities claims, the jury reached a verdict in defendants' favor).   Additionally, a

10   plaintiff who succeeds at trial still may find its verdict overturned on appeal.  *See, e.g.*, *Glickenhaus

11   & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing $2.46 billion jury verdict

12   in favor of plaintiffs).  And, even when a plaintiff obtains a jury verdict, it still may face substantial

13   challenges in securing a recovery.

14        Additionally, courts have held repeatedly that it is in the public interest to have experienced

15   and able counsel enforce the securities laws and regulations pertaining to the duties of officers and

16   directors of public companies.  *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

17   308, 313 (2007) (Supreme Court noting that securities class actions are "an essential supplement

18   to criminal prosecutions and civil enforcement actions" brought by the SEC); *Cohn v. Nelson*, 375

19   F. Supp. 2d 844, 865 (E.D. Mo. 2005) ("The Supreme Court has emphasized that while private

20   actions provide a most effective weapon in the enforcement of the securities laws and are a

21   necessary supplement to [SEC] action, it is imperative that the filing of contingent class action and

22   derivative lawsuits not be chilled by the failure to award attorneys fees or by the imposition of fee

23   awards that fail to adequately compensate counsel for the risks of pursuing such litigation."

24   (internal marks omitted)).   As recognized by Congress through the passage of the PSLRA,

25   vigorous private enforcement of the federal securities laws and state corporation laws can occur

26   only if private investors, particularly institutional investors, take an active role in protecting the

27

28   *Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012) (same); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3rd Cir. 2007) (same).

interests of shareholders.  If this important policy is to be carried out, courts should award fees that will adequately compensate private plaintiff's counsel, considering the enormous risks undertaken with a clear view of the economics of a securities class action.  *See, e.g.*, *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *17 n.15 (S.D.N.Y. Dec. 19, 2014) ("Courts have [] recognized that, in addition to providing just compensation, awards of attorneys' fees from a common fund serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future misconduct of a similar nature.").

115.    Here, Lead Counsel's diligent efforts in the face of substantial risks and uncertainties have resulted in a significant and immediate recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of Lead Counsel's substantial effort and the very favorable result achieved, the requested benchmark fee of 25% of the Settlement Fund is reasonable and should be approved.  *See generally* Fee Memorandum.

### 4.    Standing and Expertise of Lead Counsel

116.    The skill and diligence of Lead Counsel also supports the requested fee.  Motley Rice's expertise and experience in securities litigation is set forth in the firm's Shareholder and Securities Fraud Resume, which is Exhibit 6 to the Motley Rice Declaration.  As detailed therein, Motley Rice has served as lead or co-lead counsel in numerous securities class actions throughout the United States.  Those actions have recovered billions of dollars for investors.  In 2022, for example, Motley Rice was recognized by the Institutional Shareholder Services ("ISS"), in its "Securities Class Action Services Top 50" report, as having recovered $809.5 million for shareholders in 2022, which involved the single largest settlement during the year, and which remains one of the largest settlements ever achieved within the Ninth Circuit.  *See* ISS Securities Class Action Services, *Top 50 of 2022*, at 4 (Feb. 28, 2023).

117.    Similarly, the expertise and experience of Saxena White's attorneys are described in its firm resume, attached as Exhibit 4 to the Saxena White Declaration.  As detailed therein, since its founding in 2006, Saxena White has recovered over $2 billion on behalf investors in complex securities and shareholder litigation, and succeeded in changing how companies do business by requiring the implementation of significant corporate governance changes.

Recognized for its "effective representation of institutional investors in securities fraud class actions, and expertise in shareholder litigation," Saxena White is one of only a handful of firms ranked by Chambers USA 2024 in the Nationwide category for Securities: Litigation – Mainly Plaintiff. Saxena White has achieved this honor for four years in a row, starting in 2020. Saxena White has also ranked in ISS's top-five list for three of the last six years, which recognizes plaintiffs' firms by the annual aggregate dollar value of securities class action settlements obtained for investors.

118. Lead Counsel believe their extensive experience in the securities field (and the ability of their attorneys) added valuable leverage during settlement negotiations. Indeed, the substantial result achieved for the Class here reflects the superior quality of Lead Counsel's representation.

119. The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of their opposition. Defendants were represented by experienced attorneys from Cooley LLP, a global law firm with approximately 1,300 attorneys and 19 offices worldwide—including over 100 lawyers focused on securities litigation (as described on the firm website)—with a well-deserved reputation for vigorous advocacy in the defense of complex civil cases. Despite this formidable opposition, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that will significantly benefit the Settlement Class.

**B.    Request for Litigation Expenses**

120. Lead Counsel also seek payment from the Settlement Fund of $261,602.23 in litigation expenses reasonably and necessarily incurred in connection with commencing and prosecuting the claims against Defendants.

121. From the beginning of the case, Lead Counsel were aware that they may not recover any of their expenses and, at the very least, would not recover anything unless and until the Action was successfully resolved. Thus, Lead Counsel were motivated to, and did, take steps to reduce their expenses when practicable without jeopardizing the vigorous and efficient prosecution of the case.

122.     Lead Counsel maintained strict control over the litigation expenses incurred in connection with the Action.  For instance, they maintained control over the primary expenses in the Action by managing a joint litigation fund ("Joint Litigation Expense Fund" or "Litigation Fund").  A description of the expenses incurred by the Litigation Fund by category is included in the individual firm declarations submitted on behalf of Lead Counsel.  *See* Ex. 4 to Motley Rice Decl. and Ex. 3 to Saxena White Decl.

