UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN LEVENTHAL,<br><br>Plaintiff,<br><br>v.<br><br>CHEGG, INC., et al.,<br><br>Defendants. | Case No. 21-cv-09953-PCP<br><br>**ORDER GRANTING MOTION FOR FINAL APPROVAL OF SETTLEMENT AND GRANTING MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**<br><br>Re: Dkt. Nos. 193, 194 |

Before the Court are plaintiffs' motions for final settlement approval and for attorneys' fees and expenses. One objection to the motion for final approval has been submitted. For the following reasons, the Court grants both motions.

**BACKGROUND**

This is a securities fraud class action lawsuit by lead plaintiffs Pompano Beach Police and Firefighters' Retirement System ("Pompano Beach P&F") and KBC Asset Management NV against defendants Chegg, Inc., Chegg CEO Daniel Rosensweig, Chegg CFO Andrew Brown, and Chegg President of Learning Services Nathan Schultz. The Court appointed KBC and Pompano Beach P&F as lead plaintiffs after concluding that they were the plaintiffs with the largest financial stake in the litigation. They assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 promulgated thereunder, and Section 20A of the Exchange Act on behalf of a class of individuals and entities who purchased Chegg common stock between May 5, 2020 and November 1, 2021 ("the "Class Period").

Chegg is a publicly traded educational technology company that provides textbook rentals, online tutoring services, and homework help to students. Chegg is comprised of two main business

segments: (1) Chegg Services, which includes online subscription products such as "Expert Q&A," wherein freelance experts answer students' academic questions in nearly real-time; and (2) Required Materials, which consists of the company's print and electronic textbook offerings. Plaintiffs allege that Chegg defendants made material misrepresentations that inflated the company's stock price (which peaked in February 2021) and eventually caused a steep stock price decline in early November 2021. Specifically, plaintiffs allege that defendants attributed Chegg's unprecedented growth during the COVID-19 pandemic to the growing trend of online learning rather than rampant cheating on the platform. Plaintiffs contend that remote learning environments during the pandemic accelerated Expert Q&A subscriptions, through which students cheated on graded assignments and exams, and that Chegg failed to fully disclose the extent of this cheating to protect its market valuation.

After the operative complaint was filed, the parties engaged in extensive motions practice regarding the adequacy of plaintiffs' pleadings. First, in February 2023, defendants moved to dismiss the consolidated class action complaint. After full briefing and a hearing, the Court denied the motion to dismiss. Then, in April 2024, defendants moved for reconsideration of that order or, in the alternative, for the Court to certify the order for interlocutory appeal. The Court again ordered full briefing and ultimately denied the motion in July 2024.

The parties also engaged in extensive discovery and two rounds of mediation before reaching the proposed settlement. Lead plaintiffs first engaged in informal discovery, building a collection of internal university documents, detailed accounts of dozens of witnesses, and an empirical analysis of Chegg's online platform. Formal discovery commenced in March 2024 when plaintiffs served interrogatories, requests for production, and requests for admission. Plaintiffs served over thirty non-party subpoenas. Defendants produced roughly 77,000 pages of custodial emails from the individual defendants as well as user engagement metrics covering date ranges before, during, and after the Class Period. Plaintiffs also obtained 47,000 pages of documents from non-parties. On August 2, 2024, the parties agreed to participate in private mediation, which took place on September 26, 2024. After their full-day, in-person mediation, the parties agreed to the mediator's proposal and notified the Court of their settlement agreement.

1  On November 6, 2024, the parties moved for preliminary approval of a class action
2  settlement, conditional certification of the settlement class, approval of class notices, and setting of
3  a final approval hearing. The motion was unopposed. The Court heard argument on the motion for
4  preliminary approval on December 19, 2024 and granted preliminary approval later that day.

5  As part of the settlement approval process, plaintiffs requested certification of the
6  following settlement class: "all persons who purchased, or otherwise acquired Chegg common
7  stock between May 5, 2020, and November 1, 2021, inclusive, and who were damaged thereby."

8  Under the terms of the settlement, defendants will pay $55,000,000 cash into an interest-
9  accruing escrow account. A.B. Data will administer the settlement and process the claims of class
10 members. The parties note that this $55,000,000 settlement figure is over five times the $10
11 million median recovery for securities class action settlements between 2014-2022. The amount of
12 the settlement also represents one-third of Chegg's market capitalization. The parties propose
13 reimbursing $3,500 and $1,400 to lead plaintiffs KBC and Pompano P&F, respectively. Lead
14 counsel requests that 25% of the settlement fund be allocated to attorneys' fees and seeks
15 reimbursement of $261,602.23 in litigation expenses.