123.     The Motley Rice Declaration and Saxena White Declaration summarize by category the expenses incurred by Lead Counsel in connection with the prosecution of this Action. *See generally* Exhibits D & E.  The expenses are reflected on the books and records maintained by Lead Counsel.  These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.

124.     The expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in complex commercial litigation and routinely paid by non-contingent clients in the private legal marketplace.  Lead Counsel's expenses include court costs and mediation fees, process servers, online legal and factual research, expert and consultant fees, costs related to the document productions and data hosting and analysis on an eDiscovery platform, printing and reproduction, and postage and delivery expenses.

125.     Regarding expert expenses, Lead Counsel engaged with academic integrity consultants to thoroughly understand and investigate the allegations asserted in the Complaint. Moreover, Lead Counsel worked extensively with Lead Plaintiffs' economic experts on issues related to market efficiency, loss causation, and damages.  This work was instrumental in Lead Counsel's appraisal of the claims, preparing for a likely class certification motion, and ultimately bringing about the favorable result achieved.

126.     Lead Counsel also incurred the expense of retaining a database providers to host and manage the data from the extensive document productions made in the Action, as well as documents collected for prompt production once Defendants served written discovery.

127.     Regarding mediation fees, Lead Counsel incurred a total of $32,500 in connection with the mediation session with Judge Phillips and his associates.

128.    Lead Counsel incurred significant costs for online legal and factual research, which were incurred from vendors such as LexisNexis, PACER, Thomson Reuters, Bloomberg BNA, and Westlaw.  These resources were used to obtain access to SEC filings, factual databases, legal research, and citation verification.

129.    All of the litigation expenses for which Lead Counsel seeks reimbursement, which total $261,602.23, were necessary to the successful prosecution and resolution of the claims against Defendants.  This total expense amount is well below the $490,000 maximum expense amount contained in the Settlement Notices.

C.    **Lead Plaintiffs Should be Reimbursed Pursuant to the PSLRA**

130.    The PSLRA limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."  15 U.S.C. § 78u-4(a)(4).  Here, as explained in their declarations, Lead Plaintiffs are seeking the modest aggregate amount of $4,900 ($3,500 for KBC and $1,400 for Pompano P&F) related to their active participation in the Action.  *See* KBC Decl. ¶¶ 10-11; Pompano P&F Decl. ¶¶ 3-6; 15.

131.    As discussed in the accompanying Fee Memorandum, numerous courts have approved payments to compensate class representatives for their costs and efforts on behalf of a class.

132.    As discussed in the Lead Plaintiffs' supporting declarations, each of the Lead Plaintiffs have been fully committed to pursuing the Class's claims since they became involved in the litigation over three years ago.  Lead Plaintiffs' efforts required their employees to dedicate time and resources to this Action that would have otherwise been devoted to serving KBC and Pompano P&F and their beneficiaries.  The efforts expended by KBC and Pompano P&F representatives and employees throughout this Action, as detailed in Exhibits A and B hereto, fully support the instant request for a service award under the PSLRA in connection with services rendered in the Action.

1

**D.    The Reaction to Date of the Class to the Fee and Expense Application**

2      133.    As mentioned above, consistent with the Preliminary Approval Order, as of

3  February 26, 2025, a total of 91,343 Postcard Notices have been emailed or mailed to potential

4  Class Members and nominees.  *See* Brauns Decl.  ¶ 11.  The Postcard Notice states that Lead

5  Counsel would seek an award of attorneys' fees not to exceed 25% of the Settlement Fund, plus

6  accrued interest, and payment of expenses in an amount not greater than $490,000, plus accrued

7  interest.  Additionally, the Summary Notice, which also disclosed the fee request, was published

8  in *Investor's Business Daily*, and transmitted over the internet using *PR Newswire*.  *Id.* ¶ 12.  Since

9  January 6, 2025, the Notice and the Stipulation have been available for download from the

10  settlement website maintained by the Claims Administrator.  *Id.* ¶ 13-15.  The Notice further

11  discloses that Lead Plaintiffs may seek a reimbursement of the reasonable costs and expenses

12  incurred by Lead Plaintiffs directly related to their representation of the Settlement Class in an

13  amount not to exceed $20,000. *Id.*

14      134.    The deadline for Class Members to object to the requested fees and expenses is

15  March 27, 2025.  Although this deadline has not yet passed, to date, Lead Counsel has received no

16  objections to the requested fee and no objections to the requested expenses.  Lead Counsel will

17  respond to any objections that may be received subsequently in its reply papers that are due to be

18  filed with the Court on April 10, 2025.

19  **IX.    <u>CONCLUSION</u>**

20      135.    In view of the significant recovery to the Class and the substantial risks of this

21  litigation, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement should be

22  approved as fair, reasonable, and adequate, and that the Plan of Allocation should likewise be

23  approved as fair, reasonable, and adequate.  In view of the significant recovery in the face of

24  substantial risks, the quality of work performed, the contingent nature of the fee, and the experience

25  of Lead Counsel, Lead Counsel respectfully request that the Court award attorneys' fees in the

26  amount of 25% of the Settlement Fund and expenses in the amount of $261,602.23, plus the

27  interest earned thereon.  In addition, Lead Counsel respectfully submit that Lead Plaintiffs should

28  be awarded the total sum of $4,900 related to their active participation in the Action.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 27th day of February, 2025, at Solana Beach, California.

/s/ David R. Kaplan
DAVID R. KAPLAN

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 27th day of February, 2025, at Mount Pleasant, South Carolina.

/s/ Christopher F. Moriarty
CHRISTOPHER F. MORIARTY