16 The settlement includes a release of claims by members of the class. Class members had
17 the choice to opt out of the settlement by submitting an exclusion request or objection no later than
18 March 27, 2025. Those who did not opt out are required to release all claims that were or could
19 have been asserted in this action, including all claims that arise from or are related to the facts
20 alleged in this action. The release further encompasses any claims that relate to Chegg securities
21 transactions during the Class Period.

22 After preliminary approval, the parties provided notice of the terms of the settlement in
23 accordance with the preliminary approval order. Notice was provided by first-class mail on
24 January 8, 2025 to the addresses of 4,933 banks, brokers, and other nominees in A.B. Data's
25 database. On January 17, 2025, A.B. Data provided notice via first-class mail to an additional 40
26 unique persons or entities, provided by defendants, who were identified as record holders of
27 Chegg common stock during the Class Period. After receiving additional addresses and names of
28 potential settlement class members, A.B. Data disseminated a total of 91,343 post card notices to

3

potential class members on February 26, 2025. At the time the parties filed their motion for final approval, they had received only one request for exclusion from the class. The Court has received an objection to the settlement from one class member.

On February 27, 2025, plaintiffs moved for final approval of class action settlement and attorneys' fees and costs. The Court heard plaintiffs' motions on April 24, 2025.

## LEGAL STANDARDS

### I. Certification of the Settlement Class

The Court must first confirm its prior determination that the requirements for certification of the Settlement Class under Federal Rule of Civil Procedure 23 are met. A class action may be certified for settlement only if it meets the requirements of Federal Rule of Civil Procedure 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Additionally, "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). The parties seek certification under Rule 23(b)(3), which requires that common questions of law or fact "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining whether a class meets the requirements of Rule 23(b), the court should consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

4

>   (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
>   (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Rule 23's requirements "demand undiluted, even heightened, attention" when a proposed class is to be certified only for the purposes of settlement. *Amchem Prods.*, 521 U.S. at 620. "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.*

## II. Final settlement approval

"The claims, issues, or defenses of a certified class may be settled ... only with the court's approval." Fed. R. Civ. P. 23(e). "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). In addition, Rule 23(e) "requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Id.* at 1026. The district court must balance several factors—the "*Churchill* factors"—in this analysis:

>   (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

Settlements that occur before formal class certification require a higher standard of fairness. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000). The court must ensure that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (cleaned up). Possible signs of collusion include a "clear sailing provision," a revisionary arrangement, and unreasonable attorneys' fees. *Id.*

5

### III. Attorneys' fees and costs

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, ... courts have an independent obligation to ensure that the award, like the settlement itself is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941 (internal citation omitted). "Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method" to assess the reasonableness of the requested attorneys' fee award. *Id.* at 942. "Because the benefit to the class is easily quantified in common-fund settlements," the Ninth Circuit permits courts "to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." *Id.*

In the Ninth Circuit, the "benchmark for an attorneys' fee award in a successful class action is twenty-five percent of the entire common fund." *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997). Courts in the Ninth Circuit generally start with the 25 percent benchmark and adjust upward or downward depending on:

> the extent to which class counsel "achieved exceptional results for the class," whether the case was risky for class counsel, whether counsel's performance "generated benefits beyond the cash settlement fund," the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis.

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015) (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002)).

In common fund cases, the lodestar calculation can provide a useful cross-check on the reasonableness of a percentage award. *Vizcaino*, 290 F.3d at 1050. "The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941. Where the attorneys' investment in the case "is minimal, as in the case of an early settlement, the lodestar calculation may convince a court that a lower percentage is reasonable." *Vizcaino*, 290 F.3d at 1050. "Similarly, the lodestar calculation can be helpful in suggesting a higher percentage when

6

1    litigation has been protracted." *Id.* Thus, even when the primary basis of the fee award is the

2    percentage method, "the lodestar may provide a useful perspective on the reasonableness of a

3    given percentage award." *Id.*

4    Regardless of whether the court uses the lodestar or percentage approach, the main inquiry

5    is whether the fee award is "reasonable in relation to what the plaintiffs recovered." *Powers v.*

6    *Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000).

7    In common fund cases, attorneys are also entitled to recover the reasonable expenses of

8    acquiring the fund. *Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977). To recover

9    such expenses, the attorneys should provide an itemized list of their expenses by category with the

10   total amount advanced for each category so that the Court can assess whether the expenses were

11   reasonable. *Wren v. RGIS Inventory Specialists*, No. 06-cv-5778, 2011 WL 1230826, at *30 (N.D.

12   Cal. Apr. 1, 2011), *supplemented*, No. 06-cv-5778, 2011 WL 1838562 (N.D. Cal. May 13, 2011).

**ANALYSIS**

**I.   Class certification**

As the Court previously concluded, the Settlement Class meets the requirements for certification.

**A.   Rule 23(a)**

As explained above, a class action may be certified only if it meets the requirements of numerosity, commonality, typicality, and adequacy of representation. *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). The Settlement Class here does so.

Numerosity requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Generally, the numerosity requirement is met where the plaintiff class contains forty or more members. *Corley v. Google, Inc.*, 316 F.R.D. 277, 290 (N.D. Cal. 2016). A.B. Data disseminated over 90,000 notices to potential class members.  Accordingly, the numerosity requirement is met.

The second requirement of Rule 23(a) is that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Here, class members share multiple common questions of law and fact pertaining to whether defendants omitted or misrepresented material facts, whether

7

1  defendants acted with scienter, and whether Chegg's stock price was artificially inflated during the
2  class period. Accordingly, the commonality requirement is met.

3        The typicality requirement is met when "each class member's claim arises from the same
4  course of events, and each class member makes similar legal arguments to prove the defendant's
5  liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (cleaned up). Here, the claims
6  of the lead plaintiffs are typical of the class, arising from the defendants' same course of conduct.
7  Pompano Beach P&F and KBC purchased Chegg common stock during the class period and were
8  injured due to defendants' alleged conduct. Accordingly, the typicality requirement is met.

9        Finally, the class representative parties must "fairly and adequately protect the interests of
10 the class." Fed. R. Civ. P. 23(a)(4). This requires that (1) named plaintiffs and their counsel have
11 no conflicts of interest with other class members and (2) named plaintiffs and their counsel
12 prosecute the action vigorously on behalf of the class. *In re Online DVD-Rental Antitrust Litig.*,
13 779 F.3d at 943. Pompano Beach P&F and KBC's interests are directly aligned with those of the
14 settlement class members because they purchased Chegg stock during the class period and
15 suffered losses akin to that of other settlement class members. As plaintiffs with the largest
16 financial stake in the litigation, the lead plaintiffs are well positioned to represent the interests of
17 the absent class members. Further, there are no known conflicts of interest between the named
18 plaintiffs and class counsel, on the one hand, and the proposed class members, on the other. Class
19 counsel have vigorously prosecuted the action, including by filing an amended complaint,
20 successfully opposing defendants' motion to dismiss, conducting extensive discovery, filing a
21 motion for preliminary approval, securing a settlement that far exceeds the median securities
22 settlement amount, and demonstrating a willingness to take the case to trial if necessary. The lead
23 plaintiffs have actively participated in the litigation since its inception. Accordingly, the
24 representation of the class by the lead plaintiffs and class counsel is adequate.

25     **B.**    **Rule 23(b)(3)**

26       Certification also requires that the action be "maintainable under Rule 23(b)(1), (2), or
27 (3)." *Amchem Prods., Inc.*, 521 U.S. at 614. Here, the parties seek certification under Rule
28 23(b)(3), which imposes two further requirements: predominance and superiority.

8

Predominance requires that "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Because this is a securities class action, the common legal and factual issues turning on an alleged common course of conduct by the defendants and common questions as to defendants' conduct, scienter, and whether Chegg's price was artificially inflated predominate over any individual inquiries. Accordingly, plaintiffs have shown predominance.

Superiority "assure[s] that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (cleaned up). The settlement class is large and geographically dispersed. The size of the class further indicates that, for many individual investors, pursuing an individual lawsuit would have been impossible because the cost of legal representation would have far outstripped their individual recovery. Accordingly, pursuing the claims in this case as a class action is superior to other means of adjudicating the dispute.

*\*\*\**

Because the requirements of Rules 23(a) and 23(b)(3) are satisfied, the Court confirms its grant of class certification for settlement purposes only.

## II. Final settlement approval

### A. Adequacy of notice

For any proposed class settlement, the court must "direct notice [of a proposed class settlement] in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). The parties must provide class members with "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). "[T]he class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 624 (9th Cir. 1982). To satisfy Rule 23(e)(1), settlement notices must "present information about a proposed settlement neutrally, simply, and understandably." *Rodriguez*, 563 F.3d at 962. "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse

9

viewpoints to investigate and to come forward and be heard.'" *Id.* (quoting *Churchill*, 361 F.3d at 575).

The court approved the plaintiffs' plan for providing notice to the class when it granted preliminary approval. Plaintiffs now provide a declaration from Kathleen Brauns, a project manager at A.B. Data, documenting the administrator's implementation of that plan. The declaration shows that the settlement administrator complied with the notice plan and disseminated 91,343 postcard notices to potential class members. The administrator also published a notice in *Investor's Business Daily* and *PR Newswire*, and designed, implemented, and maintains a website dedicated to this settlement that allows potential class members to file claims online. The Court is satisfied that the notice that class members received complies with Federal Rule of Civil Procedure 23 and constitutional due process requirements.

### B. Fairness, adequacy, and reasonableness

As discussed above, the Court must determine whether the settlement is fair, reasonable, and adequate. *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). During the preliminary approval stage, the Court found that the settlement met that standard. Application of the *Churchill* factors following notice to the class confirms that the settlement is fair, reasonable, and adequate.

Under the first and second factors, the Court considers (1) the strength of the plaintiffs' case, weighing the likelihood of success on the merits and the range of possible recovery; and (2) the risk, expense, complexity, and duration of further litigation. The plaintiffs recognize the inherent risks of going to trial, especially as they have faced strong opposition from defendants. Continued litigation would likely require substantial additional discovery, including depositions, and pre-trial motions, which would be expensive and time-consuming. At the time of settlement, Chegg had only $4.5 million in net cash, such that plaintiffs might have been unable to recover a substantial portion of any damages awarded at trial. Appeals could be expected to further delay any recovery by class members. Proceeding with litigation would thus likely be risky, protracted, and costly. Accordingly, the first two factors weigh in favor of final approval.

Under the third factor, the Court considers the risk of maintaining class action status throughout the trial. At the time that the parties agreed to the proposed settlement, the Court had

not yet granted class certification, so the plaintiffs faced the risks of either failing to certify any class or failing to maintain class certification through trial. These risks, measured against the certainty of recovery under the settlement, weigh in favor of final approval.

The fourth factor is the amount offered in settlement. Under the terms of the settlement, defendants will contribute a total amount of $55,000,000. This is over five times the $10 million median recovery for securities class action settlements from 2014 through 2022. This figure represents one-third of Chegg's market capitalization and twelve times its net cash. Lead plaintiffs' expert Dr. Matthew Cain opined that had plaintiffs prevailed at trial, damages could range from nearly $900 million to over $1.4 billion. But defendants also presented strong arguments that could have impacted the amount available in recovery. For example, defendants sought to shorten the class period and to attack the merits of plaintiffs' claims that the decline in stock price was attributable to any fraud.

Under these circumstances, the amount offered in settlement—between four and six percent of defendants' estimated maximum potential exposure—represents a reasonable compromise between the potential recovery at trial and the risks of continuing to litigate plaintiffs' claims in the face of defendants' strong opposition. The parties cite to third-party reports that show this figure is two- to three-times higher than the two percent median recovery in cases with over $1 billion in damages. The amount offered in settlement thus weighs in favor of final approval.

Under the fifth factor, courts consider the extent of discovery completed and the stage of the proceedings. In this case, the parties' settlement was reached after informal and formal discovery, including written discovery, and an exchange of over 100,000 pages of documents. The Court is satisfied that, at the time of settlement, the parties were sufficiently familiar with the strengths and weaknesses of the case to make informed decisions. This factor thus weighs in favor of final approval.

The sixth factor is the experience and views of counsel. Class counsel have extensive experience litigating similar cases. They have demonstrated a thorough understanding of the strengths and weaknesses of this case and concluded that the settlement is fair, adequate, and

11

1  reasonable. This factor thus also favors final approval.

2  The seventh factor—the presence of a governmental participant—is neutral because there
3  is no governmental participant in this case.

4  Under the eighth factor, the court considers the reaction of the class members to the
5  proposed settlement. The overall reaction of the class here is overwhelmingly positive. Notice was
6  given to over 90,000 potential class members. At the time the parties filed their motion, they had
7  received only one request for exclusion. Only one class member has filed an objection with the
8  Court. Accordingly, this factor strongly favors final approval.

9  Because this settlement was reached prior to class certification, the Court must also ensure
10 that it is "not the product of collusion among the negotiating parties." *In re Bluetooth*, 654 F.3d at
11 947 (cleaned up). This settlement does not contain a "clear sailing provision," a revisionary
12 arrangement, or unreasonable attorneys' fees, all of which can be warning signs of collusion. *Id.*
13 The settlement was reached only after defendants unsuccessfully sought to dismiss the case on the
14 pleadings, confirmatory discovery, expert analyses, and an arm's length mediation with
15 experienced mediators. *See G. F. v. Contra Costa Cnty.*, No. 13-03667-MEJ, 2015 WL 4606078,
16 at *13 (N.D. Cal. July 30, 2015) (noting that "[t]he assistance of an experienced mediator in the
17 settlement process" provides some evidence "that the settlement is non-collusive"). Accordingly,
18 none of the *Bluetooth* factors are present, and the settlement does not raise an inference of
19 collusion on any other ground.

20 **C.   Objection to settlement**

21 Class member Ethan Fieldman filed an objection to the proposed settlement. He argues
22 that Section 533 of the California Insurance Code bars the use of private insurance coverage to
23 fund this class action securities settlement. This argument is unavailing for two reasons.

24 First and foremost, although Mr. Fieldman has standing as a member of the settlement
25 class to raise an objection, the specific objection he raises is not to a matter properly before the
26 Court. Section 533 absolves an insurer of liability "for a loss caused by the wilful act of the
27 insured[.]" The provision allows *insurers* to deny coverage of claims that are "uninsurable under
28 the law" and places the burden of proof on the insurer to show that such claims are uninsurable.

12

1  *Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106 1111 (citing *Raychem Corp. v. Fed. Ins. Co.*, 853 F. Supp. 1170, 1175 (N.D. Cal. 1994)). The statute thus restricts the scope of an insurer's coverage obligations by precluding coverage in instances contrary to public policy. But on a motion for approval of final settlement, the Court considers only whether the settlement is fair to the absent class members, not whether it properly allocates the burden of payment. Chegg's insurers have not objected to funding this settlement. To the contrary, they have already transferred the settlement funds into escrow. In the absence of any dispute between the insurers and their insureds regarding the scope of the insurers' coverage obligations, there is no controversy before the Court regarding Section 553. Although Mr. Fieldman may be correct that Section 533 bars the use of insurance to cover matters contrary to public policy, he needs to raise his objection in a different forum or directly to the insurer.

Even if the question were properly before the Court, the objection would nevertheless fail. Assuming Mr. Fieldman is correct that California law should govern this federal securities case, Section 533 bars coverage of a loss that is attributable to the "wilful act of the insured[.]" Such an act must amount to "deliberate conduct that the insured expected or intended to cause damage." *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 743 (1993); *see also Raychem*, 853 F. Supp. at 1180 (holding that Section 533 prevents coverage of acts done with "a preconceived design to inflict injury."). In this case, there has been no proof of "deliberate conduct" or intent on Chegg's part. The complaint may allege these things, but complaints often plead far more than what is ultimately proven at trial, and the defendants continue to vigorously dispute plaintiffs' allegations. Further, to prevail on a Section 10(b) claim, plaintiffs need only prove that defendants acted with deliberate recklessness, a level of culpability that falls below what Section 533 requires. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1180 (9th Cir. 2009). Thus, even if the insurers' coverage obligations were properly before the Court, Mr. Mr. Fieldman has failed to show that Section 533 would bar coverage.

\*\*\*

After considering the record as a whole, guided by the *Churchill* factors, the Court finds that notice of the proposed settlement was adequate; the settlement is not the result of collusion;

13

1    the settlement is a fair, adequate, and reasonable resolution of a bona fide dispute; and the

2    objection to the settlement is insufficient to prevent its approval. Accordingly, the Court grants

3    final approval of the settlement.

**III.    Attorneys' fees, costs, and service awards**

**A.    Attorneys' fees and costs**

Class counsel seeks an award of attorneys' fees amounting to 25% of the settlement fund—$13,750,000 in total. This reflects a 1.4 multiplier of their $9,811,027.75 lodestar. Class counsel also requests $261,602.23 in out-of-pocket litigation expense reimbursement.

Plaintiffs maintain that their requested fee award is appropriate under either the percentage of recovery or lodestar method of calculation. They contend that their request under the percentage method is within the range of reasonableness when considering the Ninth Circuit's benchmark of 25% and aligns with comparable cases within the Ninth Circuit. Class counsel further emphasizes the significant monetary value of the settlement to the class; the contingent risk assumed by counsel in representing plaintiffs in this litigation; the skill and experience of counsel; the contingent nature of the fee and the associated financial burden carried by counsel; and counsel's substantial hours devoted to prosecuting this action.

After reviewing the results achieved for the class and the risk counsel incurred in pursuing class members' claims on a contingent basis, the Court concludes that an award of 25% of the common fund—$13,750,000—is reasonable. This amount aligns with the Ninth Circuit benchmark and thus appropriately reflects the settlement's resolution of claims. It also reflects the strong results achieved for members of the class. In particular, the fact that class counsel has only received one exclusion request and that only one class member has come forward to object to the settlement reflects the class's strong positive reaction to the work of class counsel.

A lodestar cross-check confirms the reasonableness of an award of 25% of the common fund to class counsel. As stated above, counsel's lodestar is $9,811,027.75, which reflects 13,110 hours spent in connection with the litigation. Based on the documentation submitted by counsel in support of their request for attorneys' fees, the Court concludes that the number of hours spent by

14

1  counsel on the litigation and the hourly rates used by class counsel in their lodestar calculation
2  reflect the reasonable effort and commercial value of their work.
3        Awarding class counsel 25% of the common fund reflects a multiplier of approximately
4  1.4 on their $9,811,027.75 lodestar. The Ninth Circuit has recognized that multipliers generally
5  range from 1 to 4. *Vizcaino*, 290 F.3d at 1051 n.6. District courts within the Ninth Circuit
6  commonly apply multipliers in that range. *See, e.g.*, *Flemming v. Impax Lab'ys*, *9 No. 16-cv-
7  06557-HSG, 2023 WL 2503539 (N.D. Cal. July 15, 2022) (applying a multiplier of 2.6);
8  *Destefano v. Zynga*, No. 12-cv-04004-JSC, 2016 WL 537946, at *21 (N.D. Cal. Feb. 11, 2016)
9  (concluding that "the 1.7 multiplier [is] towards the lower end of the Ninth Circuit's scale" and
10 therefore reasonable). Given the results achieved for the class and the risk counsel faced, applying
11 a relatively low multiplier of 1.4 to counsel's lodestar is reasonable.
12       Class counsel also seeks reimbursement of up to $261,602.23 in litigation costs. The notice
13 provided to settlement class members apprised them that expenses in this settlement could reach
14 $490,000, and counsel now seeks an amount well below that figure. Counsel filed supporting
15 documentation outlining the expenses included in this figure, which include expenses typical of
16 this litigation, including court fees, mediation fees, legal research charges, and expert fees. The
17 Court has reviewed counsel's expenses and finds them reasonable. Therefore, the Court grants the
18 request for reimbursement of costs totaling $261,602.23.

19 **B.     Lead plaintiff reimbursement**

20       Lead plaintiffs KBC and Pompano P&F seek a service award of $3,500 and $1,500,
21 respectively.
22       The Private Securities Litigation Reform Act authorizes courts to allow reimbursement to a
23 lead plaintiff for "reasonable costs and expenses … directly relating to the representation of the
24 class to any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). In their
25 supporting papers, the parties detailed the time and effort that KBC and Pompano P&F spent in
26 representing the interests of the class members in this action and the reasonable value of that time.
27 Their contributions include reviewing counsels' filings, conducting regular communications with
28 counsel, and supervising the settlement process. Given the documented work that lead plaintiffs

have done on behalf of the class, the Court awards reimbursement of $3,500 in costs and expenses to KBC and of $1,400 in costs and expenses to Pompano P&F.

## CONCLUSION

For the foregoing reasons, the Court hereby orders as follows:

1. The Court confirms its conditional certification of the Settlement Class for settlement purposes only.

2. The Court grants final approval of the parties' settlement agreement. The objection to final approval is overruled.

3. The Court awards class counsel $13,750,000 in attorneys' fees. $1,375,000 of this amount shall remain in escrow until A.B. Data has disbursed all payments to class members and lead counsel have notified the Court of such disbursement.

4. The Court awards class counsel costs of up to $261,602.23.

5. The Court awards reimbursement of costs and expenses to lead plaintiffs KBC and Pompano P&F in the amounts of $3,500 and $1,400, respectively.

6. The individuals who requested to opt out of the Class are excluded from the Class.

**IT IS SO ORDERED.**

Dated: May 21, 2025

P. Casey Pitts
United States District Judge